

LEGAL MAIL
Provided to Wakulla CI
OCT 19 2022
for mailing

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA

## CIVIL RIGHTS COMPLAINT FORM FOR
## PRO SE, PRISONER LITIGANTS IN ACTIONS UNDER
## 28 U.S.C. § 1331 or § 1346 or 42 U.S.C. § 1983

Prophet PaulCN                    ,

Inmate ID Number: W11537     ,

_____,
*(Write the full name and inmate ID*
*number of the Plaintiff.)*

**Case No.:** 4:22-cv-00313-mw-MAF
*(To be filled in by the Clerk's Office)*

**v.**

Ricky Diton, sec. Fla Dept,
of corh, et al.,

_____,

**Jury Trial Requested?**
☐ **YES**   ☐ **NO**

_____,
*(Write the full name of each*
*Defendant who is being sued. If the*
*names of all the Defendants cannot*
*fit in the space above, please write*
*"see attached" in the space and*
*attach an additional page with the*
*full list of names. Do not include*
*addresses here.)*

_____/

FILED USDC FLND TL
OCT 20 '22 PM3:07



# I. PARTIES TO THIS COMPLAINT

## A. Plaintiff

Plaintiff's Name: _Prophet Paulcyn_    ID Number: _W11537_

List all other names by which you have been known: _____

_____

Current Institution: _Dade C.I._

Address: _19000 S.W. 377th Street_

_Florida City, FL 33034-6409_

## B. Defendant(s)

State the name of the Defendant, whether an individual, government agency, organization, or corporation. For individual Defendants, identify the person's official position or job title, and mailing address. Indicate the capacity in which the Defendant is being sued. Do this for *every* Defendant:

1. Defendant's Name: _Ricky Dixon_

   Official Position: _Secretary Florida Department of corrections_

   Employed at: _Tallahassee_

   Mailing Address: _501 S. Calhoun Street, Tallahassee,_

   _Fl 32399_

   ☐ Sued in Individual Capacity        ☒ Sued in Official Capacity

2. Defendant's Name: _Robert Gould_

Official Position: _State Classification Officer_

Employed at: _Wakulla C.I. Annex_

Mailing Address: _110 melaleuca DR._

_crawfordville, Fl 32327_

&#9632; Sued in Individual Capacity     &#9633; Sued in Official Capacity

3. Defendant's Name: _S. Floyd_

Official Position: _psychologist_

Employed at: _Wakulla C.I. Annex_

Mailing Address: _110 melaleuca DR._

_crawfordville, Fl 32327_

&#9633; Sued in Individual Capacity     &#9633; Sued in Official Capacity

*(Provide this information for all additional Defendants in this case by attaching additional pages, as needed.)*

## II. BASIS FOR JURISDICTION

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution" and federal law. Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), you may sue federal officials for the violation of certain Constitutional rights.

4. Defendants Name: S. Castano
   Official Position: Classification officer
   Employed at: wakulla C.I.-Annex
   mailing address: 110 melaleuca DR.crawfordville,
   Fl 32327

5. Defendants Name: R.R. Tetreault
   Official Position: captain
   Employed at: wakulla C.I.-Annex
   mailing address: 110 melaleuca DR. crawfordville,
   FL 32327

6. Defendant's Name: E. Olds
   Official Position: Lieutenant
   Employed at: wakulla C.I.-Annex
   mailing address: 110 melaleuca DR. crawfordville,
   FL 32327

7. Defendants Name: M. Ethridge
   Official Position: Sergeant
   Employed at: wakulla C.I. Annex
   mailing address: 110 melaleuca DR.crawfordville,
   FL 32327

8.) Defendants name: V.E Huggins
   Official Position: sergeant
   Employed at: wakulla C.I.-Annex
   mailing address: 110 melaleuca DR.crawfordville,
   FL 32327

3A.

9. Defendant's Name: J.D. Chunn
   Official Position: classification officer
   Employed at: Wakulla C.I. Annex
   mailing address: 110 melaleuca Dr.
   Crawfordville, FL 32327

3B.

Are you bringing suit against (*check all that apply*):

☐ Federal Officials (*Bivens case*)     ☒ State/Local Officials (*§ 1983 case*)

## III. PRISONER STATUS

Indicate whether you are a prisoner, detainee, or in another confined status:

☐ Pretrial Detainee     ☐ Civilly Committed Detainee

☒ Convicted State Prisoner     ☐ Convicted Federal Prisoner

☐ Immigration Detainee     ☐ Other (*explain below*):

_____

_____

## IV. STATEMENT OF FACTS

Provide a short and plain statement of the *facts* which show why you are entitled to relief. Describe how *each* Defendant was involved and what each person did, or did not do, in support of your claim. Identify when and where the events took place, and state how each Defendant caused you harm or violated federal law. Write each statement in short numbered paragraphs, limited as far as practicable to a single event or incident. *Do not make legal argument, quote cases, cite to statutes, or reference a memorandum.* You may make copies of the following page if necessary to supply all the facts. Barring extraordinary circumstances, no more than five (5) additional pages

should be attached. *Facts not related to this same incident or issue must be*

*addressed in a separate civil rights complaint.*

1.) Plaintiff, is a physically small inmate with mental health disabilities and protection needs.

2.) On August 30, 2018, Plaintiff filed a third amended complaint through court appointed counsel James v. Cook against Secretary FDOC et al, in case # 2:17-cv-232-spc-mram. For failure to treat and failure to protect plaintiff against gang extortion and inmate and staff violence

3.) on or about Feb. 2018, as a result of said civil rights complaint against FDOC, Plaintiff was placed on Permanent Protective management and transferred to wak.c.I-Annex P.m.unit.

4.) Defendants were aware that plaintiff suffered disabilities and said disabilities made him vulnerable to staff and prisoner abuse, coercion, intimidation, and violence.

5.) wak.c.I. Annex is designated as a Protective management facility. which houses Prisoners whom are not gang affiliated, not violent prone, and whom also have protection needs. etc. wak.c.I-annex also houses Prisoners whom have been victims of

**Statement of Facts Continued** *(Page 2 of 15 )*

homocide attempts and or have active boundries on their life or otherwise, who were or will be extremely vulnerable in general population.

6.) On or about July-December 2018, Plaintiff was persuaded into a romantic relationship with then sgt. V.E. Huggins, whom was designated as Wakulla C.I-Annex P.m. dorm sgt.

7.) The relationship went sour and defendant Huggins was a woman's scorned who threatened plaintiff with death, and fierce reprisal.

8.) Plaintiff was reassigned to close management (c.m.) in 2019.

9.) Plaintiff was released from c.m. in 2020 and transfered back to Wak.C.I.-Annex P.M.unit

10. Immediately upon his return to Wak.P.m unit defendant Huggins begin to harass and threaten to have plaintiff killed See EX.A

11.) On or about Feb. or march of 2020, defendant Huggins, went over the shift officer in charge, to classification supervisor M.A. machant

~~and~~ to place plaintiff in Administrative confinement under ~~false~~ allegations of extortion.

12.) Defendant Huggins attempted to compel several P.m. Prisoners to write witness statements, that plaintiff was extorting money from them, so that she could use said manufactured evidence as a justification to have plaintiff expelled from the protection unit.

13.) On or about ~~may~~ April, may, and June, of 2020, plaintiff was approached by several inmates on the P.m. unit, who confessed to plaintiff that defendant Huggins had employed them to seriously maim or kill him. See Ex. A.

14.) On or about may, 2020 plaintiff was physically assaulted by an Inmate employed by Sgt. Huggins.

15.) On or about march, April, may, and June defendant Huggins engaged in a campaign of harassment against plaintiff by repeatedly reassigning plaintiff's housing next to known violent ex-gang members, who she solicited to murder plaintiff.

16.) Plaintiff informed the prison warden, defendant olds, Gould, Lloyd, and M.A. marchant in person on several occasions of Huggins threats and attempts to solicit his murder. Defendants failed to take any corrective actions.

17.) On or about march or April 2020, defendant Olds & Lloyd informed plaintiff during a visit that Sgt. Huggins had a lot of friends here at walk Annex and plaintiff needed to be careful whom he made enemies with. That he could get plaintiff transferred to columbia P.m. units

6A.

4/15

18.) On or about April and May of 2020, defendants conspired with eachother Huggins, Gould, Lloyd, Ravis, & marchant to transfer plaintiff to columbia c.I. Annex P.M. unit in retaliation for plaintiff complaining and filing complaints against defendant Huggins.

19.) Plaintiff attempted suicide by overdosing on pills and cutting his wrist multiple times with a homemade razor out of fear for his safety in an attempt to prevent said transfer.

20.) On or about May, 2020, plaintiff wrote several emergencies grievances to the prison warden, central office defendant marchant, whom was the classification supervisor and possess the authority to investigate and prevent plaintiff's transfer to columbia. Plaintiff wrote informed defendant Gould whom also had the authority to investigate and prevent plaintiff's transfer.

21.) Plaintiff informed his attorney, MR. James Cook and provided him with testimony and grievances from other Prisoners who was present and just left columbia P.M. unit to wakulla. That they witnessed other inmates and/or was approached by other Prisoners who to kill plaintiff for monetary reward. EX. B.

22.) Plaintiff was promised protection after requesting it from defendant marchant, Gould, and central office.

23.) On or about May and June, 2020, plaintiff again spoke to defendant Ravis Lloyd, Gould, and marchant in person concerning his request for protection from defendant Huggins and requested a transfer to

6B.

5/15

Columbia-Annex P.M. unit. Defendants Gould, Lloyd, Olds, and Marchant promised to investigate the threat posed to plaintiff's safety if he was transferred to columbia P.m. unit. But defendants did not.

24.) Plaintiff had no special reviews against any other Prisoner at Wakull P.m. unit. There existed no penological justification to transfer plaintiff to columbia P.m unit and place his safety in jeopardy

25.) Defendant Gould, Marchant, Lloyd, and Huggins were made aware of the threat posed to plaintiff's safety if he was transferred to columbia C.I-Annex P.M. unit. Defendant Olds was also made aware

26.) On June 12, 2020, during the taking of plaintiff's deposition by FDOC attorney in case No: 2:17-cv-232-sPC. plaintiff and his attorney MR. Cook, presented evidence of a serious threat posed to plaintiff's safety by defendant Huggins and plaintiff's transfer to columbia C.I-Annex P.m. unit. See Ex. B

27.) On or about June 15, 2020, counsel for plaintiff filed a preliminary injunction with the U.S. District Court Middle District of Florida Ft. myers Division in case No: 2:17-cv-232-sPC. To prevent plaintiff transfer to columbia P.m. unit Ex. B

28.) Upon information and belief, when MR. Paulcin was transferred to columbia P.m. unit. Defendant Huggins announced to the dorm that she had the power to get anyone transferred or removed from the P.m. unit. Just like she did Prophet Paulcin.

6C.

6/13

29.) Defendant olds was the P.m. dorm Lieutenant. And is a personal friend of defendant Huggins. Defendant olds at all material times. Did intentional derail and or sabotage any investigation into the allegations plaintiff had against Ms. Huggins.

30.) Defendant olds did conspire with Ms. Huggins to deliberate deny plaintiff protection against defendant Huggins and to deliberate deny plaintiff protection against a transfer to columbia C.I-Annex

31.) Defendant olds encouraged, condoned, or turned a blind eye to the protection needs of plaintiff

32.) On or abut June 17, 2020, Mr. Paulcin was transferred to columbia P.m. unit without any investigation into his protection needs at columbia. or without any protection safeguards while at columbia P.m. unit.

33.) on June 21, 2020, plaintiff was stabbed in the back with a knife, while walking to breakfast. Plaintiff was taken to the hospital with life threatening injuries and diagnosed with lung contusion. For approx. three days. See EX. C

34.) On or about June 24, 2020, plaintiff was released from the hospital back to columbia Annex P.m. unit and placed in ADA. Administrative confinement

35.) As a direct result of the attempted homicide on Plaintiff's life, he attempted suicide by cutting the veins in his wrist and had to be recommended for CSU/TCU. And was transferred to Lake for mental health.

36.) On or about september of 2020, while at Lake C.I.

6D.

for mental Health services. Plaintiff was reviewed by the I.C.T and approved for a Protective management transfer from columbia C.I. P.m. unit back to wak. C.I.-Annex P.m. unit, said P.m. transfer was approved by state classification and placed in FDOC OBIS transfer system.

37.) On or about December 2020, Plaintiff was again reviewed by columbia-Annex I.C.T. and approved for protective transfer back to wakulla P.M. unit. Based on a history of assault. But instead said P.m. transfer was unconstitutionally denied by SCO and plaintiff was unconstitutionally reassigned to C.m. instead as punishment

38.) On march 29, 2022, plaintiff was released from C.m. and transferred back to wak. Annex P.m. unit

39.) On march 30, 2022, defendant Huggins approached plaintiff in an aggressive manner accompanied by J.D. chunn and stated that, this is the bitch I was telling you about mrs.chunn. we need to get rid of him ASAP. Defendant Huggins stated to plaintiff that she has a long memory and holds grudges and will get plaintiff sooner or later. For plaintiff to watch his back.

40.) Defendant J.D. chunn is now wak, Annex P.m. dorm sergeant and V.E. Huggins is wak, Annex P.m. gang sergeant,

41.) Defendant chunn informed plaintiff on March 30, 2022 to pack his property, that he was going to

6E.

8/15

jail. when plaintiff inquired of defendant chunn why was he going to jail. Defendant Chunn stated she would think of something. maybe Possession of narcotics. ~~And~~ ~~defendants~~

42.) Defendants chunn and Huggins have a history of allegations against them by Prisoners for engaging in unauthorized sexual relationships with inmates, and making false allegations against prisoners, and planting drugs on Prisoners, See EX.D

43.) on or about April 07, 2022, I was again called out to a corner by defendant Huggins, chunn and olds, and threaten with death and/or fabrication of illegal drugs on my person or property if I did not sign off of the P.M. unit.

44.) On or about April 11, 2022, after a legal visit ~~with~~ with my attorney, I was approached by Defen. Huggins and threatened that I had it coming.

45.) On April 16, 2022, while walking back from single dose medication unescorted by security, plaintiff was attacked by another Prisoner from a different dorm. who was permitted to hide in front of Lima outside restroom. ~~and~~ See EX.E

46.) Plaintiff who was housed in M-2 at said time and the assailant who was housed in L-dorm at said time should not have been permitted ~~a~~ contact with eachother.

47.) Prisoners in both L-and M-dorm are prohibited from mixing with eachother. Due to

6F.

their protection needs and various special reviews amongst each other.

48.) Defendants E Thridge and Tetreault was responsible for supervising and monitoring the coming and going of both dorms and P.M. Prisoners.

49.) Defendants E Thridge and Tetreault was aware that extra cautions are to be taken to protect P.M. Prisoners and to keep both L-dorm and M-dorm Prisoners apart from each other at all times.

50.) Defendant E Thridge and Tetreault through deliberate indifference permitted L-dorm prisoners to exist their dormatory for single dose medication without monitoring said prisoners or adequately supervision of said prisoners, prior to the defendants compelling plaintiff to enter through the gates.

51.) Both plaintiff and the assailant was unaccompanied by security to prevent the attack.

52.) Defendant E Thridge was sitting under K-dorm Pavillion, failing to monitor or escort said prisoners, when prisoner Mark Smith DC#E29305 rose from his hiding and was permitted to run about fifteen feet towards plaintiff, threaten to kill him and attack him unprovoked.

53.) The attack of plaintiff by Mark Smith was captured on video footage

54.) Plaintiff sustained injuries to the right orbital area of his face. Abrasion to the second digit of his left hand and soreness and stiffness to his back and neck.

6

10/15

55.) Upon information and belief, prisoner smith was employed by Huggins and chunn to kill plaintiff. see EX. F

56.) Defendant Ethridge and capt. Tetreault exhibited a complete disregard towards plaintiff's safety, by failing to follow safety policy. And monitoring and ~~expecting~~ supervising said prisoners to keep them separate.

57.) Defendant Tetreault also ~~alte~~ submitted inaccurate and false reports to cover up the prison staff reckless disregard towards plaintiff's safety and to protect staff Ethridge employment.

58.) plaintiff immediately filed grievances and submitted complaints concerning the reckless disregard toward his safety by defendant Tetreault and Ethridge. And the imminent threat posed to his life by staff employing other prisoners to kill him.

59.) On May 17, 2022, plaintiff was referred for C.M, by defendant Castano whom conspired with defendant Huggins, ~~and~~ chunn, and olds to recommend plaintiff for c.m. for exercing his right to petition his government for redress of grievances. see EX. E

60.) The recommendation for c.m. by defendants supports plaintiff's position, that the recommen-dation was in retaliation for plaintiff exercing his First amendment rights. Defendant castano did inform plaintiff that olds, chunn, and Huggins influenced her to recommend plaintiff for c.m. Witnessed by another inmate.

6H.

11/18

61.) The recommendation was completely without merits, or facts, or evidence. Defendants castano, olds, chum, and Huggins knew the facts alleged in the recommendation to be false.

62.) Defendant castano, olds, chum, and Huggins conspired with each other to deprive plaintiff of his first, eighth, and fourteenth amendment rights under the U.S. constitution.

63.) Defendants placed plaintiff in administrative confinement pending c.m. referal from May 05, through June 01, 2022, causing plaintiff to suffer emotional distress and psychological torture.

64.) After releasing the assailant mark smith with only canteen suspension and receiving notice that plaintiff was pursuing a civil rights complaint against all parties involved in the deprivation of plaintiff's rights. See EX. G

65.) Defendants removed mr. smith from the compound on false reports that he defeated a locking devise on the date and time he attack me inorder to absolve defendants of guilt for employing mark smith to attack me. And absolve defendants of guilt for their reckless disregard of plaintiff's safety to prevent the attack and attempts to cover up the true facts of the attack.

66.) Defendants olds, Huggins, and chum have multiple complaints against them by other prisoners, prisoners family and have been under investigation and or either discipline for improper relationships or treatment of prisoners under their care.

6I.

12/15

67.) Secretary of FDOC has failed to adequately supervise and monitor its employees at Wak. C.I. Annex when it knows that said facility houses extremely vulnerable prisoners whom suffer intellectual and physical disabilities and whom warrant special protection needs and are vulnerable to staff and prisoners threats, coercion, and abuse.

68.) Defendants Huggins and chunn continue to plan and scheme on varies methods to retaliate against plaintiff in order to have plaintiff recommended for C.M. or involuntary removed from the P.M. unit or killed by gang members awaiting plaintiff's return to general population so they can kill him, see EX. D, F, G, and H.

69.) Plaintiff continues to be exposed to conditions of confinement that subjects him to imminent danger of serious physical injuries or death. Plaintiff is in fear of his safety from defendants chunn and Huggins. And is in fear of being transfered to columbia-C.I.-Annex P.M. unit.

70.) Each defendant acting with deliberate indifference exposed plaintiff to a sufficient substantial risk of serious damage to his future health and safety.

71.) secretary of FDOC, having employed counsel to act and represent his interest in civil case No.: 2:17-CV-232-SPC-MRM was sufficiently placed on notice of a threat to plaintiff's safety by specific staff at wakulla C.I.-Annex P.M. unit on June 12, 2020

6J.

13/15

during the taking of plaintiff's deposition by counsel James V. cook. And by virtue of the litigation of the case.

72.) The secretary of FDOC was also placed on adequate litigate throughout the litigation of said case not by counsel and again on June 12, 2020 of a specific threat posed to plaintiff's safety if he was transferred to Columbia C.I.- Annex P.m. unit.

73.) The secretary of FDOC failed to act reasonable or investigate the specific threat posed to plaintiff's safety and health at wak, annex P.m. Unit and columbia-Annex P.m. unit.

74.) Defendant Tetreault was absolutely responsible for plaintiff's health and safety on the day he was attack.

75.) Defendant Tetreault failed to adequately supervise his staff and the P.m. Prisoners being escorted to and from their housing.

76.) On July 29, 2022, plaintiff was falsely accused by defendant Sgt. chunn of being under the influence of synthetic drug. K-2. And written several bogus D.R.'s by defendant Sgt. chunn. See Ex. H.

77.) Defendant Sgt. chunn deliberately failed to convey her reason to m-dorm Sgt. M. E Thridge for locking plaintiff up.

78.) Prisoners in M-2 dorm witnessed chunn reasoning for locking plaintiff up was based on a false pretense to retaliate against him.

79.) Plaintiff was escorted by defendant chunn to

6k.

19/15

medical pre-confinement alone. Defendant chunn repeatedly threaten plaintiff that she was going to have him killed.

80.) Defendant chunn deliberately failed to inform the duty nurse to examine plaintiff for signs of being under the influence of k-2.

81.) After experiencing intense anxiety and fear of imminent death, plaintiff cut his veins between the crook of his elbow with a homemade razor.

82.) plaintiff refused to come out of the holding cell without the video camera being placed on him for safety concerns.

83.) Defendant olds and Huggins immediately responded to the ~~cam and begin them~~ scene and begin threatening plaintiff with bodily harm.

84.) Believing defendant had a plan to kill him, plaintiff informed capt. washington, who was the shift officer in charge (O.I.C) of his reasonable fear of defendants retalitary actions towards him and the need for a special review against defendant chunn and Huggins.

85.) Sgt. Perry informed capt. washington that he witnessed sgt. chunn enter the unaccopied room in J-dorm sally port for the specific purpose of hiding from the dorm cameras and threaten to kill plaintiff.

86.) Only the spoken threat D'R was not dismissed written against plaintiff by sgt. chunn.

87.) Each defendant is being sued in their individual and official capacity.

6L.

15/15

88.) Plaintiff is being subjected to a substantial risk of serious harm. And remains in imminent danger of death

89) Plaintiff is posed to be transfered back to wakulla C.I-Annex under the authority and supervision of the same defendants mentioned herein. And or posed to be transferred back to columbia C.I. Annex P.M. unit. wherein there remains an active bounty on plaintiffs life. M1 moreover the perpetrator(s) responsible for Stabbing plaintiff or placing the hit on Plaintiff was not an identified. And the Department I.C.T found plaintiff to have a history of assaults, and transferred plaintiff from columbia-Annex And unconstitutionally reassigned Plaintiff to c.m. for protection needs.

90.) At all material times mentioned herein each defendant acted under color of state law, within the course and scope of their employment.

6M.

## V. STATEMENT OF CLAIMS

State what rights under the Constitution, laws, or treaties of the United States have been violated. Be specific. If more than one claim is asserted, number each separate claim and relate it to the facts alleged in Section IV. If more than one Defendant is named, indicate which claim is presented against which Defendant.

1.) Failure to protect under 42 U.S.C § 1983 (Ricky Dixon) injunctive relief, cruel and unusual punishing conditions of confinement.

9.) Plaintiff is entitled to declaratory and injunctive relief against defendant Ricky Dixon, in his official capacity for A

## VI. RELIEF REQUESTED

State briefly what relief you seek from the Court. Do not make legal arguments or cite to cases/ statutes. If requesting money damages *(either actual or punitive damages)*, include the amount sought and explain the basis for the claims.

a. Declaratory and injunctive relief as to defendant Dixon, as secretary, finding him in violation of the constitution and laws cited and requiring him to provide the protection, care, and accommodations to which plaintiff is entitled

= STATEMENT OF CLAIMS =

systematic failure through his agents and
employees (staff) to protect plaintiff in violation of
the eighth amendment to the u.s. constitution, as
further set out in the common allegations of facts,
and as follows:

a. Defendant Dixon is liable to plaintiff because
Dixon failed as secretary of FDOC to screen, train,
supervise, discipline, monitor, and or terminate
Huggins, Churry, Castano, Gould, olds, Tetreault,
marchant, Lloyd, and Ethridge. Because he acquiese,
in, condoned and ratified their behavior at
Wakulla C.I.- Annex Protective Management Unit.

b. Plaintiff has routinely been exposed to attacks
by gang members, violent inmates, and correction
staff. And sexual harassment by staff.

c. Plaintiff has been repeatedly placed under the
supervision of correction staff whom have previously
engaged in romantic relationship with plaintiff and or
other prisoners. And who have consistently retaliated
against plaintiff and solicited other prisoners to kill
plaintiff.

d. Defendant Dixon was placed on adequate notice
of a specific threat posed to plaintiff's future
health and safety. Defendant failed to act
reasonably to abate that threat risk.

11. Failure To protect, cruel and unusual
punishing conditions of confinement. 42 U.S.C §
1983 ( Gould marchant, Lloyd, olds, and Huggins

7A.

92.) Plaintiff is entitled to relief against defendants Gould, Marchant, Lloyd, olds, and Huggins for failure to protect plaintiff and creating cruel and unusual punishing conditions of his confinement iv violation of the eighth amendment to the U.S. constitution, as further set out in the common allegations of facts and as follows.

a. Plaintiff has routinely been exposed to attacks by gang members, violent prisoners, and correction staff.

b. Defendants Marchant, Gould, Lloyd, and Huggins were aware of the risk of serious harm to plaintiff's safety by corrections staff at wakulla C.I.-Annex and the risk posed to plaintiff's safety by other prisoners if transferred to columbia C.I.-Annex P.M. unit and failed to act reasonably to abate the risk.

c. Defendants Gould, Marchant, and olds were aware of corrections staff at wakulla C.I.-Annex engaging in unauthorized sexual relationship with prisoners on the P.M. unit and were aware of the risk posed to prisoners safety when they reported corrections staff unwanted sexual advances or sought to terminate unauthorized romantic relationships.

d. Defendants Gould, Marchant, olds, and Lloyd knew Huggins had a reputation for soliciting romantic relationships with prisoners and/or soliciting other prisoners to injure other prisoners in retaliation for complaints against her.

7B.

e. Defendants Gould, marchant, Lloyd, and olds were aware that plaintiff at whom warranted special protection needs was being confined under conditions, posing a substantial and serious risk of harm to his safety and failed to correct said conditions.

93. As a proximate result of defendants denial of adequate protection and confining plaintiff under cruel and unusual conditions posing a serious risk to his safety, Plaintiff has suffered significant physical injuries, mental distress, humiliation, and Pain. And will continue to suffer such injuries in the future.

111. FAILURE TO PROTECT, and cruel AND unusual TREATMENT, 42 U.S.C § 1983.

94. Plaintiff is entitled to relief against defendants Ethridge and Tetreault for failure to protect and deliberate indifference towards - plaintiff's safety needs. In violation of the eighth amendment to the U.S. constitution, as further set out in the common allegations of facts and as follows.

a. Plaintiff has routinely been exposed to attacks by gang members, violent Prisoners, and correction staff.

b. Defendants Ethridge and Tetreault were aware of the risk of serious harm to plaintiff's safety by ex-gang members and or violent Prisoners on the P.M. unit and failed to act reasonably to abate the risk. However, defendants did facilitate the risk of serious

7c.

harm to plaintiff's safety by with deliberate indifference

c. Defendants were aware that prisoners at wak.nnex
P.m. unit required special protection needs from non-P.m.
and P.m. Prisoners alike.

d. Defendants were aware that prisoners in both
protection dorms (L & m) had protection needs and
special reviews against eachother. And were required as
a matter of policy to be kept apart between a physical
barrier.

e. Defendants were aware that P.m. prisoners are to be
escorted at all times upon existing their dorms.

F. As Aproximate result of defendants deliberate
indifference towards plaintiff safety and failure to
properly monitor and supervise P.m. Prisoners when
existing their dormitory. Plaintiff has suffered
significant physical injuries, mental distress,
humiliation, and pain. And will continue to suffer
such injuries in the future

IV. Infliction of cruel And unusual Punishment,
42 u.s.c§1983

95. Plaintiff is entitled to relief against defendants
Chunn and Huggins for inflicting cruel and unusual
treatment on plaintiff. Attempting to solicit his murder,
and waging a relentless campaign of sexual
harassment, retaliation, and harassment against
plaintiff. In violation of the ban against against
cruel and unusual punishment to the U.S.
Constitution. as further set out in the common
allegations of facts and as follows.

a. plaintiff has routinely been exposed to attacks

7d.

by gang members, violent Prisoners, and correction staff.

b. Defendant Huggins deliberately seduced plaintiff into a romantic relationship with her. Upon termination of that relationship, defendant was aware that sexual harassment of plaintiff and attemps to solicit plaintiff's murder posed a serious threat to his health and safety.

c. Defendants Huggins and Chunn knew by soliciting other prisoners to harm or murder plaintiff will cause him grave injury or death. And did cause him injury.

d. Defendants knew that their persistent campaign of sexual harassment and or harassment of plaintiff violated the ban against cruel and unusual punishment.

96. As a proximate result of defendants cruel and unusual treatment of plaintiff. Plaintiff has suffered significant physical injuries, mental distress, humiliation, and pain. And will continue to suffer such injuries in the future.

V. Retaliation For petitioning the government for redress of grievance and or filing legitimate complaints against staff. 42 U.S.C. § 1983

97. Plaintiff is entitled to relief against defendants Chunn and Huggins for retaliatory actions against plaintiff for petitioning his government for redress of grievances, and or making complaints against them. And refusing sexual advances

7e

by staff. In Violation of plaintiff's rights
under the first amendment to the U.S. constitution,
as further set out in the common allegations of
facts and as follows.

a. plaintiff has routinsely been exposed to attacks
by gang members, violent Prisoners, and correction
staff.

b. Defendants chunn and Huggins has routinely
retaliated against plaintiff for exercising his right to
petition the government for redress of grievance and or
making complaints against them.

c. Defendants have submitted multiple false reports
and written bogus disciplinary reports against
plaintiff on several occasions.

d. Defendants have placed plaintiff in confinement
and attempted on multiple occasions to reassign
him to close management without any penological
justification.

e. Defendants have conspired and persuaded prisoners
and staff to harm and retaliate against plaintiff
infringing upon his rights.

f. As a proximate result of defendants retaliatory
actions towards plaintiff legitimate exercise of his
first amendment right. plaintiff has suffered
Significant physical injuries, mental distress,
humiliation, and pain. And will continue to suffer
such injuries in the future.

VI. Conspiracy To deprive plaintiff of his right
to due process of Law; 42 U.S.C. § 1983
98. Plaintiff is entitled to to relief against

7A.

defendants chunn, Huggins, olds, and castano
for their colluded attempts to reassign plaintiff
to c.m. based on inaccurate and false reports.
In violation of the fourteenth amendment to the
u.s. constitution, as further set out in the common
allegations of facts and as follows.

a. Plaintiff has routinely been exposed to attacks
by gang members, violent prisoners, and correction
staff.

b. Defendant chunn and Huggins conspired to solicit
prisoner mark smith to kill plaintiff.

c. Prisoner mark smith attack against plaintiff
subsequently resulted in both plaintiff and mr. smith
being released from D'R court with only canteen
suspencion.

d. Defendant chunn and Huggins learned that plaintiff
had uncovered their plot in soliciting mr. smith to
kill him, conspired with Lieutenant olds and classification
staff castano to recommend plaintiff for c.m.

e. Defendants learned that plaintiff was in communication
with his attorney. And was preparing to file a civil rights
action against them. Placed plaintiff back in confinement
two weeks later, after initially releasing him. Pending
c.m. review on evidence defendants themselves
manufactured.

f. Defendant castano communicated to plaintiff while in
her office during an attorney call, in the presence of
another inmate witness, that she was compelled by
chunn, Huggins, and olds to recommend plaintiff
for c.m. based on the ~~information~~ false information

7g.

provided to her by defendants
99. As a proximate result of defendants denial of plaintiff right to due process of law and collusion and or conspiracy. Plaintiff has suffered significant injuries, mental health distress, humiliation, and pain. And will continue to suffer such injuries in the future.

VII. Conspiracy To deprive Plaintiff of his right to Due process of law, 42 U.S.C § 1983
100. Plaintiff is entitled to relief against defendants Gould, Huggins, marchant, Lloyd, and olds for conspiring to deny plaintiff adequate protection and from a credible, substantial threat to his health and safety at present at columbia C.I. annex P.M Unit. In order to transfer plaintiff from wakulla to columbia P.M. unit. In violation of the fourteenth amendment to the U.S. constitution, as further set out in the common allegations of facts and as follows.

a. plaintiff has routinely been exposed to attacks by gang members, violent prisoners, and correction staff.

b. Defendants entered into an unlawful agreement to transfer plaintiff in retaliation for complaining about Huggins, and exposing their prior relationship, and also requesting a special review against her.

c. Defendants Gould deliberately disregarded credible reports of a threat posed to plaintiff's safety at columbia C.I.-Annex in making the decision to transfer plaintiff against FDOC policy.

d. Defendant Marchant deliberately derailed and or

7h.

failed to admit evidence into the record or consider the same in making the decision to transfer plaintiff

e. Defendants Oldds and Lloyd fabricated evidence and or suppressed exonerating evidence which would of have potentially resulted in appropriate disciplinary actions against Huggins

f. Defendants conspired with each other, so that plaintiff and not defendant Huggins would be transferred from Wakulla C.I.-Annex

100. As a proximate result of defendants denial of plaintiff right to due process of law, plaintiff has suffered significant physical injuries, mental health distress, humiliation, and pain, and will continue to suffer such injuries in the future.

71.

= PRAYER FOR RELIEF =

b. Plaintiff will not be returned to columbia c.I-Annex l.m. unit

c. Plaintiff will not be returned to the care or supervision of Defendants Huggins and chunn

d. A preliminary order for injunctive relief against all named defendants to cease their illegal conduct against plaintiff

e. compensatory, punitive, and nominal damages against each named defendant.

f. Appointment of counsel

g. A trial by Jury.

h. And any other relief deemed proper, Just, and equitable.

7J

A. To the best of your knowledge, have you had any case dismissed for a reason listed in § 1915(g) which counts as a "strike"?

☑ YES  ☐ NO

If you answered yes, identify the case number, date of dismissal and court:

1. Date: 8/6/09 _____ Case #: ~~2014 c~~ 3:08cv-00528-1v-~~EMT~~
   Court: N. Dist.

2. Date: 2009 _____ Case #: 3:09 cv 493/lac /cjk
   Court: N. Dist.

3. Date: 2012 _____ Case #: 3:12-cv-00516-BJD-PDB
   Court: middle Dist

*(If necessary, list additional cases on an attached page)*

B. Have you filed other lawsuits in either *state or federal court* dealing with the same facts or issue involved in this case?

☑ YES ☐ NO

If you answered yes, identify the case number, parties, date filed, result *(if not still pending)*, name of judge, and court for each case *(if more than one)*:

1. Case #: 2021 CA1100 _____ Parties: Dep't of Corr.,

A. To the best of your knowledge, have you had any case dismissed for a reason listed in §1915(g) which counts as a "strike"?

Plaintiff admits to having three or more strike, but have had Fdoc louse his personal property and legal papers over the years. So the information required is no longer in plaintiffs possession

B. Have you filed other lawsuits in either state or federal court dealing with the same facts or issue involved in this case?

1.) Case #2:17-cv-232-SPC-MNM  2.) secretary of Fdoc, etal;
3.) middle district of Florida Ft. myers division.  4.) Still pending

C. Have you filed any other lawsuits in federal court either challenging your conviction or otherwise relating to the conditions of your confinement?

Plaintiff admits to filing at least two federal Habeas corpus challenging his state conviction.

Plaintiff admits to filing multiple lawsuits in federal court, challenging the conditions of his confinement. But does not have access to said documents in his possession. Due to Fdoc loosing his personal property and legal papers

Plaintiff reserves the right to admend or supplement the answers to each questions in paragraphs A, B, and C should such documents be made available and if necessary at a later date. Plaintiff again, admits to having three prior lawsuits dismissed as maliciously, failure to state a claim, or frividous.

9a.

Court: _3rd Jud. Cir. Judith Mee_ Judge: _Do not know, Never Responded_

Date Filed: _6/21/21_ Dismissal Date (if not pending): _Pending_

Reason: _Habeas corpus challenge Abatement w/ C.m_

2.  Case #: _4:20-cv-470-ws-mst_ Parties: _Mark S. Inch_

Court: _U.S. norther Dish Tall/Div._ Judge: _Michael J. Frank_

Date Filed: _2020_ Dismissal Date (if not pending): _Nov. 4, 2020_

Reason: _Malicious, I believe_

C. Have you filed any other lawsuit in federal court either challenging your conviction or otherwise relating to the conditions of your confinement?

☑ YES   ☐ NO

If you answered yes, identify all lawsuits:

1.  Case #: _2:17cv-232-St_ Parties: _Secretary DOC, Et al,_

Court: _Middle Dist. Ft. myers Div_ Judge: _John L. Badalamenti_

Date Filed: _2017_ Dismissal Date (if not pending): _Pending_

Reason: _Eight Amended Violation_

2.  Case #: _3:12-cv-vv516_ Parties: _Michael D Crews, et al_

Court: _Middle Dist. Jacksonville_ Judge: _Do not have documents._

Date Filed: _2012_ Dismissal Date (if not pending): _Settlement_

Reason: _Sexual Abuse_

3.  Case #: _2:17-cv-232_ Parties: _Julie Jones, et al,_

Court: _Southern Disk/anigan_    Judge: _Cecila M. Altunga_

Date Filed: _7/6/17_    Dismissal Date *(if not pending)*: _8/24/17_

Reason: _Inadequate mental Health treatment_

4. Case #: _3:15-1V-76-mca-GRJ_ Parties: _Sec. FDOC_

Court: _N. Dish F/A_    Judge: _Gary R. Jones_

Date Filed: _2015_    Dismissal Date *(if not pending)*: _Don't recall_

Reason: _State court conviction_

5. Case #: _Do Not Have paper_ Parties: _Do not Have legal papers_

Court:_____Judge: _____

Date Filed:_____Dismissal Date *(if not pending)*: _____

Reason: _Do not Have legal Papers FDOC loss my Property_

6. Case #: _Yes_    Parties: _Yes_

Court:_____Judge: _____

Date Filed:_____Dismissal Date *(if not pending)*: _____

Reason: _Do Not Have legal Papers FDOC loss personal property_

*(Attach additional pages as necessary to list all cases. **Failure to**

**disclose all prior cases may result in the dismissal of this case.**)*

## IX. CERTIFICATION

I declare under penalty of perjury that the foregoing (including all

continuation pages) is true and correct. Additionally, as required by Federal

Rule of Civil Procedure 11, I certify that to the best of my knowledge, information, and belief, this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to timely notify the Clerk's Office if there is any change to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date: 10-14-22 Plaintiff's Signature: _Prophet Paulcn_

Printed Name of Plaintiff: _Prophet Paulcn_

Correctional Institution: _Wakulla C.I. - Annex_

Address: _110 Melaleura Drive_

_Crawfordville, FL 32327_

**I certify and declare, under penalty of perjury, that this complaint was (*check one*) ☒ delivered to prison officials for mailing or ☐ deposited in**

the prison's mail system for mailing on the _19th_ day of _October_ ,
20_22_ .


Signature of Incarcerated Plaintiff: _[signature]_



**Witness Statement**

| | |
|---|---|
| **State of Florida** | **Department of Corrections** |

Log #_____

## I.    Identifying Inmate Information

DC # Y47246          Inmate Name   Jose G. Arce

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

## II.    Witness

☐    Staff Member:  Name and Position_____

☐    Other Individual:  Name_____

☐    Inmate:    DC #_____    Name_____

## III.    Voluntary Refusal

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____   Date_____

Signature of Investigating Officer_____   Date_____

## IV.    Statement

On about march 2020 sgt Huggins paid ~~me~~ 3 pack of cigaretts to stab Profet Paulicin DC#LW11537 My bunky give me 2 pack to Help him To stab This inmate I acepted But I changed my mind. and told Inmate Profet Paulicin becavse he is good guy. and sgt Huggins is a evil vindictive person.

Witness Signature   Jose G Arce                          Date_____

Signature of Investigating Officer_____   Date_____

DC6-112C (Revised 8/06)          Original:  Inmate File          Copy:  Central Office

**Witness Statement**

**State of Florida**

Log #_____

**Department of Corrections**

## I.  Identifying Inmate Information

DC # *517677*        Inmate Name *Patrick Garrick*

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

## II.  Witness

☐    Staff Member:  Name and Position_____

☐    Other Individual:  Name_____

☐    Inmate:     DC #_____        Name_____

## III.  Voluntary Refusal

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____     Date_____

Signature of Investigating Officer_____     Date_____

## IV.  Statement

Back in March of 2020 Rm Sarge say to me u wanna work? i say yeah. I was offered 3 packs to Assault Prophet Paulion. Then i was Threaten with CM IF'N i don't. I refuseord her And Told him Im is on C.M. Now they got me the Next month sio i cain't adjust. just like she said.

Witness Signature *Patrick Garrick*_____     Date_____

Signature of Investigating Officer_____     Date_____

DC6-112C (Revised 8/06)          Original:  Inmate File          Copy:  Central Office

**Witness Statement**

| State of Florida | Log #_____ | Department of Corrections |
|---|---|---|

**I.    Identifying Inmate Information**

DC # A51963          Inmate Name Hogan, Jeremy

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

**II.    Witness**

☐    Staff Member: Name and Position_____

☐    Other Individual: Name_____

☐    Inmate:    DC #_____    Name_____

**III.    Voluntary Refusal**

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____    Date_____

Signature of Investigating Officer_____    Date_____

**IV.    Statement** I Was Approached by V. E. Huggins to Stab P. Paulcin she told me she Would Pay me 3 Packs of Cigserette's When I did it and I told Her No that I Would Not do it this Was in march of 2020

Witness Signature _____    Date_____

Signature of Investigating Officer_____    Date_____

DC6-112C (Revised 8/06)          Original: Inmate File          Copy: Central Office

**State of Florida**                    **Witness Statement**                    **Department of Corrections**

Log #_____

## I.  Identifying Inmate Information

DC # S10007                    Inmate Name  Zito, Anthony

Violation Code and Short Title  _____

Use of Force #  _____

Date Report Written  _____

## II.  Witness

☐  Staff Member:  Name and Position_____

☐  Other Individual:  Name_____

☐  Inmate:    DC #_____    Name_____

## III.  Voluntary Refusal

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature  _____    Date_____

Signature of Investigating Officer_____    Date_____

## IV.  Statement

Sometime in Feb 2020 I overheard Ms. Huggin Cusing and Threatening At inmate Phropet while i was on the Rec yard it Scemed to me at first they were Playing, But Sgt. Huggins Started Cusing alot And Really getting mad Then i overheard The statement Boy im gonna get you Hit I thought She Said im gonna Hit you But that wasn't the case She Stated im going to get you Hit Boy Lil Boy and She Smiled like Ha Ha im going to win type of thing Like she was ready out to get inmate Paghet Again i dont Recall what Or how it Started But i do Remember The Threats and The Cusing and her actions were like im gonna get you type of attitude

Witness Signature _____    Date_____

Signature of Investigating Officer_____    Date_____

DC6-112C (Revised 8/06)              Original: Inmate File          Copy: Central Office

### UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

PROPHET PAULCIN,
      Plaintiff,

vs.

WEXFORD HEALTH SOURCES, et al.,
      Defendants.

Case No. 2:17-cv-232-SPC-MRM

### PLAINTIFFS' TIME-SENSITIVE UNOPPOSED MOTION
### FOR PRELIMINARY INJUNCTIVE RELIEF

COMES NOW Plaintiff PROPHET PAULCIN, through counsel, and moves this Honorable Court for Preliminary Injunctive Relief to enjoin his transfer from the Wakulla Annex Protective Management program, and would show that Defendants do not oppose this Motion and would further show:

1. Plaintiff is a psychologically impaired inmate with a long history as a target of gang "hits" including beatings and stabbings by other inmates.

2. For the past more than five years, Mr. Paulcin has repeatedly been extorted, beaten, and stabbed by gang members and other predatory inmates.

3. Since transfer to the Protective Management program at Wakulla Annex, on February 28, 2018, Paulcin has enjoyed relative stability and safety.

4. Plaintiff understands that members of Security Threat Groups (STG) can be admitted to the Protective Management program at Columbia Annex.

5. There is a history of gangs infiltrating FDC Protective Management programs in order to carry out hits on other inmates seeking protection.

6. Plaintiff has been warned of death threats from gangs at Columbia Annex and other prisons. (Exhibit 1). Plaintiff realizes he is not guaranteed complete safety but believes he is most safe in the Wakulla program.

7. Plaintiff is seeking this Court's Order enjoining his transfer from the Protective Management program at Wakulla Annex.

8. Plaintiff faces irreparable harm through severe injury or death;

9. Plaintiff has a strong likelihood of success through strong fact witness testimony and including expert testimony supporting relief;

10. Plaintiff's request for relief is narrowly drawn and least intrusive;

11. The relief Plaintiff seeks would not be contrary to the public interest.

### MEMORANDUM OF LAW

A preliminary injunction is appropriate if the movant demonstrates all of these elements: (1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest. *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034–35 (11th Cir.2001). *Chavez v. Florida SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014). Certainly, the realization of the threats against Mr. Paulcin would constitute

2

irreparable injury, possibly death. Counsel for the Department does not oppose it. The operation of the Prison Litigation Reform Act limits the life of a preliminary injunction to 90 days so that it would not be of long duration unless renewed.

### I.    Background to Request for Preliminary Injunctive Relief

#### A. History of Extortion by Predatory Inmates

On May 15, 2015, the attorney for the Florida Department of Corrections announced that settlement had been reached in a lawsuit litigated *pro se* by inmate Prophet Paulcin. (ECF 137, *Paulcin v. Jones*, 3:12-cv-00516-BJD-PDB (M.D. Fla.)). Paulcin recovered $54,770.00, netting approximately $47,000, after liens, which was placed in his inmate account. (Exhibit 2, Paulcin Inmate Account, at 7). On May 27, the date the liens were deducted from his account, Mr. Paulcin was transferred to Charlotte Correctional Institution, (Exhibit 3, Overall Inmate Record, at 4), where predatory inmates quickly learned of his recovery.

Over the next approximately two years, Mr. Paulcin was extorted to provide canteen items to, or send money to family members of, predatory inmates, including gang members. The draws from his account appear in his inmate account statement. (Exhibit 2). By March 6, 2017, his inmate account was zero. (Id at 14). And it has remained so. After his inmate account was exhausted, predatory inmates, including gang members, refused to believe that he had no more money. Threats became increasingly intense. Mr. Paulcin sought protection. However, seeking protection from gangs is itself a serious offense punishable by death. (Exhibit 4, McAndrew Expert Report, at 6). For that reason, Mr. Paulcin temporarily withdrew his request for protection, reasserting it later.

#### B. Multiple Diagnoses and Conflict with Prison Officials

Because of his psychological and medical diagnoses, Mr. Paulcin has been a challenging inmate, sometimes at odds with prison staff. Conflicts have often resulted in transfers from one prison to another. Until his transfer to Wakulla Annex on February 28, 2018, Mr. Paulcin was being transferred to a different facility every few weeks or months from May 27, 2015, to February 28, 2018. In the Wakulla Annex Protective Management program, he has been the safest and the most stable, relatively, since he became the focus of gang attention. This is, frankly, a tribute to the Wakulla Protective Management program. It is a program that should be replicated at other Florida institutions to expand the Protective Management program to meet an increasing need.

#### C. Danger of Transfer to Columbia Annex

Of course, at times, gang members and former gang members may also need Protective Management. Protective Management programs exist for gang members as well. One of the benefits of being housed at Wakulla Annex is that no one with a Security Threat Group (STG) (gang) history is permitted in the Wakulla program. This is important because gangs have the power to coerce their members to seek entry into Protective Management programs in order to carry out "hits." Inmates with life sentences or very long sentences are often not prosecuted even for murder. For instance, Hurley Brown killed his cellmate Christopher Cox on March 15, 2015 (Exhibit 5, FDLE report). Brown was not prosecuted and his most recent prison face sheet shows no trace of the event. (Exhibit 6, Brown face sheet). Since 2014, there have been three homicides at Columbia, Main Unit, and four homicides

at the Annex where the protective management program is housed. Investigation of one death from this past April is currently pending. (Exhibit 7, six of the homicide investigation summaries from Columbia Main Unit and Annex). During the same timeframe, there have been only two homicides identified at Wakulla Main unit and Annex (one each).[1] There have been no homicides at the Annex since Mr. Paulcin has been at Wakulla Protective Management program.

**II.    Plaintiff Meets Legal Standards for Preliminary Injunctive Relief**

To merit preliminary injunctive relief, a plaintiff must show: (A) there is a substantial likelihood of success on the merits; (B) the injunction is necessary to prevent irreparable harm; (C) the threatened harm outweighs any harm to defendants; and (D) an injunction would not be contrary to the public interest. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016).

**A. Paulcin Would Likely Succeed on the Merits of His Claim**

The Eighth Amendment to the United States Constitution prohibits the government from inflicting "cruel and unusual punishments" on prisoners and constitutionally requires protection from known risks of harm. *Wilson v. Seiter*, 501 U.S. 294, 296–97, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Here, there is a clear risk of harm demonstrated by the Plaintiff's own history and the history of extortion and violent activity of gangs and predatory inmates in Florida prisons. (See Expert Report of Ron McAndrew at 2-11).

---

[1] http://www.dc.state.fl.us/pub/mortality/118.html
http://www.dc.state.fl.us/pub/mortality/122.html

Defendants are not opposing the requested injunctive relief. The parties were informed of an earlier intention to transfer Mr. Paulcin to Columbia Annex, which was placed on hold, and at this point it is unknown whether the transfer will be carried out. However, Plaintiff feels it will be necessary to have the intervention of this Court to forestall a revival of the earlier transfer plan. Because of the 90-day limitation required by the Prison Litigation Reform Act, 18 U.S.C. 3626(a)(2), the Preliminary Injunction would not be open-ended.

**B. Plaintiff Faces Irreparable Harm with No Adequate Remedy at Law**

"[I]njunctive relief is appropriate 'to prevent a substantial risk of serious injury from ripening into actual harm.'" *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) (*quoting Farmer v. Brennan*, 511 U.S. 825, 845, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). In such circumstances, the irreparable-injury requirement may be satisfied by demonstrating a history of harmful actions, which "gives rise to an inference that future injury is imminent." *Id.*

**C. The Balance of Hardships Favors A Preliminary Injunction**

Plaintiff faces a danger of severe injury or death. Expert testimony confirms the danger from any failure to protect, *supra*. The cost of continuing to provide a safe environment would not be greater than the status quo. However, as noted by the court in *Hoffer v. Jones*, "The threat of harm to the plaintiffs cannot be outweighed by the risk of financial burden or administrative inconvenience to the defendants." *Lanbe v. Haley*, 234 F.Supp.2d 1227, 1252 (M.D. Ala. 2002); *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1304 (N.D. Fla. 2017).

### D. A Preliminary Injunction Is Not Contrary to the Public Interest

Society has an interest in the protection of its prisoners. The standard Florida commitment order is to "safely keep" the prisoners committed to state care and ends with the words, "herein fail not." The safety and decent treatment of prisoners who will someday be released into the community, hopefully to rejoin families and workmates, is a public good. As noted in *Costello v. Wainwright*, 397 F.Supp. 20 (M.D. Fla. 1975):

> [I]t seems clear to this Court that, in the long run, providing decent medical care and housing to inmates would serve to promote the rehabilitative goals of the criminal justice system so as to permit their re-entry into free society as upright and law abiding citizens and to prevent their re-entry into the criminal justice system.

*Id.* at 37, *vacated in part on other grounds*, 539 F.2d 547 (5th Cir. 1976), *rev'd*, 430 U.S. 325, 97 S.Ct. 1191, 51 L.Ed.2d 372 (1977.

### III.    Prayer for Relief

A. Preliminary Injunctive Relief as follows:

1. To continue to maintain Prophet Paulcin, DC# W11537, in the Protective Management Program at Wakulla Annex for the term of this injunction.

B. Such other relief as the Court deems just.

Respectfully Submitted,   s/James V. Cook
                          JAMES V. COOK, ESQ.
                          Florida Bar Number 0966853
                          Law Office of James Cook
                          314 West Jefferson Street
                          Tallahassee, Florida 32301
                          (850) 222-8080; 850 561-0836 fax
                          cookjv@gmail.com

                          ATTORNEY FOR PLAINTIFF

7

I CERTIFY that I have conferred in good faith with opposing counsel and opposing counsel do not object to the Motion.

I CERTIFY the foregoing was filed electronically on 6/16/20 and served on all counsel registered with the CM/ECF electronic mail system.

s/James V. Cook

8

## Left Form

**Witness Statement**

State of Florida          Log #_____          Department of Corrections

**I. Identifying Inmate Information**

DC # Y47146          Inmate Name  Jose G. Arce

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

**II. Witness**

☐ Staff Member: Name and Position_____

☐ Other Individual: Name_____

☐ Inmate:    DC #_____    Name_____

**III. Voluntary Refusal**

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____    Date_____

Signature of Investigating Officer _____    Date_____

**IV. Statement**

On about march 2020 sgt Huggins paid me  3 pack of cigaretts to stab Robert Paulion DC #w11537 My bunky give me 1pack to Help him To stab this inmate I acepted But I changed my mind. and toll Inmate Robert Paulicin because he is good.guy. And sgt Huggins is a evil vindictive person.

Witness Signature  Jose G Arce _____    Date_____

Signature of Investigating Officer _____    Date_____

DC6-112C (Revised 8/06)          Original: Inmate File          Copy: Central Office

## Right Form

**Witness Statement**

State of Florida          Log #_____          Department of Corrections

**I. Identifying Inmate Information**

DC # 517677          Inmate Name  Patrick Garrick

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

**II. Witness**

☐ Staff Member: Name and Position_____

☐ Other Individual: Name_____

☐ Inmate:    DC #_____    Name_____

**III. Voluntary Refusal**

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____    Date_____

Signature of Investigating Officer _____    Date_____

**IV. Statement**

Back in march of 2020 Sgt Huggins say to me U wanna work? : my yeah. I was offered 3 packs to assault Prophet Paulion. Than i was threaten with C.M IFW i don't. I refoosed her. and Told him Im is on C.M. Now they lost me the Next month sid i caint adjust. just like she said?

Witness Signature  Patrick Garrick _____    Date_____

Signature of Investigating Officer _____    Date_____

DC6-112C (Revised 8/06)          Original: Inmate File          Copy: Central Office

**Witness Statement**

State of Florida          Log #_____          Department of Corrections

**I.   Identifying Inmate Information**

DC # S10007          Inmate Name  Z. To, Anthony

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

**II.   Witness**

☐  Staff Member:  Name and Position_____

☐  Other Individual:  Name_____

☐  Inmate:   DC #_____   Name_____

**III.   Voluntary Refusal**

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____   Date_____

Signature of Investigating Officer_____   Date_____

**IV.   Statement**

Sometime in Feb 2020 I overheard Ms. Higgins Cusing and Threatening at inmate Prophet while i was on the Rec yard it seemed to me at first they were Playing, But Sgt. Higgins started Cusing alot and really getting mad Then i overheard the statement Boy im gonna get you hit I thought she said im gonna hit you but that wasn't the case She stated im going do get you hit Boy Lil boy and She Said Ha Ha Ha im going to until type of thing like she was really out to get inmate Prophet Again i dont recall what or how it started out i do Remember the Threats and the Cusing and her actions were like im gonna get you type of attitude

Witness Signature _____   Date_____

Signature of Investigating Officer_____   Date_____

DC6-112C (Revised 8/06)          Original: Inmate File          Copy: Central Office

---

**Witness Statement**

State of Florida          Log #_____          Department of Corrections

**I.   Identifying Inmate Information**

DC # J15777          Inmate Name  Randall Todd

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

**II.   Witness**

☐  Staff Member:  Name and Position_____

☐  Other Individual:  Name_____

☐  Inmate:   DC #_____   Name_____

**III.   Voluntary Refusal**

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____   Date_____

Signature of Investigating Officer_____   Date_____

**IV.   Statement**

I Randall D. Todd Jr. am in Fear for inmate Prophet Poulson DC#W11537. IT seems To me as if the Department of Corrections is Trying To Kill him. I was at Columbia C.I. in 2018 when I first heard about the hit on him. The only place he is safe at is Wakulla Annex. However now a staff member has become a threat therat To his safity by Trying to get others to hurt him. This is not fair. He will be killed if he goes to columbia C.I. alot of killings happen there

Witness Signature  Randall Todd   Date 5/28/20

Signature of Investigating Officer_____   Date_____

DC6-112C (Revised 8/06)          Original: Inmate File          Copy: Central Office

**Witness Statement**

| State of Florida | Log #_____ | Department of Corrections |
|---|---|---|

## I. Identifying Inmate Information

DC # **X82872**    Inmate Name **Christopher. Melendez, A**

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

## II. Witness

- ☐ Staff Member: Name and Position_____
- ☐ Other Individual: Name_____
- ☐ Inmate: DC #_____ Name_____

## III. Voluntary Refusal

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____ Date_____

Signature of Investigating Officer_____ Date_____

## IV. Statement

On 04/19/2022 At Approximately 1500 HRS I walked into The dayRoom with a white Sheet, a Bag of canteen and My DrinKing Bottel It only had DRinKing water in It. So while I'm putting my stuff Down at the tabel they call Dinner, So I leave my stuff there and go eat. When I come BacK Sgt Chonn, JessI, A. Came into the Dorm and cam into the dayRoom and Begin Searching So I walKed in there and told her this is my stuff Can I atleast get my water Bottel BacK She told me after I test it for Drugs But you could See is only water in It and I told her I dont do any Drugs at all. They Came BacK 2hrs later

Witness Signature _~~Christopher melen~~_    Date_05/18/22_

Signature of Investigating Officer_____ Date_____

DC6-112C (Revised 8/06)    Original: Inmate File    Copy: Central Office

and told me I'm under investigation for Having 38+ grams Of MethAMPheTaMiNe. I'm willing to summit a lie dietector test and a Drug test plus I have verdego and teRe Mediction For it So if I was DrinRing 38+ grams of Methamphetamine I will be Dead. The DB numbere is # 122-220678

## Left Form

**Witness Statement**

State of Florida                          Log # _____                Department of Corrections

**I.  Identifying Inmate Information**

DC # Y47146          Inmate Name  Jose G Arce

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

**II.  Witness**

☐  Staff Member: Name and Position _____

☐  Other Individual: Name _____

☐  Inmate:   DC # _____   Name _____

**III.  Voluntary Refusal**

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____   Date_____

Signature of Investigating Officer _____   Date_____

**IV.  Statement**

While I was at okeechobee C.I. in It was made known to me
Tha The gangs Had a Hit out on several Inmates. To — — Include
me and — Prophet Paulin His life is in grave and my to. The
Gangs run The prisions and The officers help them to due. sow.
They are Killing people — reason. And DOC is doing nothing About it
Please some one hat — help up

Witness Signature  Jose G Arce          Date 5/28/20

Signature of Investigating Officer _____   Date_____

DC6-112C (Revised 8/06)          Original: Inmate File          Copy: Central Office

## Right Form

**Witness Statement**

State of Florida                          Log # _____                Department of Corrections

**I.  Identifying Inmate Information**

DC # 561502          Inmate Name  Johnny Foster

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

**II.  Witness**

☐  Staff Member: Name and Position _____

☐  Other Individual: Name _____

☐  Inmate:   DC # _____   Name _____

**III.  Voluntary Refusal**

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____   Date_____

Signature of Investigating Officer _____   Date_____

**IV.  Statement**

While I was housed within the Protective management unit at Columbia
C.I. it was Common Knowledge that inmate Prophet #561502
had a hit out on him and that if he transferred to Columbia Pm
unit he would be stabbed up. this came from not only the black
Cajun Community but also the Spanish Community.
Now that You are aware that Prophet will be harmed Shall he transfer there to
Columbia Pm unit. the administration Whom approves such transfer may
be held liable under the Eighth Amendment, for acting with deliberate —
indifference to inmate health and safety only if he knows that inmate
faces a substancial risk of serious harm and disregards that risk
by failure to take reasonable measures to abate it.
I am a witness that inmate Prophets life has been threatened at Columbia
Pm unit and will Swear under oath to this Fact.
Now You have been made aware that a serious risk of harm or death
may result Shall You transfer inmate Prophet to Columbia Pm
unit Where his enemies are waiting for him.

Witness Signature  Tommy Foster          Date 5/28/2020

Signature of Investigating Officer _____   Date_____

DC6-112C (Revised 8/06)          Original: Inmate File          Copy: Central Office

**Witness Statement**

| State of Florida | Log # _____ | Department of Corrections |
|---|---|---|

**I. Identifying Inmate Information**

DC # X-08250    Inmate Name  michael Aiken

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

**II. Witness**

☐ Staff Member: Name and Position _____

☐ Other Individual: Name _____

☐ Inmate:   DC # _____   Name _____

**III. Voluntary Refusal**

The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:

Witness Signature _____    Date _____

Signature of Investigating Officer _____    Date _____

**IV. Statement**

I was at Martin C.I when I Inmate Prophet Paulian DC# W11537 was Housed in B-Dorm in Oct 2017 and heard Inmates on wing say the have more on his head to its a small words!

Witness Signature  Michael Aiken XIorax    Date 5-28-20

Signature of Investigating Officer _____    Date _____

DC6-112C (Revised 8/06)         Original: Inmate File         Copy: Central Office

---

**Witness Statement**

| State of Florida | Log # _____ | Department of Corrections |
|---|---|---|

**I. Identifying Inmate Information**

DC # 166690    Inmate Name  Joseph Baker

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

**II. Witness**

☐ Staff Member: Name and Position _____

☐ Other Individual: Name _____

☐ Inmate:   DC # _____   Name _____

**III. Voluntary Refusal**

The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:

Witness Signature _____    Date _____

Signature of Investigating Officer _____    Date _____

**IV. Statement**

while being housed at Columbia Annex (PM) unit I over heard gang members talking about stabbing inmate Paulcin, P and killing him. The inmates names are Johnny Hodges w03027, and Darren Biles A50422. The hit was coming from inmates on the compound. GANG members from the ZMF and Bloods. I heard they had a state wide hit on him. GANG MEMBERS on the compound At Columbia have access to inmates on PM unit to put hits on inmates via Rec yard.

Witness Signature _____    Date 5-31-20

Signature of Investigating Officer _____    Date _____

DC6-112C (Revised 8/06)         Original: Inmate File         Copy: Central Office

```
IBSR163 (76)                    FLORIDA DEPARTMENT OF CORRECTIONS              06/28/20
                                   TRUST FUND ACCOUNT STATEMENT                11:28:37
                                FOR: 31/31/2015 - 04/28/2020                   PAGE   22

ACCT NAME: PAULCIN, PROPHET        ACCT#: W11537
BED: M1163E                        TYPE: INMATE TRUST
PO BOX:
```

| POSTED DATE | HBR | TYPE | REFERENCE NUMBER | FAC | REMITTER/PAYEE | +/- | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 05/20/15 | 294 | LIEN PAYMENT | 091503048069 | 000 | | | $0.00 | $0.00 |
| | | MEDICAL CO-PAY | 09/15/2009 | 091539935608 | | | | |
| 05/20/15 | 265 | LIEN PAYMENT | 091603159933 | 000 | | | $0.00 | $0.00 |
| | | MEDICAL CO-PAY | 09/16/2509 | 6903305010CS | | | | |
| 05/27/15 | 191 | NO FEE DEPOSITS | 6304438255 | 003 | DIVISION OF RISK MANAGEME | + | $54,790.00 | $54,790.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 369 | | | $245.00 | $54,525.00 |
| | | ST. PRISON LITI- | 04/19/2009 | 09CA03116OAM | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191003 | 000 | | | $325.00 | $54,200.00 |
| | | ST. PRISON LITI- | 06/05/2009 | 2009CA001317 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $465.00 | $53,795.00 |
| | | ST. PRISON LITI- | 08/27/2009 | 09CA3036AMD | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $425.00 | $53,330.00 |
| | | ST. PRISON LITI- | 11/24/2009 | 2009CA004333 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $198.50 | $53,131.50 |
| | | ST. PRISON LITI- | 02/11/2010 | 09CA1100 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $191.50 | $52,940.00 |
| | | ST. PRISON LITI- | 04/28/2010 | 09CA003036AP | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $181.00 | $52,759.00 |
| | | ST. PRISON LITI- | 09/27/2010 | 39CA1317 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $125.00 | $52,634.00 |
| | | FED PRISON LITI- | 02/05/2003 | 2/5/03 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $130.00 | $52,504.00 |
| | | FED PRISON LITI- | 04/23/2003 | 4/23/03 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $105.00 | $52,399.00 |
| | | FED PRISON LITI- | 09/25/2003 | 9/25/03 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $350.00 | $52,049.00 |
| | | FED PRISON LITI- | 02/26/2007 | 307CV29MCREN | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $350.00 | $51,699.00 |
| | | FED PRISON LITI- | 09/30/2008 | 608CV418 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $350.00 | $51,349.00 |
| | | FED PRISON LITI- | 10/28/2008 | 308CV398 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $350.00 | $50,999.00 |
| | | FED PRISON LITI- | 04/29/2009 | 309CV153 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $350.00 | $50,649.00 |
| | | FED PRISON LITI- | 06/16/2009 | 309CV253 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $455.00 | $49,739.00 |
| | | FED PRISON LITI- | 03/28/2009 | 09-11804-C | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $455.00 | $49,739.00 |
| | | FED PRISON LITI- | 09/16/2009 | 091455GD | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $380.00 | $49,389.00 |
| | | FED PRISON LITI- | 11/19/2009 | 309CV511 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $350.00 | $49,039.00 |
| | | FED PRISON LITI- | 12/23/2009 | 309CV693 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $350.00 | $48,689.00 |
| | | FED PRISON LITI- | 01/04/2013 | 309CV573 | | | | |

```
IBSR163 (76)                    FLORIDA DEPARTMENT OF CORRECTIONS              04/28/20
                                   TRUST FUND ACCOUNT STATEMENT                11:28:37
                                FOR: 01/31/2015 - 04/28/2020                   PAGE   23

ACCT NAME: PAULCIN, PROPHET        ACCT#: W11537
BED: M1163E                        TYPE: INMATE TRUST
PO BOX:
```

| POSTED DATE | HBR | TYPE | REFERENCE NUMBER | FAC | REMITTER/PAYEE | +/- | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $350.00 | $48,339.00 |
| | | FED PRISON LITI- | 06/17/2011 | 311CV367 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $350.00 | $47,989.00 |
| | | FED PRISON LITI- | 02/12/2013 | 312CV516 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,985.00 |
| | | MEDICAL CO-PAY | 03/14/2302 | 0235021655GC | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191003 | 000 | | | $4.00 | $47,981.00 |
| | | MEDICAL CO-PAY | 09/20/2002 | 0920021729EN | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191003 | 000 | | | $4.00 | $47,977.00 |
| | | MEDICAL CO-PAY | 09/23/2002 | 0919021509MW | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,973.00 |
| | | MEDICAL CO-PAY | 01/10/2003 | 1227020330P9 | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,969.00 |
| | | MEDICAL CO-PAY | 01/29/2303 | 0117030630DB | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,965.00 |
| | | MEDICAL CO-PAY | 02/06/2303 | 0203020045PB | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191101 | 000 | | | $4.00 | $47,961.00 |
| | | MEDICAL CO-PAY | 02/28/2303 | 0225030035PB | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,957.00 |
| | | MEDICAL CO-PAY | 03/12/2003 | 0305030035C | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,953.00 |
| | | MEDICAL CO-PAY | 03/24/2003 | 0703030210DS | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715391001 | 000 | | | $4.00 | $47,949.00 |
| | | MEDICAL CO-PAY | 12/32/2003 | 1219030909PH | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,945.00 |
| | | MEDICAL CO-PAY | 12/15/2004 | 1213040815DC | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,941.00 |
| | | MEDICAL CO-PAY | 01/31/2006 | 0130040815CB | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,937.00 |
| | | MEDICAL CO-PAY | 03/27/2008 | 0326040845CD | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,933.00 |
| | | MEDICAL CO-PAY | 04/06/2006 | 0330040890CB | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,929.00 |
| | | MEDICAL CO-PAY | 09/13/2006 | 0912060930CS | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,925.00 |
| | | MEDICAL CO-PAY | 09/22/2006 | 0919060835CB | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,921.00 |
| | | MEDICAL CO-PAY | 09/25/2006 | 0922060800CS | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,917.00 |
| | | MEDICAL CO-PAY | 11/06/2006 | 1101060935CB | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,913.00 |
| | | MEDICAL CO-PAY | 11/22/2006 | 1120060935GH | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,909.00 |
| | | MEDICAL CO-PAY | 12/12/2006 | 1212060935DB | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | | $4.00 | $47,905.00 |
| | | MEDICAL CO-PAY | 01/03/2007 | 1229060755CD | | | | |

IS5R160 (74)

FLORIDA DEPARTMENT OF CORRECTIONS
TRUST FUND ACCOUNT STATEMENT
FOR: 01/01/2015 - 06/28/2020

06/28/20
11:28:37
PAGE  24

ACCT NAME: PAULCIN, PROPHET
BED: M1163S
PO BOX:

ACCT#: W11537
TYPE: INMATE TRUST

| POSTED DATE | MCR | TYPE | REFERENCE NUMBER | FAC | REMITTER/PAYEE | +/- | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,901.00 |
| | | MEDICAL CO-PAY | 03/22/2007 | 032107C015CQ | | - | $4.00 | $47,897.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,897.00 |
| | | MEDICAL CO-PAY | 04/03/2007 | 0313071000CS | | - | $4.00 | $47,893.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,893.00 |
| | | MEDICAL CO-PAY | 06/04/2007 | 040207083SCS | | - | $4.00 | $47,889.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,889.00 |
| | | MEDICAL CO-PAY | 06/12/2007 | 0611070900CS | | - | $4.00 | $47,885.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,885.00 |
| | | MEDICAL CO-PAY | 06/27/2007 | 0626071630CS | | - | $4.00 | $47,881.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,881.00 |
| | | MEDICAL CO-PAY | 07/25/2007 | 0702670215CS | | - | $4.00 | $47,877.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,877.00 |
| | | MEDICAL CO-PAY | 07/18/2007 | 070307092SWS | | - | $4.00 | $47,873.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,873.00 |
| | | MEDICAL CO-PAY | 07/17/2007 | 0713070845CS | | - | $4.00 | $47,869.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,869.00 |
| | | MEDICAL CO-PAY | 07/30/2007 | 0718070815CS | | - | $4.00 | $47,865.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,865.00 |
| | | MEDICAL CO-PAY | 08/01/2007 | 0730070810CS | | - | $4.00 | $47,861.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,861.00 |
| | | MEDICAL CO-PAY | 08/08/2007 | 0802070822CS | | - | $4.00 | $47,857.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,857.00 |
| | | MEDICAL CO-PAY | 08/09/2007 | 3806070815CS | | - | $4.00 | $47,853.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,853.00 |
| | | MEDICAL CO-PAY | 08/30/2007 | 0822070500CS | | - | $4.00 | $47,849.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,849.00 |
| | | MEDICAL CO-PAY | 09/07/2007 | 0906070800CS | | - | $4.00 | $47,845.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,845.00 |
| | | MEDICAL CO-PAY | 09/07/2007 | 0829070750CS | | - | $4.00 | $47,841.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,841.00 |
| | | MEDICAL CO-PAY | 09/30/2007 | 0936070915CS | | - | $4.00 | $47,837.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,837.00 |
| | | MEDICAL CO-PAY | 10/11/2007 | 1013071020CC | | - | $4.00 | $47,833.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,833.00 |
| | | MEDICAL CO-PAY | 12/27/2007 | 1116070720CC | | - | $4.00 | $47,829.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,829.00 |
| | | MEDICAL CO-PAY | 12/04/2007 | 1129070615CC | | - | $4.00 | $47,825.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,825.00 |
| | | MEDICAL CO-PAY | 01/03/2008 | 1233070632CC | | - | $4.00 | $47,821.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,821.00 |
| | | MEDICAL CO-PAY | 01/23/2008 | 1226070630CC | | - | $4.00 | $47,817.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,817.00 |
| | | MEDICAL CO-PAY | 02/05/2008 | 0206080748CC | | - | $4.00 | $47,813.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,813.00 |
| | | MEDICAL CO-PAY | 02/11/2008 | 0211080715CC | | - | $4.00 | $47,809.00 |

IS5R160 (74)

FLORIDA DEPARTMENT OF CORRECTIONS
TRUST FUND ACCOUNT STATEMENT
FOR: 01/01/2015 - 06/28/2020

06/28/20
11:28:37
PAGE  25

ACCT NAME: PAULCIN, PROPHET
BED: M1163S
PO BOX:

ACCT#: W11537
TYPE: INMATE TRUST

| POSTED DATE | MCR | TYPE | REFERENCE NUMBER | FAC | REMITTER/PAYEE | +/- | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,809.00 |
| | | MEDICAL CO-PAY | 04/03/2008 | 0324080750CS | | - | $4.00 | $47,805.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,805.00 |
| | | MEDICAL CO-PAY | 04/10/2008 | 0407080832CS | | - | $4.00 | $47,801.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,801.00 |
| | | MEDICAL CO-PAY | 05/16/2008 | 0506080845CS | | - | $4.00 | $47,797.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,797.00 |
| | | MEDICAL CO-PAY | 07/16/2008 | 0715081015CS | | - | $4.00 | $47,793.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,793.00 |
| | | MEDICAL CO-PAY | 07/23/2008 | 0721681015CS | | - | $4.00 | $47,789.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,789.00 |
| | | MEDICAL CO-PAY | 09/08/2008 | 0901080815CS | | - | $4.00 | $47,785.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,785.00 |
| | | MEDICAL CO-PAY | 09/22/2008 | 0920081030CS | | - | $4.00 | $47,781.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,781.00 |
| | | MEDICAL CO-PAY | 11/21/2008 | 1031080825CS | | - | $4.00 | $47,777.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,777.00 |
| | | MEDICAL CO-PAY | 11/06/2008 | 1104081130DS | | - | $4.00 | $47,773.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,773.00 |
| | | MEDICAL CO-PAY | 11/21/2008 | 1107080845CS | | - | $4.00 | $47,769.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,769.00 |
| | | MEDICAL CO-PAY | 12/03/2008 | 1116080810CS | | - | $4.00 | $47,765.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,765.00 |
| | | MEDICAL CO-PAY | 12/04/2008 | 1120080830CS | | - | $4.00 | $47,761.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,761.00 |
| | | MEDICAL CO-PAY | 12/23/2008 | 1219080825CB | | - | $4.00 | $47,757.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,757.00 |
| | | MEDICAL CO-PAY | 01/09/2009 | 1229080815CS | | - | $4.00 | $47,753.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,753.00 |
| | | MEDICAL CO-PAY | 03/16/2009 | 0107090915CS | | - | $4.00 | $47,749.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,749.00 |
| | | MEDICAL CO-PAY | 03/30/2009 | 0312091000CD | | - | $4.00 | $47,745.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,745.00 |
| | | MEDICAL CO-PAY | 03/31/2009 | 0323090750CE | | - | $4.00 | $47,741.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,741.00 |
| | | MEDICAL CO-PAY | 04/03/2009 | 0333090950CE | | - | $4.00 | $47,737.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,737.00 |
| | | MEDICAL CO-PAY | 04/29/2009 | 0438090830CD | | - | $4.00 | $47,733.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,733.00 |
| | | MEDICAL CO-PAY | 05/25/2009 | 0513090802CD | | - | $4.00 | $47,729.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,729.00 |
| | | MEDICAL CO-PAY | 06/10/2009 | 0521090845CS | | - | $4.00 | $47,725.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $4.00 | $47,725.00 |
| | | MEDICAL CO-PAY | 06/19/2009 | 0621090830CC | | - | $4.00 | $47,721.00 |

```
IBSR140 (74)                    FLORIDA DEPARTMENT OF CORRECTIONS          04/28/20
                                   TRUST FUND ACCOUNT STATEMENT            11:28:17
                                FOR: 01/01/2015 - 04/28/2020               PAGE   26

ACCT NAME: PAULCIN, PROPHET      ACCT#: M11537
BED: M11638                      TYPE: INMATE TRUST
PO BOX:
```

| POSTED DATE | MBR | TYPE | REFERENCE NUMBER | FAC | REMITTER/PAYEE | +/- | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,716.00 |
| | | MEDICAL CO-PAY | - 07/29/2009 | 0728091255DB | | - | $5.00 | $47,711.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,766.00 |
| | | MEDICAL CO-PAY | - 10/01/2009 | 1002090810CS | | - | $5.00 | $47,731.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 12/03/2009 | 1123090910CS | | - | $5.00 | $47,696.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,691.00 |
| | | MEDICAL CO-PAY | - 12/23/2009 | 1231091245DB | | - | $5.00 | $47,686.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,681.00 |
| | | MEDICAL CO-PAY | - 12/30/2009 | 1218090825CS | | - | $5.00 | $47,676.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191031 | 030 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 12/30/2009 | 1222090930CS | | - | $5.00 | $47,666.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,671.00 |
| | | MEDICAL CO-PAY | - 01/06/2010 | 1231090800CS | | - | $5.00 | $47,661.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,656.00 |
| | | MEDICAL CO-PAY | - 01/23/2010 | 0212090815CS | | - | $5.00 | $47,651.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191031 | 300 | | - | $5.00 | $47,646.00 |
| | | MEDICAL CO-PAY | - 01/27/2010 | 0125101415CS | | - | $5.00 | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,641.00 |
| | | MEDICAL CO-PAY | - 02/16/2010 | 0215101010CS | | - | $5.00 | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,636.00 |
| | | MEDICAL CO-PAY | - 03/03/2010 | 0226101615CS | | - | $5.00 | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,631.00 |
| | | MEDICAL CO-PAY | - 03/15/2010 | 0312100935CS | | - | $5.00 | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,626.00 |
| | | MEDICAL CO-PAY | - 04/05/2010 | 0401100810CS | | - | $5.00 | $47,621.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 04/06/2010 | 0407100810CS | | - | $5.00 | $47,616.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,611.00 |
| | | MEDICAL CO-PAY | - 04/09/2010 | 0428100840CS | | - | $5.00 | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,606.00 |
| | | MEDICAL CO-PAY | - 08/19/2010 | 0519101820CS | | | | |

```
IBSR140 (74)                    FLORIDA DEPARTMENT OF CORRECTIONS          04/28/20
                                   TRUST FUND ACCOUNT STATEMENT            11:28:37
                                FOR: 01/01/2015 - 04/28/2020               PAGE   27

ACCT NAME: PAULCIN, PROPHET      ACCT#: M11537
BED: M11638                      TYPE: INMATE TRUST
PO BOX:
```

| POSTED DATE | MBR | TYPE | REFERENCE NUMBER | FAC | REMITTER/PAYEE | +/- | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,601.00 |
| | | MEDICAL CO-PAY | - 06/23/2010 | 0523101045EM | | - | $5.00 | $47,596.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 06/24/2010 | 0623100935DS | | - | $5.00 | $47,591.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 07/15/2010 | 3711100620CS | | - | $5.00 | $47,586.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 07/23/2010 | 0723100900CS | | - | $5.00 | $47,581.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 08/04/2010 | 0802100935DS | | - | $5.00 | $47,576.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 09/29/2010 | 0909100925DS | | - | $5.00 | $47,571.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191003 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 09/27/2010 | 0927101030CS | | - | $5.00 | $47,566.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 11/05/2010 | 1131100805EM | | - | $5.00 | $47,561.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 12/21/2010 | 1221100810CS | | - | $5.00 | $47,556.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 12/30/2010 | 1230100800CS | | - | $5.00 | $47,551.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 01/13/2011 | 0112101915CS | | - | $5.00 | $47,541.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191003 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 02/08/2011 | 0208103815CS | | - | $5.00 | $47,536.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,531.50 |
| | | MEDICAL CO-PAY | - 03/22/2011 | 0222110558EM | | - | $5.00 | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,526.00 |
| | | MEDICAL CO-PAY | - 03/16/2011 | 0316110800CS | | - | $5.00 | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,521.00 |
| | | MEDICAL CO-PAY | - 04/01/2011 | 0401110623EM | | - | $5.00 | $47,516.92 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 04/20/2011 | 0418110940CS | | - | $5.00 | $47,511.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 06/13/2011 | 0610111030CS | | - | $5.00 | $47,506.00 |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,501.00 |
| | | MEDICAL CO-PAY | - 08/02/2011 | 0801111120CS | | - | $5.00 | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,496.00 |
| | | MEDICAL CO-PAY | - 08/22/2011 | 0819111000CS | | - | $5.00 | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | |
| | | MEDICAL CO-PAY | - 10/07/2011 | 1004110840CS | | - | $5.00 | $47,491.00 |

```
IR5R140 (74)                     FLORIDA DEPARTMENT OF CORRECTIONS              04/28/20
                                   TRUST FUND ACCOUNT STATEMENT                 11:28:37
                                  FOR: 01/02/2015 - 04/28/2020                  PAGE  28

ACCT NAME: PAULCIN, PROPHET          ACCT#: W11537
BED: M11638                          TYPE: INMATE TRUST
PO BOX:
```

| POSTED DATE | NBR | TYPE | REFERENCE NUMBER | FAC | REMITTER/PAYEE | +/- | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,486.00 |
| | | MEDICAL CO-PAY | - 12/20/2011 1219113710CB | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,481.00 |
| | | MEDICAL CO-PAY | - 02/29/2012 0215220905CB | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,476.00 |
| | | MEDICAL CO-PAY | - 04/02/2012 0324120905DB | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,471.00 |
| | | MEDICAL CO-PAY | - 05/04/2012 0501121050CB | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,466.00 |
| | | MEDICAL CO-PAY | - 06/27/2012 0622121015BC | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,461.00 |
| | | MEDICAL CO-PAY | - 07/26/2012 0724121230CS | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,456.00 |
| | | MEDICAL CO-PAY | - 08/22/2012 0821120930DB | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,451.00 |
| | | MEDICAL CO-PAY | - 10/03/2012 0926121000DB | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,446.00 |
| | | MEDICAL CO-PAY | - 12/27/2012 1220120940FU | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,441.00 |
| | | MEDICAL CO-PAY | - 01/03/2013 0102230910DB | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,436.00 |
| | | MEDICAL CO-PAY | - 01/12/2013 0109130930CB | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,431.00 |
| | | MEDICAL CO-PAY | - 01/26/2013 0123130900CS | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,426.00 |
| | | MEDICAL CO-PAY | - 02/01/2013 0130130700CB | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,421.00 |
| | | *MEDICAL CO-PAY | - 02/19/2013 0213130800CS | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,416.00 |
| | | MEDICAL CO-PAY | - 02/23/2013 0221131120DB | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,411.00 |
| | | MEDICAL CO-PAY | - 02/08/2014 3266140930DB | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,406.00 |
| | | MEDICAL CO-PAY | - 04/02/2014 0401140945BC | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,401.00 |
| | | MEDICAL CO-PAY | - 12/03/2014 1125140820SC | | | | | |
| 05/27/15 | 194 | LIEN PAYMENT | 052715191001 | 000 | | - | $5.00 | $47,396.00 |
| | | MEDICAL CO-PAY | - 12/27/2014 12261412428C | | | | | |
| 05/30/15 | 077 | CANTEEN SALES | 40220150529 | 000 | | - | $66.37 | $47,329.63 |
| 05/31/15 | 077 | CANTEEN SALES | 40220150530 | 000 | | - | $33.37 | $47,296.26 |
| 06/01/15 | 141 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $47,295.26 |
| 06/02/15 | 077 | CANTEEN SALES | 40220150601 | 000 | | - | $99.55 | $47,195.71 |
| 06/08/15 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $47,194.71 |
| 06/09/15 | 091 | CANTEEN SALES | 51020150608 | 000 | | - | $43.35 | $47,151.36 |
| 06/11/15 | 091 | CANTEEN SALES | 51020150610 | 000 | | - | $36.05 | $47,115.31 |

```
IR5R140 (74)                     FLORIDA DEPARTMENT OF CORRECTIONS              04/28/20
                                   TRUST FUND ACCOUNT STATEMENT                 11:28:37
                                  FOR: 01/01/2015 - 04/28/2020                  PAGE  29

ACCT NAME: PAULCIN, PROPHET          ACCT#: W11537
BED: M11632                          TYPE: INMATE TRUST
PO BOX:
```

| POSTED DATE | NBR | TYPE | REFERENCE NUMBER | FAC | REMITTER/PAYEE | +/- | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 06/12/15 | 089 | CANTEEN SALES | 51020150611 | 000 | | - | $15.21 | $47,100.10 |
| 06/14/15 | 091 | CANTEEN SALES | 51020150613 | 000 | | - | $5.36 | $47,094.74 |
| 06/15/15 | 144 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $47,093.74 |
| 06/16/15 | 091 | CANTEEN SALES | 51020150615 | 000 | | - | $76.76 | $47,016.98 |
| 06/17/15 | 091 | CANTEEN SALES | 51020150616 | 000 | | - | $22.83 | $46,994.15 |
| 06/22/15 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $46,993.15 |
| 06/24/15 | 089 | CANTEEN SALES | 51020150623 | 000 | | - | $99.05 | $46,894.10 |
| 06/26/15 | 091 | CANTEEN SALES | 51020150627 | 000 | | - | $0.94 | $46,893.16 |
| 06/29/15 | 139 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $46,892.16 |
| 07/01/15 | 091 | CANTEEN SALES | 51020150630 | 000 | | - | $99.84 | $46,792.32 |
| 07/06/15 | 141 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $46,791.32 |
| 07/07/15 | 091 | CANTEEN SALES | 51020150706 | 000 | | - | $95.02 | $46,696.30 |
| 07/30/15 | 091 | CANTEEN SALES | 51020150709 | 000 | | - | $4.89 | $46,691.41 |
| 07/10/15 | 123 | INDIVIDUAL CHEC | 0598074 | 000 | IRMA D. QUINONES | - | $200.00 | $46,491.41 |
| 07/13/15 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $46,490.41 |
| 07/14/15 | 091 | CANTEEN SALES | 51020150713 | 000 | | - | $99.42 | $46,390.99 |
| 07/15/15 | 215 | MEDICAL CO-PAY | 0711150715SC | 000 | | - | $5.00 | $46,385.99 |
| 07/16/15 | 112 | INDIVIDUAL CHEC | 0598501 | 000 | QUINCHELLE HOLDER | - | $125.00 | $46,260.99 |
| 07/19/15 | 091 | CANTEEN SALES | 51020150718 | 000 | | - | $0.55 | $46,260.44 |
| 07/20/15 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $46,259.44 |
| 07/23/15 | 091 | CANTEEN SALES | 51020150720 | 000 | | - | $99.55 | $46,159.89 |
| 07/27/15 | 139 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $46,158.89 |
| 07/28/15 | 091 | CANTEEN SALES | 51020150727 | 000 | | - | $63.82 | $46,095.07 |
| 07/28/15 | 133 | INDIVIDUAL CHEC | 0599298 | 000 | JEAN, JENNY | - | $3,500.00 | $42,595.07 |
| 07/29/15 | 091 | CANTEEN SALES | 51020150728 | 000 | | - | $28.38 | $42,566.69 |
| 07/29/15 | 133 | INDIVIDUAL CHEC | 0599395 | 000 | JOSE MANUEL PRADO | - | $450.00 | $42,116.69 |
| 07/30/15 | 091 | CANTEEN SALES | 51020150729 | 000 | | - | $7.56 | $42,109.13 |
| 08/02/15 | 089 | CANTEEN SALES | 51020150801 | 000 | | - | $0.24 | $42,108.89 |
| 08/03/15 | 139 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $42,107.89 |
| 08/04/15 | 091 | CANTEEN SALES | 51020150803 | 000 | | - | $99.81 | $42,008.08 |
| 08/07/15 | 134 | INDIVIDUAL CHEC | 0599909 | 000 | ANNE SELLER | - | $150.00 | $41,858.08 |
| 08/07/15 | 134 | INDIVIDUAL CHEC | 0599910 | 000 | SHEDDRICK JACOBS | - | $300.00 | $41,558.08 |
| 08/10/15 | 145 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $41,557.08 |
| 08/11/15 | 113 | CANTEEN SALES | 51020150810 | 000 | | - | $44.49 | $41,512.59 |
| 08/12/15 | 091 | CANTEEN SALES | 51020150811 | 000 | | - | $38.15 | $41,474.44 |
| 08/13/15 | 091 | CANTEEN SALES | 51020150812 | 000 | | - | $4.94 | $41,469.50 |
| 08/17/15 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.88 | $41,468.62 |
| 08/18/15 | 223 | ACCESS CATALOG | 3510 | 000 | | - | $94.51 | $41,374.11 |
| 08/20/15 | 133 | INDIVIDUAL CHEC | 0600811 | 000 | TOPAZE THOMAS | - | $200.00 | $41,174.11 |
| 08/20/15 | 133 | INDIVIDUAL CHEC | 0600816 | 000 | TEDRA KUMP | - | $175.00 | $40,999.11 |
| 08/20/15 | 183 | MEDICAL CO-PAY | 0819151012DB | 000 | | - | $5.00 | $40,994.11 |
| 08/24/15 | 242 | INDIVIDUAL CHEC | 0599910 | 000 | SHEDDRICK JACOBS | +($) | $300.00 | $41,294.11 |
| 08/28/15 | 189 | MEDICAL CO-PAY | 0827151322DB | 000 | | - | $5.00 | $41,289.11 |
| 09/02/15 | 091 | CANTEEN SALES | 51020150901 | 000 | | - | $20.53 | $41,268.58 |
| 09/07/15 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.21 | $41,268.17 |

```
                              FLORIDA DEPARTMENT OF CORRECTIONS                    04/28/20
ISSR24G (76)                     TRUST FUND ACCOUNT STATEMENT                      11:24:33
                              FOR: 01/01/2015 - 04/28/2020                        PAGE    30

ACCT NAME: PAULCIN, PROPHET          ACCT#: W11537
         BED: M1163S                 TYPE: INMATE TRUST
         PO BOX:
```

| POSTED DATE | HDR | TYPE | REFERENCE NUMBER | FAC | REMITTER/PAYEE | +/- | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 09/12/15 | 091 | CANTEEN SALES | 51020151019 | 000 | | - | $12.96 | $41,255.43 |
| 09/14/15 | 145 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.13 | $41,255.30 |
| 09/17/15 | 091 | CANTEEN SALES | 51020150916 | 000 | | - | $84.25 | $41,171.05 |
| 09/18/15 | 089 | CANTEEN SALES | 51020150917 | 000 | | - | $15.42 | $41,155.63 |
| 09/21/15 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $41,154.63 |
| 09/23/15 | 091 | CANTEEN SALES | 51020150923 | 000 | | - | $98.92 | $41,055.71 |
| 09/23/15 | 091 | CANTEEN SALES | 51020150922 | 000 | | - | $0.99 | $41,054.72 |
| 09/28/15 | 141 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $41,053.72 |
| 09/28/15 | 091 | CANTEEN SALES | 51020150928 | 000 | | - | $99.96 | $40,953.76 |
| 10/05/15 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $40,952.76 |
| 10/08/15 | 091 | CANTEEN SALES | 51020151007 | 000 | | - | $40.17 | $40,912.59 |
| 10/09/15 | 103 | INDIVIDUAL CHEC | 0603815 | 000 | CATHERINE WILSON | + | $125.00 | $40,787.59 |
| 10/09/15 | 103 | INDIVIDUAL CHEC | 0603817 | 003 | RANDY BAILEY | + | $50.00 | $40,737.59 |
| 10/09/15 | 103 | INDIVIDUAL CHEC | 0603837 | 003 | CHARMAIN BROWN | + | $600.00 | $40,237.59 |
| 10/09/15 | 103 | INDIVIDUAL CHEC | 0603838 | 003 | JENNY JEAN | + | $1,000.00 | $39,237.59 |
| 10/12/15 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.40 | $39,237.19 |
| 10/16/15 | 089 | CANTEEN SALES | 51020151015 | 000 | | - | $48.42 | $39,188.77 |
| 10/17/15 | 091 | CANTEEN SALES | 51020151016 | 000 | | - | $51.49 | $39,137.28 |
| 10/19/15 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $39,136.28 |
| 10/23/15 | 091 | CANTEEN SALES | 51020151019 | 000 | | - | $99.70 | $39,036.58 |
| 10/26/15 | 141 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $39,035.58 |
| 10/27/15 | 091 | CANTEEN SALES | 51020151026 | 000 | | - | $99.95 | $38,935.63 |
| 10/28/15 | 149 | LEGAL POSTAGE W | 20150211 | 000 | | - | $0.49 | $38,934.94 |
| 10/28/15 | 148 | LEGAL POSTAGE W | 20150211A | 000 | | - | $0.49 | $38,934.25 |
| 10/28/15 | 266 | MP3 PROGRAM W/D | 3510 | 000 | | - | $282.54 | $38,651.71 |
| 10/31/15 | 397 | MEDICAL CO-PAY | 10301511402C | 000 | | - | $5.00 | $38,646.71 |
| 11/02/15 | 141 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $38,645.71 |
| 11/03/15 | 091 | CANTEEN SALES | 51020151102 | 000 | | - | $99.05 | $38,546.66 |
| 11/04/15 | 103 | INDIVIDUAL CHEC | 0605409 | 000 | TANISA MARTIN | + | $300.00 | $38,246.66 |
| 11/03/15 | 103 | INDIVIDUAL CHEC | 0605490 | 003 | TENISA BROWN | + | $350.00 | $37,896.66 |
| 11/03/15 | 103 | INDIVIDUAL CHEC | 0605508 | 000 | MARISABEL RICHARDS | + | $600.00 | $37,296.66 |
| 11/04/15 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.30 | $37,296.36 |
| 11/09/15 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $37,294.76 |
| 11/10/15 | 091 | CANTEEN SALES | 51020151109 | 000 | | - | $99.98 | $37,194.78 |
| 11/12/15 | 142 | LEGAL POSTAGE W | 20150225 | 000 | | - | $2.45 | $37,193.33 |
| 11/12/15 | 142 | LEGAL POSTAGE W | 20150225A | 000 | | - | $2.03 | $37,190.30 |
| 11/11/15 | 266 | MP3 PROGRAM W/D | 3510 | 000 | | - | $6.42 | $37,183.88 |
| 11/13/15 | 103 | INDIVIDUAL CHEC | 0606382 | 000 | REGINALD BROWN | + | $125.00 | $37,058.88 |
| 11/13/15 | 103 | INDIVIDUAL CHEC | 0606599 | 000 | CHANTEL NUNEZ | + | $700.00 | $36,358.88 |
| 11/16/15 | 141 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $36,357.88 |
| 11/16/15 | 335 | ACCESS CATALOG | 3510 | 000 | | - | $72.33 | $36,285.55 |
| 11/17/15 | 091 | CANTEEN SALES | 51020151116 | 000 | | - | $99.82 | $36,185.72 |
| 11/20/15 | 103 | INDIVIDUAL CHEC | 0606588 | 000 | JENNY JEAN | + | $5,000.00 | $31,185.73 |
| 11/20/15 | 137 | INDIVIDUAL CHEC | 0606592 | 000 | DALE DAVIS | + | $1,200.00 | $29,985.73 |
| 11/23/15 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $29,984.73 |

```
                              FLORIDA DEPARTMENT OF CORRECTIONS                    04/28/20
ISSR24G (76)                     TRUST FUND ACCOUNT STATEMENT                      11:24:33
                              FOR: 01/01/2015 - 04/28/2020                        PAGE    31

ACCT NAME: PAULCIN, PROPHET          ACCT#: W11537
         BED: M1163S                 TYPE: INMATE TRUST
         PO BOX:
```

| POSTED DATE | HDR | TYPE | REFERENCE NUMBER | FAC | REMITTER/PAYEE | +/- | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 11/24/15 | 091 | CANTEEN SALES | 51020151123 | 000 | | - | $47.63 | $29,937.10 |
| 11/25/15 | 089 | CANTEEN SALES | 51020151124 | 000 | | - | $43.01 | $29,894.49 |
| 11/30/15 | 341 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.99 | $29,886.50 |
| 12/01/15 | 091 | CANTEEN SALES | 51020151130 | 000 | | - | $99.96 | $29,786.54 |
| 12/07/15 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $29,785.54 |
| 12/08/15 | 091 | CANTEEN SALES | 51020151207 | 000 | | - | $99.81 | $29,685.73 |
| 12/10/15 | 099 | INDIVIDUAL CHEC | 0607492 | 000 | TANIKA MARTIN | + | $450.00 | $29,235.73 |
| 12/16/15 | 141 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $29,232.73 |
| 12/16/15 | 091 | CANTEEN SALES | 51020151215 | 000 | | - | $83.25 | $29,147.38 |
| 12/17/15 | 091 | CANTEEN SALES | 51020151216 | 000 | | - | $13.12 | $29,134.26 |
| 12/21/15 | 139 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.98 | $29,133.28 |
| 12/22/15 | 091 | CANTEEN SALES | 51020151221 | 000 | | - | $99.23 | $29,034.05 |
| 12/23/15 | 212 | MP3 PROGRAM W/D | 3510 | 010 | | - | $476.61 | $28,557.44 |
| 12/28/15 | 147 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $3.99 | $28,158.45 |
| 12/28/15 | 250 | INDIVIDUAL CHEC | 0608481 | 000 | JENNY JEAN | + | $1,000.00 | $27,158.45 |
| 12/29/15 | 091 | CANTEEN SALES | 51020151228 | 000 | | - | $63.67 | $27,094.78 |
| 12/30/15 | 091 | CANTEEN SALES | 51020151229 | 000 | | - | $36.79 | $27,059.99 |
| 12/31/15 | 091 | CANTEEN SALES | 51020151230 | 000 | | - | $1.50 | $27,058.49 |
| 01/04/16 | 139 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $27,057.49 |
| 01/04/16 | 091 | CANTEEN SALES | 51020160104 | 000 | | - | $98.64 | $26,958.85 |
| 01/05/16 | 103 | INDIVIDUAL CHEC | 0608876 | 000 | KARELIA HALL | + | $1,000.00 | $25,958.85 |
| 01/07/16 | 091 | CANTEEN SALES | 51020160106 | 000 | | - | $0.70 | $25,958.15 |
| 01/06/16 | 089 | CANTEEN SALES | 51020160107 | 000 | | - | $10.65 | $25,947.50 |
| 01/11/16 | 147 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.30 | $25,956.54 |
| 01/12/16 | 091 | CANTEEN SALES | 51020160111 | 000 | | - | $93.30 | $25,863.30 |
| 01/14/16 | 091 | CANTEEN SALES | 51020160113 | 000 | | - | $6.64 | $25,856.66 |
| 01/18/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $25,855.66 |
| 01/19/16 | 091 | CANTEEN SALES | 51020160118 | 000 | | - | $95.50 | $25,760.00 |
| 01/21/16 | 091 | CANTEEN SALES | 51020160120 | 000 | | - | $4.25 | $25,756.13 |
| 01/21/16 | 112 | INDIVIDUAL CHEC | 0609925 | 000 | LEBRENDA JOHNSON | + | $450.00 | $25,305.83 |
| 01/21/16 | 113 | INDIVIDUAL CHEC | 0609933 | 003 | REGINALD BROWN | + | $500.00 | $24,805.83 |
| 01/25/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $24,804.83 |
| 01/26/16 | 091 | CANTEEN SALES | 51020160125 | 000 | | - | $99.50 | $24,704.91 |
| 02/01/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $24,703.93 |
| 02/02/16 | 091 | CANTEEN SALES | 51020160201 | 000 | | - | $99.77 | $24,604.16 |
| 02/08/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $24,603.16 |
| 02/09/16 | 091 | CANTEEN SALES | 51020160208 | 000 | | - | $99.00 | $24,504.16 |
| 02/11/16 | 091 | CANTEEN SALES | 51020160210 | 000 | | - | $1.59 | $24,503.17 |
| 02/16/16 | 147 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $24,502.17 |
| 02/16/16 | 266 | ACCESS CATALOG | 3510 | 000 | | - | $50.73 | $24,451.44 |
| 02/16/16 | 091 | CANTEEN SALES | 51020160215 | 000 | | - | $2.99 | $24,469.36 |
| 02/23/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $97.82 | $24,451.44 |
| 02/22/16 | 091 | CANTEEN SALES | 51020160222 | 000 | | - | $1.00 | $24,350.54 |
| 02/23/16 | 091 | CANTEEN SALES | 51020160222 | 000 | | - | $99.68 | $24,252.86 |
| 02/29/16 | 147 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $24,249.86 |

```
I8SR160 (74)                      FLORIDA DEPARTMENT OF CORRECTIONS              04/28/20
                                    TRUST FUND ACCOUNT STATEMENT                 11:26:37
                                 FOR: 01/01/2015 - 04/28/2020                    PAGE    32

ACCT NAME: PAULCIN, PROPHET        ACCT#: M11537
          EED: M1163S              TYPE: INMATE TRUST
          PO BOX:
```

| POSTED DATE | MSR | TYPE | REFERENCE NUMBER | FAC | REMITTER/PAYEE | +/- | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 03/01/16 | 091 | CANTEEN SALES | 51026166229 | 000 | | - | $103.60 | $24,349.46 |
| 03/07/16 | 149 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $24,348.46 |
| 03/08/16 | 091 | CANTEEN SALES | 51026160307 | 000 | | - | $93.44 | $24,055.42 |
| 03/08/16 | 112 | INDIVIDUAL CHEC | 0612896 | 000 | RETURAN PRIMUS | + | $2,450.00 | $21,405.42 |
| 03/09/16 | 091 | CANTEEN SALES | 51020160308 | 000 | | - | $6.33 | $21,399.09 |
| 03/14/16 | 147 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $21,398.09 |
| 03/15/16 | 091 | CANTEEN SALES | 51020160314 | 000 | | - | $99.64 | $21,298.45 |
| 03/21/16 | 145 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.99 | $21,297.46 |
| 03/22/16 | 091 | CANTEEN SALES | 51020160321 | 000 | | - | $62.44 | $21,235.02 |
| 03/23/16 | 091 | CANTEEN SALES | 51020160322 | 000 | | - | $36.80 | $21,198.22 |
| 03/28/16 | 145 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.99 | $21,197.23 |
| 03/29/16 | 091 | CANTEEN SALES | 51020160328 | 000 | | - | $88.19 | $21,109.14 |
| 03/30/16 | 091 | CANTEEN SALES | 51020160329 | 000 | | - | $11.07 | $21,098.06 |
| 04/04/16 | 147 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.99 | $21,097.07 |
| 04/05/16 | 091 | CANTEEN SALES | 51020160404 | 000 | | - | $85.63 | $21,011.44 |
| 04/08/16 | 091 | CANTEEN SALES | 51020160407 | 000 | | - | $14.29 | $20,997.15 |
| 04/11/16 | 147 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $20,996.15 |
| 04/12/16 | 091 | CANTEEN SALES | 51020160411 | 000 | | - | $93.15 | $20,903.00 |
| 04/13/16 | 126 | INDIVIDUAL CHEC | 0600916 | 000 | TERRA RUMP | -( | $175.00) | $21,078.00 |
| 04/14/16 | 089 | CANTEEN SALES | 51020160413 | 000 | | - | $6.73 | $21,071.27 |
| 04/18/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $21,070.27 |
| 04/19/16 | 091 | CANTEEN SALES | 51020160418 | 000 | | - | $99.99 | $20,970.28 |
| 04/25/16 | 145 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $20,969.28 |
| 04/26/16 | 091 | CANTEEN SALES | 51020160425 | 000 | | - | $76.19 | $20,893.09 |
| 04/27/16 | 103 | INDIVIDUAL CHEC | 0630250 | 000 | PERPALL, ETHEL | + | $450.00 | $21,443.09 |
| 04/27/16 | 091 | CANTEEN SALES | 51020160427 | 000 | | - | $16.09 | $21,427.00 |
| 04/28/16 | 119 | INDIVIDUAL CHEC | 0616389 | 000 | BROWN, REGINAL | + | $1,500.00 | $18,927.00 |
| 04/28/16 | 119 | INDIVIDUAL CHEC | 0616360 | 000 | BROWN, REGINAL | + | $2,100.00 | $16,837.00 |
| 05/02/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $7.70 | $16,819.30 |
| 05/03/16 | 091 | CANTEEN SALES | 51020160502 | 000 | | - | $93.24 | $16,739.06 |
| 05/09/16 | 089 | CANTEEN SALES | 51020160505 | 000 | | - | $6.70 | $16,740.36 |
| 05/09/16 | 147 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $16,757.36 |
| 05/10/16 | 091 | CANTEEN SALES | 51020160509 | 000 | | - | $50.83 | $16,638.54 |
| 05/11/16 | 091 | CANTEEN SALES | 51020160510 | 000 | | - | $6.12 | $16,632.41 |
| 05/12/16 | 091 | CANTEEN SALES | 51020160511 | 000 | | - | $20.89 | $16,631.52 |
| 05/16/16 | 091 | CANTEEN SALES | 51020160513 | 000 | | - | $14.00 | $16,617.44 |
| 05/16/16 | 145 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $16,616.44 |
| 05/16/16 | 370 | ACCESS CATALOG | 3510 | 000 | | - | $109.38 | $16,507.16 |
| 05/17/16 | 091 | CANTEEN SALES | 51020160516 | 000 | | - | $60.08 | $16,447.08 |
| 05/18/16 | 091 | CANTEEN SALES | 51020160517 | 000 | | - | $28.44 | $16,418.64 |
| 05/23/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $11.68 | $16,407.16 |
| 05/23/16 | 091 | CANTEEN SALES | 51020160520 | 000 | | - | $1.00 | $16,406.16 |
| 05/24/16 | 091 | CANTEEN SALES | 51020160523 | 000 | | - | $61.90 | $16,344.26 |
| 05/24/16 | 126 | INDIVIDUAL CHEC | 0618093 | 000 | SYLVIA BURDMAN | + | $200.00 | $16,044.26 |

```
I8SR160 (74)                      FLORIDA DEPARTMENT OF CORRECTIONS              04/28/20
                                    TRUST FUND ACCOUNT STATEMENT                 11:26:37
                                 FOR: 01/01/2015 - 04/28/2020                    PAGE    33

ACCT NAME: PAULCIN, PROPHET        ACCT#: M11537
          EED: M1163S              TYPE: INMATE TRUST
          PO BOX:
```

| POSTED DATE | MSR | TYPE | REFERENCE NUMBER | FAC | REMITTER/PAYEE | +/- | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 05/25/16 | 103 | INDIVIDUAL CHEC | 0618181 | 000 | LAFARAN PEARSON | + | $555.00 | $15,489.26 |
| 05/25/16 | 107 | INDIVIDUAL CHEC | 0618182 | 000 | TAREEA WILSON | + | $2,400.00 | $13,089.26 |
| 05/26/16 | 091 | CANTEEN SALES | 51020160525 | 000 | | - | $38.07 | $13,051.19 |
| 05/30/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.10 | $13,050.09 |
| 05/31/16 | 091 | CANTEEN SALES | 51020160530 | 000 | | - | $99.58 | $12,950.61 |
| 06/06/16 | 145 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $12,949.61 |
| 06/07/16 | 091 | CANTEEN SALES | 51020160636 | 000 | | - | $96.07 | $12,853.54 |
| 06/07/16 | 219 | MEDICAL CO-PAY | 0606161330DO | 000 | | - | $5.00 | $12,848.54 |
| 06/09/16 | 091 | CANTEEN SALES | 51020160608 | 000 | | - | $3.19 | $12,845.35 |
| 06/11/16 | 091 | CANTEEN SALES | 51020160610 | 000 | | - | $0.72 | $12,845.33 |
| 06/13/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.99 | $12,844.34 |
| 06/14/16 | 091 | CANTEEN SALES | 51020160613 | 000 | | - | $58.74 | $12,785.60 |
| 06/14/16 | 091 | CANTEEN SALES | 51020160614 | 000 | | - | $33.93 | $12,763.47 |
| 06/16/16 | 091 | CANTEEN SALES | 51020160615 | 000 | | - | $15.68 | $12,745.99 |
| 06/20/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.98 | $12,745.01 |
| 06/24/16 | 103 | INDIVIDUAL CHEC | 0619880 | 000 | HILDA GOMEZ | + | $1,000.00 | $11,745.01 |
| 07/01/16 | 091 | CANTEEN SALES | 51020160630 | 000 | | - | $96.15 | $11,648.86 |
| 07/02/16 | 091 | CANTEEN SALES | 51020160701 | 000 | | - | $12.57 | $11,636.29 |
| 07/03/16 | 091 | CANTEEN SALES | 51020160702 | 000 | | - | $3.10 | $11,633.19 |
| 07/04/16 | 091 | CANTEEN SALES | 51020160703 | 000 | | - | $7.80 | $11,645.33 |
| 07/06/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $11,644.31 |
| 07/05/16 | 091 | CANTEEN SALES | 51020160704 | 000 | | - | $92.54 | $11,593.77 |
| 07/07/16 | 089 | CANTEEN SALES | 51020160706 | 000 | | - | $40.99 | $11,552.78 |
| 07/08/16 | 091 | CANTEEN SALES | 51020160707 | 000 | | - | $8.46 | $11,544.32 |
| 07/11/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $11,543.32 |
| 07/12/16 | 091 | CANTEEN SALES | 51020160711 | 000 | | - | $99.07 | $11,444.25 |
| 07/15/16 | 103 | INDIVIDUAL CHEC | 0631242 | 000 | TRAVIS DAVIS | + | $2,500.00 | $8,944.25 |
| 07/18/16 | 103 | INDIVIDUAL CHEC | 0631243 | 000 | LISA MACK | + | $1,650.00 | $7,294.25 |
| 07/18/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.59 | $7,293.26 |
| 07/19/16 | 091 | CANTEEN SALES | 51020160718 | 000 | | - | $58.57 | $7,234.69 |
| 07/20/16 | 091 | CANTEEN SALES | 51020160719 | 000 | | - | $31.51 | $7,203.18 |
| 07/25/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $9.73 | $7,193.45 |
| 07/26/16 | 129 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $7,192.45 |
| 07/26/16 | 091 | CANTEEN SALES | 51020160725 | 000 | | - | $50.50 | $7,141.95 |
| 07/28/16 | 091 | CANTEEN SALES | 51020160727 | 000 | | - | $24.32 | $7,117.63 |
| 07/29/16 | 091 | CANTEEN SALES | 51020160728 | 000 | | - | $10.40 | $7,107.63 |
| 07/30/16 | 091 | CANTEEN SALES | 51020160729 | 000 | | - | $14.16 | $7,092.87 |
| 08/03/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.80 | $7,091.07 |
| 08/03/16 | 091 | CANTEEN SALES | 51020160801 | 000 | | - | $67.01 | $7,024.67 |
| 08/04/16 | 091 | CANTEEN SALES | 51020160802 | 000 | | - | $15.92 | $7,008.55 |
| 08/06/16 | 091 | CANTEEN SALES | 51020160805 | 000 | | - | $16.66 | $6,991.89 |
| 08/08/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $6,990.89 |
| 08/09/16 | 091 | CANTEEN SALES | 51020160808 | 000 | | - | $36.78 | $6,964.11 |
| 08/10/16 | 091 | CANTEEN SALES | 51020160809 | 000 | | - | $14.63 | $6,949.48 |
| 08/12/16 | 091 | CANTEEN SALES | 51020160811 | 000 | | - | $36.21 | $6,913.27 |

```
IBER140 (74)                          FLORIDA DEPARTMENT OF CORRECTIONS           04/28/20
                                        TRUST FUND ACCOUNT STATEMENT            11:28:37
                                      FOR: 01/01/2015 - 04/28/2020               PAGE  34

ACCT NAME: PAULCIN, PROPHET        ACCT#: W11537
     BED: M11638                   TYPE: INMATE TRUST
     PO BOX:
```

| POSTED DATE | NBR | TYPE | REFERENCE NUMBER | FAC | REMITTER/PAYEE | +/- | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 08/15/16 | 091 | CANTEEN SALES | 51020160414 | 000 | | - | $14.16 | $6,899.11 |
| 08/15/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.92 | $6,898.19 |
| 08/16/16 | 091 | CANTEEN SALES | 51020160815 | 000 | | - | $41.32 | $6,856.87 |
| 08/16/16 | 295 | ACCESS CATALOG | 3510 | 000 | | - | $26.75 | $6,832.12 |
| 08/17/16 | 091 | CANTEEN SALES | 51020160816 | 000 | | - | $52.53 | $6,777.59 |
| 08/18/16 | 091 | CANTEEN SALES | 51020160817 | 000 | | - | $3.12 | $6,774.47 |
| 08/19/16 | 091 | CANTEEN SALES | 51020160818 | 000 | | - | $3.02 | $6,771.45 |
| 08/22/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $6,770.45 |
| 08/22/16 | 091 | CANTEEN SALES | 51020160822 | 000 | | - | $61.42 | $6,709.03 |
| 08/23/16 | 175 | INDIVIDUAL CHEC | 0623597 | 000 | DAVID MADERA | - | $1,400.00 | $5,309.03 |
| 08/23/16 | 175 | INDIVIDUAL CHEC | 0623598 | 000 | LISA MACK | - | $2,150.00 | $3,159.03 |
| 08/24/16 | 091 | CANTEEN SALES | 51020160823 | 000 | | - | $31.19 | $3,127.84 |
| 08/24/16 | 091 | CANTEEN SALES | 51020160825 | 000 | | - | $6.13 | $3,121.71 |
| 08/27/16 | 091 | CANTEEN SALES | 51020160826 | 000 | | - | $1.00 | $3,120.71 |
| 08/29/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $3,119.71 |
| 08/30/16 | 091 | CANTEEN SALES | 51020160829 | 000 | | - | $71.45 | $3,048.26 |
| 08/31/16 | 091 | CANTEEN SALES | 51020160830 | 000 | | - | $25.98 | $3,022.28 |
| 09/02/16 | 091 | CANTEEN SALES | 51020160831 | 000 | | - | $2.04 | $3,020.24 |
| 09/05/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.99 | $3,019.25 |
| 09/06/16 | 091 | CANTEEN SALES | 51020160905 | 000 | | - | $55.24 | $2,964.01 |
| 09/07/16 | 091 | CANTEEN SALES | 51020160906 | 000 | | - | $43.85 | $2,920.16 |
| 09/12/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.99 | $2,919.17 |
| 09/13/16 | 091 | CANTEEN SALES | 51020160912 | 000 | | - | $81.17 | $2,838.00 |
| 09/15/16 | 091 | CANTEEN SALES | 51020160914 | 000 | | - | $18.79 | $2,819.21 |
| 09/19/16 | 141 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $2,818.21 |
| 09/20/16 | 091 | CANTEEN SALES | 51020160919 | 000 | | - | $37.91 | $2,780.30 |
| 09/21/16 | 091 | CANTEEN SALES | 51020160920 | 000 | | - | $29.93 | $2,750.37 |
| 09/23/16 | 091 | CANTEEN SALES | 51020160922 | 000 | | - | $16.91 | $2,735.46 |
| 09/24/16 | 091 | CANTEEN SALES | 51020160923 | 000 | | - | $26.36 | $2,719.10 |
| 09/26/16 | 141 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.99 | $2,718.11 |
| 09/27/16 | 091 | CANTEEN SALES | 51020160926 | 000 | | - | $49.58 | $2,668.53 |
| 09/27/16 | 212 | INDIVIDUAL CHEC | 0625665 | 000 | WILLIE JONES | - | $630.00 | $2,038.53 |
| 09/28/16 | 091 | CANTEEN SALES | 51020160927 | 000 | | - | $50.22 | $1,988.31 |
| 10/03/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $1,987.31 |
| 10/05/16 | 091 | CANTEEN SALES | 51020161004 | 000 | | - | $96.15 | $1,891.16 |
| 10/09/16 | 087 | CANTEEN SALES | 51020161008 | 000 | | - | $3.67 | $1,887.49 |
| 10/10/16 | 139 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $1,886.49 |
| 10/11/16 | 091 | CANTEEN SALES | 51020161010 | 000 | | - | $99.14 | $1,787.35 |
| 10/17/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.99 | $1,786.36 |
| 10/18/16 | 091 | CANTEEN SALES | 51020161017 | 000 | | - | $99.38 | $1,686.98 |
| 10/24/16 | 091 | CANTEEN SALES | 51020161023 | 000 | | - | $0.60 | $1,686.38 |
| 10/24/16 | 141 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $1,685.38 |
| 10/25/16 | 091 | CANTEEN SALES | 51020161024 | 000 | | - | $100.00 | $1,585.38 |
| 10/28/16 | 104 | INDIVIDUAL CHEC | 0627407 | 000 | GLOBAL LIONS MINISTRIES I | - | $1,000.00 | $585.38 |
| 10/31/16 | 139 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $584.38 |

```
IBER140 (74)                          FLORIDA DEPARTMENT OF CORRECTIONS           04/28/20
                                        TRUST FUND ACCOUNT STATEMENT            11:28:37
                                      FOR: 01/01/2015 -04/28/2020                PAGE  35

ACCT NAME: PAULCIN, PROPHET        ACCT#: W11537
     BED: M11635                   TYPE: INMATE TRUST
     PO BOX:
```

| POSTED DATE | NBR | TYPE | REFERENCE NUMBER | FAC | REMITTER/PAYEE | +/- | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 11/01/16 | 091 | CANTEEN SALES | 53020161031 | 000 | | - | $99.49 | $484.89 |
| 11/07/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.99 | $483.90 |
| 11/08/16 | 091 | CANTEEN SALES | 51020161107 | 020 | | - | $85.87 | $398.03 |
| 11/10/16 | 091 | CANTEEN SALES | 51020161109 | 030 | | - | $14.12 | $383.91 |
| 11/14/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $382.91 |
| 11/17/16 | 091 | CANTEEN SALES | 51020161116 | 000 | | - | $100.00 | $282.91 |
| 11/21/16 | 139 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $281.91 |
| 11/22/16 | 091 | CANTEEN SALES | 51020161121 | 000 | | - | $99.91 | $182.00 |
| 11/28/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $181.00 |
| 11/30/16 | 091 | CANTEEN SALES | 51020161129 | 000 | | - | $45.27 | $135.73 |
| 12/02/16 | 091 | CANTEEN SALES | 51020161201 | 000 | | - | $44.91 | $90.82 |
| 12/04/16 | 091 | CANTEEN SALES | 51020161203 | 000 | | - | $9.81 | $81.01 |
| 12/05/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $1.00 | $80.01 |
| 12/15/16 | 091 | CANTEEN SALES | 51020161214 | 000 | | - | $17.56 | $62.45 |
| 12/19/16 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.18 | $62.27 |
| 12/30/16 | 091 | CANTEEN SALES | 51020161229 | 000 | | - | $22.27 | $40.00 |
| 01/02/17 | 149 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.22 | $39.79 |
| 01/05/17 | 198 | MEDICAL CO-PAY | 1230161420SC | 000 | | - | $0.00 | $39.79 |
| | | LIEN CREATED | - 01/05/2017 | 1230161420SC | | | | |
| 01/13/17 | 091 | CANTEEN SALES | 51020170112 | 000 | | - | $24.39 | $15.39 |
| 01/16/17 | 145 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.24 | $15.15 |
| 01/26/17 | 091 | CANTEEN SALES | 51020170125 | 000 | | - | $15.15 | $0.00 |
| 01/30/17 | 141 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $0.00 | $0.00 |
| | | LIEN CREATED | - 01/30/2017 | 20170130 | | | | |
| 02/11/17 | 091 | CANTEEN SALES | 51020170210 | 000 | | -1 | $17.56 | $17.56 |
| 02/19/17 | 083 | CANTEEN SALES | 43020170210 | 000 | | - | $11.38 | $6.18 |
| 02/20/17 | 143 | PROCESSING FEE | WEEKLY DRAW | 000 | | - | $6.11 | $6.07 |
| 02/24/17 | 091 | CANTEEN SALES | 43020170223 | 000 | | - | $6.06 | $0.01 |
| 02/27/17 | 145 | LIEN PAYMENT | WEEKLY DRAW | 000 | | - | $0.01 | $0.00 |
| | | PROCESSING FEE | - 02/27/2017 | 20170227 | | | | |
| 03/01/17 | 302 | JPAY DEPOSIT | 69442849 | 000 | JEAN, JEANETTE | + | $50.00 | $50.00 |
| 03/01/17 | 303 | LIEN PAYMENT | 03013732Q410 | 000 | | - | $0.15 | $49.85 |
| | | PROCESSING FEE | - 03/30/2017 | 20170136 | | | | |
| 03/03/17 | 303 | LIEN PAYMENT | 03013732Q410 | 000 | | - | $0.05 | $49.80 |
| | | PROCESSING FEE | - 02/27/2017 | 20170227 | | | | |
| 03/01/17 | 303 | LIEN PAYMENT | 03013732Q410 | 000 | | - | $5.00 | $44.80 |
| | | MEDICAL CO-PAY | - 01/05/2017 | 1230161420SC | | | | |
| 03/03/17 | 083 | CANTEEN SALES | 43020170302 | 000 | | - | $44.74 | $0.06 |
| 03/06/17 | 151 | LIEN PAYMENT | WEEKLY DRAW | 000 | | - | $0.06 | $0.00 |
| | | PROCESSING FEE | - 03/06/2017 | 20170306 | | | | |
| 05/03/17 | 179 | LEGAL POSTAGE W | 2017051201 | 000 | | - | $0.00 | $0.00 |
| | | LIEN CREATED | - 05/03/2017 | 2017050201 | | | | |
| 05/22/17 | 190 | LEGAL POSTAGE W | 2017051801 | 000 | | - | $0.00 | $0.00 |
| | | LIEN CREATED | - 05/22/2017 | 2017051801 | | | | |
| 05/22/17 | 190 | LEGAL POSTAGE W | 2017051802 | 000 | | - | $0.00 | $0.00 |
| | | LIEN CREATED | - 05/22/2017 | 2017051802 | | | | |

FLORIDA DEPARTMENT OF CORRECTIONS

■ ■ W11537                                    ■ ■ ■ DLEGDB2
NAME: PAULCIN, PROPHET              DOC NO: W11537     STATUS: ACTIVE

```
**------------------------------------------------------------------**
               OVERALL INMATE RECORD AS OF 07/10/19       TIME: 15:52
*------------------------------------------------------------------*
```

THE FOLLOWING INFORMATION IS FROM THE RECORD OF THE INMATE NAMED ABOVE.
SOME DATA AS WELL AS RELEASE DATE(S) ARE SUBJECT TO CHANGE WITH THE
AWARD OF AND/OR FORFEITURE OF GAIN TIME OR PROVISIONAL CREDITS OR WITH
A CHANGE IN SENTENCE STRUCTURE OR INMATE STATUS.

LOCATION: 205-FLORIDA STATE PRISON      PROVISIONAL RELEASE DATE: NO CREDITS
OVERALL TERM: 45 YRS 0MOS  0DAYS        TENTATIVE RELEASE DATE:  11/24/2039
CUSTODY GR: CLOSE     SINCE: 01/21/00   LAST PROV.AWARD:  0 DAYS ON  / /
DATE OF BIRTH: 06/12/80 SEX: MALE       LAST GAIN TIME:   2 DAYS ON 05/31/19
BIRTHPLACE: FLORIDA     HT: 6' 0"       RACE: BLACK      EYES: BROWN
SOC.SEC.NO.:                            FBI NO:          FDLE:
FILE IMAGING: COMPLETE RECORD IMAGED

THE FOLLOWING DATES ARE SET BY THE FLORIDA COMMISSION ON OFFENDER REVIEW.
QUESTIONS ABOUT THESE DATES SHOULD BE DIRECTED TO THAT AGENCY AT (850)488-1655.
CONTROL RELEASE DATE:  / /          PRESUMPTIVE PAROLE DATE: 99/99/9999

```
**------------------------------------------------------------------**
               INMATE SENTENCES AS OF 07/10/19            TIME: 15:52
*------------------------------------------------------------------*
```

THE CURRENT INMATE RECORD IS COMPRISED OF CONCURRENT AND/OR CONSECUTIVE
SENTENCES WHICH ARE COMBINED TO ESTABLISH THE OVERALL TERM.

```
              --- CURRENT INCARCERATION ---
IMPOSED     COUNTY     CASE NO.     OFFENSE            YRS MO DY
--------    ------     --------     -------            --------
08/20/99  PALM BEACH   50-9711143  ROBB. GUN OR DEADLY  30  0  0
   SPEC.PROV.: FIREARM;PAROLE INEL              MAND:  3 YRS.
   SENTENCING GUIDELINES OFFENSE LEVEL: 09
   85% MINIMUM RELEASE DATE: 04/26/2023
08/20/99  PALM BEACH   50-9711143  ROBB. GUN OR DEADLY  30  0  0
   SPEC.PROV.: FIREARM;PAROLE INEL              MAND:  3 YRS.
   SENTENCING GUIDELINES OFFENSE LEVEL: 09
   85% MINIMUM RELEASE DATE: 04/26/2023
08/20/99  PALM BEACH   50-9711143  ROBB. GUN OR DEADLY  30  0  0
   SPEC.PROV.: FIREARM;PAROLE INEL              MAND:  3 YRS.
   SENTENCING GUIDELINES OFFENSE LEVEL: 09
   85% MINIMUM RELEASE DATE: 04/26/2023
08/20/99  PALM BEACH   50-9711143  ROBB. GUN OR DEADLY  30  0  0
   SPEC.PROV.: FIREARM;PAROLE INEL              MAND:  3 YRS.
   SENTENCING GUIDELINES OFFENSE LEVEL: 09
```

                          PAGE: 1

```
   85% MINIMUM RELEASE DATE: 04/26/2023
08/20/99  PALM BEACH   50-9711143  ROBB. GUN OR DEADLY  30  0  0
   SPEC.PROV.: FIREARM;PAROLE INEL              MAND:  3 YRS.
   SENTENCING GUIDELINES OFFENSE LEVEL: 09
   85% MINIMUM RELEASE DATE: 04/26/2023
08/20/99  PALM BEACH   50-9711143  AGG ASSLT-W/WPN NO I  5  0  0
   SPEC.PROV.: FIREARM;PAROLE INEL              MAND:  3 YRS.
   SENTENCING GUIDELINES OFFENSE LEVEL: 06
   85% MINIMUM RELEASE DATE: 01/29/2002
01/05/00  OKEECHOBEE   47-9800052  ROBB. GUN OR DEADLY  5 11  6
   SPEC.PROV.: FIREARM;PAROLE INEL              MAND:  3 YRS.
   SENTENCING GUIDELINES OFFENSE LEVEL: 09
   85% MINIMUM RELEASE DATE: 10/28/2002
   SENTENCE VACATED
08/01/06  SANTA ROSA   57-0300941  CONSTRUC.POSSESS CON 15  0  0
   SPEC.PROV.: HABIT.VIOL;PAROLE INEL           MAND: 10 YRS.
   SENTENCING GUIDELINES OFFENSE LEVEL: 03
   85% MINIMUM RELEASE DATE: 08/25/2037
08/01/06  SANTA ROSA   57-0300941  AGG.BATT.BY DETAINEE 15  0  0
   SPEC.PROV.: HABIT.VIOL;PAROLE INEL           MAND: 15 YRS.
   SENTENCING GUIDELINES OFFENSE LEVEL: 07
   85% MINIMUM RELEASE DATE: 08/25/2037
```

```
**------------------------------------------------------------------**
               INMATE DETAINERS AS OF 07/10/19           TIME: 15:52
*------------------------------------------------------------------*
```

THE FOLLOWING REFLECTS DETAINERS AGAINST THIS RECORD, AND/OR REQUESTS TO
BE NOTIFIED PRIOR TO RELEASE OF THE INMATE.

```
             --- PRIOR INCARCERATION ---
FILED    TYPE    AUTHORITY              CHARGE(S)              REMOVED
------   ----    ---------              ---------              -------
             NO DETAINER RECORDS FOUND
```

```
**------------------------------------------------------------------**
       INMATE MOVEMENT/TRANSFER HISTORY AS OF 07/10/19    TIME: 15:52
*------------------------------------------------------------------*
```

THE FOLLOWING ENTRIES REFLECT MOVEMENT BY THE INMATE BETWEEN DEPARTMENT
FACILITIES AS WELL AS RELEASES AND RETURNS FROM OUTSIDE AGENCIES.

```
             --- CURRENT INCARCERATION ---
DATE       MOVEMENT TYPE      DESTINATION/LOCATION     FROM
--------   --------------     --------------------     -----
01/13/00   NEW COMMITMENT     CFRC-MAIN                OKEECHOBEE
02/02/00   TRANSFERRED TO     CFRC-EAST                CFRC-MAIN
02/02/00   TRANSFERRED TO     CFRC-EAST                CFRC-MAIN
02/16/00   TRANSFERRED TO     HAMILTON ANNEX           CFRC-MAIN
02/18/00   TRANSFERRED TO     HAMILTON C.I.            HAMILTON ANNEX
10/26/00   TRANSFERRED TO     HAMILTON ANNEX           HAMILTON C.I.
11/14/00   TRANSFERRED TO     HAMILTON C.I.            HAMILTON ANNEX
```

                          PAGE: 2

| Date | Action | Location 1 | Location 2 |
|---|---|---|---|
| 12/15/00 | TRANSFERRED TO | BAKER C.I. | HAMILTON C.I. |
| 08/20/01 | TRANSFERRED TO | COLUMBIA C.I. | BAKER C.I. |
| 09/27/01 | OUT TO COURT | OKEECHOBEE | COLUMBIA C.I. |
| 10/10/01 | RET.FM.CRT.NO N/S | COLUMBIA C.I. | OKEECHOBEE |
| 11/14/01 | OUT TO COURT | OKEECHOBEE | COLUMBIA C.I. |
| 11/20/01 | RET.FM.CRT.NO N/S | COLUMBIA C.I. | OKEECHOBEE |
| 06/21/02 | TRANSFERRED TO | CENTURY C.I. | COLUMBIA C.I. |
| 06/21/02 | IN TRANSIT AT | R.M.C.- MAIN UNIT | COLUMBIA C.I. |
| 07/02/02 | TRANSFERRED TO | CENTURY C.I. | R.M.C.- MAIN UNIT |
| 10/21/02 | TRANSFERRED TO | SANTA ROSA C.I. | CENTURY C.I. |
| 11/19/02 | TRANSFERRED TO | MARTIN C.I. | SANTA ROSA C.I. |
| 11/19/02 | IN TRANSIT AT | OKALOOSA C.I. | SANTA ROSA C.I. |
| 11/20/02 | TRANSFERRED TO | MARTIN C.I. | OKALOOSA C.I. |
| 11/20/02 | IN TRANSIT AT | R.M.C.- MAIN UNIT | OKALOOSA C.I. |
| 11/21/02 | TRANSFERRED TO | MARTIN C.I. | R.M.C.- MAIN UNIT |
| 11/21/02 | IN TRANSIT AT | S.F.R.C. | R.M.C.- MAIN UNIT |
| 11/26/02 | TRANSFERRED TO | MARTIN C.I. | S.F.R.C. |
| 12/17/02 | TRANSFERRED TO | SANTA ROSA C.I. | MARTIN C.I. |
| 12/17/02 | IN TRANSIT AT | S.F.R.C. | MARTIN C.I. |
| 12/19/02 | TRANSFERRED TO | SANTA ROSA C.I. | S.F.R.C. |
| 12/19/02 | IN TRANSIT AT | R.M.C.- MAIN UNIT | S.F.R.C. |
| 12/23/02 | TRANSFERRED TO | SANTA ROSA C.I. | R.M.C.- MAIN UNIT |
| 10/27/03 | OUT TO COURT | SANTA ROSA C.I. | SANTA ROSA |
| 10/27/03 | RET.FM.CRT.NO N/S | SANTA ROSA C.I. | SANTA ROSA |
| 03/03/04 | OUT TO COURT | SANTA ROSA | SANTA ROSA C.I. |
| 03/04/04 | RET.FM.CRT.NO N/S | SANTA ROSA C.I. | SANTA ROSA |
| 04/08/04 | OUT TO COURT | SANTA ROSA | SANTA ROSA C.I. |
| 09/07/04 | RET.FM.CRT.NO N/S | SANTA ROSA C.I. | SANTA ROSA |
| 12/16/04 | OUT TO COURT | SANTA ROSA | SANTA ROSA C.I. |
| 01/09/06 | RET.FM.CRT.NO N/S | SANTA ROSA C.I. | SANTA ROSA |
| 03/16/06 | OUT TO COURT | SANTA ROSA | SANTA ROSA C.I. |
| 06/22/06 | OUT TO COURT | SANTA ROSA | SANTA ROSA C.I. |
| 06/22/06 | RET.FM.CRT.NO N/S | SANTA ROSA C.I. | SANTA ROSA |
| 08/01/06 | OUT TO COURT | SANTA ROSA | SANTA ROSA C.I. |
| 08/09/06 | RET.FM.CRT.N/S | R.M.C.- MAIN UNIT | SANTA ROSA |
| 09/05/06 | TRANSFERRED TO | SANTA ROSA C.I. | R.M.C.- MAIN UNIT |
| 09/18/07 | TRANSFERRED TO | SANTA ROSA ANNEX | SANTA ROSA C.I. |
| 09/18/07 | TRANSFERRED TO | OKALOOSA C.I. | SANTA ROSA ANNEX |
| 11/14/07 | TRANSFERRED TO | FRANKLIN C.I. | OKALOOSA C.I. |
| 11/14/07 | IN TRANSIT AT | NWFRC ANNEX | OKALOOSA C.I. |
| 11/14/07 | TRANSFERRED TO | FRANKLIN ANNEX | NWFRC ANNEX |
| 03/07/08 | TRANSFERRED TO | SANTA ROSA ANNEX | FRANKLIN C.I. |
| 03/07/08 | TRANSFERRED TO | SANTA ROSA ANNEX | SANTA ROSA ANNEX |
| 11/21/08 | OUT TO COURT | SANTA ROSA C.I. | SANTA ROSA C.I. |
| 11/21/08 | OUT TO COURT | SANTA ROSA C.I. | SANTA ROSA C.I. |
| 11/21/08 | RET.FM.CRT.NO N/S | SANTA ROSA C.I. | SANTA ROSA |
| 01/19/10 | TRANSFERRED TO | SANTA ROSA ANNEX | SANTA ROSA C.I. |
| 01/19/10 | TRANSFERRED TO | R.M.C.- MAIN UNIT | SANTA ROSA ANNEX |
| 01/19/10 | IN TRANSIT AT | NWFRC ANNEX | SANTA ROSA ANNEX |
| 01/20/10 | TRANSFERRED TO | R.M.C.- MAIN UNIT | NWFRC ANNEX |
| 03/09/10 | TRANSFERRED TO | SANTA ROSA ANNEX | R.M.C.- MAIN UNIT |
| 03/09/10 | IN TRANSIT AT | NWFRC ANNEX | R.M.C.- MAIN UNIT |
| 03/11/10 | TRANSFERRED TO | SANTA ROSA ANNEX | NWFRC ANNEX |

PAGE:  3

| Date | Action | Location 1 | Location 2 |
|---|---|---|---|
| 03/11/10 | TRANSFERRED TO | SANTA ROSA C.I. | SANTA ROSA ANNEX |
| 05/03/10 | TRANSFERRED TO | SANTA ROSA ANNEX | SANTA ROSA ANNEX |
| 05/03/10 | TRANSFERRED TO | FLORIDA STATE PRISON | SANTA ROSA ANNEX |
| 06/14/10 | TRANSFERRED TO | UNION C.I. | FLORIDA STATE PRISON |
| 06/25/10 | TRANSFERRED TO | FLORIDA STATE PRISON | UNION C.I. |
| 04/05/11 | TRANSFERRED TO | UNION C.I. | FLORIDA STATE PRISON |
| 10/31/11 | TRANSFERRED TO | FLORIDA STATE PRISON | UNION C.I. |
| 11/04/11 | TRANSFERRED TO | UNION C.I. | FLORIDA STATE PRISON |
| 01/13/12 | TRANSFERRED TO | R.M.C.- MAIN UNIT | UNION C.I. |
| 02/03/12 | TRANSFERRED TO | UNION C.I. | R.M.C.- MAIN UNIT |
| 03/03/13 | OUT TO COURT | PALM BEACH | UNION C.I. |
| 02/02/14 | RET.FM.CRT.NO N/S | UNION C.I. | PALM BEACH |
| 05/14/14 | TRANSFERRED TO | SUWANNEE C.I | SUWANNEE C.I |
| 11/01/14 | OUT TO COURT | PALM BEACH | SUWANNEE C.I |
| 11/13/14 | RET.FM.CRT.NO N/S | SUWANNEE C.I. | PALM BEACH |
| 05/27/15 | TRANSFERRED TO | CHARLOTTE C.I. | SUWANNEE C.I |
| 05/27/15 | IN TRANSIT AT | R.M.C.- MAIN UNIT | SUWANNEE C.I |
| 05/28/15 | TRANSFERRED TO | CHARLOTTE C.I. | R.M.C.- MAIN UNIT |
| 05/28/15 | IN TRANSIT AT | S.F.R.C. | R.M.C.- MAIN UNIT |
| 06/02/15 | TRANSFERRED TO | CHARLOTTE C.I. | S.F.R.C. |
| 02/14/17 | TRANSFERRED TO | MARTIN C.I. | CHARLOTTE C.I. |
| 02/14/17 | IN TRANSIT AT | S.F.R.C. | CHARLOTTE C.I. |
| 02/15/17 | TRANSFERRED TO | MARTIN C.I. | S.F.R.C. |
| 04/24/17 | TRANSFERRED TO | CHARLOTTE C.I. | MARTIN C.I. |
| 05/08/17 | TRANSFERRED TO | DADE C.I. | CHARLOTTE C.I. |
| 07/27/17 | TRANSFERRED TO | MARTIN C.I. | DADE C.I. |
| 07/27/17 | IN TRANSIT AT | S.F.R.C. | DADE C.I. |
| 08/02/17 | TRANSFERRED TO | MARTIN C.I. | S.F.R.C. |
| 10/04/17 | TRANSFERRED TO | LAKE C.I. | MARTIN C.I. |
| 10/04/17 | IN TRANSIT AT | S.F.R.C. | MARTIN C.I. |
| 10/05/17 | TRANSFERRED TO | LAKE C.I. | S.F.R.C. |
| 10/05/17 | IN TRANSIT AT | CFRC-MAIN | S.F.R.C. |
| 10/09/17 | TRANSFERRED TO | LAKE C.I. | CFRC-MAIN |
| 12/08/17 | TRANSFERRED TO | CHARLOTTE C.I. | LAKE C.I. |
| 01/16/18 | TRANSFERRED TO | LAKE C.I. | CHARLOTTE C.I. |
| 01/16/18 | IN TRANSIT AT | S.F.R.C. | CHARLOTTE C.I. |
| 01/18/18 | TRANSFERRED TO | LAKE C.I. | S.F.R.C. |
| 01/18/18 | IN TRANSIT AT | CFRC-MAIN | S.F.R.C. |
| 01/25/18 | TRANSFERRED TO | CHARLOTTE C.I. | CFRC-MAIN |
| 02/15/18 | TRANSFERRED TO | LAKE C.I. | CHARLOTTE C.I. |
| 02/20/18 | TRANSFERRED TO | WAKULLA ANNEX | LAKE C.I. |
| 05/25/18 | TRANSFERRED TO | WAKULLA ANNEX | WAKULLA ANNEX |
| 05/29/18 | TRANSFERRED TO | WAKULLA ANNEX | WAKULLA C.I. |
| 06/25/18 | TRANSFERRED TO | R.M.C.- MAIN UNIT | WAKULLA ANNEX |
| 07/16/18 | TRANSFERRED TO | WAKULLA ANNEX | R.M.C.- MAIN UNIT |
| 12/27/18 | TRANSFERRED TO | WAKULLA C.I. | WAKULLA ANNEX |
| 12/31/18 | TRANSFERRED TO | WAKULLA ANNEX | WAKULLA C.I. |
| 05/10/19 | TRANSFERRED TO | FLORIDA STATE PRISON | WAKULLA ANNEX |

PAGE:  4

```
*-----------------------------------------------------------------*
|        INMATE DISCIPLINARY ACTIONS AS OF 07/10/19      TIME: 15:52 |
*-----------------------------------------------------------------*

THE FOLLOWING ENTRIES REFLECT DISCIPLINARY ACTIONS AGAINST THE INMATE
FOR VIOLATION OF THE RULE CITED AND INDICATE THE GAIN TIME DAYS LOST.

                    --- CURRENT INCARCERATION ---
DATE      DAYS      VIOLATION                    LOCATION
------    ----      ---------                    --------
06/11/00   0    DISOBEY REGULATIONS          HAMILTON C.I.
06/17/00   0    FIGHTING                     HAMILTON C.I.
07/09/00   0    DISORDERLY CONDUCT           HAMILTON C.I.
08/18/00   0    FIGHTING                     HAMILTON C.I.
10/26/00   0    UNARMED ASSAULT              HAMILTON C.I.
12/14/00   0    DISOBEYING ORDER             HAMILTON C.I.
12/14/00   0    DISORDERLY CONDUCT           HAMILTON C.I.
01/29/01   0    DISRESP.TO OFFICIALS         BAKER C.I.
02/17/02  12    BEING IN UNAUTH AREA         COLUMBIA C.I.
02/17/02  30    DISOBEYING ORDER             COLUMBIA C.I.
07/31/02  28    FIGHTING                     CENTURY C.I.
09/08/02   8    DISOBEYING ORDER             CENTURY C.I.
09/08/02   0    FEIGNING ILLNESS OR          CENTURY C.I.
09/08/02   0    LYING TO STAFF               CENTURY C.I.
10/01/02   0    LYING TO STAFF               CENTURY C.I.
10/05/02   0    DISORDERLY CONDUCT           CENTURY C.I.
12/23/02   0    LYING TO STAFF               SANTA ROSA C.I.
12/31/02   0    UNARMED ASSAULT              SANTA ROSA C.I.
01/29/03   0    ASSAULTS OR ATTEMP           SANTA ROSA C.I.
10/28/03   4    DISORDERLY CONDUCT           SANTA ROSA C.I.
12/02/03   0    INCITING RIOTS               SANTA ROSA C.I.
12/03/03   0    DISRESP.TO OFFICIALS         SANTA ROSA C.I.
10/17/04   4    DISOBEYING ORDER             SANTA ROSA C.I.
12/12/07  15    BEING IN UNAUTH AREA         FRANKLIN C.I.
12/31/07   0    LEWD OR LASC. EXHIB.         FRANKLIN C.I.
12/31/07   0    SPOKEN THREATS               FRANKLIN C.I.
02/11/08  90    LEWD OR LASC. EXHIB.         FRANKLIN C.I.
02/26/08  11    DISRESP.TO OFFICIALS         FRANKLIN C.I.
02/26/08   0    PART.IN DISTURBANCE          FRANKLIN C.I.
05/10/08   0    DISORDERLY CONDUCT           SANTA ROSA C.I.
07/02/08   0    SPOKEN THREATS               SANTA ROSA C.I.
07/03/08   0    ASSAULT/ATT/CO               SANTA ROSA C.I.
07/10/08   0    DISOBEYING ORDER             SANTA ROSA C.I.
07/10/08   0    TAMPER W/SEC. DEVICE         SANTA ROSA C.I.
07/10/08   0    PART.IN DISTURBANCE          SANTA ROSA C.I.
08/30/08   0    DISORDERLY CONDUCT           SANTA ROSA C.I.
10/18/08   0    DISOBEYING ORDER             SANTA ROSA C.I.
04/08/09   0    DISOBEYING ORDER             SANTA ROSA C.I.
04/22/09   0    OBSCENE PROFANE ACT          SANTA ROSA C.I.
04/23/09   0    DISOBEYING ORDER             SANTA ROSA C.I.
04/23/09   0    BATTERY/ATT/CO               SANTA ROSA C.I.
05/07/09   0    DISOBEYING ORDER             SANTA ROSA C.I.
07/05/09   0    LEWD OR LASC. EXHIB.         SANTA ROSA C.I.

                        PAGE:  5
```

```
08/25/09   4    DISORDERLY CONDUCT           SANTA ROSA C.I.
12/15/09   0    LEWD OR LASC. EXHIB.         SANTA ROSA C.I.
02/18/10   0    PART.IN DISTURBANCE          R.M.C.- MAIN UNIT
02/18/10   0    DISOBEYING ORDER             R.M.C.- MAIN UNIT
02/26/10   0    DISORDERLY CONDUCT           R.M.C.- MAIN UNIT
03/03/10   0    ARSON OR ATTEMPT             R.M.C.- MAIN UNIT
03/11/10   0    POSS OF STOLEN PROP.         SANTA ROSA ANNEX
03/14/10   0    SPOKEN THREATS               SANTA ROSA C.I.
03/14/10   0    TAMPER W/SAFETY DEV          SANTA ROSA C.I.
03/14/10   0    PART.IN DISTURBANCE          SANTA ROSA C.I.
03/14/10   0    BATTERY/ATT/CO               SANTA ROSA C.I.
03/16/10   0    PART.IN DISTURBANCE          SANTA ROSA C.I.
03/16/10   0    BATTERY/ATT/CO               SANTA ROSA C.I.
03/16/10   0    DISORDERLY CONDUCT           SANTA ROSA C.I.
05/14/10   0    DISOBEYING ORDER             FLORIDA STATE PRISON
05/14/10   0    TAMPER W/SAFETY DEV          FLORIDA STATE PRISON
06/14/10   0    DISOBEYING ORDER             FLORIDA STATE PRISON
06/14/10   0    TAMPER W/SAFETY DEV          FLORIDA STATE PRISON
06/14/10   0    BATTERY/ATT/CO               FLORIDA STATE PRISON
06/14/10   0    BATTERY/ATT/CO               FLORIDA STATE PRISON
08/13/10   0    DISOBEYING ORDER             FLORIDA STATE PRISON
02/02/11   4    TAMPER W/SAFETY DEV          FLORIDA STATE PRISON
02/22/11   0    DISOBEYING ORDER             FLORIDA STATE PRISON
03/15/11   0    DISOBEYING ORDER             FLORIDA STATE PRISON
03/15/11   0    DISOBEYING ORDER             FLORIDA STATE PRISON
03/22/11   0    DISOBEYING ORDER             FLORIDA STATE PRISON
03/22/11   0    TAMPER W/SAFETY DEV          FLORIDA STATE PRISON
03/22/11   0    DISOBEYING ORDER             FLORIDA STATE PRISON
03/31/11   0    DISOBEYING ORDER             FLORIDA STATE PRISON
04/02/11   0    DISOBEYING ORDER             FLORIDA STATE PRISON
04/02/11   0    DISOBEYING ORDER             FLORIDA STATE PRISON
04/04/11   0    BATTERY/ATT/CO               FLORIDA STATE PRISON
06/01/11   0    LEWD OR LASC. EXHIB.         UNION C.I.
07/14/11   0    DEST. OF ST. PROP.           UNION C.I.
08/24/11   0    DISOBEYING ORDER             UNION C.I.
08/24/11   0    DISOBEYING ORDER             UNION C.I.
10/31/11 180    BATTERY/ATT/CO               FLORIDA STATE PRISON
10/31/11 180    BATTERY/ATT/CO               FLORIDA STATE PRISON
10/31/11   0    DISOBEYING ORDER             FLORIDA STATE PRISON
11/02/11   0    DISOBEYING ORDER             FLORIDA STATE PRISON
11/02/11   0    DISOBEYING ORDER             FLORIDA STATE PRISON
11/02/11   0    DISOBEYING ORDER             FLORIDA STATE PRISON
11/12/11   0    POSS OF CONTRABAND           UNION C.I.
11/14/11   0    DISOBEYING ORDER             UNION C.I.
11/14/11   0    POSS OF WEAPONS              UNION C.I.
11/14/11   0    POSS OF WEAPONS              UNION C.I.
03/14/12   0    LEWD OR LASC. EXHIB.         UNION C.I.
03/14/12   0    DEST. OF ST. PROP.           UNION C.I.
04/09/12   0    DISOBEYING ORDER             UNION C.I.
04/09/12   0    DISOBEYING ORDER             UNION C.I.
05/14/12   0    DEFACING STATE PROP.         UNION C.I.
05/14/12   0    PART.IN DISTURBANCE          UNION C.I.

                        PAGE:  6
```

| | | | |
|---|---|---|---|
| 05/14/12 | 0 | DISOBEYING ORDER | UNION C.I. |
| 08/23/12 | 0 | DISOBEYING ORDER | UNION C.I. |
| 09/02/12 | 90 | LEWD OR LASC. EXHIB. | UNION C.I. |
| 11/02/12 | 0 | DISOBEYING ORDER | UNION C.I. |
| 01/31/13 | 0 | DISOBEYING ORDER | UNION C.I. |
| 08/14/15 | 0 | FIGHTING | CHARLOTTE C.I. |
| 12/05/16 | 0 | UNAUTH POS CELL/WIRELESS DV | CHARLOTTE C.I. |
| 06/18/17 | 0 | SPOKEN THREATS | DADE C.I. |
| 04/02/18 | 0 | BATTERY/ATT/INMATE | WAKULLA ANNEX |
| 05/25/18 | 0 | UNAUTH USE OF DRUGS | WAKULLA ANNEX |
| 06/18/18 | 0 | FIGHTING | WAKULLA ANNEX |
| 12/22/18 | 0 | BATTERY/ATT/INMATE | WAKULLA ANNEX |
| 12/22/18 | 40 | DISOBEYING ORDER | WAKULLA ANNEX |

```
**----------------------------------------------------------------------**
       INMATE CLASSIFICATION ACTIONS AS OF 07/10/19    TIME: 15:52
*----------------------------------------------------------------------*
```

THE FOLLOWING ENTRIES REFLECT CLASSIFICATION ACTIONS TAKEN REGARDING
THE INMATE.

```
                    --- CURRENT INCARCERATION ---
DATE       TYPE      CUSTODY     LOCATION
--------   --------  ----------  ----------------
01/21/00   SCHEDULE  CLOSE       CFRC-MAIN
08/22/06   INITIAL   CLOSE       R.M.C.- MAIN UNI
```

```
**----------------------------------------------------------------------**
       CONTROL RELEASE ACTIONS AS OF 07/10/19    TIME: 15:52
*----------------------------------------------------------------------*
```

THE FOLLOWING ENTRIES REFLECT CONTROL RELEASE ACTIONS TAKEN BY THE
FLORIDA COMMISSION ON OFFENDER REVIEW FOR THIS INMATE INCLUDING ANY
ADVANCEMENTS OF THE INMATE'S CONTROL RELEASE DATE.

```
                  --- PRIOR INCARCERATION   ---
DATE              TYPE             DAYS     REASON
--------   ------------------------ ----   ----------------------
                NO CONTROL RELEASE RECORDS
```

```
**----------------------------------------------------------------------**
       OFFENDER NAMES AS OF 07/10/19    TIME: 15:52
*----------------------------------------------------------------------*
```

THE FOLLOWING ENTRIES REFLECT ALL NAMES BY WHICH THE OFFENDER IS KNOWN.

```
TYPE          NAME
----------    ------------------------
TRUE          PAULCIN, PROPHET
ALIAS         CHRIS, CHANEY
```

PAGE: 7

---

ALIAS        PAULCIN, PROFIT

```
**----------------------------------------------------------------------**
  GAIN TIME(GT)& PROVISIONAL CREDITS(PC) AS OF 07/10/19    TIME: 15:52
*----------------------------------------------------------------------*
```

THE FOLLOWING ENTRIES REFLECT ONLY THAT GT AND PC WHICH HAS BEEN USED
TO COMPUTE THE INMATE'S OVERALL RELEASE DATE.  NOT SHOWN IS GT AND PC
PREVIOUSLY EARNED THAT DOES NOT AFFECT THE RELEASE DATES DUE TO MANDATORY
TERMS, OTHER SENTENCING PROVISIONS, REVOCATIONS, OR ESCAPE CONVICTIONS.

```
                        --- CURRENT INCARCERATION ---
```

| AWARDED | TYPE | DAYS | AWARDED | TYPE | DAYS |
|---------|------|------|---------|------|------|
| 05/31/01 | STP GT | 10 | | | |
| 06/30/01 | STP GT | 10 | | | |
| 07/31/01 | STP GT | 10 | | | |
| 10/31/01 | STP GT | 10 | | | |
| 11/30/01 | STP GT | 10 | | | |
| 12/31/01 | STP GT | 10 | | | |
| 01/31/02 | STP GT | 10 | | | |
| 06/30/02 | STP GT | 8 | | | |
| 09/30/03 | STP CT | 4 | | | |
| 09/30/04 | STP GT | 4 | | | |
| 01/31/06 | STP GT | 2 | | | |
| 03/31/06 | STP GT | 4 | | | |
| 04/30/06 | STP GT | 4 | | | |
| 05/31/06 | STP GT | 4 | | | |
| 06/30/06 | STP GT | 4 | | | |
| 07/31/06 | STP GT | 4 | | | |
| 08/31/06 | STP GT | 4 | | | |
| 09/30/06 | STP GT | 4 | | | |
| 11/30/06 | STP GT | 2 | | | |
| 12/31/06 | STP GT | 4 | | | |
| 01/31/07 | STP GT | 4 | | | |
| 02/28/07 | STP GT | 2 | | | |
| 03/31/07 | STP GT | 4 | | | |
| 04/30/07 | STP GT | 4 | | | |
| 05/31/07 | STP GT | 10 | | | |
| 06/30/07 | STP GT | 10 | | | |
| 07/31/07 | STP GT | 10 | | | |
| 08/31/07 | STP GT | 10 | | | |
| 09/30/07 | STP GT | 10 | | | |
| 10/31/07 | STP GT | 6 | | | |
| 11/30/07 | STP GT | 10 | | | |
| 03/31/09 | STP GT | 4 | | | |
| 10/31/10 | STP GT | 2 | | | |
| 12/31/10 | STP GT | 2 | | | |
| 02/28/12 | STP GT | 8 | | | |
| 06/30/12 | STP GT | 8 | | | |
| 10/31/12 | STP GT | 8 | | | |
| 12/31/12 | STP GT | 6 | | | |
| 02/28/13 | STP GT | 6 | | | |
| 03/31/13 | STP GT | 8 | | | |
| 04/30/13 | STP GT | 4 | | | |

PAGE: 8

```
05/31/13   STP GT        4
06/30/13   STP GT        4
07/31/13   STP GT        4
08/31/13   STP GT        4
09/30/13   STP GT        4
10/31/13   STP GT        4
11/30/13   STP GT        4
12/31/13   STP GT        4
01/31/14   STP GT        4
02/28/14   STP GT        8
04/30/14   STP GT        8
05/31/14   STP GT        4
06/30/14   STP GT        8
07/31/14   STP GT        6
08/31/14   STP GT        8
09/30/14   STP GT        8
10/31/14   STP GT        8
11/30/14   STP GT        8
12/31/14   STP GT        8
01/31/15   STP GT        8
02/28/15   STP GT        6
03/31/15   STP GT        4
04/30/15   STP GT        6
05/31/15   STP GT        8
06/30/15   STP GT        10
07/31/15   STP GT        10
09/30/15   STP GT        10
10/31/15   STP GT        10
11/30/15   STP GT        6
12/31/15   STP GT        10
01/31/16   STP GT        10
02/28/16   STP GT        10
03/31/16   STP GT        10
04/30/16   STP GT        10
05/31/16   STP GT        10
06/30/16   STP GT        10
07/31/16   STP GT        10
08/31/16   STP GT        10
09/30/16   STP GT        10
10/31/16   STP GT        10
11/30/16   STP GT        10
01/31/17   STP GT        10
02/28/17   STP GT        10
03/31/17   STP GT        10
04/30/17   STP GT        10
05/31/17   STP GT        10
07/31/17   STP GT        10
08/31/17   STP GT        4
09/30/17   STP GT        10
10/31/17   STP GT        5
11/30/17   STP GT        10
12/31/17   STP GT        6
01/31/18   STP GT        10
02/28/18   STP GT        6
```

PAGE:  9

```
03/31/18   STP GT        10
07/31/18   STP GT        6
08/31/18   STP GT        10
09/30/18   STP GT        10
10/31/18   STP GT        10
11/30/18   STP GT        10
01/31/19   STP GT        4
02/28/19   STP GT        4
03/31/19   STP GT        4
04/30/19   STP GT        4
05/31/19   STP GT        2
```

```
**----------------------------------------------------------------**
              INTERNAL MOVEMENTS AS OF 07/10/19        TIME: 15:52
*----------------------------------------------------------------*
```

THE FOLLOWING ENTRIES REFLECT THE OFFENDER'S INTERNAL MOVEMENTS AND JOB
ASSIGNMENTS DURING INCARCERATION

```
                      --- CURRENT INCARCERATION ---
   DATE      FACILITY         HOUSING   ASSIGNMENT AM       ASSIGNMENT PM
---------- ---------------   --------  ------------------  ------------------
01/13/2000  CFRC-MAIN        F2112U    RECEPTION/ORIENT    RECEPTION/ORIENT
01/18/2000  CFRC-MAIN        E4103U    RECEPTION/ORIENT    RECEPTION/ORIENT
02/02/2000  CFRC-EAST        C1106L    RECEPTION/ORIENT    RECEPTION/ORIENT
02/02/2000  CFRC-MAIN        E4101U    RECEPTION/ORIENT    RECEPTION/ORIENT
02/16/2000  HAMILTON ANNEX   F1213L    RECEPTION/ORIENT    RECEPTION/ORIENT
02/18/2000  HAMILTON C.I.    G1121U    RECEPTION/ORIENT    RECEPTION/ORIENT
02/18/2000  HAMILTON C.I.    G1121U    INSIDE GROUNDS      INSIDE GROUNDS
02/24/2000  HAMILTON C.I.    G1121U    INSIDE GROUNDS      E15-XXXXXXXXXXXXX
06/13/2000  HAMILTON C.I.    G1121U    INSIDE GROUNDS      E15-XXXXXXXXXXXXX
06/17/2000  HAMILTON C.I.    Y2107U    CONFINEMENT-ADMI    CONFINEMENT-ADMI
06/17/2000  HAMILTON C.I.    Y2109U    CONFINEMENT-ADMI    CONFINEMENT-ADMI
06/22/2000  HAMILTON C.I.    Y1108U    CONFINEMENT-DISC    CONFINEMENT-ORIENT
06/11/2000  HAMILTON C.I.    G1117U    UNASSIGNED-OPEN     UNASSIGNED-OPEN
08/15/2000  HAMILTON C.I.    G1117U    INSIDE GROUNDS      INSIDE GROUNDS
08/18/2000  HAMILTON C.I.    Y2108U    CONFINEMENT-ADMI    CONFINEMENT-ADMI
08/23/2000  HAMILTON C.I.    Y2108U    CONFINEMENT-ADMI    CONFINEMENT-ADMI
08/24/2000  HAMILTON C.I.    Y2108U    CONFINEMENT-DISC    CONFINEMENT-DISC
09/18/2000  HAMILTON C.I.    G1117U    UNASSIGNED-OPEN     UNASSIGNED-OPEN
09/19/2000  HAMILTON C.I.    G1117U    INSIDE GROUNDS      INSIDE GROUNDS
10/24/2000  HAMILTON C.I.    G1117U    E15-XXXXXXXXXXXXX   INSIDE GROUNDS
10/26/2000  HAMILTON ANNEX   H1220L    CONFINEMENT-ADMI    CONFINEMENT-ADMI
11/02/2000  HAMILTON ANNEX   H2220L    CONFINEMENT-DISC    CONFINEMENT-DISC
11/06/2000  HAMILTON ANNEX   H2220L    CONFINEMENT-DISC    CONFINEMENT-DISC
11/07/2000  HAMILTON ANNEX   N2104S    N26-XXXXXXXXXXXXX   N26-XXXXXXXXXXXXX
11/08/2000  HAMILTON ANNEX   H2220L    CONFINEMENT-DISC    CONFINEMENT-DISC
11/14/2000  HAMILTON C.I.    Y2104U    CONFINEMENT-DISC    CONFINEMENT-DISC
11/17/2000  HAMILTON C.I.    Y1110U    CONFINEMENT-DISC    CONFINEMENT-DISC
12/12/2000  HAMILTON C.I.    Y1110U    CONFINEMENT-DISC    CONFINEMENT-DISC
12/15/2000  BAKER C.I.       G2217L    CLOSE-MANAGEMENT    CLOSE-MANAGEMENT
12/15/2000  BAKER C.I.       G2213L    CLOSE-MANAGEMENT    CLOSE-MANAGEMENT
12/18/2000  BAKER C.I.       G2222U    CONFINEMENT-DISC    CLOSE-MANAGEMENT
```

PAGE: 10

| Date | Facility | Code | Category 1 | Category 2 |
|---|---|---|---|---|
| 03/02/2001 | BAKER C.I. | G2112U | CLOSE-MANAGEMENT | CLOSE-MANAGEMENT |
| 03/28/2001 | BAKER C.I. | G2106L | CLOSE-MANAGEMENT | CLOSE-MANAGEMENT |
| 04/04/2001 | BAKER C.I. | G2112L | HOUSEMAN | CLOSE-MANAGEMENT |
| 04/24/2001 | BAKER C.I. | G2202U | HOUSEMAN | CLOSE-MANAGEMENT |
| 08/20/2001 | COLUMBIA C.I. | G1114U | CLOSE-MANAGEMENT | CLOSE-MANAGEMENT |
| 08/22/2001 | COLUMBIA C.I. | G1114U | ORDERLY-SECURITY | ORDERLY-SECURITY |
| 08/30/2001 | COLUMBIA C.I. | G1114U | RESTRICTED LABOR | RESTRICTED LABOR |
| 09/10/2001 | COLUMBIA C.I. | G4205L | RESTRICTED LABOR | RESTRICTED LABOR |
| 10/10/2001 | COLUMBIA C.I. | G1212L | RESTRICTED LABOR | RESTRICTED LABOR |
| 10/16/2001 | COLUMBIA C.I. | G4214U | RESTRICTED LABOR | RESTRICTED LABOR |
| 10/26/2001 | COLUMBIA C.I. | G4214U | RESTRICTED LABOR | RESTRICTED LABOR |
| 11/21/2001 | COLUMBIA C.I. | G4110U | RESTRICTED LABOR | RESTRICTED LABOR |
| 01/03/2002 | COLUMBIA C.I. | G4110U | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 01/03/2002 | COLUMBIA C.I. | F4112L | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 01/11/2002 | COLUMBIA C.I. | F4112L | INSIDE GROUNDS | INSIDE GROUNDS |
| 02/17/2002 | COLUMBIA C.I. | H2114S | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 02/19/2002 | COLUMBIA C.I. | Y2110L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 02/26/2002 | COLUMBIA C.I. | Y1101L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 03/12/2002 | COLUMBIA C.I. | F3207U | INSIDE GROUNDS | INSIDE GROUNDS |
| 06/21/2002 | R.M.C.- MAIN UNIT | E1120U | IN-TRANSIT | IN-TRANSIT |
| 06/21/2002 | R.M.C.- MAIN UNIT | F1108U | IN-TRANSIT | IN-TRANSIT |
| 07/02/2002 | CENTURY C.I. | A2114U | RECEPTION/ORIENT | RECEPTION/ORIENT |
| 07/09/2002 | CENTURY C.I. | F1114U | RECEPTION/ORIENT | RECEPTION/ORIENT |
| 07/10/2002 | CENTURY C.I. | F1114U | INSIDE GROUNDS | INSIDE GROUNDS |
| 07/31/2002 | CENTURY C.I. | Y2101S | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 08/08/2002 | CENTURY C.I. | H2102U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 09/04/2002 | CENTURY C.I. | G3203U | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 09/08/2002 | CENTURY C.I. | Y2115L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 09/09/2002 | CENTURY C.I. | I2101S | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 09/12/2002 | CENTURY C.I. | Y2101S | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 09/12/2002 | CENTURY C.I. | H2121S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 09/17/2002 | CENTURY C.I. | H2107L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 10/21/2002 | SANTA ROSA C.I. | C2209U | CLOSE-MANAGEMENT | CONFINEMENT-DISC |
| 10/21/2002 | SANTA ROSA C.I. | C2221L | CLOSE-MANAGEMENT | CONFINEMENT-DISC |
| 11/01/2002 | SANTA ROSA C.I. | C3103L | CLOSE-MANAGEMENT | CONFINEMENT-DISC |
| 11/01/2002 | SANTA ROSA C.I. | D3121S | CLOSE-MANAGEMENT | CONFINEMENT-DISC |
| 11/05/2002 | SANTA ROSA C.I. | D3115L | CLOSE-MANAGEMENT | CONFINEMENT-DISC |
| 11/19/2002 | OKALOOSA C.I. | E1111L | CONFINEMENT-ADMI | IN-TRANSIT |
| 11/20/2002 | R.M.C.- MAIN UNIT | K3113L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 11/21/2002 | S.F.R.C. | E1204U | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 11/26/2002 | MARTIN C.I. | D3122S | CLOSE-MANAGEMENT | CLOSE-MANAGEMENT |
| 12/04/2002 | MARTIN C.I. | D3122S | CLOSE-MANAGEMENT | CONFINEMENT-DISC |
| 12/05/2002 | MARTIN C.I. | D3207L | CLOSE-MANAGEMENT | CONFINEMENT-DISC |
| 12/19/2002 | S.F.R.C. | E1210L | IN-TRANSIT | IN-TRANSIT |
| 12/19/2002 | R.M.C.- MAIN UNIT | K3210L | IN-TRANSIT | CONFINEMENT-ADMI |
| 12/23/2002 | SANTA ROSA C.I. | D3211U | CLOSE-MANAGEMENT | CONFINEMENT-DISC |
| 01/29/2003 | SANTA ROSA C.I. | D3213L | CLOSE-MANAGEMENT | CONFINEMENT-DISC |
| 02/10/2003 | SANTA ROSA C.I. | I2103S | CLOSE-MANAGEMENT | CONFINEMENT-DISC |
| 02/12/2003 | SANTA ROSA C.I. | D3213L | CLOSE-MANAGEMENT | CONFINEMENT-DISC |
| 02/12/2003 | SANTA ROSA C.I. | D3209L | CLOSE-MANAGEMENT | CONFINEMENT-DISC |
| 03/07/2003 | SANTA ROSA C.I. | D3209L | CLOSE-MANAGEMENT | CONFINEMENT-DISC |
| 03/07/2003 | SANTA ROSA C.I. | C1109L | CLOSE-MANAGEMENT | CONFINEMENT-DISC |
| 03/07/2003 | SANTA ROSA C.I. | C3222L | CLOSE-MANAGEMENT | CONFINEMENT-DISC |
| 03/18/2003 | SANTA ROSA C.I. | I2102S | CLOSE-MANAGEMENT | CONFINEMENT-DISC |

PAGE: 11

| Date | Facility | Code | Category 1 | Category 2 |
|---|---|---|---|---|
| 03/26/2003 | SANTA ROSA C.I. | F2114L | CLOSE MANAGEMENT | CONFINEMENT-DISC |
| 08/25/2003 | SANTA ROSA C.I. | F2114L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 09/16/2003 | SANTA ROSA C.I. | F2114L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 10/17/2003 | SANTA ROSA C.I. | F2114L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 10/27/2003 | SANTA ROSA C.I. | F2114L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 11/05/2003 | SANTA ROSA C.I. | F2114L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 12/05/2003 | SANTA ROSA C.I. | F2114L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 12/10/2003 | SANTA ROSA C.I. | F2114L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 03/04/2004 | SANTA ROSA C.I. | F2114L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 03/14/2004 | SANTA ROSA C.I. | F2114L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 09/07/2004 | SANTA ROSA C.I. | F2109L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 09/14/2004 | SANTA ROSA C.I. | F2109L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 10/07/2004 | SANTA ROSA C.I. | F2109L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 10/27/2004 | SANTA ROSA C.I. | F2109L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 12/02/2004 | SANTA ROSA C.I. | F2109L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 01/09/2006 | SANTA ROSA C.I. | G1107L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 01/19/2006 | SANTA ROSA C.I. | I2102S | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 01/23/2006 | SANTA ROSA C.I. | B2117L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 02/23/2006 | SANTA ROSA C.I. | B2117L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 03/16/2006 | SANTA ROSA C.I. | B2117L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 06/22/2006 | SANTA ROSA C.I. | E2216L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 07/26/2006 | SANTA ROSA C.I. | E2216L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 08/09/2006 | R.M.C.- MAIN UNIT | K3110U | RECEPTION/ORIENT | CONFINEMENT-ADMI |
| 08/10/2006 | R.M.C.- MAIN UNIT | K3110U | RECEPTION/ORIENT | CONFINEMENT-ADMI |
| 08/15/2006 | R.M.C.- MAIN UNIT | K3216L | RECEPTION/ORIENT | CONFINEMENT-ADMI |
| 08/16/2006 | R.M.C.- MAIN UNIT | K3216L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 09/05/2006 | SANTA ROSA C.I. | E2212L | CLOSE-MANAGEMENT | CLOSE MANAGEMENT |
| 11/08/2006 | SANTA ROSA C.I. | E3215U | CLOSE-MANAGEMENT | CLOSE-MANAGEMENT |
| 11/09/2006 | SANTA ROSA C.I. | E3215U | CLOSE-MANAGEMENT | CLOSE-MANAGEMENT |
| 12/27/2006 | SANTA ROSA C.I. | E3115U | CLOSE-MANAGEMENT | CLOSE-MANAGEMENT |
| 04/18/2007 | SANTA ROSA C.I. | E1103L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 04/19/2007 | SANTA ROSA C.I. | E1103L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 05/18/2007 | SANTA ROSA C.I. | E1103L | LABORER-WELLNESS | LABORER-WELLNESS |
| 09/06/2007 | SANTA ROSA C.I. | E1103L | LABORER-WELLNESS | LABORER-WELLNESS |
| 09/18/2007 | SANTA ROSA C.I. | E1103L | LABORER-WELLNESS | LABORER-WELLNESS |
| 09/18/2007 | OKALOOSA C.I. | C3114U | RECEPTION/ORIENT | RECEPTION/ORIENT |
| 09/20/2007 | OKALOOSA C.I. | C3114U | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 10/01/2007 | OKALOOSA C.I. | C3114U | HOUSEMAN | HOUSEMAN |
| 10/18/2007 | OKALOOSA C.I. | E1104L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 10/18/2007 | OKALOOSA C.I. | E1104L | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 10/19/2007 | OKALOOSA C.I. | E1104U | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 11/11/2007 | OKALOOSA C.I. | E1102L | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 11/13/2007 | OKALOOSA C.I. | E1102L | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 11/14/2007 | NWFRC ANNEX. | J1203L | UNASSIGNED | UNASSIGNED |
| 11/14/2007 | FRANKLIN C.I. | G1120U | RECEPTION/ORIENT | RECEPTION/ORIENT |
| 11/20/2007 | FRANKLIN C.I. | A4102U | RECEPTION/ORIENT | RECEPTION/ORIENT |
| 11/20/2007 | FRANKLIN C.I. | B1114L | RECEPTION/ORIENT | RECEPTION/ORIENT |
| 11/21/2007 | FRANKLIN C.I. | B1114L | HOUSEMAN | HOUSEMAN |
| 12/31/2007 | FRANKLIN C.I. | A1210L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 01/03/2008 | FRANKLIN C.I. | A1102L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 01/08/2008 | FRANKLIN C.I. | A2103L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 02/05/2008 | FRANKLIN C.I. | B4208L | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 02/07/2008 | FRANKLIN C.I. | B4208L | INSIDE GROUNDS | INSIDE GROUNDS |
| 02/11/2008 | FRANKLIN C.I. | A1101L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |

PAGE: 12

| | | | | |
|---|---|---|---|---|
| 02/19/2008 | FRANKLIN C.I. | A1101L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 02/20/2008 | FRANKLIN C.I. | A1111U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 02/20/2008 | FRANKLIN C.I. | A1111U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 02/22/2008 | FRANKLIN C.I. | I2101S | H26-XXXXXXXXXXXX | H26-XXXXXXXXXXXX |
| 02/24/2008 | FRANKLIN C.I. | I2105S | H26-XXXXXXXXXXXX | H26-XXXXXXXXXXXX |
| 02/26/2008 | FRANKLIN C.I. | A1204L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 02/26/2008 | FRANKLIN C.I. | A1204L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 02/26/2008 | FRANKLIN C.I. | A1210L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 03/07/2008 | SANTA ROSA C.I. | C3215U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 03/13/2008 | SANTA ROSA C.I. | C3202U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 05/16/2008 | SANTA ROSA C.I. | C3205L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 07/06/2008 | SANTA ROSA C.I. | C3101L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 07/10/2008 | SANTA ROSA C.I. | E3104L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 08/13/2008 | SANTA ROSA C.I. | E3104L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 08/13/2008 | SANTA ROSA C.I. | E2115L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 08/13/2008 | SANTA ROSA C.I. | E2115L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 11/21/2008 | SANTA ROSA C.I. | E2115L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 01/12/2009 | SANTA ROSA C.I. | E2101L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 03/30/2009 | SANTA ROSA C.I. | E2101L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 03/30/2009 | SANTA ROSA C.I. | E2101L | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 04/16/2009 | SANTA ROSA C.I. | E2101L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 04/22/2009 | SANTA ROSA C.I. | G1113L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 04/23/2009 | SANTA ROSA C.I. | I2106G | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 04/23/2009 | SANTA ROSA C.I. | G1113L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 05/13/2009 | SANTA ROSA C.I. | B2119L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 09/04/2009 | SANTA ROSA C.I. | F2110L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 12/01/2009 | SANTA ROSA C.I. | F2122S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 12/15/2009 | SANTA ROSA C.I. | F2202L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 12/22/2009 | SANTA ROSA C.I. | F2202L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 12/31/2009 | SANTA ROSA C.I. | D2114L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 01/19/2010 | NWFRC ANNEX. | J3108L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 01/20/2010 | R.M.C.- MAIN UNIT | K2220L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 02/18/2010 | R.M.C.- MAIN UNIT | K3202L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 02/21/2010 | R.M.C.- MAIN UNIT | K3201L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 03/02/2010 | R.M.C.- MAIN UNIT | K3201L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 03/03/2010 | R.M.C.- MAIN UNIT | J2103S | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 03/09/2010 | NWFRC ANNEX. | J3113L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 03/11/2010 | SANTA ROSA C.I. | B3207L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 03/14/2010 | SANTA ROSA C.I. | B2101L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 03/25/2010 | SANTA ROSA C.I. | B2102L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 03/28/2010 | SANTA ROSA C.I. | B3108L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 04/26/2010 | SANTA ROSA C.I. | D2108L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 05/03/2010 | FLORIDA STATE PRISON | B1319S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 05/14/2010 | FLORIDA STATE PRISON | C1322S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 06/14/2010 | UNION C.I. | T2104S | H26-XXXXXXXXXXXX | H26-XXXXXXXXXXXX |
| 06/16/2010 | UNION C.I. | O2204S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 06/25/2010 | FLORIDA STATE PRISON | C1124S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 09/09/2010 | FLORIDA STATE PRISON | C1124S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 11/16/2010 | FLORIDA STATE PRISON | A1101S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 11/17/2010 | FLORIDA STATE PRISON | C1124S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 02/02/2011 | FLORIDA STATE PRISON | C1219S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 02/02/2011 | FLORIDA STATE PRISON | C1124S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 03/23/2011 | FLORIDA STATE PRISON | B1109S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 03/23/2011 | FLORIDA STATE PRISON | D1102S | CONFINEMENT-DISC | CONFINEMENT-DISC |

| | | | | |
|---|---|---|---|---|
| 04/05/2011 | FLORIDA STATE PRISON | D1102S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 04/05/2011 | UNION C.I. | O3119S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 04/08/2011 | UNION C.I. | T2102S | H26-XXXXXXXXXXXX | H26-XXXXXXXXXXXX |
| 04/11/2011 | UNION C.I. | O3119S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 04/15/2011 | UNION C.I. | S4115S | H23-XXXXXXXXXXXX | H23-XXXXXXXXXXXX |
| 04/18/2011 | UNION C.I. | S1107S | H23-XXXXXXXXXXXX | H23-XXXXXXXXXXXX |
| 07/26/2011 | UNION C.I. | O2213S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 10/31/2011 | FLORIDA STATE PRISON | C1131S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 10/31/2011 | FLORIDA STATE PRISON | A1104S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 11/01/2011 | FLORIDA STATE PRISON | B1117S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 11/01/2011 | FLORIDA STATE PRISON | E1119S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 11/02/2011 | FLORIDA STATE PRISON | E1116S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 11/04/2011 | UNION C.I. | U3106L | H23-XXXXXXXXXXXX | H23-XXXXXXXXXXXX |
| 11/07/2011 | UNION C.I. | U2105L | H26-XXXXXXXXXXXX | H26-XXXXXXXXXXXX |
| 11/15/2011 | UNION C.I. | T2108S | H24-XXXXXXXXXXXX | H24-XXXXXXXXXXXX |
| 11/22/2011 | UNION C.I. | T1108S | H24-XXXXXXXXXXXX | H24-XXXXXXXXXXXX |
| 11/30/2011 | UNION C.I. | T1113S | H24-XXXXXXXXXXXX | H24-XXXXXXXXXXXX |
| 01/06/2012 | UNION C.I. | T1108S | H24-XXXXXXXXXXXX | H24-XXXXXXXXXXXX |
| 01/13/2012 | R.M.C.- MAIN UNIT | Z1120S | | |
| 01/16/2012 | R.M.C.- MAIN UNIT | H1112S | H24-XXXXXXXXXXXX | CONFINEMENT-ADMI |
| 01/17/2012 | R.M.C.- MAIN UNIT | H1112S | H24-XXXXXXXXXXXX | CONFINEMENT-ADMI |
| 01/25/2012 | R.M.C.- MAIN UNIT | K3204L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 01/31/2012 | R.M.C.- MAIN UNIT | K3204L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 02/03/2012 | UNION C.I. | O2111S | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 02/06/2012 | UNION C.I. | O2111S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 02/12/2012 | UNION C.I. | O2124S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 02/23/2012 | UNION C.I. | O2106S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 02/27/2012 | UNION C.I. | O2212S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 03/05/2012 | UNION C.I. | O2122S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 04/09/2012 | UNION C.I. | T2115S | H26-XXXXXXXXXXXX | H26-XXXXXXXXXXXX |
| 04/11/2012 | UNION C.I. | O2212S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 05/14/2012 | UNION C.I. | O2105S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 05/15/2012 | UNION C.I. | O2212S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 07/30/2012 | UNION C.I. | O2116S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 08/15/2012 | UNION C.I. | O2120S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 09/23/2012 | UNION C.I. | O2109S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 10/11/2012 | UNION C.I. | O2207S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 01/31/2013 | UNION C.I. | T2104S | H26-XXXXXXXXXXXX | H26-XXXXXXXXXXXX |
| 02/01/2013 | UNION C.I. | O2111S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 02/04/2013 | UNION C.I. | T2115S | H26-XXXXXXXXXXXX | H26-XXXXXXXXXXXX |
| 02/04/2013 | UNION C.I. | O2209S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 02/02/2014 | UNION C.I. | O1214S | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 02/02/2014 | UNION C.I. | O1220S | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 02/06/2014 | UNION C.I. | O2212S | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 02/12/2014 | UNION C.I. | O2212S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 02/12/2014 | UNION C.I. | O2223S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 04/29/2014 | UNION C.I. | O3214S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 05/09/2014 | UNION C.I. | O3214S | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 05/12/2014 | UNION C.I. | O3214S | CLOSE-MANAGEMENT | CLOSE-MANAGEMENT |
| 05/14/2014 | SUWANNEE C.I | F22132 | CLOSE-MANAGEMENT | CLOSE-MANAGEMENT |
| 10/10/2014 | SUWANNEE C.I | G31041 | CLOSE-MANAGEMENT | CLOSE-MANAGEMENT |
| 11/13/2014 | SUWANNEE C.I | G31061 | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 11/13/2014 | SUWANNEE C.I | G41141 | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 01/05/2015 | SUWANNEE C.I | G41142 | CLOSE MANAGEMENT | CLOSE MANAGEMENT |

| Date | Facility | Code | Category 1 | Category 2 |
|---|---|---|---|---|
| 05/08/2015 | SUWANNEE C.I | G41142 | CLOSE MANAGEMENT | CLOSE MANAGEMENT |
| 05/12/2015 | SUWANNEE C.I | G41142 | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 05/14/2015 | SUWANNEE C.I | G11012 | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 05/18/2015 | SUWANNEE C.I | G11122 | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 05/26/2015 | SUWANNEE C.I | G12072 | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 05/27/2015 | R.M.C.- MAIN UNIT | F1105U | IN-TRANSIT | IN-TRANSIT |
| 05/28/2015 | S.F.R.C. | H3210U | IN-TRANSIT | IN-TRANSIT |
| 06/02/2015 | CHARLOTTE C.I. | G4202U | RECEPTION/ORIENT | RECEPTION/ORIENT |
| 06/10/2015 | CHARLOTTE C.I. | G4202U | HOUSEMAN | HOUSEMAN |
| 07/25/2015 | CHARLOTTE C.I. | H1111S | H26-XXXXXXXXXXXX | H26-XXXXXXXXXXXX |
| 07/27/2015 | CHARLOTTE C.I. | G4202U | HOUSEMAN | HOUSEMAN |
| 08/14/2015 | CHARLOTTE C.I. | A1211L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 08/18/2015 | CHARLOTTE C.I. | A3107L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 08/20/2015 | CHARLOTTE C.I. | A3211L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 09/16/2015 | CHARLOTTE C.I. | F2103L | CONFINEMENT-OPEN | UNASSIGNED-OPEN |
| 09/23/2015 | CHARLOTTE C.I. | F2103L | HOUSEMAN | HOUSEMAN |
| 10/03/2015 | CHARLOTTE C.I. | A1105L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 10/15/2015 | CHARLOTTE C.I. | G1203L | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 10/16/2015 | CHARLOTTE C.I. | G4108U | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 10/21/2015 | CHARLOTTE C.I. | G4108U | HOUSEMAN | HOUSEMAN |
| 06/15/2016 | CHARLOTTE C.I. | A3102U | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 06/29/2016 | CHARLOTTE C.I. | G1207U | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 07/06/2016 | CHARLOTTE C.I. | G1207U | HOUSEMAN | HOUSEMAN |
| 07/29/2016 | CHARLOTTE C.I. | G1207U | HOUSEMAN | HOUSEMAN |
| 12/05/2016 | CHARLOTTE C.I. | A3109U | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 12/12/2016 | CHARLOTTE C.I. | A3109U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 12/21/2016 | CHARLOTTE C.I. | A3208U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 12/29/2016 | CHARLOTTE C.I. | A3208U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 01/10/2017 | CHARLOTTE C.I. | A2207L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 01/19/2017 | CHARLOTTE C.I. | A1214U | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 01/23/2017 | CHARLOTTE C.I. | G4203U | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 01/26/2017 | CHARLOTTE C.I. | G4203U | HOUSEMAN | HOUSEMAN |
| 01/30/2017 | CHARLOTTE C.I. | A2212U | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 01/30/2017 | CHARLOTTE C.I. | A2212U | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 01/31/2017 | CHARLOTTE C.I. | A1107U | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 01/31/2017 | CHARLOTTE C.I. | A1107U | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 02/14/2017 | CHARLOTTE C.I. | A1107U | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 02/14/2017 | S.F.R.C. | J3201U | IN-TRANSIT | IN-TRANSIT |
| 02/15/2017 | MARTIN C.I. | G3213U | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 02/24/2017 | MARTIN C.I. | G3213U | HOUSEMAN | HOUSEMAN |
| 03/10/2017 | MARTIN C.I. | G3106U | HOUSEMAN | HOUSEMAN |
| 03/21/2017 | MARTIN C.I. | F3105U | HOUSEMAN | HOUSEMAN |
| 04/15/2017 | MARTIN C.I. | C1101U | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 04/17/2017 | MARTIN C.I. | H1101S | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 04/21/2017 | MARTIN C.I. | H1103S | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 04/24/2017 | CHARLOTTE C.I. | C1113S | H24-XXXXXXXXXXXX | H24-XXXXXXXXXXXX |
| 04/26/2017 | CHARLOTTE C.I. | C1210S | H24-XXXXXXXXXXXX | H24-XXXXXXXXXXXX |
| 04/27/2017 | CHARLOTTE C.I. | C1210S | H24-XXXXXXXXXXXX | H24-XXXXXXXXXXXX |
| 04/28/2017 | CHARLOTTE C.I. | C2212S | H24-XXXXXXXXXXXX | H24-XXXXXXXXXXXX |
| 05/08/2017 | DADE C.I. | J2107S | H23-XXXXXXXXXXXX | H23-XXXXXXXXXXXX |
| 05/08/2017 | DADE C.I. | J2107S | H23-XXXXXXXXXXXX | H23-XXXXXXXXXXXX |
| 05/18/2017 | DADE C.I. | J2110S | H23-XXXXXXXXXXXX | H23-XXXXXXXXXXXX |
| 07/05/2017 | DADE C.I. | J1225S | H23-XXXXXXXXXXXX | H23-XXXXXXXXXXXX |
| 07/18/2017 | DADE C.I. | J1225S | H23-XXXXXXXXXXXX | H23-XXXXXXXXXXXX |

| Date | Facility | Code | Category 1 | Category 2 |
|---|---|---|---|---|
| 07/18/2017 | DADE C.I. | F2116U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 07/19/2017 | DADE C.I. | H2103U | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 07/20/2017 | DADE C.I. | F2107U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 07/24/2017 | DADE C.I. | F2116U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 07/27/2017 | S.F.R.C. | E2208U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 07/31/2017 | S.F.R.C. | E2107L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 08/02/2017 | MARTIN C.I. | C3108U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 08/03/2017 | MARTIN C.I. | C2112U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 08/06/2017 | MARTIN C.I. | B4214U | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 08/30/2017 | MARTIN C.I. | B4214L | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 08/30/2017 | MARTIN C.I. | B4214L | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 09/21/2017 | MARTIN C.I. | Z1101S | H27-XXXXXXXXXXXX | H27-XXXXXXXXXXXX |
| 09/27/2017 | MARTIN C.I. | H1101S | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 09/29/2017 | MARTIN C.I. | H1102S | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 10/02/2017 | MARTIN C.I. | B3104U | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 10/03/2017 | MARTIN C.I. | B3213L | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 10/03/2017 | MARTIN C.I. | B3213L | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 10/04/2017 | S.F.R.C. | E1101L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 10/05/2017 | CFRC-MAIN | E4205L | IN-TRANSIT | IN-TRANSIT |
| 10/05/2017 | CFRC-MAIN | Y2107L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 10/09/2017 | LAKE C.I. | F3101L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 10/26/2017 | LAKE C.I. | F3201L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 10/31/2017 | LAKE C.I. | F1107U | RECEPTION/ORIENT | RECEPTION/ORIENT |
| 11/13/2017 | LAKE C.I. | F1107U | INSIDE GROUNDS | INSIDE GROUNDS |
| 11/17/2017 | LAKE C.I. | F2110L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 11/17/2017 | LAKE C.I. | G2101S | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 11/20/2017 | LAKE C.I. | H5202S | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 12/05/2017 | LAKE C.I. | H5102S | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 12/08/2017 | CHARLOTTE C.I. | C1109S | H24-XXXXXXXXXXXX | H24-XXXXXXXXXXXX |
| 12/14/2017 | CHARLOTTE C.I. | C1210S | H24-XXXXXXXXXXXX | H24-XXXXXXXXXXXX |
| 12/27/2017 | CHARLOTTE C.I. | C1212S | H24-XXXXXXXXXXXX | H24-XXXXXXXXXXXX |
| 01/02/2018 | CHARLOTTE C.I. | C3213S | H23-XXXXXXXXXXXX | H23-XXXXXXXXXXXX |
| 01/03/2018 | CHARLOTTE C.I. | A1204U | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 01/10/2018 | CHARLOTTE C.I. | A1204U | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 01/12/2018 | CHARLOTTE C.I. | A1204U | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 01/16/2018 | S.F.R.C. | E3106L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 01/17/2018 | S.F.R.C. | E3106L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 01/18/2018 | CFRC-MAIN | H3120L | IN-TRANSIT | IN-TRANSIT |
| 01/19/2018 | CFRC-MAIN | Y1107L | H28-XXXXXXXXXXXX | H28-XXXXXXXXXXXX |
| 01/25/2018 | CHARLOTTE C.I. | C2110S | H24-XXXXXXXXXXXX | H24-XXXXXXXXXXXX |
| 01/26/2018 | CHARLOTTE C.I. | C2214S | H24-XXXXXXXXXXXX | H24-XXXXXXXXXXXX |
| 02/02/2018 | CHARLOTTE C.I. | C3213S | H23-XXXXXXXXXXXX | H23-XXXXXXXXXXXX |
| 02/05/2018 | CHARLOTTE C.I. | Y2102U | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 02/09/2018 | CHARLOTTE C.I. | Y2102U | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 02/15/2018 | LAKE C.I. | F2216L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 02/15/2018 | LAKE C.I. | H5101S | UNASSIGNED-OPEN | UNASSIGNED-OPEN |
| 02/20/2018 | LAKE C.I. | F2219U | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 02/28/2018 | WAKULLA ANNEX | M1139S | PROTECTIVE MANAG | PROTECTIVE MANAG |
| 02/28/2018 | WAKULLA ANNEX | M1139S | HOUSEMAN | HOUSEMAN |
| 03/15/2018 | WAKULLA ANNEX | M1138S | HOUSEMAN | HOUSEMAN |
| 04/02/2018 | WAKULLA ANNEX | J2102L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 04/02/2018 | WAKULLA ANNEX | J1113L | H26-XXXXXXXXXXXX | H26-XXXXXXXXXXXX |
| 04/04/2018 | WAKULLA ANNEX | J1113L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 04/10/2018 | WAKULLA ANNEX | J1113L | CONFINEMENT-DISC | CONFINEMENT-DISC |

| 04/10/2018 | WAKULLA ANNEX | J2107L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 04/26/2018 | WAKULLA ANNEX | M1141S | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 05/16/2018 | WAKULLA ANNEX | M1141S | HOUSEMAN | HOUSEMAN |
| 05/25/2018 | WAKULLA ANNEX | J2106L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 05/25/2018 | WAKULLA C.I. | I1104S | H26-XXXXXXXXXXXX | H26-XXXXXXXXXXXX |
| 05/27/2018 | WAKULLA C.I. | I1105S | H26-XXXXXXXXXXXX | H26-XXXXXXXXXXXX |
| 05/29/2018 | WAKULLA ANNEX | J2205L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 05/31/2018 | WAKULLA ANNEX | J2205L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 06/08/2018 | WAKULLA ANNEX | M1119L | PROTECTIVE MANAG | PROTECTIVE MANAG |
| 06/14/2018 | WAKULLA ANNEX | M1119L | HOUSEMAN | HOUSEMAN |
| 06/18/2018 | WAKULLA ANNEX | J2115U | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 06/21/2018 | WAKULLA ANNEX | J2115U | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 06/26/2018 | R.M.C.- MAIN UNIT | K3106L | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 06/27/2018 | R.M.C.- MAIN UNIT | K3113L | H28-XXXXXXXXXXXX | H28-XXXXXXXXXXXX |
| 06/27/2018 | R.M.C.- MAIN UNIT | K3113L | H28-XXXXXXXXXXXX | H28-XXXXXXXXXXXX |
| 07/06/2018 | R.M.C.- MAIN UNIT | K3113L | CONF-ADMIN/PROTE | CONF-ADMIN/PROTE |
| 07/16/2018 | WAKULLA ANNEX | J1207U | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 07/19/2018 | WAKULLA ANNEX | J1207U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 08/02/2018 | WAKULLA ANNEX | J1207U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 08/02/2018 | WAKULLA ANNEX | J1207U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 08/03/2018 | WAKULLA ANNEX | J1207U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 08/03/2018 | WAKULLA ANNEX | M1108U | PROTECTIVE MGT.- | PROTECTIVE MGT.- |
| 08/03/2018 | WAKULLA ANNEX | M1113U | PROTECTIVE MGT.- | PROTECTIVE MGT.- |
| 08/09/2018 | WAKULLA ANNEX | M1113U | HOUSEMAN | HOUSEMAN |
| 09/10/2018 | WAKULLA ANNEX | M1159S | HOUSEMAN | HOUSEMAN |
| 09/26/2018 | WAKULLA ANNEX | J1104L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 10/17/2018 | WAKULLA ANNEX | M1115U | PROTECTIVE MGT.- | PROTECTIVE MGT.- |
| 10/21/2018 | WAKULLA ANNEX | M1155S | PROTECTIVE MGT.- | PROTECTIVE MGT.- |
| 10/24/2018 | WAKULLA ANNEX | M1155S | HOUSEMAN | HOUSEMAN |
| 12/22/2018 | WAKULLA ANNEX | J3110L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 12/22/2018 | WAKULLA ANNEX | J3210L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 12/22/2018 | WAKULLA ANNEX | J2110L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 12/24/2018 | WAKULLA ANNEX | J3113L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 12/26/2018 | WAKULLA ANNEX | J3113L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 12/27/2018 | WAKULLA C.I. | I1102S | H26-XXXXXXXXXXXX | H26-XXXXXXXXXXXX |
| 12/31/2018 | WAKULLA ANNEX | J2111L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 01/02/2019 | WAKULLA ANNEX | J3210L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 01/03/2019 | WAKULLA ANNEX | J3210L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 01/11/2019 | WAKULLA ANNEX | J3210L | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 01/15/2019 | WAKULLA ANNEX | J3116U | CONFINEMENT-DISC | CONFINEMENT-DISC |
| 02/11/2019 | WAKULLA ANNEX | J3116U | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 04/07/2019 | WAKULLA ANNEX | J3116L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 04/26/2019 | WAKULLA ANNEX | J1205L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 04/30/2019 | WAKULLA ANNEX | J3113L | CONFINEMENT-ADMI | CONFINEMENT-ADMI |
| 05/10/2019 | FLORIDA STATE PRISON | D1326S | CLOSE-MANAGEMENT | CLOSE-MANAGEMENT |
| 05/14/2019 | FLORIDA STATE PRISON | J2219S | CLOSE-MANAGEMENT | CLOSE-MANAGEMENT |
| 05/21/2019 | FLORIDA STATE PRISON | J1305S | CLOSE-MANAGEMENT | CLOSE-MANAGEMENT |
| 06/13/2019 | FLORIDA STATE PRISON | M1121S | CLOSE-MANAGEMENT | CLOSE-MANAGEMENT |
| 06/24/2019 | FLORIDA STATE PRISON | M1322S | CLOSE-MANAGEMENT | CLOSE-MANAGEMENT |

PAGE: 17

---

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FT. MYERS DIVISION**

PROPHET PAULCIN,

Plaintiff,

vs.

WEXFORD HEALTH SOURCES, et al.,

Defendants.

Case No. 2:17-cv-232-SPC-MRM

**NOTICE OF SERVICE OF PLAINTIFF'S RULE 26(a)(2) DISCLOSURES (McANDREW)**

NOTICE IS HEREBY GIVEN that Plaintiff, PROPHET PAULCIN, through undersigned counsel, serves this Rule 26(a)(2) disclosure, as follows:

(i)     *A complete statement of all opinions the witness will express and the basis and reasons for them:* Attached please find the report prepared by Ron McAndrew.

(ii)    *The facts or data considered in forming opinion:* Attached hereto please find the report prepared by Ron McAndrew.

(iii)   *Any exhibits that will be used to summarize or support opinions:* Exhibit A, Resume; Exhibit B, Testimony List; Exhibit C, OPPAGA Report; Exhibit D, Inch Retaliation Memo.

(iv)    *The witness's qualifications, including a list of all publications authored in the previous ten years:* Please see the CV of expert attached hereto.

(v)     *A list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition:* See testimony list attached hereto.

(vi)    *Compensation to be paid in the case:* See Fee Schedule within Report.

I CERTIFY a true copy hereof was sent by Electronic Mail on 4/3/20 to:

William O. Kratochvil, Esq, Vernis & Bowling of Southwest Florida, wkratochvil@florida-law.com
Alexander Dombrowsky, Esq., Chimpoulis & Hunter, P.A., adombrowsky@pchimpoulishunter.com
M. Katherine Hunter, Esq., Chimpoulis & Hunter, P.A., khunter@chimpoulishunter.com

Respectfully Submitted,

s/James V. Cook, Esq.
Florida Bar Number 0966843
Law Office of James Cook
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 222-8080; 561-0836 fax
cookjv@gmail.com

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

PROPHET PAUL CIN
MRM

        Plaintiff,

        V.

MARK INCH as Secretary of FDC
WEXFORD HEALTH SOURCES,
INC, JOHN D. WILLIS, KARA
WILLIAMS, JAMES LICATA,
JONATHAN REID, J. BRUSSELL,
JELANI POLICARD, STEPHEN
MATHEWSON, KAREN
BLANKENSHIP, ANDRES OZUAL,
CAROLYN NIES, and C. JOHNSON
        Defendants.

CIVIL ACTION: 2:17-CV-232-SPC-
MRM

)
)
)
)
)
)
)
)
)
)
)
)
)
)

## Expert Witness Report of Ron McAndrew

I, Ron McAndrew, am over the age of 18 and make this report and declaration:

### Section I. Introduction

I have been retained by the Law Office of James V Cook, Esq., Law Office of James Cook, 314 West Jefferson Street, Tallahassee, Florida 32301, (850) 222-8080, to render professional opinions and/or testify in the above referenced case

### Section II. Qualifications of Expert

I have worked in the field of corrections for 23 years. During this time, I served as a basic recruit correctional officer, certified correctional officer, sergeant, lieutenant, captain, investigative lieutenant, correctional inspector, and major at eight major close/maximum custody prisons in Florida. In these various capacities, I performed all 'gut level' assignments in open population, administrative confinement, protective confinement and disciplinary confinement,

1

food service, control room assignments, mail room officer, arsenal sergeant, visitation officer, visitation sergeant, inside and outside security officer, receiving officer, work squad supervisor, transfer officer, property room officer, classification review team officer, hospital officer, perimeter security officer, medical officer, psychiatric observation officer, medical escort officer, investigatory, escape and recapture officer, confrontation team member (riot team); training officer and orientation officer, as well as inspector of all institutional criminal, administrative and accident matters. During my four years as an investigator and inspector, I testified approximately 12 times in the 7th Judicial Circuit of Daytona Beach, FL on cases that I had filed with the State Attorney's Office supporting criminal investigations that I had conducted.

After approximately 10 years in uniform and the investigative ranks, I was promoted to Assistant Warden at a new (and not yet opened) close custody prison reception center later renamed Central Florida Reception Center ("CFRC") in Orlando, FL. There, I held the duties of Deputy Warden I, Deputy Warden II of Operations, and Deputy Warden II of East Unit. As the Deputy Warden, I worked directly under the Warden, responsible for the operations of the entire institution to include Security, Reception & Processing, Classification, Maintenance, Construction, Personnel, Food Service, Medical, Dental, Psychology, Psychiatric Services, Chaplaincy and as American Correctional Association ("ACA") & Americans with Disabilities Act ("ADA") coordinator. As Deputy Warden II, my responsibilities were much the same but with shared duties of another Deputy Warden II. CFRC became one of the largest prisons in Florida, with three units and approximately 3,000 inmates.

In 1992, I was appointed as a new Warden of a new close-custody prison in Wewahitchka, FL (Gulf Correctional Institution) Within one year this prison absorbed Gulf Work Camp (25 miles to the south) and Franklin Work Camp (71 miles to the east). That raised the population to 3,250 inmates by 1995, making it the largest prison in Florida.

In 1996, I was appointed as the Warden of Florida State Prison in Starke, Florida. Florida State Prison houses Florida's death row and, at the time, the state's electric chair. My duties included complete operational control of the entire prison to include an annex, the "O" unit, a farming program where most of the prison's vegetables were grown, supervision of 3 Deputy Wardens, supervision of approximately 700 employees, the custody and care of 1450 maximum and close custody inmates, and carrying out of executions as directed by the Governor of Florida. During my tenure as Warden of Florida State Prison, I testified approximately 3 times in Federal Court on matters related to the use of the electric chair as a method of carrying out executions. Each time, I testified on behalf of the State of Florida. At least twice during this tenure, I was selected to testify before the Corrections Committee of the State Legislature concerning issues related to the death penalty, executions, and prison operations. Later, I supervised the transition of electric chair to lethal injection by the State of Florida at the direction of the Governor.

In 1998, I was appointed as the Warden of Central Florida Reception Center, the largest state prison in Florida by this time. CFRC had at this time 3,300 inmates stemming from 4 separate units that included a reception and diagnostic center for all new commitments from the central Florida region. Additionally, my supervision included the East Unit of 1013 inmates, the South Unit 250 inmates (an HIV/AIDS Treatment Facility), and a work release center in Orlando of approximately 175 inmates.

2

In 2001, I retired from the State of Florida. Five days into my retirement, I was called by the Orange County Mayor and asked to take over the direction of the 13th largest county jail in the United States: Orange County Jail, FL with 1,761 staff and over 4,400 inmates, an operating budget of $110 million and construction budget of $114 million. I agreed to take charge as the Interim Director of Orange County Jail until a national search could be conducted for a replacement. Almost one year later, the new Director was hired, and I moved toward a new life direction.

In 2005, I began work as a prison and jail consultant. In the past 14 years, I have been retained in more than 500 cases representing plaintiffs and defendants for law firms and county, state, and federal agencies, and have also provided professional services and conducted pre-incarceration training. I have testified in state and federal courts and/or given deposition at the order of the court in approximately 200 cases. In September 2016, I formally testified before the United Nations, New York City.

Throughout my climb through all of the correctional officer and investigative ranks, as described above, I served as a transport officer when needed, with duties and responsibilities for overseeing the movement of prisoners or detainees throughout the state of Florida. Further, as a deputy warden I was in charge of a reception (receiving) center overseeing the processing in and out of more than 100 prisoners daily with direction over scheduling and transportation. Later in my career I was warden in this same reception center (Central Florida Reception Center), Orlando, FL. Finally, as the director of the Orange County Jail (Nation's 13th largest jail), I directed the receiving and transporting of approximately 125 prisoners or detainees each work day. From this specific experience as well as my general experience in corrections, I have gained extensive knowledge about the accepted practices and standards for transporting prisoners or detainees and the responsibilities that are involved in that process by the transporting entity.

My qualifications in the field of corrections are further summarized in my résumé, attached as Exhibit A.

## Section III. Testimony as an Expert Witness at Trial or Deposition

A listing of cases in which I have testified as an expert at trial or deposition within the preceding ten years is attached hereto as Exhibit B.

## Section IV. Records Reviewed

1. Plaintiff's Third Amended Complaint
2. Defendants' Answers
3. 2019 OPPAGA Report on Florida Correctional Facilities
4. Inmate Requests and Grievances
5. Florida Department of Corrections Mortality Lists
6. Medical Records
7. Secretary Mark Inch Statement on Retaliation
8. Transfer/Arrival Summaries
9. Paulein DC-14, Overall Inmate Record as of 07/10/19

3

10. Florida Department of Corrections Policies: FAC 33-602.220 Administrative Confinement
11. Florida Department of Corrections Policies: FAC 33-602.221, Protective Management

## Section V. Summary

**Inmate Prophet Paulein**

Prophet Paulein could have been almost any Florida prison inmate. He was physically small and psychologically vulnerable. He had money in his canteen account. He began to experience extortion attempts by predatory inmates in 2015. When he resisted those attempts, he experienced physical attacks, many involving improvised edged weapons. On multiple occasions he suffered stab wounds that appeared to receive minimal treatment, given their danger. It appears that he experienced repeated emotional crises and attempted self-harm on multiple occasions. His Overall Inmate Record (DC-14) tells most of the rest of the story.

1. 06/02/2015: Transferred to Charlotte C.I.
2. 02/14/2017: Transferred to Martin C.I.
3. 04/24/2017: Transferred to Charlotte C.I.
4. 05/08/2017: Transferred to Dade C.I.
5. 08/02/2017: Transferred to Martin C.I.
6. 10/09/2017: Transferred to Lake C.I.
7. 12/08/2017: Transferred to Charlotte C.I.
8. 01/16/2018: Transferred to Lake C.I.
9. 01/25/2018: Transferred to Charlotte C.I.

According to the records reviewed, time and again Inmate Paulein was sent back to Charlotte C.I. where he was repeatedly extorted and assaulted by predatory inmates and gang members. Although he repeatedly requested Protective Management, not until February 28, 2018, according to the Overall Inmate Record, was he actually placed in Protective Management when he was sent to Wakulla Annex, one of the few prisons in Florida with Protective Management beds.

The undersigned does not assume the truth of Inmate Paulein's allegations or of the record entries by prison officials. That is beyond the scope of this opinion and is part of the truth-seeking job of the Jury, should this case go to trial. But if these allegations should prove out, then a grave wrong was done to Inmate Paulein by the delay and denial of Protective Management status.

**Protective Management**

The Florida Department of Corrections (FDC) supervises over 95,000 inmates in 145 facilities across the state. Florida spends nearly $2.5 billion on its prisons. But in the past decade, Florida has not kept up with prison funding needs. Programs have been cut. Staffing has been inadequate. And into the vacuum of power have stepped well organized gangs. They traffic contraband and even human beings. Unfortunately, they sometimes have partners among prison staff. They often move freely, selling contraband, collecting debts, and meting out punishment. Prison inmates have no legitimate means of protecting themselves. It is for that reason that the system of protective management was created. But that system has been overwhelmed by increasing need and prison inmates in Florida can no longer rely on its protection.

4

There was a time when prison inmates marked for gang violence — whether for unpaid debts, personal animosity, disrespect, or efforts of gang members to renounce the gang — could be transferred to other facilities where they would be safe in the general population. However, in this age of the Internet, prisoners who are moved to another institution can easily be looked up online by gang members on the street in their new location sent to gang members inside the new institution. A transfer to an institution across the state may only buy a threatened inmate a week or two of peace before violent attacks start again. Even where there are prison beds dedicated to protective management, enemies can infiltrate the protective management dorm and take advantage of the first misstep in corrections security to carry out attacks.

In the Florida Department of Corrections, protective management is governed by 33-602.221 of the Florida Administrative Code. The rule provides that "Protective Management where used herein refers to a special management status for the protection of inmates from other inmates in an environment as representative of that of the general population as is safely possible." Protective management is not designed to be punishment, but the requirements of security do limit a prison inmate's freedom of movement and access to programs and services. Moreover, prisoners who request protective management often end up on the gangs' "bad list." One reason for this is that prison inmates who "check in" are expected to give the names of those who have threatened or assaulted him or her. That person is marked as a "snitch." That alone tends to reduce an inmate's temptation to seek protective management without a real need.

Stabbing has become a primary means of punishment by gangs against those who question their authority in the prison environment. Pieces of metal, plastic, or glass, anything that can hold a sharpened point or edge is used as a weapon. Stabbing is quick and effective and severe damage can often be done before the attacker can even be recognized. Stab wounds may be intended to be fatal but not always. Attackers sometimes talk about "wetting" the victim, meaning drawing blood. For someone deemed to be a "snitch," a cut on the face may be intended to advertise to other inmates that the victim is to be avoided or further harmed. Because stab wounds are often not taken seriously by short-staffed private medical providers that contract with prisons, they are often not adequately cleaned and the seriousness of the attack is not adequately documented. That means, in turn, that prison officials responsible for deciding who gets protection may not taken attack seriously in their decision-making.

The gateway to protective management is set out in Department of Corrections Rule 33-602.220, Administrative Confinement, which provides, in part:

*33-602.220 Administrative Confinement. (1) Definitions. (a) Administrative Confinement – the temporary removal of an inmate from the general inmate population in order to provide for security and safety until such time as more permanent inmate management processes can be concluded.*

****

*(3) Reasons for Placement in Administrative Confinement with time limits. Placement of an inmate in administrative confinement is authorized for the following reasons:*

***

5

*(c) Inmates shall be placed in administrative confinement pending review of the inmate's request for protection from other inmates. (Rule 33-602.221, F.A.C.). The inmate shall be placed in administrative confinement by a senior correctional officer when the inmate presents a signed written statement alleging that the inmate fears for his safety from other inmates, and that the inmate feels there is no other reasonable alternative open to him. A senior correctional officer shall place an inmate in administrative confinement, pending review for protective management based on evidence that such a review is necessary and the senior correctional officer determines that no other reasonable alternative is available. The inmate shall be encouraged to provide information and otherwise cooperate with the investigation of the matter. The protective management process, including the ICT's action, shall be completed within 15 working days from the initial confinement of the inmate.*

*1. The Institutional Classification Team (ICT) shall complete an OBIS electronic classification contact log entry approving the inmate's continuation in confinement. This entry will initiate an appointment for an investigation to be conducted. The investigator shall enter the results of the investigation in the electronic classification contact log in OBIS; this entry will automatically schedule an ICT review appointment.*

*2. If the inmate submits a request for release in writing at any time during the ICT review or investigation process, the housing supervisor shall provide the inmate with a Form DC6-203, Protection Waiver/Appeal Decision, Form DC6-203 is hereby incorporated by reference. A copy of this form is available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500, http://www.dc.rules.org/Gateway/reference.asp?No=Ref-01671. The effective date of the form is 1-19-03. The inmate shall complete Form DC6-203 and return it to the housing supervisor for submission to the ICT along with the inmate's written request.*

*3. Once the investigation is complete, the ICT shall interview the inmate to determine whether the inmate has a legitimate, verifiable need for protection. The ICT shall review all documentation available concerning the need for protection to include any written statements submitted by the inmate. The inmate's written request for release and the DC6-203 will also be reviewed. The following elements shall be considered in determining whether protective management is necessary:*

*a. A record of having been assaulted;*

*b. A reputation among the inmate population, attested to in writing by staff, as an informant or trial witness;*

*c. Verified threats, verbal abuse, or harassment;*

*d. A former criminal justice activity resulting in verified threats, verbal abuse, or harassment;*

*e. A conviction of a crime repugnant to the inmate population;*

*f. Reliable, confirmed evidence of sexual harassment;*

*g. Other factors such as physical size, build and age producing a risk from the general inmate*

6

*population.*

*4. The ICT shall make recommendations concerning protective management based on the facts within 15 working days from the date of initial confinement. The ICT's findings and recommendations shall be entered in the electronic classification contact log in OBIS; this entry will automatically schedule an SCO review appointment. Whether the ICT recommends protective management or not, the inmate shall remain in administrative confinement at that facility pending review by the SCO. All non-electronic related documentation shall be made available to the SCO by the ICT. The State Classification Office shall approve, disapprove or return for additional information the recommendation of the Institutional Classification Team.*

*5. The State Classification Office (SCO) shall determine within five working days whether protection is necessary based upon the investigation and any follow-up they deem appropriate. The SCO shall approve or disapprove placement of the inmate in protective management. The SCO's decision shall be documented in the electronic classification contact log in OBIS. If the SCO determines that a need for protection exists, they shall direct that the inmate shall be placed in a protective management unit or transferred to resolve the inmate's need for protection. If a decision is made to transfer the inmate for housing in a protective management unit or to resolve the inmate's need for protection at the inmate's current location, the inmate shall be kept in administrative confinement until the transfer is completed. Transfers for protection needs shall be effected within five working days. SCO members are authorized to approve transfers. If the SCO determines that protective management is not necessary, the inmate may appeal this decision directly to the Office of the Secretary pursuant to Rules 33-103.007 and 33-103.011, F.A.C. The inmate shall be notified of the SCO's decision by the ICT. At the time of notification, the inmate shall be asked if he wants to appeal the decision. The inmate's acknowledgement of being informed of the SCO denial and the inmate's decision on whether or not to appeal shall be documented on the electronically produced Notification of Protective Management Disapproval, Form DC6-137, and the electronic contact log. Form DC6-137 is hereby incorporated by reference. A copy is available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500, http://www.flrules.org/Gateway/reference.asp?No=Ref-01673. The effective date on the form is 1-19-03. The inmate shall remain in administrative confinement until the appeal process is complete.*

*6. Within three working days after an inmate has been either received at a protective management facility for the purpose of protective management or after an inmate already housed at a facility with a protective management unit has been approved for protective management by the SCO, a determination shall be made by the ICT as to appropriate housing. The ICT shall ensure that the housing supervisor assesses the inmate being placed into the protective management unit for his potential for risk to or from other inmates in the protective management unit. The inmate shall remain in administrative confinement until this assessment is made.*

According to 33-602.220(3)(d), inmates can also present a signed written statement that they are in fear of staff and provide specific information to support the claim and will also be placed in administrative confinement pending investigation by the Inspector General and recommendation to the Institutional Classification Team or the State Classification Office.

7

Attitudes toward corrections have evolved in the past hundred years. Humiliation, deprivation, cruelty, and corporal punishment have, at least officially, been replaced with the recognition of prisoners' rights, and at least some physical comforts and efforts to provide adequate medical care. But mass incarceration in prison budgets that have not caught up with need, and the interference of the profit motive with constitutionally mandated medical care, have undermined the provision of the kind of care that corrections planners have sought to achieve. Short staffing corrections positions and hiring or keeping unqualified people, have led to the rise of the gangs who are more powerful within the prison walls than the public can imagine.

Regardless of the nature of the crime, prisoners have a right to be treated humanely and fairly. As part fair treatment, the right of prisoners to be protected from violent, predatory, and sometimes mentally ill prisoners has been recognized and forms the basis of protective management systems. But that requires an adequate investment in our corrections system and perhaps a closer assessment of who we lock up and for how long. We have come to the point where we, as a society, cannot afford or are not willing to fund the level of incarceration that we are currently at. The abandonment of programs for rehabilitation and education virtually guarantee that few are "corrected" and the poverty of medical and mental health care guarantee that prisoners who are released will be a burden on, if not a threat to, their communities.

The first formal attention to protective management programs in Florida was in 1979, when a policy on Administrative Confinement included a provision for segregation based on the need for protection. In 1983, a policy titled Protective Confinement (currently 33-602.221 FAC) was issued. As the prison system struggled to become more humane, the need for inmate protection was increasingly recognized. Society began to accept the notion that prisoners may sexually attack each other, those needing protection for reasons associated with such behavior began to see their alternatives. In 2003, Congress passed the Prison Rape Elimination Act which, finally, in 2012 promulgated a set of guidelines to promote the reporting and investigation of sexual assault, whether by prisoner or by prison employee. Prisons implemented formal rules and procedures to avoid placing vulnerable inmates in cells with violent predatory inmates.

Vulnerable inmates seeking protection may include prisoners who are small in stature, young or elderly, have issues relating to sexual identity or orientation, have mental or physical disabilities. Others may need protection because of their offenses – which are also available on-line because they are believed to have "snitched" or "checked in" on another inmate, because of conflicts they had before they came to prison or while prisoners. Some are former law enforcement officers or have testified against another prisoner in court. Some are threatened because they have debts they can't pay or because they want to end gang membership. Some inmates are known to have property or resources that can be extorted from them by predatory inmates. Many inmates believe that the threats they receive from inmates are initiated by corrections staff based on personal animus and paid for by favors or contraband.

Understandably, classification teams want to know enough details about the threats that motivate an inmate to seek protective management, and the persons who make the threats, to judge whether the threats are credible and legitimate reasons to provide protection. Unfortunately, the information that inmate seeking protection give officers may be transmitted to the inmates who are alleged to have made the threat so that the fate of the inmate seeking protection is sealed if protection is not thereafter provided. Prison gangs have long memories and if they see a gap in security that allows

8

them to get to an enemy, even years later, they will often step through it.

Indifference to the welfare of vulnerable inmates is one side of the problem. Unfortunately, the other side involves officers who organize and encourage fights between inmates and their enemies or even predatory inmates. These phenomena are sometimes called "gladiator games" or "fight clubs." Often, only one of the contenders is a willing participant and sometimes neither is.

The number of deaths in the Florida Department of Corrections have shot up from around 300 in 2013 to around 440 and 2018, five years later. During the same time, the numbers of prisoners in Florida prisons have dropped from more than 100,000 down to around 96,000. Deaths from other than natural causes have risen dramatically.

An October 2019 Office of Program Policy Analysis and Government Accountability (OPPAGA) study of Florida Correctional Facilities (Exhibit C) shows 489 protective management beds in open bay dorms (as opposed to individual cells) separated from the general population. The number of inmates temporarily in administrative confinement being considered for protective management is unknown at this time. The Protective Management beds, according to the report, are at Columbia Annex near Lake City, Florida, and Wakulla Annex near Crawfordville, Florida. It should be noted that Columbia Correctional Institution main unit (not the Annex) was named by the *Miami Herald* in a comprehensive series on Florida prison system abuses as the most violent facility in Florida. It is unclear how that affects the Annex.

Protective Management admittedly demands resources. Each inmate who has been approved for protection, and those whose status is being investigated, must be individually escorted to the medical department for sick call and doctor appointments. When approved Protective Management inmates are going to the dining hall, the remaining inmates must be locked in their housing units to assure the protection inmates do not come into contact with them. When working, Protective Management inmates must be separated from other inmates who must also have job assignments. Additionally, there are hourly counts and security checks, issuing of cleaning supplies, disciplinary report hearings, recreation, and trips to the law library. Protective Management represents a logistical challenge that requires additional security. Ironically, the growing need for Protective Management has come about because of the increasing shortages of security staff, which have empowered the gangs and other predatory inmates. Predictably, the same factors that have led to short-staffing security positions cause intense resistance to increasing the system's ability to protect inmates threatened with injury and death from others. That has led to threats from staff to inmates who even mention "checking in." Whether for better security throughout the system or better protection for individual inmates, the solution has to include either more funding or fewer prisoners.

Some facilities seem to have fewer problems with protection issues than others. It is hard to determine whether these facilities are more successful because inmates don't experience the need for protection or because requests for protection are aggressively discouraged by prison staff. There is a need to analyze inmate complaints in the form of grievances, grievance appeals, and appeals from denials of Protective Management — both the grievances and appeals themselves and also the communications among institution staff discussing requests for Protective Management, between institution staff in the state classification office on appeals of Protective

9

Management denial, and study of the individual cases where protective management is denied and the denial was appealed. Whether such studies exist is currently unknown.

## Section VI. Opinions

1. Of course, additional funding to raise security staffing levels or changes in the law to permit greater awards of gain time for prisoners who adjust well and follow the rules is within the purview of the Legislature and there is nothing that can be done within the Department except advocacy for better funding and more realistic laws relating to incarceration. The 2020 Legislature has done little to raise hopes in that area.

2. Some studies have indicated that it takes as many as seven times the staff to run confinement dorms as it does to run open population dorms. In Florida prisons, confinement dorms are often short-staffed to the point that, at times, there may just be one corrections officer present in a dorm with hundreds of inmates. That single officer is stuck in the officer station and cannot do security checks. An emergency requiring an escort could not be handled without calling officers from other dorms which are likewise short-staffed. At the same time, confinement dorms appear to be frequently utilized to inflict retaliation against inmates who complain or write grievances. Secretary Inch has written a strong and very specific Memorandum against Retaliation (Exhibit D) but it is unclear whether this Memorandum is being acted upon in many institutions.

3. The number of Protective Management beds need to be increased. A comprehensive study needs to be done on the numbers of requests and denials with a close study of the records involved in follow-up of the results of denials in terms of additional attacks and injuries of prison inmates. The anecdotal evidence is very strong that denials of Protective Management by Institutional Classification Teams (ICT) or the State Classification Office (SCO) have resulted in predictable serious injuries and deaths.

4. Gang assaults and stabbings need to be taken much more seriously. Improvised knives are often contaminated with substances intended to increase the morbidity and mortality wounds. There is some evidence that the medical departments have been minimizing the seriousness of stab wounds by describing them as "superficial," where there appears to be no effort to determine the depth of the wounds and very little indication of follow-up to prevent infection or tetanus. Given the problems of navigating around protected health information, under HIPAA, there would have to be a thorough, high-priority, study of the injuries caused by gang attacks, and especially by stabbings.

5. Factors that increase the need for Protective Management need to be addressed. Extortion by predatory inmates, gangs, and even sometimes staff, needs to be addressed internally. Predatory inmates and gangs are often able to enter other housing areas to extort, distribute contraband, collect payment, and inflict punishments. It is of concern that while inmates who are found in unauthorized areas can be punished, there is no disciplinary violation for corrections staff who let unauthorized inmates into the housing areas or let them out again even after a violent incident is taken place. Placement of nonviolent and vulnerable inmates, including inmates who are small in stature or developmentally delayed, and, elderly, disabled, chronically ill, inmates, in institutions as retaliation for complaints and

10

grievances should be looked at closely.

6.  There is some reason to believe that predatory inmates and gang members may be allowed to act as orderlies or housemen with freedom to move around institutions to clean or deliver meals and at the same time to deliver threats, deny meals (delivering what are called "air trays" which are covered trays which contain no food), contaminate meals, and even inflict overt violence. Sometimes such inmates are not formally assigned to such roles but act at the behest of officers who use them as personal assistants.

7.  Eliminate blind spots. In every housing area, there are places just out of camera range where assaults and also uses of force very often take place. Camera coverage needs to be reevaluated both inside and outside housing areas to maximize coverage of places where assaults are most likely to take place. Prison inmates should be able to move from place to place knowing that any assaults on them would be recorded in a way that could lead to the apprehension of their attackers and discouragement of future attacks.

The above opinions are given to a reasonable degree of probability based on my education and experience and special training in the field of management and corrections.

### Section VII. Compensation

**CONSULTANT'S FEES.** You will be billed monthly or after your account has reached $1500.00. Fees will be billed at the following rate:

- $100.00 per hour for travel to and from courtroom/place of inspection or interview as well as waiting time.
- $250.00 per hour while conducting analytical review of evidence, conducting interviews, inspections, preparing reports, Attorney/Consultant consultations preparing for deposition and court testimony.
- Document review $750.00 for up to 250 pages, $1500.00 for up to 500 pages, $3000.00 for up to 1000 pages or $3.00 per page thereafter.
- Testimony and depositions are $350.00 per hour.
- Hotel: actual paid either by Ron McAndrew or firm.
- Food: Actual or per-diem rate allowed.
- Travel $.60 per mile if via vehicle plus tolls or government rate (if Applicable)
- Travel actual airfare (Business or first class only) plus parking and ground transportation.

**Deposing firms will be billed $250.00 per hour for reasonable deposition preparation hours per the rule.**

11

### Section VIII Declaration

I hereby declare under penalty of perjury this 3rd day of April, 2020 that the foregoing is true and correct to the best of my knowledge and belief.

Ron McAndrew
Prison and Jail Consultant
20390 The Granada
Dunnellon, Florida 34432
(352) 465 5919

12

(352) 465 5919 Office
(352) 465 5919 FAX
(352) 342 1450 Cell
ronmcandrew@reagan.com
www.RonMcAndrew.com

Dunnellon, Fl 34432

# Ron
# McAndrew, Prison & Jail Consultant

**Qualified to Provide Those Services as they relate to prison or jail settings**

- Expert Witness related to prison & jail issues
- Review and consultation of prisoner abuse and deaths
- Review and consultation of executions (both lethal injection & electric chair)
- Expert Witness involving employee abuse and/or injury on the job in prisons or jails
- Review and consultation of correctional staff termination appeals
- Assistance for increasing safety and protection for staff & prisoners
- Comprehensive prison management advice & guidance
- Comprehensive security operational advice & guidance
- Assistance for the reduction of sexual staff related matters
- Assistance for Americans Disability Act incidents
- Consultant services to legal counsel for initial review of cases
- Assistance for the reduction of violence, in-custody deaths and life threatening events
- Escape prevention-consultation and advice
- Sexual harassment cases
- Prison/Jail Volunteer Services
- Resentencing cases-Miller/Graham/Hurst
- Pre-incarceration consulting
- Prison Adjustment Specialist
- Resentencing Testimony
- Data Intelligence
- Expert Translator (English/French/English)
- Court Assigned Monitoring

**Experience**

**2003-Present**    **Elected Official & Self Employed**

Following a short stint as an elected city councilperson in Dunnellon, FL and an unsuccessful bid for the mayor's seat, time has been devoted entirely to prison & jail consulting with law firms, law schools, private and state agencies around the country and abroad. **(Retained to more than 500 separate verifiable cases – testified in state/federal courts in more than 130 cases)**

**2001-2002**    **Orange County Commission**    Orlando, FL
**Interim Director of Corrections**

Immediately following my career retirement from the Florida Department of Corrections I was ask to serve as the Interim Director of Corrections for Orange County. My interim service would be during a period that Orange County would complete a national search for a new director. On these terms I accepted the position and served as Interim Director for a period of 9 months. During this

**EXHIBIT A**

---

period I was responsible for the direction of 1651 employees, the custody, care, safety, rehabilitation of over 4000 inmates and the direction of a budget that exceeded $100,000,000 and construction budget of $114,000,000. On April 1, 2002 I retired to my home in Dunnellon, FL with the goal of both politics and starting a new private consulting business

**1998–2001**    **Florida Dept. of Corrections**    Orlando, FL
**Warden-CFRC**

- Protect the public. Under Florida Statute 944 14 Supervision of the correctional institution; enforcement of orders and regulations Supervise the government, discipline, and policy of the state correctional institution Administrative and operational direction of 801 career service and select exempt service employees. Care, custody, control and rehabilitation of approximately 3000 convicted state prisoners; Fiscal management of a budget that exceeds $43M. Inform and educate the public of DC values and vision; Develop partnerships with private and public agencies to provide programs and services. Train staff to meet the standards of the Florida Department of Corrections.

**1996 - 1998**    **Florida State Prison**    Starke, Fl
**Warden**

- Protect the public. Under Florida Statute 944 14 Supervision of the prison, enforcement of orders and regulations Supervise the government, discipline, and policy of the state prison, and to enforce all orders, rules and regulations. Administrative and operational direction of 635 career service and select exempt service employees, care, custody and control of approximately 1500 convicted state prisoners; overall supervision of Florida State Prison's death row to include the execution of such inmates as directed by the Governor of Florida; fiscal management of a budget that exceeds $40M; work to meet the needs of the Florida Legislature, private and public agencies, inform and educate the public of DC values and vision

**1992 - 1996**    **Gulf Correctional Inst.**    Wewahitchka, Fl
**Warden**

- Protect the public. Under Florida Statute 944 14 Supervision of correctional the institution; enforcement of orders and regulations Supervise the government, discipline, and policy of the state correctional institution, and to enforce all orders, rules and regulations Staff and open new all custody correctional institution oversee the construction of additional operational buildings of an entire new 1400 bed annex Administrative and operational direction of 614 career service and select exempt service employees, care, custody, control and rehabilitation of 3300 convicted felons located a five separate units, fiscal management of a budget that exceeds $23M, inform and educate the public of DC values and vision, develop partnerships with private and public agencies to provide programs and services

**1988 - 1992**    **Florida Dept. of Corrections**    Orlando, Fl
**Assistant Warden**

2

- Protect the public; serve the warden in operational and program capacities. Oversaw the construction of the East Unit (1100 man complete unit with all operational buildings, perimeter, towers and gatehouse); oversaw the reconstruction of the South Unit and additional dormitory buildings at the main unit.

1987 – 1988        **Martin Correctional Institution**        Stuart, Fl
**Correctional Major**

Protect the public; direction of security for work camp activities that includes the cultivation and growing of 220 acres of citrus, breeding, care and raising of 150 head Beef Master cattle; care, custody and rehabilitation of 209 convicted felons; supervision of a cattle/citrus production educational program for offenders. This program also included a 1000 hour course for inmates in 'cattle and citrus production.'

1982 – 1987        **Tomoka Correctional Institution**        Daytona Bch, Fl
**Investigator/Inspector**

- Protect the public; charged with criminal and accident investigations at Tomoka Correctional Institution; coordinates criminal cases with State Attorney's Office and assists with prosecution; maintains intelligence of inmate/gang activity; drug interdiction; submits investigations to the warden. During the last 18 months at Tomoka Correctional Institution I oversaw the construction of a 400 man work camp adjacent to the main unit with dormitories, food service, gatehouse and support elements.

1979-1982        **Dade Correctional Institution**        Florida City, Fl

**Correctional Officer ranks of CO, Sergeant, Lieutenant, Captain**

- Climbed subject ranks performing all officer and supervisor duties surrounding the supervision of staff and convicted offenders

**General Manager/International Sales Manager**
1964 – 1978        **Bluebell International (Monaco) S.A.**    Monte Carlo, Monaco
(a French owned S.A.)

Tokyo, Japan
Hong Kong
Saigon, Rep. Viet.
Manila, P.I.
Agana, Guam
Honolulu, HI

- Responsible for sales of company represented products to all duty free zones, ports and US/Canada Military Exchanges & Embassies located in Hawaii, PI, Japan, Korea, Taiwan, Vietnam, Okinawa, Hong Kong and Guam; residence in and extensive travel for the areas involved.

3

Reported to corporate office in Monte Carlo, Monaco; secured and contracted new accounts for the referenced market; filed US taxes and provided European bank with related fiscal information; analyzed accounts, income and determined budget for duty free trade.
Lived in France , Beirut, Japan, Korea, Hong Kong, Saigon, Taipei, Manila and Honolulu during this period for (16 years).

1957 – 1964        **United States Air Force**        Evreux, France
**E-4 (4 years 7 months...Civilian Employee additional 2 years)**
- Sergeant E-4 in military and GS-7 as NAF Civil Service Employee. Honorable Discharge. Discharged in France. Top Secret Military Clearance, F.B.I. Background Exam, O S I  Dist 1, Washington D.C.

Education
- 1979 - 1984        Miami Dade Community College        Miami, Fl
- A.A., Criminal Justice Administration
  1989 – 1992 FSU, Center for Public Management        Tallahassee, Fl
  Certification, Certified Public Manager (State of FL Certification)
- **STATE OF FLORIDA – Florida Department of Law Enforcement**
- 1980 Certified by State of FL as Certified Correctional Officer
- 1994  Florida Criminal Justice Executive Institute  FDLE. Certificate of Achievement, Chief Executive Class # 10, Tallahassee, FL
- Twelve Each - 40 Hour FDLE Career Development Courses by Florida DOC through Florida Community Colleges; Report Writing, Suicide Prevention, Stress Management; Cell Extraction & Use of Force, Narcotics & Dangerous Drugs - Substance Abuse; Interpersonal Communications, Criminal Law;, Environmental Health & Safety; Criminal Investigations, Interview & Interrogation Techniques, Inmate Gangs & Threat Groups, Crisis Intervention; Inmate Discipline and Confinement Techniques; Inmate Supervision & Transport; Hostage Negotiation, Taser Techniques, Inmate Manipulation;

Professional
Affiliations
- American Correctional Association
- American Jail Association – Professional Member
- Florida Capital Resource Center, Board of Directors
- Fraternal Order of Police – Past Member
- Florida Corrections Foundation – Member - Contributor
- Southern States Correctional Association – Past Member
- North American Association of Wardens and Superintendents
- Florida Society of Certified Public Managers – Past Member
- National Org. of Hispanics in Criminal Justice

4

- Marion County FL Sheriff's Rainbow River Watch Patrol-Retired
- Corrections One News Newsletter@CorrectionsOne.com
- Florida Peace Officers Association Past Active.(foundation closed after 84 years)

| | |
|---|---|
| **Special Qualifications** | Absolute fluency French/English/French (little if any accent) |
| | Some Japanese/Spanish/Korean |
| | Computer literate |
| | Certified Correctional Officer (Florida)(Retirement Status) |
| | Certified First Responder - Retired |
| | Weapons certified – Retired |
| | Concealed Weapons Permit |
| **Most Recent Awards** | Leadership Award, Central Florida Reception Center, 1992 |
| | Outstanding Contribution, City of Wewahitchka, Fl 1996 |
| | Outstanding Service & Dedication, Florida State Prison, 1996 |
| | Outstanding Service Award, Gulf County Commission, 1996 |
| | Support & Contribution Award, Gulf County Sheriff, 1996 |
| | Distinguished Service Award, Florida Council on Crime & Delinquency 1998 |
| | Outstanding Man of the Year for Orange County, David C. Crotty Award, 2000 |
| | Certificate of Recognition, Florida House of Representatives, 2001 |
| | Award of Merit, Central Florida Blood Bank (4 gallons) 2001 |
| | Outstanding Service Award, Orange County Spanish Jail Ministry, 2002 |
| | Orange County Sheriff's Citation, Outstanding Service Award, 2002 |
| | Leadership Award, Correctional Education (O.C.P.S.) Orange County, 2002 |
| | Certificate, Alpha Phi Sigma, National Criminal Justice Honor Society, 2008 |
| **PUBLICATIONS AUTHORED** | I have authored the following articles/books: |

5

- Contributing Author – Book – Death Penalty And The Victims, United Nations Human Rights, Office of the High Commissioner, 2016
  /-
  DP-Victims-WEB PDF

- *Guards' "Code of Silence" Hinders Clemency Efforts*, Houston Chronicle, Feb. 26, 2009;

- *Former Prison Warden Haunted by Executions*, Catholic San Francisco Magazine, Nov. 5, 2008.

- *Safety and Abuse in America's Prisons*, Presented to the National Commission on Safety and Abuse in America's Prisons in 2005, chaired by The Honorable Nicholas de B. Katzenbach and the Honorable John J. Gibbons and subsequently incorporated in part in the commission's presentation to the US House of Representatives in June, 2006.

- Additionally, I have authored many magazine and newspaper articles, participated in numerous television interviews and public speaking engagements but do not retain copies of such events. As a public speaker I am featured in numerous articles from various United States and foreign publications. Most recently I am featured in an 'interview' story of Esquire Magazine's online edition, January 2014 edition. This story is available via subscription only.

6

# Florida Department of Law Enforcement

## Case Number: OR-37-0026

### Nineteenth Judicial Circuit of Florida



*Investigative Summary:*

Department of Corrections (DOC)
Inmate Homicide

Incident Date: March 15, 2015

Case Agent:
Special Agent Eric Jester

VICTIM:                   Christopher Cox
                          DC#T43015
                          White Male
                          DOB: 08/22/1975

SUSPECT:                  Hurley Brown
                          DC#402730
                          Black Male
                          DOB: 09/26/1965

LOCATION:                 Martin Correctional Institution
                          1150 SW Allapattah Road
                          Indiantown, Florida 34956

Stone v Hendry 000580

**INVESTIGATIVE SUMMARY**

| I. | FDLE Response to Scene | (IR-01, IR-02) |
| --- | --- | --- |

On Sunday, March 15, 2015, Special Agent (SA) Eric Jester of the Fort Pierce Field Office of the Florida Department of Law Enforcement (FDLE) received a notification from Resident Agent in Charge (RAC) Michael Bartus that there was an alleged inmate suicide at the Martin Correctional Institution (MCI). RAC Bartus requested that SA Jester respond to MCI. SA Jester also read an email from the Florida Fusion Center that stated inmate Christopher Cox (DC# T43015) was found with a rope around his neck where he possibly hung himself. SA Jester contacted Martin County Sheriff's Office (MCSO) Crime Scene Sergeant (Sgt.) Todd Schimelfanick and requested that a crime scene detective respond to MCI. SA Jester subsequently responded to MCI.

Upon arrival at MCI, Warden Robert Hendry met SA Jester. Warden Hendry explained to SA Jester that inmate Cox's cellmate, inmate Hurley Brown (DC# 402730), spontaneously stated to a corrections officer (CO) that inmate Cox attacked inmate Hurley and that inmate Hurley "took him out." SA Jester relayed this information to RAC Bartus who subsequently contacted Nita Denton, Chief Attorney of the Martin County State Attorneys' Office.

SA Jester, Department of Corrections (DOC) Inspector Ryan Nicholas, and Crime Scene Detective Mark Weaver of the MCSO then entered MCI and proceeded to the crime scene. The crime scene was located in the D Dormitory, wing 2, cell 2210.

SA Jester examined cell D2210 from the outside initially and observed a white male identified as Cox lying on his back and partially fastened to a backboard or stretcher. SA Jester observed that the top bunk appeared unmade and a sheet was thrown on top of the bunk. There was what appeared to be a twisted white t-shirt on the left side [looking down at Cox]. Cox's blue shirt was raised. His blue pants along with one (1) pair of boxer shorts were lowered just below his groin area. A second pair of boxer shorts was pulled up above Cox's waist. There were at least two (2) blankets [one on either side] next to Cox. The bottom bunk contained two (2) pillows, one of which had blood on it. There was various personal protection equipment (PPE) on the floor and on the bottom bunk including gloves. An electrode patch was affixed to the lower right side and upper left side of Cox. SA Jester observed a small area of blood on the floor near Cox's head and blood on a pillow located on the bottom bunk. There was also a small amount of blood on the twisted T-shirt. SA Jester did not observe blood on any other clothing, walls, bunks, rags, towels, etc.

SA Jester next inspected Cox. SA Jester noted the presence of blood inside Cox's mouth. Cox's ears were purple in color. SA Jester observed swelling and a contusion [possibly hematoma] to Cox's left forehead area. Cox also had what appeared to be abrasions to the front of his neck. Cox's hands and feet did not appear to be injured. Cox's core was warm to the touch. His extremities were cold to the touch. There was significant to full rigor mortis and some lividity.

2

Stone v Hendry 000581

SA Jester contacted the Medical Examiner's Office. Medical Examiner Investigator William Miller, Jr. arrived on scene and conducted an examination of Cox and the crime scene. Tri- County Mortuary Transfer responded to the scene, removed Cox's body, and transported Cox's body to the Medical Examiner's Office for autopsy.

| II. | EMS Response to MCI | (IR-26, IR-34) |
|---|---|---|

On Wednesday, April 8, 2015, SA Jester interviewed Paramedic Kristian Nader at Station 24 in Indiantown, Florida. During the sworn, digitally recorded interview, Paramedic Nader stated that he was assigned to work Station 24 on March 15, 2015. Paramedic Nader was responding to a motor vehicle accident and re-routed to MCI for a medical emergency. Paramedic Nader stated that the original call was for cardiac arrest. Paramedic Nader stated that when he arrived to cell D2210 he observed two (2) MCI medical personnel. Cox was hooked up to the Automated External Defibrillator (AED) and no signs of life were observed. Paramedic Nader asked the nurses if the AED ever advised to shock. According to Paramedic Nader, the nurses stated that it had not. Paramedic Nader placed Cox on a backboard and connected Cox to a monitor. Paramedic Nader stated that Cox was "flat-lined, asystole." Paramedic Nader described Cox as having cyanosis from his upper chest to the back of his head. According to Paramedic Nader, it appeared Cox had "been down" at least 45 minutes. Paramedic checked Cox's mouth and stated that his jaw had some signs of rigor mortis. At that time, Paramedic Nader pronounced Cox deceased. SA Jester inquired of Paramedic Nader observed any injuries. Paramedic Nader stated he did not recall any injuries. Paramedic Nader stated that Cox was warm and thought they would have to transport. Once Paramedic Nader began his assessment, he determined that Cox was deceased. Paramedic Nader provided SA Jester with run #4236.

On Monday, April 20, 2015, SA Jester received reports and documents from Tammy Pasqualone, Battalion Chief Secretary, of the Martin County Fire Rescue (MCFR). SA Jester reviewed the report and observed that MCFR was called to MCI on March 15, 2015, to respond to a cardiac arrest. The call originated at 19:55:33 hours and was dispatched at 19:57:44 hours. MCFR arrived at MCI at 20:10:00 hours and had patient contact at 20:19:00 hours. Paramedic Kristian Nader and an EMT responded to MCI.

| III. | Documents Obtained from MCI Reference Incident | IR-04 |
|---|---|---|

On Wednesday, March 18, 2015, SA Jester received several logs from Inspector Scott Thomas of the Martin Correctional Institution (MCI). SA Jester reviewed the logs and determined that each log was written on a Department of Corrections (DOC) Housing Log. The logs were entitled: D, "B"-Dorm, wing enter exit (Delta), and D-Wing 2 Cell D2210.

Stone v Hendry 000582

The following logged times contain information significant to this investigation found on log "D":

| 7:00 PM | Sergeant (Sgt.) Robert Feipel, CO Christopher Rose, assumed duties and responsibilities of housing unit D and subsequently conducted an inmate count |
|---|---|
| 7:25 PM | Inspections of the doors, and non-cell windows began |
| 7:25 PM | Nurse [Carolyn Conrad] entered D dormitory to pass out medications |
| 7:29 PM | Sgt. Feipel and CO Rose open cell 2210 with nurse [C |
| 7:31 PM | Advised Medical of unresponsive inmate |
| 7:35 PM | Captain (Capt.) Charles Marteens and CO David Baile |
| 7:41 PM | Nurses Leah Darlington and Rashena Williams arrive |
| 7:43 PM | CO Shedeldra Townsend enters with defibrillator |
| 8:16 PM | EMS arrives |
| 8:24 PM | CO Ricardo Velez exits with evidence from inmate Bro |
| 8:24 PM | EMS reports inmate [Cox] deceased |

The log was maintained by correctional officer (CO) Wisly Mathias and signed off on by Sgt Feipel.

The following logged times contain information significant to this investigation found on log "B"- Dorm:

| 9:08 PM | Inmate Brown stated that he thought he broke his right hand |
|---|---|
| 9:33 PM | Inmate Brown stated that his arms and hands hurt |
| 23:52 | FDLE enters to document injuries to inmate Brown |
| 0:00 | Inmate Brown placed in restraints to be interviewed by FDLE |
| 3:05 AM | Inmate Brown to be transferred |

The log was maintained by correctional officer (CO) A. Harvey and CO Brown.

Stone v Hendry 000583

The following logged times contain information significant to this investigation found on log "wing enter exit (Delta)":

Times began at 9:30 PM and continued until 1:36 AM.    This log listed all individuals who entered/exited wing 2 of the D Dormitory on March 15-16, 2015.

The log was signed off on by Sgt Fiepel.

The following logged times contain information significant to this investigation found on log "D-Wing 2 Cell D2210" and will be documented as the crime scene log:

| 7:24 PM | Nurse Conrad entered D Dorm to pass out medication |
| 7:25 PM | Sgt. Feipel entered dorm to assist nurse Conrad |
| 7:28 PM | CO Rose entered wing 2 |
| 7:29 PM | opened 2210 |
| 7:31 PM | advised Medical of unresponsive inmate |
| 7:35 PM | Captain (Capt.) Martins and CO Bailes enter D2 |
| 7:41 PM | Nurses Darlington and Williams arrive with a stretcher |
| 7:43 PM | CO Townsend enters with AED |
| 8:05 PM | Nurse Jenell Jones departs |
| 8:08 PM | Nurse Conrad entered D2210 |
| 8:11 PM | Nurse Conrad departs D2210 |
| 8:18 PM | EMS arrives at D2210: Myers, Thatcher, Nader, Hartman, and Davidson |
| 8:21 PM | Nurse Darlington and Nurse Williams depart D2210 |
| 8:24 PM | EMS pronounced inmate Cox deceased |
| 8:28 PM | Cell 2210 secured |
| 1:36 AM | Tri County removed inmate Cox |
| 1:37 AM | Crime scene cleared |

The log was maintained by correctional officer (CO) Chase and signed off on by Sgt Fiepel.

5

Stone v Hendry 000584

**IV.    Documents/Information Obtained from MCI Reference Inmate Cox and Inmate Brown                                    (IR-05, 10)**

On Wednesday, March 18, 2015, SA Jester received a Daily Record of Special Housing from Inspector Scott Thomas of the Martin Correctional Institution (MCI).  SA Jester reviewed the document and determined that Cox was initially placed in special housing on February 3, 2015 in the D Dormitory, wing 2, cell 2214U.  On March 4, 2015 under the "action and remarks" section, it read "psych-evals."  On March 5, 2015 under "remarks," it stated that inmate took a handful of pills in front of Nurse Doyle at 7:50 PM and that Nurse Doyle conducted a self-harm check at 10:15 PM.  SA Jester did not observe any record on Cox being moved to cell 2210.  Furthermore, on March 13, 2015, when Cox was allegedly moved to cell 2210 the record only reflected satisfactory appearance and attitude.

SA Jester asked Inspector Thomas to review any visitor or phone logs of Cox.  Inspector Thomas stated that Cox did not have any visitors or make any phone calls while incarcerated at MCI.  Inspector Thomas provided emergency contact information for Cox, which was Brenda Truitt, Cox's grandmother.  Inspector Thomas indicated that Cox was received at MCI on January 14, 2015 and was placed in protective management (PM) February 3, 2015.  Once in PM, Cox was not able to have visitors or make phone calls.

Additionally, as Hurley Brown was in PM he was not allowed to have visitors or make phone calls.  Brown was in PM prior to Cox being placed in the same cell and was transferred from MCI after the incident.

**V.    Sworn Interviews of Inmates                    (IR-15, IR-16, IR-17, IR-28, IR-35)**

**Inmate Ernest Powell III            (IR-15)**
*Serving 20 years for Burglary with Assault and Sexual Battery with a Weapon or Force*

On Monday, March 23, 2015, SA Jester interviewed inmate Ernest Powell, III (DC# P09831) at MCI. During the sworn, digitally recorded interview, Powell stated that he was housed in the D Dormitory, wing 2, cell 2211 on March 15, 2015. Powell stated that when the incident occurred, he heard noise, "boom, boom, boom" followed by silence. Powell then heard inmates screaming, "Man down!" SA Jester asked Powell to elaborate on the noises that he heard. Powell stated that there was no yelling or screaming from the cell. Powell heard "slinging around" and knocks on the wall. SA Jester asked if Brown yelled man down. Powell stated that the inmate in D2209 (later identified as Derek Damiencedrick Wells aka Derek Cedri) yelled "man down, seizure" first, and then everyone else followed.

Powell stated that Cox was in cell D2214 before being moved to cell D2210. Powell stated that Cox seemed very uncomfortable about moving into cell D2210. Powell indicated that he did not know if it was a set up. Powell stated that he talked to Cox while in confinement before being moved to the D Dormitory. Powell stated that he did not know of any problems that Cox had. Powell stated that an officer told Powell's

6

Stone v Hendry 000585

cellmate (later identified as Peter Larangera) that Brown choked out Cox and stomped on his throat. Powell stated that it took officers approximately 25-30 minutes of inmates banging on the doors for officers to respond. (Powell added that inmates frequently kicked the doors and yelled for no reason.) Powell stated that when an officer finally arrived to the cell, the officer checked the cell, opened the door flap, and gave inmate Brown medication. According to Powell, the nurse told the officer to cuff the other inmate, hurry up, and open the door. Powell stated that Brown was removed from the dorm.

SA Jester asked Powell about the 30-minute checks that were conducted by officers in the protective management (PM) wing. SA Jester asked if the officers woke everyone up or just looked in the windows of the cell doors. Powell stated that most of the times the lights are on in the cells but sometimes the lights are off and the officers shine a flashlight into the cell.

**Inmate Peter Larangera            (IR-16)**
*Serving 3 years for Burglary and Grand Theft of Motor Vehicle*

On Monday, March 23, 2015, SA Jester interviewed inmate Peter Larangera (DC# W07656) at MCI. During the sworn, digitally recorded interview, Larangera stated that he was housed in the D Dormitory, wing 2, cell 2211 on March 15, 2015. Larangera added that he was placed in this cell on March 12, 2015 and was in the work camp prior to that. Larangera stated that when the incident occurred, he heard banging in cell D2210. Larangera described the noise as "thumping." Larangera then heard inmates screaming, "Man down," and kicking the cell doors. SA Jester asked Larangera if he heard any screaming or fighting. Larangera stated that he did not hear any screaming or cussing, just a "couple of good solid thumps." Larangera stated that all the inmates yelled "man down, seizure" and kicked the cell doors. Larangera added that the inmates yelled and kicked the cell doors about every 15 minutes all day every day.

SA Jester inquired if he heard any arguing or altercations prior to the incident on March 15, 2015. Larangera stated that he never heard any fighting or arguing. Larangera added that the air vents were open and that one could hear everything from the cells on both sides of his cell. Larangera stated that he did not hear any conversations from D2210.

SA Jester asked Larangera if he had anything else to add. Larangera stated that MCI was known as a facility in which an inmate would kill a cellmate whom the inmate disliked. Larangera stated that every inmate was armed at MCI and that inmates would often stab each other. Larangera added that he had been in 10 different prisons and that MCI was the worst. Larangera stated that security checks of the dorms were usually at the top of the hour or close to the top of the hour, and an inmate could easily time the checks if they wanted to do something. Larangera stated that he believed the incident occurred approximately 15 minutes after the last security check. Larangera added that it took the officers at least 30 minutes to respond to the cell once the yelling began. Larangera indicated that the responding officer did not want to open the cell door. Larangera stated that the door was finally opened and that the nurse and officer went into cell D2210.

7

**Inmate Derek Cedri            (IR-17)**
*Serving 10 years for Burglary, Grand Theft, Trafficking in Stolen Property, False VIN*

On Monday, March 23, 2015, SA Jester interviewed inmate Derek Damiencedrick Wells aka Derek Cedri (DC# T20840) at MCI. Prior to the interview, Cedri stated that he had an issue with a correctional officer (CO) and wished to be moved from MCI in return for providing a statement. SA Jester explained that it was an internal issue and SA Jester would not make promises in exchange for a statement. Additionally, Cedri mentioned that he had "visions" a few days prior to Cox being moved into cell D2210. Cedri stated that he saw Cox's face in his window, then again as he was looking up at the underneath of the top bunk. Cedri stated that these "visions" allowed him to know that something was going to happen to Cox.

During the sworn, digitally recorded interview, Cedri stated that his real name was Derek Wells but that upon entering the Department of Corrections (DOC) his name was changed to Derek Cedri. Cedri stated that he was housed in the D Dormitory, wing 2, cell 2209 on March 15, 2015. Cedri stated that at approximately 7:15PM-7:20PM he heard talking and fighting coming from cell D2210 through the vent. Cedri stated that he asked what was going on when inmate Hurley Brown stated everything was alright. Cedri stated that Cox then yelled, "Help, Ced, everything is not alright!" Cedri stated that it sounded like Cox was being strangled. Cedri stated that he observed a CO (Later identified as CO David Bailes) doing a perimeter check of the C Dormitory and that he yelled at CO Bailes to tell him a man was getting killed in the cell next to Cedri's. According to Cedri, CO Bailes wrote a report about the incident. Cedri then got the other inmates inside the D Dormitory to yell and scream, "Man down, seizure, room 10 top," and to beat their cell doors.

Cedri stated that a CO and a nurse then came into wing 2 and delivered medications to cell four on the bottom. Cedri stated that the CO and nurse ignored the calls for help. After delivering the medications, the CO and nurse then exited the wing. About 5-10 minutes later, the CO and nurse came back into wing two and then went to cell D2210. Cedri added that the cell lights were off during the incident and that the lights did not come back on until they opened cell D2210.

Cedri next stated that the incident happened because Brown wanted to have sex with Cox. According to Cedri, Cox stated that he did not "get down like that" and that Brown began to fight Cox. This fight lead to the murder and Cedri stated that he thought Brown still had sex with Cox. Cedri stated that Brown had a lot of time to clean up everything. Cedri stated that he heard water running and the sound of a rag wiping the wall in cell D2210 after the incident. Cedri stated that Brown made the crime scene look like Cox fell off his bunk and hit his head.

SA Jester asked Cedri what he knew about Cox and Brown. Cedri stated that Brown was "bugged out" and was nicknamed "bug." Cedri added that Brown was facing two (2) life sentences and had nothing to lose. Cedri stated that Brown was approximately 210-220 pounds and that Cox was approximately 170 pounds. Cedri stated that he told the CO's not to put Cox in the cell with Brown because Cox was a "small, young, good looking white boy." Cedri stated that Brown never came to the cell door to tell Cedri that

8

Cox was having a seizure. Cedri stated that one evening prior to the incident, Cedri was trying to trade Brown a hamburger for a peanut butter sandwich. During this time, Cox was allegedly talking over Brown. Cedri claimed that Brown said, "Don't try to talk when I ain't talking to you. The only thing I do to crackers is fuck 'em."

SA Jester's note: Brown is approximately 165 pounds and Cox 134 pounds. Brown is not facing two (2) life sentences and is scheduled to be released in 2029.

**Inmate Michael Gallagher          (IR-28)**
*Released on April 27, 2015 after serving 3 years for Burglary and Trafficking in Stolen Property*

On Sunday, March 15, 2015, SA Jester interviewed inmate Michael Gallagher (DC# V37599) at MCI. During the sworn, digitally recorded interview, Gallagher stated that he was housed in the D Dormitory, wing 2, cell 2217U on March 15, 2015. Gallagher added that he was placed in this cell on March 1, 2015, and had been in the D Dormitory since December 21, 2014.

Gallagher stated that he looked out of his cell and observed a black inmate (later identified as Hurley Brown) choking out inmate Cox. Gallagher stated that he could only see Brown's arm around Cox's neck. Gallagher added that Cox's eyes appeared to be "bulging out of his head." Both inmates then disappeared from view. Approximately 10-15 minutes later, the inmates began yelling "man down" so he looked out of his cell door window again. SA Jester asked Gallagher if he observed any fighting prior to or after he observed Brown choking Cox. Gallagher indicated that he did not. Gallagher stated that he observed a blue inmate shirt covering the window of the cell door approximately five (5) minutes after he observed Brown choking Cox. Gallagher stated that inmate Cedri told Gallagher that Brown yelled through the vent to Cedri that Cox was down and to kick on the door. According to Gallagher, Cedri stated that he heard Brown and Cox fighting and that it sounded like someone's head was getting beat on the bunk. Gallagher stated that when Brown was taken from the cell that he, "...had a big 'ole   shit eating grin on his face...like he was pleased with what he had just done." Given the cell door windows are only approximately 4 inches wide, SA Jester asked Gallagher to describe how he could see into a cell across the wing and make out anything. Gallagher explained that he could see the inmates' when they were at the cell door window but not after they moved from being directly in front of the window. SA Jester asked Gallagher if he could hear Brown and Cox yelling or arguing. Gallagher stated that it was too loud in the dormitory to hear anything not directly next to his cell.

SA Jester inquired if Gallagher heard of any arguing or altercations prior to the incident on March 15, 2015. Gallagher stated that he never heard of any issues with Brown and Cox. SA Jester asked Gallagher what time he believed the incident to have occurred. Gallagher stated approximately 6:50PM-7:00PM. He estimated this time because every day was the same routine. Gallagher stated that at 6PM, the officers would pick up food trays and the inmates would sweep up the dormitory. Gallagher stated that it was right at shift change, approximately 30-35 minutes after the floors were swept. SA Jester asked if Gallagher witnessed the nurse handing out medications. Gallagher stated that he was doing pushups prior to witnessing Brown choking Cox. Gallagher added that once the

inmates began yelling and kicking at the door, the Sergeant (Sgt.) (later identified as Robert Feipel) and the nurse (later identified as Carolyn Conrad) handed out medications in wing two until approximately cell 2107. Sgt. Feipel and Nurse Conrad then exited the wing. Several minutes later, they returned to wing two and Sgt. Feipel and Nurse Conrad walked slowly to cell 2210. Gallagher stated that it was approximately 35 minutes after he witnessed Brown choking Cox before anyone arrived to check on Cox.

Gallagher explained that Brown's inmate prior to Cox attempted to kill himself several times. Gallagher stated that the attempts were in an effort to get out of the cell with Brown. Gallagher stated that he believed this inmate and Brown were "gassed" because of the attempt. Gallagher only knew the inmate as being a black male nicknamed "bald head." Gallagher added that the inmate was moved to a first floor cell and attempted suicide again.

Gallagher stated that he was being released from the Department of Corrections (DOC) in approximately two (2) weeks. Gallagher provided a contact number of 386-576-4063 and his mother's name, Shelley Stewart. Gallagher stated that he would testify in court if needed.

**Inmate Shernerd Richardson          (IR-35)**
*Serving 15 years for Lew and Lascivious Battery Victim 12-15*

On Tuesday, April 21, 2015, SA Jester interviewed inmate Shernerd Richardson (DC# 962778) at the Union Correctional Institution (UCI). Also present during the interview was RAC Bartus.

During the sworn interview, Richardson stated that he was incarcerated at MCI for approximately five to six months prior to being transferred to UCI on March 16, 2015. Richardson stated that he was in the D Dormitory, wing 2, cell 210 for several weeks. Richardson was at one-point cellmates with Hurley Brown (DC# 402730). Richardson stated that Brown never had any issues with Richardson and did not express any homosexual tendencies or racism towards whites. Richardson stated that the only issues Brown had were with the guards at MCI. Richardson stated that at some point the end of February or beginning of March, he expressed to Brown that he was going to kill himself. Richardson told Brown that he wanted to give up and kill himself before the inmates or guards killed him. According to Richardson, Brown tried to talk Richardson out of committing suicide. Richardson took 'the blade from his shaving razor and began to cut his wrist and arm area. Brown started kicking the cell door and yelling to the guards that Richardson was attempting to kill himself. Richardson stated that Sergeant (Sgt.) Jake Crouch and an unidentified captain came to the cell, observed Richardson cutting himself, laughed at him, and then left. Richardson stated that they later came by the cell and Richardson told them he was going to cut his throat. Richardson then began to cut his throat with the blade. Richardson stated that Sgt. Crouch then opened the food port on the door and sprayed a chemical agent inside the cell. The guards took Richardson and Brown to the showers and treated them for the exposure. Richardson was moved to the D Dormitory, wing 3 after the incident.

Richardson stated that he attempted suicide while in D3 by hanging himself. Richardson described the attempt as tying a bed sheet to the top bunk and around his neck. Richardson then dove head first off the bunk in an effort to snap his neck. Richardson stated that the condition of MCI, the fact that inmates were always being stabbed, and that guards were paying inmates to harm other inmates were the reasons he tried to kill himself. Richardson stated that he wanted moved out of MCI for his safety and no one would assist him. Richardson recalled that the night before he was moved to UCI, a white inmate (Cox) was murdered in the D2 dormitory. Richardson did not know that the inmate was Brown's cellmate. Richardson also did not have any knowledge of how or why Cox was murdered.

| VI. | Sworn Interviews and Incident Reports of DOC Officers  (IR-07, IR-08, IR-09, IR-11, IR-22, IR-24, IR-23, IR-25) |
|---|---|

**Sgt. Robert Feipel    (IR-07, IR-11, IR-24)**

*Incident Report*

SA Jester reviewed Incident Report (430-0315-113A) and determined that Sergeant (Sgt.) Robert Feipel authored the report. Sgt. Feipel stated that at approximately 7:25PM he was escorting Nurse Carolyn Conrad in the D Dormitory, wing 2, as she delivered medication. Sgt. Feipel observed inmate Cox lying face down in the corner of cell D2210 with his face in a pillow. Sgt. Feipel handcuffed inmate Hurley Brown and called for assistance. At 7:29PM, the cell door was opened and restraints were placed on Brown. Correctional Officer (CO) Christopher Rose then escorted Btrown to shower one. Nurse Conrad entered the cell and Sgt. Feipel "untied a noose from inmate Cox's throat." Nurse Conrad checked Cox for vital signs via Cox's wrist and stated that Cox was dead. Sgt. Feipel reported that he asked Nurse Conrad if she wished to perform CPR. According to Sgt. Feipel's report, Nurse Conrad stated, "He's dead and needs a stethoscope." Sgt. Feipel called for additional medical staff and notified the shift officer in charge. Nurses Leah Darlington and Rashena Williams arrived to the cell and started CPR at approximately 7:41PM.

*Inspector Nicholas Interview of Sgt. Feipel*

On Wednesday, March 18, 2015, SA Jester received an audio file of an interview from Inspector Ryan Nicholas. SA Jester listened to the audio file that contained an interview conducted between Sergeant (Sgt.) Robert Feipel and Inspector Nicholas. The interview was conducted on March 15, 2015. Sgt. Feipel indicated that he had been employed as a sergeant with MCI since approximately 2004. On March 15, 2015, Sgt. Feipel was assigned to the D Dormitory. His shift began at 7:00PM. Sgt. Feipel stated that his first security check of wing 2 was at approximately 7:25PM while he was making the medication rounds with the nurse.

Sgt. Feipel stated that he was escorting Nurse Carolyn Conrad in the D Dormitory, wing 2, as she delivered medication. Sgt. Feipel stated that as he entered wing 2 the inmates were making noises. At approximately 7:29PM, Sgt. Feipel observed inmate Cox lying face down in the corner of cell D2210 with his face in a pillow and arms to his side. Sgt. Feipel called for assistance and handcuffed inmate Hurley Brown, the cellmate.

11

Correctional Officer (CO) Christopher Rose assisted in securing Brown and then escorted Brown to the shower.

Sgt. Feipel entered the cell, rolled Cox over, placed Cox in restraints, and untied the noose from Cox's throat. Sgt. Feipel described the noose as a twisted up piece of sheet. Nurse Conrad checked Cox for vital signs and stated that Cox was dead. Sgt. Feipel stated that other nurses arrived to the cell and started CPR at approximately 7:41PM.

Inspector Nicholas asked if Brown made any statements to him. Sgt. Feipel stated that Brown voluntarily told Sgt. Feipel that he "took him out." Sgt. Feipel indicated that this occurred when Sgt. Feipel was taking Brown's clothing. Sgt. Feipel added that Cox jumped on or attacked Brown while Brown was in his bed. Sgt. Feipel stated that Brown mentioned having problems with Cox earlier but did not elaborate.

*SA Jester Interview of Sgt. Feipel*

On Wednesday, April 1, 2015, SA Jester interviewed Sergeant (Sgt.) Robert Feipel at MCI. On March 15, 2015, Sgt. Feipel was assigned to run the D Dormitory. His shift began at 7:00PM. Sgt. Feipel stated that his first security check was of wing one. He then moved to wing two with Nurse Carolyn Conrad to hand out medications when he came across the situation with Cox. SA Jester asked about the frequency of security checks in the D Dormitory. Sgt. Feipel stated that security checks usually occurred every 30 minutes and typically just before shift change, usually right before 7:00PM. Sgt. Feipel stated that SA Jester could check the Housing Log to ascertain when the last security check prior to his occurred.

During the sworn, digitally recorded interview, Sgt. Feipel stated that Cox was lying face down in the corner of the cell with a pillow underneath his face when he first encountered Cox. Cox's arms were straight by his side and there was something around Cox's neck. Sgt. Feipel called for assistance from CO Christopher Rose. Sgt. Feipel stated that he initially utilized the food port of the cell door to handcuff inmate Hurley Brown. CO Rose then escorted Brown to the shower. According to Sgt. Feipel, Brown stated that Cox had a seizure. Sgt. Feipel entered the cell then secured Cox with handcuffs behind his back and leg irons. (This was a security measure as inmates often faked injuries to harm a CO or cause another type of disturbance.) Sgt. Feipel rolled Cox over and untied the noose from Cox's throat. Sgt. Feipel described the noose as a twisted up cloth. The noose was tied in front. SA Jester asked how Cox appeared when he first entered cell D2210. Sgt. Feipel stated that Cox had neck injuries, blood on the right side of his mouth, and an injury to his temple. Sgt. Feipel indicated that Cox's eyes were stuck open and glazed. SA Jester inquired if the cell lights were off at the time he first observed Cox. Sgt. Feipel stated that the lights were on and not typically shut off until after master count. Master count occurred at 9:30PM or 10:00PM. SA Jester asked Sgt. Feipel if he utilized a flashlight to see inside of cell D2210. Sgt. Feipel stated that he did not.

According to Sgt. Feipel, Nurse Conrad checked Cox for a pulse and stated that Cox was dead. SA Jester asked where Nurse Conrad checked for a pulse. Sgt. Feipel stated Cox's right wrist. SA Jester asked if Nurse Conrad checked for a pulse anywhere else such as Cox's neck. Sgt. Stated Feipel stated that she did not. SA Jester asked if Nurse Conrad attempted CPR. Sgt. Feipel responded that she did not. Sgt. Feipel added that he asked

12

Nurse Conrad if they were going to perform CPR and Nurse Conrad stated, "no," that "he (Cox) was dead."

SA Jester asked Sgt. Feipel if every CO was trained in First Aid and CPR. Sgt. Feipel stated that they were. Sgt. Feipel stated that if medical personnel were on scene that the medical personnel were in charge and the CO's would only assist. Sgt. Feipel stated that if no medical personnel were at the scene of a medical emergency then they would render aid until someone else qualified relieved them. Sgt. Feipel stated that if Nurse Conrad would have begun CPR on Cox that he would have assisted.

SA Jester asked Sgt. Feipel if he had any further contact with Brown after he initially had him removed from the cell. Sgt. Feipel stated that at some point he collected Brown's clothing. SA Jester asked if Brown made any statements to him. Sgt. Feipel stated that Brown said Cox attacked him while he was sleeping and that he "took him out." Sgt. Feipel stated that Brown also said, "What's a murder?"

SA Jester asked Sgt. Feipel if he was familiar with inmate Derek Cedri. Sgt. Feipel stated he was not. SA Jester mentioned to Sgt. Feipel that Cedri allegedly told CO David Bailes about yelling to a CO at the C Dormitory that someone was being killed in the cell next to his; that CO Bailes reported this to Sgt. Feipel. Sgt. Feipel stated that he had no knowledge of this.

**Captain Charles Martens          (IR-08)**

SA Jester reviewed Incident Report (430-0315-113) and determined that Captain (Capt.) Charles Martens authored the report. Capt. Martens reported that at approximately 7:25PM Sgt. Feipel was escorting Nurse Carolyn Conrad in the D Dormitory, wing 2, as she delivered medication. Sgt. Robert Feipel observed inmate Cox lying face down in the corner of cell D2210 with his face in a pillow. Sgt. Feipel ordered both inmates to submit to wrist restraints, and inmate Cox was unresponsive. Inmate Cox was unresponsive. Sgt. Feipel called for assistance and CO Rose arrived. Brown was removed from the cell. Nurse Conrad entered the cell and checked Cox for a pulse. Nurse Conrad Cox found no pulse and advised Sgt. Feipel. No CPR was started. According to the report, Sgt. Feipel asked Nurse Conrad if they should start CPR, but Nurse Conrad responded that Cox was dead. Capt. Martens arrived at the cell and was advised by Nurse Conrad that Cox had no pulse and was presumed dead. Capt. Martens then considered the cell a crime scene and closed the door. Capt. Martens then requested additional medical staff. At approximately 7:41PM, Nurses Rashena Williams and Leah Darlington arrived with a stretcher. The cell was opened on order of Capt. Martens at which time the nurses began CPR. Capt. Martens reported that at approximately 7:49PM CO Sheldeldra Townsend arrived with an ambulatory bag. At approximately 7:50PM, EMS was notified and arrived at the cell at approximately 8:18PM. A paramedic pronounced Cox deceased at approximately 8:24PM.

Capt. Martens also reported that the Warden, Duty Warden, Emergency Action Center, and on call Inspector's Office were notified of the incident. Cell D2210 was closed off as a crime scene and CO Rose was assigned to document the crime scene log. Inmate

13

Brown's clothing was removed and placed into evidence bags. Inmate Brown was transported to Florida State Prison (FSP) at approximately 4:00AM on March 16, 2015.

**CO Christopher Rose          (IR-09)**

SA Jester reviewed Incident Report (430-0315-113R) and determined that CO Christopher Rose authored the report. CO Rose reported that at approximately 7:29PM, he responded to Sgt. Feipel's request for assistance in the wing 2 housing unit of the D Dormitory. CO Rose arrived to cell D2210 where Sgt. Feipel and Nurse Conrad were standing in front. CO Rose wrote that he observed inmate Cox motionless on the floor of the cell. CO Rose indicated that inmate Hurley Brown claimed Cox had a seizure. Brown was placed in restraints and Sgt. Feipel entered the cell. CO Rose and Sgt. Feipel placed inmate Cox in hand restraints and CO Rose then escorted Brown to shower one where Brown was secured. Capt. Martens and CO David Bailes arrived at approximately 7:35PM at which time CO Rose departed the wing and attempted to find a new cell location for Brown. CO Rose returned to D2 at approximately 8:00PM and maintained an emergency housing log.

On Wednesday, April 1, 2015, SA Jester interviewed correctional officer CO Rose at MCI. During the sworn, digitally recorded interview, CO Rose stated he was working on March 15, 2015, assigned to the D Dormitory. CO Rose stated that Sgt. Feipel requested assistance at which time he responded. When CO Rose arrived at cell D2210, Sgt. Feipel stated that an inmate was having a seizure. CO Rose observed inmate Cox on his side with his face in a pillow, motionless. CO Rose indicated that inmate Cox was not having a seizure as a seizure was accompanied with movement and Cox was not moving at all. CO Rose next escorted inmate Hurley Brown to shower one. CO Rose returned to cell D2210 and watched the events unfold. CO Rose was next tasked with finding alternate housing for Brown. CO Rose was then ordered to maintain cell security and keep the Crime Scene Log.

SA Jester asked if Brown made any comments or statements to CO Rose. CO Rose stated that the only thing Brown told him was that Cox had a seizure. SA Jester asked CO Rose if anyone watched Brown after he was placed in the shower. CO Rose stated that he did not believe anyone watched Brown.

CO Rose stated that he was "stunned" by Nurse Conrad's lack of action. CO Rose stated that he believed Nurse Conrad only checked for a pulse in Cox's wrist and never checked in Cox's neck area. Additionally, CO Rose stated that he heard Nurse Conrad comment that she could not do anything for Cox. Furthermore, CO Rose stated that Nurse Conrad asked for a stethoscope. CO Rose said that he believed when he returned to cell D2210 from placing Brown in the shower that Nurse Conrad was handing out medications in cell D2212 and not doing anything with Cox.

Prior to the conclusion of the interview, CO Rose mentioned that inmate Michael Gallagher, who was housed in D2217, mentioned that he saw the incident happen. CO Rose stated that it was possible to see inside cell D2210 from cell D2217. After the

14

interview, CO Rose contacted Gallagher who informed CO Rose that he would provide a statement to SA Jester.

## CO David Bailes                      (IR-22)

On Monday, March 30, 2015, SA Jester interviewed CO David Bailes at MCI. During the sworn, digitally recorded interview, CO Bailes stated that he worked 7PM to 7AM that date. CO Bailes indicated that he worked in the C Dormitory. SA Jester asked if CO Bailes conducted a perimeter security check of the C Dormitory that night. CO Bailes stated that he did not conduct the perimeter security check that night. CO Bailes stated that when he arrived to the C Dormitory for his shift, his Sergeant (Sgt.), Ryan Reynolds, asked CO Bailes to go to the control room to pick up equipment. CO Bailes subsequently went to the control room. CO Bailes gathered the equipment and was going back to the C Dormitory when he stopped to talk to Capt. Martens. CO Bailes heard Sergeant (Sgt.) Robert Feipel call on the radio for assistance at the D Dormitory. Capt. Martens and CO Bailes then responded to the D Dormitory.

SA Jester asked CO Bailes if he knew who conducted the C Dormitory perimeter security check that night. CO Bailes stated that when he was going to the control room he observed CO Andres Huertas-Rodriguez begin the check.

SA Jester asked CO Bailes if at any time he heard an inmate yell or attempt to contact him from the D Dormitory or if CO Bailes wrote any reports that night. CO Bailes responded, "No." SA Jester inquired if CO Bailes had any contact with inmate Derek Cedri that night. CO Bailes indicated that while he was inside the D Dormitory, Cedri told him he "hollered" at an officer out the window. CO Bailes subsequently passed this information on to the D Dormitory Sgt. (identified as Sgt. Feipel). CO Bailes stated that he was assigned to keep the inmates under control in the D Dormitory as EMS was in the dormitory. CO Bailes then reported to the C dormitory for the remainder of his shift. CO Bailes had no contact with inmate Hurley Brown.

## CO Andres Huertas-Rodriguez      (IR-23)

On Monday, March 30, 2015, SA Jester interviewed CO Andres Huertas-Rodriguez at MCI. During the sworn, digitally recorded interview, CO Huertas-Rodriguez stated that he worked 2:00PM to 10:00PM on March 15, 2015. CO Huertas-Rodriguez was assigned to work in the C Dormitory. SA Jester asked if CO Huertas-Rodriguez conducted a perimeter security check of the C Dormitory that night. CO Huertas-Rodriguez stated that he could not recall if he conducted the perimeter security check that night. SA Jester stated that CO Bailes stated Huertas-Rodriguez conducted the check and that the C shift was working. This helped Huertas-Rodriguez's memory and he stated that he recalled doing the perimeter check.

SA Jester asked CO Huertas-Rodriguez if at any time he heard an inmate yell or attempt to contact him from the D Dormitory. CO Huertas-Rodriguez responded, "No." CO Huertas- Rodriguez added that he did not hear anything from the D Dormitory while

outside. SA Jester asked Huertas-Rodriguez if he knew of the incident in the D Dormitory. CO Huertas-Rodriguez stated that he was inside the C Dormitory at the time and heard a radio call requesting medical assistance. CO Huertas-Rodriguez never entered the D Dormitory on March 15, 2015.

## VII.   Sworn Interviews and Incident Reports of Nurses      (IR-39, IR-42, IR-44, IR-45, IR-46, IR-47)

## Rashena Williams, LPN        (IR-13, IR-31)

On Friday, March 20, 2015, SA Jester interviewed Nurse Rashena Williams at MCI. During the sworn, digitally recorded interview, Nurse Williams indicated that she was certified as a Licensed Practicing Nurse (LPN). Nurse Williams added that she was currently employed by Wexford Health Sources Incorporated and had been for approximately three and a half months. Nurse Williams had been a nurse for approximately two (2) years.

SA Jester inquired as to Nurse Williams' duties at MCI. Nurse Williams stated that she would typically hand out medications to inmates in the various dormitories. Nurse Williams added that if the inmates were on lockdown Nurse Williams would work from the Medical Unit. Once the medications were handed out, Nurse Williams would assist in other medical functions.

SA Jester inquired as to the protocol was for call outs to dormitories for emergencies. Nurse Williams stated that if an emergency were called out correctly they would respond with the appropriate supplies. Nurse Williams stated that on March 15, 2015, she was called to respond to an inmate that had a seizure and responded with a backboard. Nurse Williams stated that she and Nurse Leah Darlington arrived at the D Dormitory and were informed that the inmate was not responsive. Nurse Williams added that Nurse Carolyn Conrad told the officers that inmate Cox "looked dead." Nurse Williams stated that she and Nurse Darlington arrived at cell D2210. Nurse Williams indicated that it took approximately 3-4 minutes for the cell door to open. Nurse Williams entered cell D2210 and observed Cox on the ground on his back. Cox had handcuffs on his hands (behind his back) and restraints on his feet. Nurse Williams observed blood in Cox's mouth and nose, and a bruise on the left side of his forehead. Nurse Williams added that Cox's ears and "finger beds" were "blueish." Nurse Williams could not get a blood pressure reading or pulse and expressed that Cox was very warm to the touch. Nurse Williams stated that she immediately requested an AED and for someone to call 9-1-1. Nurses Williams and Darlington conducted CPR on Cox. Nurse Jenell Jones arrived with an AED and assisted with CPR. Nurse Williams stated that the AED instructions never advised to shock Cox, as there was never heart activity.

SA Jester inquired if there was anything around Cox's neck. Nurse Williams stated that there was a shirt underneath Cox's neck as if it had been untied. Nurse Williams stated that she observed bruises on Cox's neck. Nurse Williams stated that she observed blood on a pillow that matched blood coming from Cox's nose and mouth.

According to Nurse Williams, Nurse Conrad told her that she found Cox face down with a shirt tied around his neck. Inmate Hurley Brown was removed from the cell. Cox was handcuffed and then turned from his stomach to his back.

Nurse Williams indicated that in this incident, the first responder should have initiated CPR. If no vital signs were observed, CPR should have started then additional medical help summoned. Additionally, medical was not informed that the inmate was unresponsive, only that he had a seizure. Nurse Williams stated that nurses could not pronounce someone deceased and must continue CPR until exhausted or EMS arrived. According to Nurse Williams, the officers did not assist and stayed out of the way.

After the initial interview, Nurse Williams initiated contact with SA Jester and asked to provide additional information. SA Jester then conducted a subsequent interview. This interview was also sworn to and digitally recorded. Nurse Williams stated that when she and Nurse Darlington finally got cell D2210 open, she was under the impression that they were taking Cox to the Medical Unit. Officers informed Nurse Williams they could not take Cox because it was a crime scene. Furthermore, officers asked what they were going to do with Cox because he appeared to be dead. Nurse Williams stated that they had to do everything possible because no one there could pronounce Cox deceased. Nurse Williams questioned whether officers told Nurse Conrad the same thing, and that was why she did not attempt CPR. SA Jester inquired who told her this. Nurse Williams stated that it was mostly a captain as she observed him wearing a white shirt. Nurse Williams did not know the captain name.

SA Jester reviewed Incident Report (430-0315-113E) and determined that Rashena Williams authored the report. Nurse Williams reported that at approximately 1930 hours, on March 15, 2015, she was asked to respond to the D Dormitory because an inmate was having a seizure and that a stretcher was needed. Nurse Williams reported that as she was headed to the D Dormitory she came across an officer and asked what had happened. According to the report, the officer told Nurse Williams, "I think he's [Cox] dead." Nurse Williams arrived at the D Dormitory where Nurse Carolyn Conrad stated "...he [Cox] looks dead." Nurse Williams and Nurse Leah Darlington arrived to cell D2210 at approximately 1940 hours and observed Cox in restraints on his back. Cox was bleeding from his mouth and nose and had a bruise on the left side of his forehead. Nurse Williams reported that Cox's nail beds and ears were cyanotic. Nurse Williams indicated that she shook Cox in an attempt to get a response to no avail. Nurse Williams was unable to obtain a pulse or blood pressure on Cox. Nurse Williams and Nurse Darlington began CPR and requested someone bring an Automated External Defibrillator (AED). Nurse Jenell Jones arrived with an AED, the restraints were removed from Cox, and AED leads attached to Cox. According to the report, the AED advised not to shock and to continue CPR. The nurses continued CPR until EMS arrived at 2005 hours.

**Jenell Jones, LPN                    (IR-14, IR-32)**

On Friday, March 20, 2015, SA Jester interviewed Nurse Jenell Jones at MCI. During the sworn, digitally recorded interview, Nurse Jones indicated that she was certified as a Licensed Practicing Nurse (LPN). Nurse Jones added that she was currently employed by Wexford Health Sources Incorporated and had been for approximately 1.5 years.

17

Nurse Jones had been a nurse for approximately 31 years. Nurse Jones had previous correctional nursing employment including Broward Correctional Institution (BCI) and Broward County Jail.

SA Jester inquired if MCI had a response kit for medical emergencies. Nurse Jones stated that a stethoscope, blood pressure cuff, saline, diabetic supplies, etc. were in the kit. SA Jester inquired if the nurses could intubate. Nurse Jones replied that only the doctor could do that. SA Jester asked what the protocol was for a medical emergency such as that which occurred on March 15, 2015. SA Jester asked if a nurse handing out medications would typically continue that activity after initially having contact with an inmate emergency. Nurse Jones stated that a nurse should assess the inmate and then begin and continue CPR if necessary.

SA Jester asked Nurse Jones what her involvement was with the incident with inmate Cox. Nurse Jones stated that she was in the Medical Unit and noticed the charge nurse looking for the AED. The charge nurse stated that an inmate in the D Dormitory was unresponsive. Nurse Jones then took the AED to the D Dormitory and provided it to the nurses in cell D2210. Nurse Jones stated that Nurse Leah Darlington began to attach the AED to Cox and Nurse Jones assisted with CPR. Nurse Jones stated that the AED never advised to shock so the nurses continued CPR.

SA Jester asked what Cox looked like when she first observed him. Nurse Jones stated that Cox was on the floor on his back. Nurse Jones observed blood in Cox's mouth, he was cyanotic, and his ears and lips were blue. According to Nurse Jones, Cox was warm to the touch. Nurse Jones observed a "long cloth" behind Cox's neck.

SA Jester reviewed Incident Report (430-0315-113F), and determined that Jenell Jones authored the report. Nurse Jones reported that at approximately 1945 hours, on March 15, 2015, Nurse Romy Codada informed her that an Automated External Defibrillator (AED) was needed in the D Dormitory because an inmate was unresponsive. Nurse Jones reported that as she arrived to cell D2210 she observed Cox in restraints on the cell floor. Cox was unresponsive, bleeding from his mouth and nose, and was warm to the touch. Nurse Jones reported that Nurse Rashena Williams and Nurse Leah Darlington were performing CPR. At approximately 1955 hours, the AED pads were attached to Cox and the AED was turned on. Nurse Jones advised that the restraints were removed from Cox. According to Nurse Jones, the AED analyzed Cox's cardiac rhythm and no shock was advised. The nurses continued CPR until EMS arrived.

**Leah Darlington, LPN                    (IR-18, IR-30)**

On Tuesday, March 24, 2015, SA Jester interviewed Nurse Leah Darlington at MCI. During the sworn, digitally recorded interview, Nurse Darlington indicated that she was certified as a Licensed Practicing Nurse (LPN). Nurse Darlington added that she was currently employed by Wexford Health Sources Incorporated and had been for approximately one (1) year. Nurse Jones had been a nurse since 2006. Nurse Darlington had prior correctional nursing employment at Augusta State Medical Prison.

18

SA Jester inquired if Nurse Darlington was working on March 15, 2015 and if she remembered an incident in the D Dormitory. Nurse Darlington stated that she did. Nurse Darlington stated that the nurses received a call out that an inmate had a seizure and needed a stretcher. As Nurse Darlington was going to the cell, more information came out that something else was wrong with Cox. Nurse Darlington arrived at cell D2210 to assess Cox. Nurse Darlington stated that some officers and a captain were at the cell and indicated that Cox was not moving. Nurse Jenell Jones was still in the Medical Unit and was asked to bring emergency equipment to include an Automated External Defibrillator (AED). Nurse Darlington stated that Cox had no pulse and was not responding so Nurse Darlington began emergency resuscitation with Nurse Rashena Williams. Nurse Darlington stated that they began giving chest compressions until a mouthpiece arrived and at which time they began giving rescue breathes. Nurse Darlington added that Nurse Conrad and a correctional officer (CO) were handing out medications when Nurse Darlington arrived to wing 2.

SA Jester asked what Cox looked like when she first observed him. Nurse Darlington stated that Cox was on the floor on his back. Nurse Darlington observed a cut with a lump on Cox's forehead, redness on Cox's neck, and a bite on Cox's tongue. Nurse Darlington observed blood in Cox's mouth and on a pillow. Nurse Darlington observed a T-shirt that was rolled and twisted underneath Cox's neck. Nurse Darlington stated that Cox was warm to the touch and was still warm when EMS arrived. SA Jester asked Nurse Darlington if she was able to get rescue breathes into Cox due to the blood in his mouth. Nurse Darlington stated that there was not enough blockage to stop air because she observed Cox's chest rise and fall with the rescue breathes. When Nurse Jones arrived, they attempted to utilize the AED but were unable to shock as there was no heart rhythm. Nurse Darlington added that when EMS arrived they attempted to utilize their AED that also did not indicate to shock.

Nurse Darlington added that officers told the nurses that the cell was a crime scene and did not want things in the cell touched. Nurse Darlington stated that nurses cannot pronounce death and moved some of the items in the cell so they could provide rescue breathe(s) and aid.

SA Jester inquired if Nurse Darlington was familiar with inmates who attempted or committed suicide. Nurse Darlington added that he was specifically asking about the T-shirt being rolled up to make it stronger. Nurse Darlington stated that it was more common to use a sheet or blanket in that manner.

Nurse Darlington stated that because they were not told what the actual emergency was, they did not arrive prepared at the cell. Nurse Darlington speculated that if Cox was found earlier they could have done more.

SA Jester reviewed Incident Report (430-0315-113D) and determined that Leah Darlington authored the report. Nurse Darlington reported that at approximately 1930 hours, on March 15, 2015, she received a call from the D Dormitory in which the officer stated that an inmate was having a seizure, to bring a stretcher. Nurse Darlington reported that she arrived at the D Dormitory, cell 2210 and observed an inmate (later identified as Cox) lying on the floor, not moving, and appeared to be unresponsive.

Nurse Darlington and Nurse Rashena Williams entered the cell and observed that Cox was on his back, had his hands handcuffed behind his back, and had shackles on his legs. Nurse Darlington wrote that Cox's ears were cyanotic and fingernail beds discolored. Nurse Darlington noted blood in Cox's mouth and nose and a laceration on his left forehead area. Nurse Darlington also reported that she observed a laceration on Cox's tongue. Nurse Darlington indicated that she attempted to get a response by shaking Cox vigorously. Nurse Darlington and Nurse Williams checked for a carotid, radial, and apical pulse to no avail. Nurses Darlington and Williams began and continued CPR until Nurse Jenell Jones arrived with an Automated External Defibrillator (AED). The nurses then followed the directions the AED instructed. This continued until EMS arrived.

**Carolyn Conrad, LPN**        (IR-27, IR-33)

On Thursday, April 9, 2015, SA Jester interviewed Nurse Carolyn Conrad at her residence located in Okeechobee, Florida. Also present during the interview was SA Kevin Kulp. During the sworn, digitally recorded interview, Nurse Conrad indicated that she was certified as a Licensed Practicing Nurse (LPN). Nurse Conrad added that she was currently unemployed, but at the time of the incident was employed by Medical Staffing Network. Nurse Conrad was employed for approximately one (1) month at MCI. Nurse Conrad had been a nurse since 1994, but only actively for approximately 12 years during that time span. Nurse Conrad had previous correctional nursing employment at Avon Park Correctional Institution and Moorehaven Correctional Institution.

SA Jester inquired if Nurse Conrad was working on March 15, 2015 and if she remembered an incident in the D Dormitory. Nurse Conrad stated that she did. Nurse Conrad stated that she was assigned to pass out medications to inmates in the D Dormitory. Nurse Conrad stated that she went to the D Dormitory and waited for security staff to escort inside the dormitory. Nurse Conrad could not remember the name of the correctional officer (CO) who was assigned to walk her around on March 15, 2015.

SA Jester asked Nurse Conrad if she remembered the environment prior to reaching inmate Cox's cell. Nurse Conrad stated that it was very noisy. She added that the inmates were yelling and banging on the cells. Nurse Conrad could not remember what the inmates were yelling. Nurse Conrad stated that she began to pass out medications; however, the CO assigned to walk her around forgot his radio and had to go to the control room to retrieve it. Nurse Conrad and the CO then reentered wing two. She began to pass out medications again, and then the CO asked her to go upstairs to cell D2210. Nurse Conrad observed Cox on the floor and the other inmate (Hurley Brown) standing or possibly sitting on his bunk. The CO called for assistance and another CO arrived. The CO handcuffed Brown and escorted him out of the cell. Nurse Conrad went inside the cell and saw Cox face down, with his head in a pillow and a white cloth around his neck. Cox's arms were straight down at his side. Nurse Conrad attempted to find vital signs on Cox to no avail. Nurse Conrad observed blood on the pillow that was under Cox's face. She also observed blood in Cox's nose and mouth and an abrasion on his head. Nurse Conrad performed a chest rub and several chest compressions but could not get a response. Nurse Conrad stated that Cox's torso was warm but that his hands, ears, and nose were discolored. Nurse Conrad stated that other medical staff were then

requested. SA Jester asked if Cox was ever handcuffed or shackled by a CO. Nurse Conrad stated that Cox was not. Nurse Conrad remembered the CO untie the cloth that was around Cox's neck. SA Jester asked Nurse Conrad if the CO's offered to or assisted her with tending to Cox. Nurse Conrad stated that they did not. Nurse Conrad was visibly upset during the interview and stated that it was the first time she had ever encountered that type of situation. SA Jester asked Nurse Conrad where she checked for a pulse on Cox. Nurse Conrad stated that she checked his wrist and neck. Nurse Conrad stated that she told the CO she thought Cox was dead. Nurse Conrad stated that she did attempt to revive Cox. After Nurse Conrad exited the cell, she later handed out the rest of the inmates' medications.

SA Jester asked Nurse Conrad if inmate Brown said anything to her or that she overheard him saying. Nurse Conrad stated she did not remember Brown saying anything. SA Jester asked Nurse Conrad if she wrote a report. Nurse Conrad stated that she wrote an incident report and turned it in. SA Kulp asked Nurse Conrad if she had any medical equipment with her. Nurse Conrad stated that she did not have a CPR mask, gloves, or any medical equipment. SA Kulp asked Nurse Conrad what type of training she received when she started working at MCI. Nurse Conrad stated that she did not have any training from Medical Staffing Network or MCI. Nurse Conrad said that she was only told to hand out medications. Nurse Conrad added that the full-time nurses who worked for Wexford Health Sources Incorporated received training.

SA Jester reviewed Incident Report (430-0315-113G) and determined that Carolyn Conrad authored the report. Nurse Conrad reported that while passing out medications in the D Dormitory, inmates declared "man down." Nurse Conrad noted an inmate in cell 210 was lying face down. She added that a cellmate (Hurley Brown) was standing in the cell and removed by officers. Nurse Conrad wrote that Cox was face down with his arms to his sides, a pillow under his face, and a white cloth around his neck that was tied in a knot. Nurse Conrad reported that Cox had no chest movement and she could not obtain a pulse on Cox. Cox was rolled over at which time Nurse Conrad noted blood in Cox's mouth and nose, an abrasion to the left forehead area, and Cox's nose and ears were discolored. Nurse Conrad reported that she rubbed Cox's chest vigorously and received no response. Nurse Conrad noted that Cox was warm and pale. According to Nurse Conrad's report, security notified the medical unit to respond with emergency equipment. Nurse Conrad reported that other nurses arrived with a stretcher, emergency bag, and Automated External Defibrillator (AED).

<u>Romy Codada, RN</u>                                (IR-29)

SA Jester reviewed Incident Report (430-0315-113C) and determined that Romy Codada, Registered Nurse (RN), authored the report. Nurse Codada reported that on March 15, 2015, she received a call from the D Dormitory in which the officer stated that an inmate was having a seizure, to bring a stethoscope. According to Nurse Codada, Nurse Leah Darlington was gathering the medical supplies for the emergency. An officer assigned to the medical unit also mentioned to bring a stretcher. Nurse Codada stated that Nurse Rashena Williams volunteered to assist Nurse Darlington. At approximately 1950 hours, Nurse Codada received a third call from the D Dormitory that indicated the inmate was unresponsive, had no vital signs or pulse, and that the nurses had begun CPR. Nurse

21

Codada state that Nurse Jenell Jones then took an Automated External Defibrillator (AED) to the D Dormitory. Nurse Jones returned to the medical unit and told Nurse Codada that the nurses were still unable to obtain any vital signs. Nurse Codada then went to the D Dormitory where EMS personnel were on scene.

---

**VIII.   Interview of Suspect Hurley Brown**                                **(IR-03)**

*Serving 35 years for Robbery with a Gun or Deadly Weapon*

On Sunday, March 15, 2015, SA Jester interviewed inmate Hurley Brown (DC#402730) at MCI. Also present during the interview were Nita Denton, Chief Attorney of the Martin County State Attorneys' Office (SAO), and Assistant State Attorney (ASA) Richard Bodek. Prior to the sworn, digitally recorded interview, SA Jester read Brown his Miranda Warnings. Brown stated that he understood his rights and wished to give SA Jester a statement. Brown stated that he arrived at MCI in approximately February 4, 2015 and was initially housed in the E Dormitory. Since approximately February 6, 2015, Brown has been housed in protective management (PM) in the D Dormitory, wing 2, cell 2210. Brown stated that he was initially housed with an inmate Richardson who was moved out of his cell on Friday, March 13, 2015. Shortly after, Cox was placed in Brown's cell. Brown stated that Cox was housed in D2214 prior to being moved.

SA Jester inquired if Brown had any prior trouble with Cox. Brown stated that he did not and added that he did not believe that either Brown or Cox should have been housed with anyone else [due to their PM status]. Brown stated that Cox came into the cell with an attitude towards the CO's. Brown stated that Cox was mad the entire time he was in the cell. Brown stated that on March 15, 2015, he went to sleep and was awakened by Cox attempting to hang himself. Brown stated that he was asleep on the lower bunk and felt his bunk "bumping." Brown stated that Cox was attempting to tie a sheet around the end of the upper bunk hitting Brown's bunk. Brown stated that Cox had a sheet or shirt tied around his neck and was attempting to tie the sheet that was around the bunk around the item on Cox's neck. Brown then told Cox he was not going to do that in the cell, and that if he wanted to, to do it in the shower or something. Cox became angry with Brown and said that Brown could not tell him what to do. Brown added that he told Cox he was not going to be sprayed [by chemical agent] because of Cox's attempt at suicide. Brown stated that he assumed the event was over and rolled over to sleep. According to Brown, Cox then jumped on Brown and began to hit Brown in the back of the head. Brown rolled over and began to fight back. Brown stated that he thought he broke his arm. Brown added that he was able to get Cox to the floor where he then punched and kicked Cox several times. Brown then stomped Cox's head with his bare feet and Cox's head bounced off the concrete floor a few times. Brown described Cox as being on his stomach during this. Brown stated that the fight went on until the fight was over because he did not know if Cox had a razor or ice pick, adding that every inmate had some sort of weapon at MCI. Brown stated that once Cox stopped responding Brown stopped fighting. Brown then noticed that Cox was making a "gagging" noise and was "having a seizure." Brown then yelled to the inmates housed in the cells next to Brown that Cox was having a seizure. Brown advised the inmates to bang on the doors to get the attention of CO's to get medical attention for Cox. Brown stated that he placed a pillow

22

underneath Cox's head so his head did not hit the floor or walls. Brown stated that Cox's head was turned to the side. Brown added that he was not trying to kill Cox.

Prior to the interview, SA Jester and Det. Weaver examined Brown for injuries. SA Jester noted what appeared to be swelling to the left forearm area of Brown. Additionally, SA Jester observed some swelling and a minor abrasion to the upper knuckle of the middle finger on Brown's right hand. The injuries were memorialized via photograph.

| IX. | Meeting with Crime Scene Detective | (IR-20) |
|---|---|---|

On Friday, March 27, 2015, SA Jester met with MCSO Det. Weaver. During the meeting, Det. Weaver provided SA Jester a copy of his report (MCSO Case #15-03115). Additionally, Det. Weaver gave SA Jester a compact disc that contained crime scene photographs. SA Jester reviewed Det. Weaver's report and read that Det. Weaver documented the crime scene with photography. Additionally, Det. Weaver reported the condition of Cox's body as he observed it along with any injuries that he observed. Det. Weaver noted and collected a blood sample from the cell floor near Cox's head.

Det. Weaver reported that he next went to where inmate Hurley Brown was being detained. Det. Weaver documented via photograph an injury to Brown's left forearm that Brown claimed was broken. Det. Weaver also photographed Brown's back and hands.

Det. Weaver reported that he attended the autopsy of Cox on March 16, 2015. Det. Weaver collected Cox's clothing from the Medical Examiner's Office.

Det. Weaver listed his items of evidence collected as follows:

| MW1 | Bed Sheet |
|---|---|
| MW2 | B.O.D.E. Collector |
| MW3 | T-shirt and socks |
| MW4 | Decedent's property |
| MW5 | Decedent's clothing from Medical Examiner's Office |

| X. | Review of D Dormitory, Wing 2 Videos | (IR-12, IR-36) |
|---|---|---|

SA Jester reviewed DVD's that contained video of the D Dormitory, wing 2, from 6:00PM to 8:00PM and 8:00PM to 8:30PM, respectively, for Sunday, March 15, 2015. (Times referenced will be approximate and from the timestamp on the video.) The following outlines the times notable activity occurred from the front camera:

18:25:21    Correctional Officer (CO) observed starting to do cell checks. CO takes time at cells on bottom left then pauses in the back of the wing and at a cell on the bottom right for approximately 45 seconds. CO finishes quick walk past the remainder of bottom right cells then a quick walk past the

23

upper cells. CO does not look into every cell. Did not appear to look into cell D2210. Cell checks complete at 18:28:02

18:35:00    The last inmate in the wing not inside a cell finished cleaning and returned to his cell.

19:24:52    Sergeant (Sgt.) Robert Feipel and Nurse Carolyn Conrad enter the wing. Sgt. Feipel immediately proceeds upstairs and Nurse Conrad goes towards a cell on the bottom floor but then proceeds to follow Sgt. Feipel upstairs.

19:25:05    Sgt. Feipel looks into cell D2210 and then appeared to communicate with an inmate (later identified as Hurley Brown). Sgt. Feipel placed handcuffs on Brown through the door opening.

19:27:37    CO Christopher Rose entered wing 2 upstairs and proceeded to cell D2210.

19:27:53    CO Rose and Sgt. Feipel entered cell D2210.

19:28:41    Nurse Conrad entered cell D2210.

19:29:27    CO Rose removed inmate Brown from the cell and took Brown out of view of the video.

19:30:24    CO Rose re-entered cell D2210.

19:34:24    Other Department of Corrections (DOC) personnel arrived at cell D2210.

19:35:15    Nurse Conrad exited cell D2210.

19:35:45    Sgt. Feipel walked downstairs.

19:36:37    Nurse Conrad and a CO begin to hand out medications to inmates in wing 2. Cell D2210 was closed, no CO's at the cell.

19:40:18    Nurses Leah Darlington and Rashena Williams arrived at cell D2210. SA Jester observed no backboard or medical supplies.

19:41:32    Nurses Darlington and Williams entered cell D2210. Nurse Conrad was observed continuing to hand out medications.

19:42:55    CO Shadeldra Townsend arrived at cell D2210 with what appeared to be a medical kit.

19:48:15    Nurse Jones arrived to cell D2210 with an AED.

19:49:22    Nurse Conrad exited wing 2.

24

20:15:56    EMS arrived to cell D2210 with a backboard.

20:23:55    EMS personnel begin to leave cell D2210.

20:25:04    Cell D2210 was closed and all personnel left the area.

20:26:06    A CO was stationed at cell D2210 with what appeared to be a log for documentation.

SA Jester reviewed a DVD and determined that it contained two (2) separate videos of the D Dormitory, wing 2. One video was from 6:00PM to 8:00PM and the other video was from 8:00PM to 8:30PM for Sunday, March 15, 2015. The videos were from a camera located in the back of wing 2 that faced the control room of the D Dormitory. It should be noted that cell D2210 is not visible on this video. (Times referenced will be approximate and from the timestamp on the video.) The following outlines the times notable activity occurred:

18:28:50    Last time a correctional officer (CO) was observed near cell D2210 until after the event.

18:36:00    Inmates exit wing 2 that had been cleaning up trash.

19:22:48    Sergeant (Sgt.) Robert Feipel and Nurse Carolyn Conrad enter the wing. Nurse Conrad begins to hand out medications.

19:23:46    Sgt. Feipel and Nurse Conrad exit wing 2

19:24:35    Sgt. Feipel and Nurse Conrad re-enter the wing. Sgt. Feipel immediately proceeds upstairs and Nurse Conrad goes towards a cell on the bottom floor but then proceeds to follow Sgt. Feipel upstairs.

19:25:05    Sgt. Feipel looks into cell D2210 and then appeared to communicate with an inmate (later identified as Hurley Brown). Sgt. Feipel placed handcuffs on Brown through the door opening.

19:27:20    CO Christopher Rose entered wing 2 upstairs and proceeded to wind D2210.

19:29:34    CO Rose walked inmate Hurley Brown from the cell and took Brown to a room upstairs and locked him inside.

19:30:22    CO Rose re-entered cell D2210.

19:33:55    Other Department of Corrections (DOC) personnel arrived at D2210.

19:35:15    Nurse Conrad exited cell D2210.

19:35:53    Sgt. Feipel walked downstairs.

25

Stone v Hendry 000604

19:38:52    Nurse Conrad and a CO begin to hand out medications to inmates in wing 2. Cell D2210 was closed, no CO's at the cell.

19:39:30    Nurses Leah Darlington and Rashena Williams arrived at cell D2210. SA Jester observed no backboard or medical supplies.

19:42:45    CO Shedeldia Townsend arrived at cell D2210 with what appeared to be a medical kit.

19:48:06    Nurse Jones arrived to cell D2210 with an AED.

20:15:20    EMS arrived to cell D2210 with a backboard.

20:23:55    EMS personnel begin to leave cell D2210

| XI. | Autopsy and Medical Examiner Report | (IR-06, IR-37) |

On Monday, March 16, 2015, SA Jester attended the autopsy of inmate Christopher Cox (DC#T43015). Also present during the autopsy was Crime Scene Detective Weaver of the MCSO. Det. Weaver memorialized the body of Cox and injuries of note via photographs. Dr. Linda Rush O'Neil of the District 19 Medical Examiner's Office conducted the autopsy. Dr. O'Neil noted that there was trauma to the head and neck of Cox. Additionally, Dr. O'Neil stated that there appeared to be a contusion on Cox's brain and a brachial cartilage tear. Dr. O'Neil noted a bite to Cox's tongue and gasses in Cox's lungs, which she stated was indicative or consistent with a seizure.

On Wednesday, May 20, 2015, SA Jester received the Medical Examiner's Report (ME Report) for Christopher Cox. SA Jester reviewed the ME Report, case number 15-19-193, authored by Linda Rush O'Neil, M.D. SA Jester observed that the cause of death was listed as blunt trauma injuries of the head and neck. The manner of death was homicide. Evidence of recent injury was noted as faint, red, petechial hemorrhages on the right periorbital regions and eyelids; subarachnoid hemorrhage of the inferior right frontal and right occipital brain; and a laryngeal anterior cartilage fracture; other abrasions and contusions were mentioned. The final anatomic diagnosis was:

I.    Blunt trauma injuries of head and neck
a.    Contusion of brain
b.    Subarachnoid hemorrhage of brain
c.    Cerebral edema, brain 1490 grams
d.    Multiple hemorrhages of musculature of neck, posterior and anterior
e.    Fracture of cartilage of larynx
f.    Contusion of tongue
II.    Hemorrhage of musculature of right back
III.    Pulmonary edema and congestion
IV.    Aspiration of gastric contents

26

Stone v Hendry 000605

## XII.   FDLE Summary Analysis

After a comprehensive investigation, Christopher Cox succumbed to injuries sustained during an altercation with Hurley Brown. Brown admitted to stomping Cox's neck and head. The Medical Examiner reported that the cause of Cox's death was a result of blunt trauma injuries of the head and neck. Brown stated that the altercation was a result of Brown defending himself against Cox, who was attempting to commit suicide and allegedly jumped Brown while Brown was in bed. Brown stated that he continued to fight Cox until Cox no longer posed a threat. Brown stated that he then attempted to get medical attention for Cox as Cox was "having a seizure."

On Tuesday, January 19, 2016, Special Agent Supervisor (SAS) Eric Jester of the Palm Beach Field Office (PBFO) of the Florida Department of Law Enforcement (FDLE) spoke with Chief Assistant State Attorney Nita Denton of the 19th Judicial Circuit. Chief Denton indicated that after reviewing the evidence, documents, interviews, Medical Examiner Report, and transcribed interview of inmate Hurley Brown it was her position that the SAO would not be filing criminal charges in the case. SAS Jester and Chief Denton discussed the case at which time Chief Denton stated that she would close the case as a warrant application that was denied. Chief Denton added that she would contact Cox's family attorney to relay the information.

## XIII.   Notarizations:

I swear the foregoing is true and correct

Special Agent Supervisor Eric Jester
Florida Department of Law Enforcement
Fort Pierce Field Office
120 Orange Avenue, Fort Pierce, FL 34950
Palm Beach Field Office
2300 High Ridge Road, Boynton Beach, 33426

SWORN to and SUBSCRIBED
This 28 day of Jan , 20 16

(Notary Public or LEO)

27

Stone v Hendry 000606

---

# Inmate Population Information Detail



## Aliases:

ALT DOB 9/22/1968, BUD TIMOTHY BROWN, HURLEY L BROWN, HURLEY LEE BROWN, WARREN BROWN, LIGHT BULB

## Current Prison Sentence History:

| Offense Date | Offense | Sentence Date | County | Case No. | Prison Sentence Length |
|---|---|---|---|---|---|
| 02/09/1996 | ROBB. GUN OR DEADLY WPN | 01/15/1998 | MIAMI-DADE | 9605206 | 35Y 0M 0D |
| 02/09/1996 | ROBB. GUN OR DEADLY WPN | 01/15/1998 | MIAMI-DADE | 9605206 | 35Y 0M 0D |

Note: The offense descriptions are truncated and do not necessarily reflect the crime of conviction. Please refer to the court documents or the Florida Statutes for further information or definition.

Case 2:17-cv-00232-JLB-MRM   Document 119-6   Filed 06/16/20   Page 2 of 3 PageID 662

## Incarceration History:

| Date In-Custody | Date Out-Custody |
|---|---|
| 07/19/1984 | 02/26/1987 |
| 05/13/1988 | 09/19/1989 |
| 02/11/1998 | Currently Incarcerated |

## Prior Prison History: (Note: Data reflected covers periods of incarceration with the Florida Dept. of Corrections since January of 1983)

| Offense Date | Offense | Sentence Date | County | Case No. | Prison Sentence Length |
|---|---|---|---|---|---|
| 12/19/1983 | ROBB. NO GUN/DDLY.WPN | 06/13/1984 | MIAMI-DADE | 8329054 | 3Y 6M 0D |
| 10/20/1983 | TRAFFIC IN STOLEN PROPERTY | 01/14/1985 | MIAMI-DADE | 8417506 | 3Y 6M 0D |
| 11/18/1983 | TRAFFIC IN STOLEN PROPERTY | 01/14/1985 | MIAMI-DADE | 8417509 | 3Y 6M 0D |
| 11/28/1983 | TRAFFIC IN STOLEN PROPERTY | 01/14/1985 | MIAMI-DADE | 8417510 | 3Y 6M 0D |
| 12/19/1983 | TRAFFIC IN STOLEN PROPERTY | 01/14/1985 | MIAMI-DADE | 8417513 | 3Y 6M 0D |
| 09/15/1987 | BATT.LEO/FIRFGT /EMS/ETC. | 03/02/1988 | MIAMI-DADE | 8729986 | 2Y 6M 0D |
| 09/15/1987 | MARIJUANA-SALE/PURCHASE | 03/02/1988 | MIAMI-DADE | 8729986 | 2Y 6M 0D |
| 09/15/1987 | RESISTING OFFICER W/VIOLEN. | 03/02/1988 | MIAMI-DADE | 8729986 | 2Y 6M 0D |
| 09/15/1987 | COCAINE-POSSESS | 03/02/1988 | MIAMI-DADE | 8729986 | 2Y 6M 0D |
| 10/09/1987 | COCAINE-POSSESS | 03/02/1988 | MIAMI-DADE | 8732663 | 2Y 6M 0D |

Case 2:17-cv-00232-JLB-MRM   Document 119-6   Filed 06/16/20   Page 3 of 3 PageID 663

The Florida Department of Corrections updates this information regularly, to ensure that it is complete and accurate, however this information can change quickly. Therefore, the information on this site may not reflect the true current location, status, release date, or other information regarding an inmate.

This database contains public record information on felony offenders sentenced to the Department of Corrections. This information only includes offenders sentenced to state prison or state supervision. Information contained herein includes current and prior offenses. Offense types include related crimes such as attempts, conspiracies and solicitations to commit crimes. Information on offenders sentenced to county jail, county probation, or any other form of supervision is not contained. The information is derived from court records provided to the Department of Corrections and is made available as a public service to interested citizens. The Department of Corrections makes no guarantee as to the accuracy or completeness of the information contained herein. Any person who believes information provided is not accurate may contact the Department of Corrections.

For questions and comments, you may contact the Department of Corrections, Bureau of Classification and Central Records, at (850) 488-9859 or go to Frequently Asked Questions About Inmates for more information. This information is made available to the public and law enforcement in the interest of public safety.

Search Criteria: Last Name: brown First Name: hurley Search Aliases: YES Offense Category: County of Commitment: ALL Current Location: ALL

Return to Corrections Offender Information Network

Case 2:17-cv-00232-JLB-MRM    Document 119-7    Filed 06/16/20    Page 1 of 53 PageID 664

# Florida Department of Corrections



# Office of the Inspector General

## CRIMINAL INVESTIGATION
## INVESTIGATIVE ASSIST
### CASE # 18-16163

Case 2:17-cv-00232-JLB-MRM    Document 119-7    Filed 06/16/20    Page 2 of 53 PageID 665

FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

**Table of Contents**

I.    AUTHORITY .................................................................................................................................. 4

II.   METHODOLOGY ......................................................................................................................... 4

III.  ANALYSIS ..................................................................................................................................... 4

IV.   DEFINITIONS ............................................................................................................................... 5

V.    PREDICATE .................................................................................................................................. 6

VI.   SUMMARY OF INVESTIGATIVE FINDINGS ...................................................................... 6

VII.  CHARGES ...................................................................................................................................... 6

VIII. CONCLUSION .............................................................................................................................. 7

Case 2:17-cv-00232-JLB-MRM   Document 119-7   Filed 06/16/20   Page 3 of 53 PageID 666

FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

Case Number: 18-16163

OIG Inspector: Senior Inspector Chip Potter

Outside Agency:  Florida Department of Law Enforcement

Outside Agency Investigator:  Special Agent Terrance Tyler

Date Assigned or Initiated: 09/13/2019

Complaint Against: Inmate Michael Hernandez DC# P31867

Location of Incident – Institution/Facility/Office: Columbia Correctional Institution

Complainant: Officer Miguel Del Valle

Outside Agency Case #:  TL-37-0094

Use of Force Number: None

PREA Number: N/A

Classification of Incident: Homicide

Confidential Medical Information Included: X  Yes _____ No

Whistle-Blower Investigation: _____ Yes    X  No

Chief Inspector General Case Number: None

Case Number: 18-16163/2                                                 Page 3 of 7

---



Case 2:17-cv-00232-JLB-MRM   Document 119-7   Filed 06/16/20   Page 4 of 53 PageID 667

FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

**I.    AUTHORITY**

The Florida Department of Corrections, Office of the Inspector General, by designation of the Secretary and § 944.31, Florida Statutes, is authorized to conduct any criminal investigation that occurs on property owned or leased by the department or involves matters over which the department has jurisdiction.

The testimony references included in this report are summations of oral or written statements provided to inspectors. Statements contained herein do not necessarily represent complete or certified transcribed testimony, except as noted. Unless specifically indicated otherwise, all interviews with witnesses, complainants, and subjects were audio or video recorded.

**II.    METHODOLOGY**

The investigation reviewed the derivations of the allegation advanced by the complainant. The scope of this investigation does not seek to specifically address tort(s), but violations of criminal statutes. The criterion used to evaluate each contention or allegation was limited to the following standard of analysis:

1.  Did the subject's action or behavior violate Florida criminal statutes?

**III.    ANALYSIS**

The standard and analysis in this investigation is predicated with the burden of proving any violation of law, established by probable cause. The evidence considered for analysis is confined to the facts and allegations stated or reasonably implied. The actions or behavior of the subject are presumed to be lawful and in compliance with the applicable Florida law, unless probable cause indicates the contrary.

Case Number: 18-16163/2                                                 Page 4 of 7



**FLORIDA DEPARTMENT OF CORRECTIONS**
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**



## IV.   DEFINITIONS

**Unfounded:**
Refers to a disposition of a criminal case for which probable cause does not exist to suggest the suspect's behavior or action occurred nor is an arrest or formal charge being initiated.

**Closed by Arrest:**
Refers to a disposition of a criminal case for which probable cause exists that an identified subject committed the offense and one for which an arrest or formal prosecution has been initiated.

**Exceptionally Cleared:**
Refers to a disposition of a criminal case for which probable cause exists that an identified suspect committed the offense, but one for which an arrest or formal charge is not initiated, or in the case of a death investigation, one for which no evidence exists that the death was the result of a crime or neglect.

**Open-Inactive:**
Refers to a disposition of a criminal case for which a criminal investigation commenced, but where evidence is insufficient to close as unfounded, closed by arrest, or exceptionally cleared.

**Investigative Assist Closed**
Refers to a disposition of an investigative assist, where the conduct being investigated by the outside agency did not concern allegations against a Department employee, contractor, inmate, offender, or other person either employed or under the supervision of the Department.

Case Number: 18-16163/2                                   Page 5 of 7



**FLORIDA DEPARTMENT OF CORRECTIONS**
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

## V.   PREDICATE

On September 13, 2018, while housed at Columbia Correctional Institution (CCI), Inmate Larry Mark (Inmate Mark) DC# 083426 was involved in an altercation with Inmate Michael Hernandez (Inmate Hernandez) DC# P31867. Inmate Mark ████████████████ unit where he was pronounced deceased ███████, at CCI.

On September 13,2018, due to the resignation of Inspector Santerfeit, this case was reassigned to Lead Senior Inspector Chip Potter, on March 05, 2019.

## VI.   SUMMARY OF INVESTIGATIVE FINDINGS

Based on the exhibits, witnesses' testimony, subject officer's statements, and the record as a whole, presented or available to the primary inspector, the following findings of facts were determined:

On September 13, 2018, after being notified of the death of Inmate Mark, Inspector Santerfeit is assumed to have responded (no notes forwarded to this writer) in accordance with Office of Inspector General (OIG) policy. Per the Memorandum of Understanding between the OIG and Florida Department of Law Enforcement (FDLE) Special Agent Terrance Tyler (SA Tyler) responded to the scene and took lead on the death investigation.

SA Tyler provided Inspector Santerfeit with an Investigative Demand Form (attached) to obtain records and videos involving this case. Inspector Santerfeit provided the attached forms and information requested to SA Tyler.

The crime scene was processed and the remain of Inmate Mark, were arranged to be transported to the Medical Examiner's Office.

On March 05, 2019, I submitted an email to SA Tyler requesting a status update on his case, and advise if he needed any further assistance from the OIG, this writer would be his contact. SA Tyler advised, via email attached, he no longer requires assistance from the OIG, and as soon as his final report (TL-37-0094) is approved he will forward me a copy for my records.

*Note: Video evidence provided to SA Tyler are too large to attach to this report; therefore, after this case they will be submitted to be maintained in this case file.*

On February 18, 2019, SA Tyler received the autopsy report for inmate Larry Mark from the Jacksonville Medical Examiner's Office. The report listed the cause of inmate Mark's death as ████████████████ The manner of death was determined to be Homicide. (FDLE Report, and Autopsy report attached)

## VII.   CHARGES
**List alleged violations of Florida Law:**

N/A

Case Number: 18-16163/2                                   Page 6 of 7



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

**VIII.     CONCLUSION**

Based on the information gathered during their investigation, it is the recommendation of FDLE Special Agent Terrance Tyler based on the Medical Examiners findings, Inmate Mark's death be classified a Homicide.

1.  Agency assist Closed

After further review of FDLE Agent Tyler's investigation, there were no administrative violations noted.

Case Number: 18-16163/2                                            Page 7 of 7

---

# Florida Department of Corrections



# Office of the Inspector General

## CRIMINAL INVESTIGATION
## INVESTIGATIVE ASSIST
### CASE # 16-11800



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**



### Table of Contents

I.   AUTHORITY                                          4
II.  METHODOLOGY                                        4
III. ANALYSIS                                           4
IV.  DEFINITIONS                                        5
V.   PREDICATE                                          6
VI.  SUMMARY OF INVESTIGATIVE FINDINGS                  6
VII. CHARGES                                            6
VIII. CONCLUSION                                        7

---



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**



**Case Number:** 16-11800

**OIG Inspector:** Inspector Brad Howard

**Outside Agency:** Florida Department of Law Enforcement

**Outside Agency Investigator:** Special Agent Jennifer Wolf

**Date Assigned or Initiated:** 06-20-2016

**Complaint Against:** Inmate Oliver Bozeman, DC# L60865

**Location of Incident – Institution/Facility/Office:** Columbia Correctional Institution

**Complainant:** Officer Dustin Cowsert

**Outside Agency Case #:** TL-04-0027

**Use of Force Number:** N/A

**PREA Number:** N/A

**Classification of Incident:** Inmate Death

**Confidential Medical Information Included:** X  Yes        No

**Whistle-Blower Investigation:** ___ Yes    X  No

**Chief Inspector General Case Number:** N/A



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**



**I.       AUTHORITY**

The Florida Department of Corrections, Office of the Inspector General, by designation of the Secretary and § 944.31, Florida Statutes, is authorized to conduct any criminal investigation that occurs on property owned or leased by the department or involves matters over which the department has jurisdiction.

The testimony references included in this report are summations of oral or written statements provided to inspectors. Statements contained herein do not necessarily represent complete or certified transcribed testimony, except as noted. Unless specifically indicated otherwise, all interviews with witnesses, complainants, and subjects were audio or video recorded.

**II.      METHODOLOGY**

The investigation reviewed the derivations of the allegation advanced by the complainant. The scope of this investigation does not seek to specifically address tort(s), but violations of criminal statutes. The criterion used to evaluate each contention or allegation was limited to the following standard of analysis:

   1.  Did the subject's action or behavior violate Florida criminal statutes?

**III.     ANALYSIS**

The standard and analysis in this investigation is predicated with the burden of proving any violation of law, established by probable cause. The evidence considered for analysis is confined to the facts and allegations stated or reasonably implied. The actions or behavior of the subject are presumed to be lawful and in compliance with the applicable Florida law, unless probable cause indicates the contrary.



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

**IV.      DEFINITIONS**

**Unfounded:**
Refers to a disposition of a criminal case for which probable cause does not exist to suggest the suspect's behavior or action occurred nor is an arrest or formal charge being initiated.

**Closed by Arrest:**
Refers to a disposition of a criminal case for which probable cause exists that an identified subject committed the offense and one for which an arrest or formal prosecution has been initiated.

**Exceptionally Cleared:**
Refers to a disposition of a criminal case for which probable cause exists that an identified suspect committed the offense, but one for which an arrest or formal charge is not initiated, or in the case of a death investigation, one for which no evidence exists that the death was the result of a crime or neglect.

**Open-Inactive:**
Refers to a disposition of a criminal case for which a criminal investigation commenced, but where evidence is insufficient to close as unfounded, closed by arrest, or exceptionally cleared.

**Investigative Assist Closed**
Refers to a disposition of an investigative assist, where the conduct being investigated by the outside agency did not concern allegations against a Department employee, contractor, inmate, offender, or other person either employed or under the supervision of the Department.



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**



**V.       PREDICATE**

On June 12, 2016, at Columbia Correctional Institution (*CCI*), Officer Dustin Cowsert (*Cowsert*) reported while assigned to F-Dormitory he observed Inmate Arthur Hicks (*Hicks*), DC# 188731 lying on the floor of the Quad 1 dayroom ▮▮▮▮▮ Cowsert initiated Incident Command System (ICS) protocol and summoned additional security and ▮▮▮▮▮▮▮▮▮ Upon the arrival of additional staff, Hicks was placed from a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ advised Hicks was ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ and Hicks was ▮▮▮▮▮▮▮▮▮▮ in Gainesville, FL. Following preliminary investigation, it was determined a possible battery had occurred.

This incident was reported to the Office Inspector General (*OIG*) and subsequently reported to the Florida Department of Law Enforcement (*FDLE*) and on-call Inspector Brad Howard and Special Agent (*SA*) Jennifer Wolf responded to CCI on June 12, 2016.

On June 16, 2016, On-Call Supervisor Joseph Hamner (*Hamner*) was notified Hicks had been pronounced deceased ▮▮▮▮▮▮▮▮▮▮ (*Gainesville, Florida*).

This information was reported to the OIG via Management Information Notification System (*MINS*) and assigned to Inspector Brad Howard as an Investigative Assist to FDLE on June 20, 2016.

**VI.       SUMMARY OF INVESTIGATIVE FINDINGS**

Based on the exhibits, witnesses' testimony, subject officer's statements, and the record as a whole, presented or available to the primary inspector, the following findings of facts were determined:

On June12, 2016, SA Wolf was dispatched to CCI due to an inmate who ▮▮▮▮▮▮▮▮ ▮▮▮▮▮ Inmate Hicks was sitting in the dayroom of F-Dormitory when he suddenly collapsed to the floor and ▮▮▮▮▮▮▮▮▮ Hicks' actions prior the collapse were viewed and revealed he was involved in a physical altercation with Bozeman and other unknown inmates several times that morning. Hicks was ▮▮▮▮▮▮▮▮▮▮▮ determined Hicks was ▮▮▮▮▮▮▮▮▮▮ Hicks was placed ▮▮▮▮▮▮▮ pending family notification. On June 13, 2016, Hicks was pronounced dead at 14:04 hours.

On June 12, 2016, SA Wolf was provided a DVD containing video surveillance footage ▮▮▮▮▮▮ Hicks and Bozeman were observed fighting with each other on four separate occasions from 09:46:23 until Hicks collapsed at 11:06:22. At 10:03:31 an unknown inmate is viewed stomping on the head of either Hicks or Bozeman. It is not clear from the video footage which inmate is on their back lying on the floor during the fight. At 10:04:12 Bozeman crawls out of the cell on his back.

Several inmates housed in F-Dormitory at the time of this incident were interviewed. Several inmates testified Hicks and Bozeman were arguing. Some inmates did not know what they were arguing about, others testified they were arguing over K-2 (*Synthetic Cannabinoids*). Some of the inmates observed Hicks and Bozeman fighting, others only heard the commotion. Multiple inmates indicated Hicks would not leave Bozeman alone and was determined to fight him. A couple of the witness inmates testified

Case Number: 16-11800/3                                                                Page 6 of 8



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**



Hicks blocked the exit door in order to keep Bozeman from going to chow but. Bozeman continued attempts to avoid a confrontation.

Bozeman was read his Miranda warning and agreed to answer questions. Bozeman testified Hicks was angry inside his cell and was under the influence of K-2. Hicks was mad because Bozeman would not smoke with him. Hicks thought Bozeman possessed K-2. Hicks wanted to fight Bozeman because he felt disrespected. Bozeman did not want to fight Hicks and tried to avoid him several times. Hicks blocked the door when the dorm was released for chow and Bozeman did not eat. Hicks was walking around the dorm antagonizing Bozeman and told him he was not going to stop until they fought. Bozeman told Hicks he did not want to fight and he told him he had a life sentence and did not care. Bozeman fought Hicks so he would stop antagonizing him. No weapons were involved. Bozeman was not trying to hurt Hicks during the altercation.

After the altercation, Hicks sat in the dayroom in front of the fan. A few moments later Hicks ▮▮▮▮▮ ▮▮▮▮▮ and collapsed to the floor.

Cowsert was working in F-Dormitory at the time of this incident. Cowsert was in the officer's station when several inmates notified him there was a ▮▮▮▮▮▮▮▮ on in F-Dormitory. Cowsert observed Hicks lying on the floor inside the dorm and several inmates were ▮▮▮▮▮▮ to him. Cowsert summoned for ▮▮▮▮▮▮▮▮ Hicks was lying on the on the floor as if he had ▮▮▮▮▮ and was ▮▮▮▮▮▮▮▮ Security and ▮▮▮▮▮▮▮ responded to F-Dormitory approximately one minute later. Hicks was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Hicks was rushed from the dormitory to the ▮▮▮▮

Cowsert indicated there were no prior calls for ▮▮▮▮▮ n this date and he knew of ▮▮▮▮▮▮ or disciplinary issues with Hicks.

On November 4, 2016, FDLE SA Wolf received a report from the District 8 Medical Examiner's Office containing the autopsy results regarding Hicks. Chief Medical Examiner William F. Hamilton, M.D., determined the probable cause of death as ▮▮▮▮▮▮▮▮▮▮▮▮ and the manner of death as a homicide.

**VII.       CHARGES**
**List alleged violations of Florida Law:**

On November 14, 2016, SA Wolf hand delivered this case file to Assistant State Attorney (*ASA*) John Durrett at the State Attorney's Office in Columbia County. The file included all Investigative Reports, Related Items, and the Investigative Summary drafted in furtherance to this investigation. Durrett signed a case file receipt. Durrett anticipated it would be several months before the SAO would have a filing decision.

**VIII.       CONCLUSION**

On November 4, 2016, FDLE SA Wolf received a report from the District 8 Medical Examiner's Office containing the autopsy results regarding Hicks. Chief Medical Examiner William F. Hamilton, M.D.,

Case Number: 16-11800/3                                                                Page 7 of 8



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

determined the probable cause of death as ████████████████████████ and the manner of death as a homicide.

On November 14, 2016, SA Wolf hand delivered this case file to Assistant State Attorney (*ASA*) John Durrett at the State Attorney's Office in Columbia County. The file included all Investigative Reports, Related Items, and the Investigative Summary drafted in furtherance to this investigation. Durrett signed a case file receipt. Durrett anticipated it would be several months before the SAO would have a filing decision.

Once a filing decision is made by the SAO concerning this investigation an additional investigative report will be added to this investigation advising the decision.

Inspector Howard reviewed the investigation completed by FDLE, and administrative issues were not identified.

Case Number: 16-11800/3                                          Page 8 of 8

---

# Florida Department of Corrections



## Office of the Inspector General

### CRIMINAL INVESTIGATION
### Case # 14-8606



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



Table of Contents

I.   AUTHORITY ............................................. 4
II.  METHODOLOGY ...................................... 4
III. ANALYSIS .............................................. 4
IV.  DEFINITIONS ......................................... 5
V.   PREDICATE ............................................ 6
VI.  SUMMARY OF INVESTIGATIVE FINDINGS .... 6
VII. CHARGES .............................................. 6
VIII. CONCLUSION ........................................ 7

---



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



Case Number: 14-8606

Inspector: Inspector Dorothy Minta

Date Assigned or Initiated: 07-05-2014

Complaint Against: Inmate David Brown DC#180307

Location of Incident – Institution/Facility/Office: Columbia Correctional Institution

Complainant: Officer Terry Hilton

Use of Force Number: N/A

PREA Number: N/A

Classification of Incident: Homicide

Confidential Medical Information Included: X Yes         ____ No

Whistle-Blower Investigation: ___ Yes     X  No

Equal Employment Opportunity Investigation: ___ Yes     X  No

Chief Inspector General Case Number: N/A



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



### I.       AUTHORITY

The Florida Department of Corrections, Office of the Inspector General, by designation of the Secretary and § 944.31, Florida Statutes, is authorized to conduct any criminal investigation that occurs on property owned or leased by the department or involves matters over which the department has jurisdiction.

The testimony references included in this report are summations of oral or written statements provided to inspectors. Statements contained herein do not necessarily represent complete or certified transcribed testimony, except as noted. Unless specifically indicated otherwise, all interviews with witnesses, complainants, and subjects were audio or video recorded.

### II.      METHODOLOGY

The investigation reviewed the derivations of the allegation advanced by the complainant. The scope of this investigation does not seek to specifically address tort(s), but violations of criminal statutes. The criterion used to evaluate each contention or allegation was limited to the following standard of analysis:

1. Did the subject's action or behavior violate Florida criminal statutes?

### III.     ANALYSIS

The standard and analysis in this investigation is predicated with the burden of proving any violation of law, established by probable cause. The evidence considered for analysis is confined to the facts and allegations stated or reasonably implied. The actions or behavior of the subject are presumed to be lawful and in compliance with the applicable Florida law, unless probable cause indicates the contrary.



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



### IV.      DEFINITIONS

**Unfounded:**
Refers to a disposition of a criminal case for which probable cause does not exist to suggest the suspect's behavior or action occurred nor is an arrest or formal charge being initiated.

**Closed by Arrest:**
Refers to a disposition of a criminal case for which probable cause exists that an identified subject committed the offense and one for which an arrest or formal prosecution has been initiated.

**Exceptionally Cleared:**
Refers to a disposition of a criminal case for which probable cause exists that an identified suspect committed the offense, but one for which an arrest or formal charge is not initiated, or in the case of a death investigation, one for which no evidence exists that the death was the result of a crime or neglect.

**Open-Inactive:**
Refers to a disposition of a criminal case for which a criminal investigation commenced, but where evidence is insufficient to close as unfounded, closed by arrest, or exceptionally cleared.



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



### V.        PREDICATE

At approximately 10:15 PM on July 4, 2014, Officer Terry Hilton entered Wing #1 of H-Dormitory at Columbia Correctional Institution (CCI) ▓▓▓▓▓▓▓▓▓▓▓▓ When Officer Hilton approached cell H1-109, which housed Inmates Inmate Dennis Alvarado, DC# B04023 and David Brown, DC# 180307, he observed Inmate Alvarado lying on the floor of the cell, face up, ▓▓▓▓▓▓▓▓▓ Officer Hilton activated Emergency Radio Traffic ICS for ▓▓▓▓▓▓▓▓ inmate.

Inmate Brown was secured in hand restraints and moved to the nearest secure area (a shower cell). Inmate Alvarado was ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ were initiated. ▓▓▓▓▓▓▓ JoAnn Grajewski arrived ▓▓▓▓▓▓▓▓▓ Inmate Alvarado.  Inmate Alvarado was moved to ▓▓▓▓▓▓▓

Inmate Alvarado was ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ was notified and arrived. ▓▓▓▓▓▓▓▓▓▓ pronounced Inmate Alvarado deceased at 10:53 PM.

The incident was reported to the Office of Inspector General via call-out on July 4, 2014, and assigned as a criminal investigation to Senior Inspector Dorothy Minta on July 5, 2014.

### VI.       SUMMARY OF INVESTIGATIVE FINDINGS

Based on the exhibits, witnesses' testimony, subject officer's statements, and the record as a whole, presented or available to the primary inspector, the following findings of facts were determined:

Officer Terry Hilton was interviewed and reported, on July 4, 2014, he entered Wing #1 of H-Dormitory at CCI after assisting with showers on Wing #3, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ When Officer Hilton approached cell H1-109, he observed Inmate Alvarado lying on the cell floor, face up, with his head towards the cell door.  Inmate Alvarado would not respond to Officer Hilton.  Officer Hilton does not recall what Inmate Alvarado was wearing other than he did not have a shirt on.  Officer Hilton initiated ICS and advised he had ▓▓▓▓▓▓▓▓ inmate on the cell floor.  Officer Hilton noted the other inmate (Later identified as Inmate David Brown) in the cell was standing by the door with his back towards the door.

Officer Hilton opened the handcuff port and handcuffed Inmate Brown, who was still standing at the door facing the back of the cell.  Officer Hilton asked Inmate Brown what was going on, but he did not reply. Other staff responded with the shield, and the cell door was breached (opened).  Officer Hilton entered the cell with the shield and placed it on Inmate Alvarado as Sergeant Jeremy Wilburn escorted Inmate Brown from the cell.  Inmate Alvarado did not move and hand restraints were secured on him, and Officer

Case Number: 14-8606                                          Page 6 of 16

---



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



Hilton and another officer (He does not recall who) picked Inmate Alvarado up ▓▓▓▓▓▓▓▓▓▓ which had been brought and placed just outside the cell door.
Once Inmate Alvarado was ▓▓▓▓▓▓▓▓▓▓ by staff present, including ▓▓▓▓▓▓▓▓▓ that had arrived, and continued as he was ▓▓▓▓▓▓▓ Officer Hilton did not know Inmate's Brown or Alvarado before this incident.  Neither of the inmates had caused any problems in confinement, and neither of them had voiced any complaints while in confinement.

On the evening of July 4, 2014, Officer Hilton and Officer Michael Matthews had conducted showers on Wing #3.  During this time, other officers who were not showering inmates ▓▓▓▓▓▓▓▓▓▓ on the wings that were not showering.  Officer Hilton ▓▓▓▓▓▓▓▓ he arrived for duty between 7:00 PM and 7:30 PM.  Officer Hilton saw both inmates in cell H1-1109, and nothing appeared out of the ordinary.

Officer Michael Matthews was interviewed and reported he was assigned to Wing #3 in H-Dormitory at CCI on July 4, 2014.  At approximately 10:15 PM, Officer Matthews was in the Officer's Station and heard Officer Hilton say over the radio he had ▓▓▓▓▓▓▓ inmate in a cell on Wing #1 and responded.

Upon arriving at cell H1-109, Officer Matthews observed Inmate Brown standing at the cell door and Inmate Alvarado lying on the cell floor, face up.  Inmate Brown was handcuffed (Officer Matthews did not recall by whom) and escorted out of the cell.  Officer Matthews observed Inmate Brown was carrying some soap and legal work when he came out of the cell.  Sergeant Jeremy Wilburn escorted Inmate Brown from the area, towards the showers.  Officer Matthews did not hear Inmate Brown say anything. Once Inmate Brown was escorted from the cell, Inmate Alvarado was on the floor, face up, and facing the door.

Officer's Hilton and Daniel Morrison entered the cell with Officer Hilton holding the shield.  Officer Hilton placed the shield on Inmate Alvarado and Officer Morrison secured handcuffs on him.  Inmate Alvarado ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ had arrived by this time.  Inmate Alvarado was ▓

Officer Matthews stayed in H-Dormitory ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and noted Inmate Brown was in the shower and had turned the water on himself.  Officer Matthews was instructed to begin a log of Wing #1 and keep the wing secured, which he did until told by the Inspectors he could stop.

Officer Matthews collected Inmate Brown's clothing and placed it into an evidence bag and initiated a chain of custody for them (These items were turned over to Amy George, FDLE Crime Laboratory Analyst).  Officer Matthews does not recall any issues with or between Inmate's Alvarado and Brown.

Officer Kyle Goodrich was interviewed and reported on July 4, 2015, he was assigned to the Officer's Station in H-Dormitory at CCI. ▓▓▓▓▓▓▓▓▓▓ Officer Goodrich heard Officer Hilton call for

Case Number: 14-8606                                          Page 7 of 16



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



*ICS (Emergency Traffic)* on the radio due to ▆▆▆▆▆▆▆inmate. Staff responded to Wing #1 where Officer Hilton was. Officer Goodrich remained in the Officer's Station and did not see anything occur inside the cell.

Officer Goodrich observed staff bring an inmate out of the cell, ▆▆▆▆▆▆▆ *(Later identified as Inmate Alvarado).* Security▆▆▆▆▆ left the dormitory with the inmate.

Officer Hilton was assigned to Wing #1 and had not mentioned to Officer Goodrich about anything unusual on the wing throughout the night. Officer Goodrich observed Officer Hilton when he made the initial count on Wing #1 and did not observe him stop at any cell for a long period of time.

Officer Brandon Clemens was interviewed and reported he was assigned as the Internal Security Officer at CCI on July 4, 2014, and responded to H-Dormitory following a radio transmission of ▆▆▆▆▆ inmate on Wing #1. When Officer Clemens arrived on Wing #1 and approached cell H1-109, the cell door was being breached and was around 10:15 - 10:20 PM. Officer Clemens responded at the same time as Sergeant Quinton Frye▆▆▆▆▆▆▆ Officer Clemens observed Inmate Alvarado lying on his back on the cell floor and a black inmate *(Later identified as Inmate Brown)* being escorted from the cell and placed in the first shower cell. Officer Clemens stood to the side of the cell as other staff went in. Inmate Alvarado was ▆▆▆▆▆ handcuffed, brought out of the cell ▆▆▆▆▆▆▆▆▆▆▆

Officer Clemens believes Sergeant Robert Pinkerton▆▆▆▆▆, ▆▆▆▆▆▆▆ as Inmate Alvarado was ▆▆▆▆▆▆▆▆ and continued videoing him ▆▆▆▆▆ pronounced him deceased. Once he completed videoing, Officer Clemens remained▆▆▆▆▆ as security on Inmate Alvarado's body until the body left CCI with the funeral home staff.

Sergeant Robert Pinkerton was interviewed and reported he was assigned as the Confinement Supervisor in H-Dormitory at CCI on July 4, 2014. ▆▆▆▆▆▆▆ Officer Hilton initiated ICS *(Emergency traffic)* for▆▆▆▆▆ inmate on Wing #1. Sergeant Pinkerton told one of the officers *(Not sure which one)* to get the shield as they all responded.

When Sergeant Pinkerton arrived at cell H1-109, he observed an inmate *(Later identified as Inmate Alvarado)* lying on the floor, face up, with his head towards the door. Sergeant Jeremy Wilburn radioed the Captain and requested permission to breach *(open)* the cell door. The other inmate *(Later identified as Inmate Brown)* in the cell was already handcuffed.

The cell door was breached, and Inmate Brown was escorted out of the cell. Officer Hilton entered the cell with the shield and placed the shield over Inmate Alvarado. Sergeant Pinkerton told someone to handcuff Inmate Alvarado. Sergeant Pinkerton does not recall who did, but Inmate Alvarado was

Case Number: 14-8606                                              Page 8 of 16

---



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



handcuffed in the front. Sergeant Quentin Frye checked for and indicated ▆▆▆▆▆ Inmate Alvarado.

▆▆▆▆▆ arrived around this time, and Inmate Alvarado was brought out of the cell ▆▆▆▆▆▆ ▆▆▆▆▆ by Officers Hilton and Daniel Morrison. Sergeant Pinkerton checked Inmate Alvarado again▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆ Someone (He did not recall who) relieved Sergeant Pinkerton from▆▆▆▆▆, and he took over▆▆▆▆▆ A few minutes later, Sergeant Pinkerton relieved Sergeant Jeremy Wilburn from▆▆▆▆▆ Sergeant Pinkerton continued▆▆▆▆▆▆▆ as Inmate Alvarado was ▆▆▆▆▆ Once ▆▆▆▆▆ Sergeant Wilburn relieved Sergeant Pinkerton, and he returned to H-Dormitory.

Inmate Brown did not say anything to Sergeant Pinkerton as he was escorted from the cell. Sergeant Pinkerton told Officer Michael Matthews to strip search Inmate Brown when he was escorted to the shower; however, he did not tell staff to take his clothing. When he returned▆▆▆▆▆ Sergeant Pinkerton told staff to take Inmate Brown's clothing as evidence. Sergeant Pinkerton also recalled telling someone to get a camera and begin recording Inmate Brown.

The only thing Inmate Brown has said to Sergeant Pinkerton was to ask him who the Warden was and if he could get his property out of the shower. Sergeant Pinkerton told Inmate Brown, who the Warden was and told him he would have to wait for whatever property was left in the shower.

Sergeant Quentin Frye was interviewed and reported he was present in the Medical Department on July 4, 2014, when a radio transmission came in about▆▆▆▆▆ inmate on Wing #1 in confinement *(H-Dormitory).* Sergeant Frye responded and escorted▆▆▆▆▆ to H-Dormitory. Upon arriving in H-Dormitory and as he▆▆▆▆▆ entered Wing #1, Sergeant Frye observed Inmate Brown being placed in handcuffs.

The cell door was breached, and Inmate Brown was escorted to the showers. Staff entered the cell, placing the shield over Inmate Alvarado and secured handcuffs on him. Sergeant Frye observed Inmate Alvarado lying on his back, face up ▆▆▆▆▆, and the area had the stench of urine and feces. Sergeant Frye▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ and Sergeant Frye saw Inmate Alvarado's eyes were closed and did not recall seeing them open at all. ▆▆▆▆▆ as they

Case Number: 14-8606                                              Page 9 of 16



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



escorted Inmate Alvarado ████████████ arrived and relieved them from ████████ The ████████ Inmate Alvarado.

Sergeant Kenneth Fralick was interviewed and reported he was assigned as the Housing Supervisor in A-Dormitory at CCI on July 4, 2014, and at approximately 10:25 PM, there was a radio transmission for ██ ████████ inmate on Wing #1 in H-Dormitory. Sergeant Fralick responded to H-Dormitory and upon arriving, he observed an inmate, whom he did not know (Later identified as Inmate Alvarado) being removed from cell H1-109. Inmate Alvarado████████████ Security staff, ████████ ████████████ and Sergeant Fralick assisted ████████ ████ ████████ Sergeant Fralick ████████ arrived and relieved them from ████████ Once relieved by

Sergeant Jeremy Wilburn was interviewed and reported he was assigned to F-Dormitory at CCI on July 4, 2014, and responded to H-Dormitory after an ICS (Emergency Traffic) call concerning ████████ inmate on Wing #1. When Sergeant Wilburn arrived, he noticed Officers Hilton and Matthews had Inmate Brown in handcuffs and Inmate Alvarado was lying on the cell floor, face up, ████████ Sergeant Wilburn radioed the Captain for permission to breach the cell, and Sergeant Pinkerton arrived with the shield.

The cell door was breached, and Sergeant Wilburn escorted Inmate Brown from the cell and secured him in the shower. When Sergeant Wilburn returned to cell H1-109, other officers, ████████ were ████████████ needed to be initiated and began immediately by Sergeant Pinkerton. Officer Hilton relieved Sergeant Pinkerton, and Sergeant Wilburn relieved Sergeant Pinkerton.

Inmate Brown did not make any statements or say anything to Sergeant Wilburn while he was securing him in the shower. ████████ Inmate Alvarado from the dormitory ████████ and until they were relieved ████

Officer Daniel Morrison was interviewed and reported he was assigned to A-Dormitory at CCI on July 4, 2014, and around 8:00 PM, he went to H-Dormitory to assist with showers on Wing #2, and they were completed around 10:00 PM. Officer Morrison was in the H-Dormitory Officer's Station when Officer Hilton called on the radio about ████████ inmate on Wing #1 and he responded.

Upon arriving at cell H1-109, Officer Morrison observed Officer Hilton entering the cell with the shield. Officer Morrison noticed one inmate (Later identified as Inmate Brown) was being escorted out of the cell in handcuffs to the shower, and there was one inmate lying on the cell floor, face up (Later identified as Inmate Alvarado). Officer Hilton put the shield on Inmate Alvarado, and Officer Morrison secured handcuffs on him.

Case Number: 14-8606                                                    Page 10 of 16

---



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



Officers Morrison and Hilton moved Inmate Alvarado ████████████████ ████████ Security staff immediately ████████ Officer Morrison got ████████ with Inmate Alvarado to ████████ as they ████████ Once they exited the wing, Officer Morrison got ████████ and one of the sergeants got ████████ Officer Morrison reported to the Control Room to get everything ready for a transport.

████████ JoAnn Grajewski was interviewed and reported she was on-duty at CCI on July 4, 2014, and responded to H-Dormitory, Wing #1 for ████████ inmate. Upon arriving, ██ Grajewski observed an inmate (Later identified as Inmate Alvarado) on the floor in cell H1-109. Inmate Alvarado was ████████ Grajewski ████████ as he was being handcuffed. ████████ Inmate Alvarado was moved ████████

██ Grajewski advised the Captain ████ needed to be activated, which was completed. Staff continued ████████ and Inmate Alvarado was moved from H-Dormitory to ████████ ████████ continued ████████ arrived, relieved the staff, and pronounced Inmate Alvarado deceased. ██Grajewski noticed Inmate Alvarado ████████

████████ Christina Shivers was interviewed and reported she was assigned to ████████ at CCI on July 4, 2014, and an inmate (Later identified as Inmate Alvarado) ████████ Shivers relieved the security officers who were ████████ and continued ████████ arrived. ██ relieved ██ Shivers and ████████ until they pronounced Inmate Alvarado deceased.

██Shivers noticed Inmate Alvarado ████████ Shivers has no knowledge of what occurred in H-Dormitory and did not see Inmate Alvarado's cellmate.

An attempt was made to interview Inmate Brown and collect any evidence that may have been on his person. Prior to turning on the recorder, Inmate Brown stated, "I have nothing to say to any of you until I get a lawyer, or you get a warrant." No additional attempts to interview Inmate Brown were made.

On July 5, 2014, an affidavit for a search warrant was prepared by FDLE Special Agent Craig Riley and presented to Columbia County Judge Tom Coleman. After reviewing the affidavit, Judge Coleman issued a warrant to collect saliva samples (DNA), fingernail scrapings, overall photographs, combed and/or plucked hair samples from anywhere on the body, and any other suspected biological evidence from Inmate Brown. Once the warrant was obtained, Inmate Brown submitted willingly to the demands of the warrant.

*The warrant was returned to the Columbia County Clerk of Courts Office on July 10, 2014.*

Case Number: 14-8606                                                    Page 11 of 16

Case 2:17-cv-00232-JLB-MRM    Document 119-7    Filed 06/16/20    Page 27 of 53 PageID 690



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



The Florida Department of Law Enforcement *(FDLE)* Crime Laboratory Analyst *(CLA)* Amy George responded to CCI. CLA George processed Inmate Alvarado's ▮▮▮▮▮▮▮, cell H1-109, and Inmate Brown after a warrant was obtained. CLA George collected several items for processing, and those items are pending examination by the Laboratory. CLA George provided a report indicating what she collected and a receipt indicating which department each item was sent to for examination. Security staff also provided a chain of custody for the clothing they collected from Inmate Brown and turned them over to CLA George.

In an FDLE Laboratory Report, dated September 28, 2014, from the FDLE Tallahassee Regional Operations Center, the following was noted from evidence collected by CLA George:

**The evidence collected was:**

1. A1, Gray, and multi-colored blanket
2. A2, blue short sleeve shirt
3. A3, silver colored metal necklace
4. A4, white blanket
7. B1, clothing from David Brown
Exhibits B1A and B1B - pair of black and white shower shoes
Exhibits B1C and B1D - pair of socks
Exhibit B1E - cut white T-shirt
Exhibit B1F - pair of blue pants
Exhibit B1G - pair of boxer shorts
Exhibit B1H - blue shirt
8. C1, buccal swabs from David Brown
9. C2, fingernail cuttings from David Brown

**The results were:**

Exhibits A1 and B1F gave chemical indications for ▮▮▮▮▮▮▮▮▮▮ Exhibit B1H failed to give chemical indications for ▮▮▮▮▮▮▮.
Exhibits A1, B1F, and B1H, failed to give indications of the presence of semen.
Exhibits A1, B1F, and B1H, gave chemical indications for the presence of amylase, a constituent of saliva and other body fluids.
A sample from Exhibit A3 was collected in an attempt to determine the possible handler of this exhibit.
Samples were collected from the left and right-hand fingernail cuttings from Exhibit C2 *(called Exhibits C2-L and C2-R, respectively)* for DNA analysis.
Samples were collected from areas 6, 7, 8 and 9 of the blanket *(Exhibit A1)*, area 5 from the

Case Number: 14-8606                                          Page 12 of 16

---

Case 2:17-cv-00232-JLB-MRM    Document 119-7    Filed 06/16/20    Page 28 of 53 PageID 691



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



pants *(Exhibit B1F)* and areas 4 and 7 from the shirt *(Exhibit B1H)* for DNA analysis.
Exhibits A2, A4, B1A, B1B, B1C, B1D, B1E, and B1G, were not examined.
STR DNA analysis was performed on samples from Exhibits A1, A3, B1F, B1H, C1 and C2 utilizing the AmpFℓ STR Identifier Plus PCR Amplification Kit.
A complete DNA profile was obtained from the buccal swabs from David Brown *(Exhibit C1)*.
The DNA profile obtained from the silver colored metal necklace *(Exhibit A3)* demonstrated the presence of a mixture of at least two individuals. No further analysis can be conducted until buccal swabs or another suitable standard from Dennis Alvarado is submitted.
DNA results foreign to David Brown *(Exhibit C1)* were obtained from the left-hand fingernail cuttings *(Exhibit C2-L)*. Due to the limited nature of these foreign DNA results, this data is not interpretable.
A partial DNA profile foreign to David Brown *(Exhibit C1)* was obtained from the right hand fingernail cuttings *(Exhibit C2-R)*.
Complete DNA profiles, consistent with originating from the same male contributor, were obtained from areas, 6, 7, 8, and 9 of the blanket *(Exhibit A1)*. There is a possibility of an additional contributor to the DNA profile obtained from area 7 of the blanket *(Exhibit A1)* which is not suitable for comparison. David Brown *(Exhibit C1)* is excluded as the source of the DNA profiles obtained from areas 6, 7, 8 and 9 of the blanket *(Exhibit A1)*.
The DNA profile obtained from area 5 of the pants from David Brown *(Exhibit B1F0)* demonstrated the presence of a mixture of at least two individuals. Assuming two donors to the mixture, a complete DNA profile major contributor and a partial DNA profile for the minor contributor could be determined. David Brown *(Exhibit C1)* is excluded as the source both major and minor DNA profiles.
No DNA results foreign to David Brown *(Exhibit C1)* were found at area 4 of the shirt *(Exhibit B1H)*. No DNA results were obtained from area 7 of the shirt *(Exhibit B1H)*.
REMARKS:
The DNA profile developed from Exhibit C1 has been entered into CODIS.
It is requested that buccal swabs or another suitable standard from Dennis Alvarado be submitted for DNA analysis.

FDLE Special Agent Craig Riley was advised on the above report via email. The blood spot card received from the Medical Examiner's Office for Inmate Alvarado was turned over to SA Riley and delivered to the lab for processing.

A report was received from the Florida Department of Law Enforcement *(FDLE)* Tallahassee Regional Operations Center Laboratory, dated October 30, 2014, and indicated the following:

**Evidence Collected;**

Exhibit 1-DB, ▮▮▮▮▮▮▮ for Dennis Alvarado

Case Number: 14-8606                                          Page 13 of 16



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



**Results:**

STR DNA analysis was performed on a sample from Exhibit 1-DB utilizing the
AMPF/STR Identifiler Plus PCR Amplification Kit. A complete DNA profile was obtained.
Assuming two donors to the mixed DNA profile obtained from the silver colored metal necklace
(Exhibit A3, previous report) and that Dennis Alvarado (Exhibit 1-DB) is a contributor, DNA
results for an additional contributor foreign to Dennis Alvarado (Exhibit 1-DB) were obtained.
David Brown (Exhibit C1, previous report) is included as a possible additional contributor. For 3
loci, the frequency of occurrence of the additional contributor obtained from Exhibit A3 for
unrelated individuals is approximately 1 in 64. The partial DNA profile foreign to David Brown (Exhibit C1,
previous report) obtained from the right-hand fingernail cuttings (Exhibit C2-R, previous report) matches
the DNA profile from Dennis Alvarado (Exhibit 1-DB). For 6 loci, the frequency of occurrence of the partial
foreign DNA profile obtained from Exhibit C2-R for unrelated individuals is approximately 1 in 1,500.
The complete DNA profiles obtained from areas 6, 7, 8 and 9 of the blanket (Exhibit A1, previous report)
and the major DNA profile obtained from area 5 of the pants from David Brown (Exhibit B1F, previous
report) all match the DNA profile from Dennis Alvarado (Exhibit 1-DB). The frequency of occurrence of the
DNA profiles obtained from Exhibit A1 (at areas 6, 7, 8 and 9) and the major DNA profile obtained from
Exhibit B1F (at area 5) for unrelated individuals is approximately 1 in 230 quintillion.
Dennis Alvarado (Exhibit 1-DB) is excluded as the source of the partial minor DNA profile
obtained from the area 5 of the pants from David Brown (Exhibit B1F, previous report).

*An email was sent to FDLE Special Agent Craig Riley (Who has been assigned to the case) to
ensure he is aware the report is available on the FDLE Laboratory Website.*

On July 5, 2014, an autopsy was performed on the body of Inmate Alvarado at the District 4 Medical
Examiner's Office in Jacksonville, Florida by Dr. Wendy Stroh. Dr. Stroh verbally stated the probable
cause of death ▇▇▇▇▇▇ However, Dr. Stroh indicated the final results were pending toxicology
and microscopic tissue examination.

On February 10, 2015, the final autopsy report completed by Associate Medical Examiner, Dr. Wendy
Stroh, at the Office of the Medical Examiner, District 4 Medical Examiner in Jacksonville, Florida, was
received. Dr. Stroh concluded Inmate Alvarado's cause of death was ▇▇▇▇▇▇▇
and the manner of death as; Homicide.

On July 23, 2014, Inmate's Joseph Jones, DC# J32609, Ryan Linsinbigler, DC# I06647, Henry Roberson,
DC# I13682, and Kareem Robinson, DC# G04186, were assigned as orderlies in H-Dormitory on July 4,
2014. Inmate's Michael McKenzie, DC# 128903 and Sainovil Saintius, DC# L41044 were housed in cell
H1-108, and all were interviewed. In their sworn, recorded statements, all of the inmates said they had no

---



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



knowledge of the incident that occurred in cell H1-109 on July 4, 2014. They did not see or hear anything,
did not know the inmates who lived in the cell, and had no knowledge of there being problems between
them.

Additionally, an attempt was made to interview Inmate Herber Frias, DC# L41044, who was housed in cell
H1-1110. Inmate Frias refused to be interviewed and stated he had nothing to say to anyone who worked
for the Department of Corrections, the Office of Inspector General, or the Florida Department of Law
Enforcement.

Inmate's Luis Munuzuri-Harris, DC# V09696 and Percival Marshall, DC# 066766 made contact requesting
to be interviewed, stating they had information concerning the death of Inmate Alvarado. In their sworn,
recorded statements, both inmates admitted they were not present in H-Dormitory on July 4, 2014.
*(Inmate Munuzuri-Lewis was housed at CCI Annex and Inmate Marshall was housed in F-Dormitory).*
Both inmates were housed with Inmate Alvarado in T-Dormitory at CCI Annex on July 1, 2014, and
witnessed parts of a use of force *(14-8482)* involving Inmate Alvarado and staff. Both inmates believe this
may have had something to do with Inmate Alvarado's death, but had no evidence to support their belief.

On February 10, 2015, Senior Inspector Dorothy Minta testified before a Grand Jury in Columbia County,
Lake City, Florida in reference to the homicide of Inmate Alvarado. Following the testimony, the Grand
Jury indicted Inmate Brown on First Degree Murder charges in the death of Inmate Alvarado.

On October 22, 2015, an email was received from Assistant State Attorney (ASA) Sandra Rosendale
inquiring about a demand for discovery. This was forwarded to Acting Inspector Supervisor Johnathan
McCray, who forwarded it to Senior Attorney, Rana Wallace. On October 26, 2015, following numerous
questions about what the Public Defender's (PD) Office wanted, I reviewed the demand for discovery, as
I had previously just forwarded it through my chain of command. Upon review of the demand, I found PD
Jonathan Austin indicated in the demand:

1. Reference is made to a video recording made of the Defendant when he was detained in a
shower immediately after being taken from his cell. Defense requests a copy of this video as it
may be relevant and material to the defense.

2. Copies of any and all video recordings in the possession of the State, including the Department
of Corrections, and the DOC Inspector General's Office made from wing videos or other
equipment which depicts either the cell, the dorm, the defendant or the deceased in the 24 hours
up to the discovery of the deceased or anytime thereafter.

3. A copy of the Inspector General's report regarding the investigation of the deceased in this
matter.



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



In reading comments made by the Shift Captain, on an incident report written by Officer Terry Hilton on July 5, 2014 (*MU-14-1079 attached*), it noted Captain Eric Roberts indicated he instructed Officer Brandon Clemens to retrieve a handheld camera and begin recording. In the comments by Major Laurie Owens, she indicated the video was attached to the report. The Major's Office was contacted and asked about any videos. Ms. Lynn Bradley pulled the report packet and found a video was attached along with a chain of custody. The report packet, video, and chain of custody were collected from the Main Unit and reviewed. There was a handwritten report in the packet (*#MU-14-1084*) written by Officer Clemons. Officer Clemons reported he videoed ▇▇▇▇ Inmate Alvarado.

There was also an incident report by Officer Kendall McMullen (*#MU-14-1093*) indicating the video camera seals were broken so the cameras could be utilized to record Inmate's Alvarado and Brown. There was only one video in the packet. I noted on the chain of custody for the video Captain Roberts turned the video over to Major Owens, who turned it over to Warden Monroe Barnes.

Warden Barnes reviewed the video and put on the chain of custody the video went from him to the file, which is where it was found. I have reviewed the video, and it begins ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇Inmate Alvarado. I have not found any video of Inmate Brown, and I did not find any reports from anyone indicating they videoed Inmate Brown.

Additionally, there was an incident report that Captain Roberts (*MU-14-1092*) attempted to download the fixed wing video and found the system was not working and had stopped recording 7-3-14 at 2221hrs and resumed 7-5-14 at 0027hrs.

This information was relayed to Acting Inspector Supervisor Darryl Cherry and Rana Wallace. Acting Supervisor Cherry advised he would make contact with the ASA and advise them of what was discovered today (October 26, 2015). Acting Supervisor Cherry advised me to make contact with FDLE Special Agent (SA) Craig Riley and advise him what was discovered today and how he wanted to obtain the video and incident reports. Contact was made with SA Riley, and it was decided the video would remain as evidence with the Office of the Inspector General (OIG).

*NOTE: The video was too large to upload into IGIIS and will be maintained as evidence in the District 4 OIG RECA.*

**VII.        CHARGES**
**List alleged violations of Florida Law:**

1. Violation of § 782.04 (1)(a) Florida Statutes, Murder.

   § 782.04 (1)(a), Florida Statute, The unlawful killing of a human being:



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**CASE SUMMARY REPORT**



1. When perpetrated from a premeditated design to effect the death of the person killed or any human being.

**VIII.        CONCLUSION**

Based on the information gathered during this investigation, it is the recommendation of Inspector Dorothy Minta the allegation against Inmate David Brown DC#180307 for **Homicide, in violation of § 782.04(1)(a), Florida Statutes,** be termed as follows:

1. **Closed by Arrest**

# Florida Department of Corrections



# Office of the Inspector General

## CRIMINAL INVESTIGATION
## INVESTIGATIVE ASSIST
### CASE # 16-10485

---


FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**


**Table of Contents**

I.    AUTHORITY                                               4

II.   METHODOLOGY                                             4

III.  ANALYSIS                                                4

IV.   DEFINITIONS                                             5

V.    PREDICATE                                               6

VI.   SUMMARY OF INVESTIGATIVE FINDINGS                       6

VII.  CHARGES                                                 6

VIII. CONCLUSION                                              7

Case 2:17-cv-00232-JLB-MRM   Document 119-7   Filed 06/16/20   Page 35 of 53 PageID 698



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**



**Case Number:** 16-10485

**OIG Inspector:** Inspector Randy Henderson

**Outside Agency:** Florida Department of Law Enforcement

**Outside Agency Investigator:** Special Agent Lawrence Perez

**Date Assigned or Initiated:** 05/30/2016

**Complaint Against:** Inmate Aaron Davis DC# 128271

**Location of Incident – Institution/Facility/Office:** Columbia Correctional Institution Annex

**Complainant:** Captain Christi Dube

**Outside Agency Case #:** TL-37-0030

**Use of Force Number:**

**PREA Number:**

**Classification of Incident:** Homicide

**Confidential Medical Information Included:** x   Yes          No

**Whistle-Blower Investigation:**      Yes      X   No

**Chief Inspector General Case Number:**

Case Number: 16-10485                                                    Page 3 of 7

---

Case 2:17-cv-00232-JLB-MRM   Document 119-7   Filed 06/16/20   Page 36 of 53 PageID 699



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

I.          **AUTHORITY**

The Florida Department of Corrections, Office of the Inspector General, by designation of the Secretary and § 944.31, Florida Statutes, is authorized to conduct any criminal investigation that occurs on property owned or leased by the department or involves matters over which the department has jurisdiction.

The testimony references included in this report are summations of oral or written statements provided to inspectors. Statements contained herein do not necessarily represent complete or certified transcribed testimony, except as noted. Unless specifically indicated otherwise, all interviews with witnesses, complainants, and subjects were audio or video recorded.

II.         **METHODOLOGY**

The investigation reviewed the derivations of the allegation advanced by the complainant. The scope of this investigation does not seek to specifically address tort(s), but violations of criminal statutes. The criterion used to evaluate each contention or allegation was limited to the following standard of analysis:

1.  Did the subject's action or behavior violate Florida criminal statutes?

III.        **ANALYSIS**

The standard and analysis in this investigation is predicated with the burden of proving any violation of law, established by probable cause. The evidence considered for analysis is confined to the facts and allegations stated or reasonably implied. The actions or behavior of the subject are presumed to be lawful and in compliance with the applicable Florida law, unless probable cause indicates the contrary.

Case Number: 16-10485                                                    Page 4 of 7



Case 2:17-cv-00232-JLB-MRM   Document 119-7   Filed 06/16/20   Page 37 of 53 PageID 700

FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**



### IV.    DEFINITIONS

**Unfounded:**
Refers to a disposition of a criminal case for which probable cause does not exist to suggest the suspect's behavior or action occurred nor is an arrest or formal charge being initiated.

**Closed by Arrest:**
Refers to a disposition of a criminal case for which probable cause exists that an identified subject committed the offense and one for which an arrest or formal prosecution has been initiated.

**Exceptionally Cleared:**
Refers to a disposition of a criminal case for which probable cause exists that an identified suspect committed the offense, but one for which an arrest or formal charge is not initiated, or in the case of a death investigation, one for which no evidence exists that the death was the result of a crime or neglect.

**Open-Inactive:**
Refers to a disposition of a criminal case for which a criminal investigation commenced, but where evidence is insufficient to close as unfounded, closed by arrest, or exceptionally cleared.

**Investigative Assist Closed**
Refers to a disposition of an investigative assist, where the conduct being investigated by the outside agency did not concern allegations against a Department employee, contractor, inmate, offender, or other person either employed or under the supervision of the Department.

Case Number: 16-10485                                      Page 5 of 7

---



Case 2:17-cv-00232-JLB-MRM   Document 119-7   Filed 06/16/20   Page 38 of 53 PageID 701

FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**



### V.    PREDICATE

On May 30, 2016, Office of Inspector General (*OIG*) District 4 On-Call Inspector Randy Henderson responded to a death at Columbia Correctional Institution Annex (*CCI*). Inspector Henderson was met by FDLE Special Agent (*SA*) Larry Perez at CCI Annex. SA Perez, per MOU, assumed lead on the death investigation. Inspector Henderson was assigned investigative assist on May 30, 2016.

### VI.    SUMMARY OF INVESTIGATIVE FINDINGS

Based on the exhibits, witnesses' testimony, subject officer's statements, and the record as a whole, presented or available to the primary inspector, the following findings of facts were determined:

On Monday, May 30, 2016, Inspector Henderson and SA Perez was advised an inmate was found ▮▮▮▮ inside of a shower cell at CCI Annex. ▮▮▮▮▮ ▮▮▮▮▮ the inmate, Steven Dorsey, to no avail. Inspector Henderson and SA Perez responded to CCI Annex and SA Perez was assigned to investigate. Upon arrival, Inspector Henderson and SA Perez obtained a briefing of events prior to agents entering the institution. According to staff, Dorsey was discovered ▮▮▮▮▮ inside of a shower cell in N Dormitory. Security and ▮▮▮▮▮▮▮▮▮▮▮ Dorsey, though ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ pronounced Dorsey at approximately 2058 hours.

Investigators also learned inmate Dorsey had been the victim of a stabbing that occurred in Wing 1 of Q Dormitory on Friday, May 27, 2016. The investigation revealed that Dorsey and inmate Arthur Dye, whom were reportedly both ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ allegedly attacked suspect inmate Aaron Davis in a dispute over canteen items. The investigation also revealed that inmate Davis allegedly stabbed Dorsey with an improvised weapon. Davis was taken to ▮▮▮▮ and subsequently ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Investigators learned that the weapon reportedly used to stab Dorsey had been recovered inside Q Dormitory and had been placed into evidence.

During the course of the subsequent investigation SA Perez interviewed a number of staff and inmate witnesses. Several inmate witnesses further advised that on May 27, 2016, Dorsey and Davis became involved in a physical altercation over a perceived debt involving some canteen items. The witnesses indicated that Dorsey and Davis entered the bathroom in Wing 1 of Q Dorm to engage in mutual combat. The witnesses advised that Dorsey attempted to strike Davis with an improvised weapon fashioned from a combination lock placed inside of a sock. However, as Dorsey attempted to strike Davis with the improvised weapon, Dorsey slipped and fell to the floor. Davis then reportedly produced his own improvised weapon, an ice pick style weapon fashioned from a 12" long piece of fence wire, and allegedly stabbed Dorsey four times as Davis stood over Dorsey. Other witnesses overheard Davis make unsolicited incriminating statements which indicated that Davis admitted to stabbing Dorsey and intended to kill him. Davis also wrote a statement admitting to stabbing Dorsey, though that statement may have been compelled by the Department of Corrections Security Staff.

Case Number: 16-10485                                      Page 6 of 7



**FLORIDA DEPARTMENT OF CORRECTIONS**
**OFFICE OF THE INSPECTOR GENERAL**
**INVESTIGATIVE ASSIST SUMMARY REPORT**



On November 10, 2016, this case was presented to a Grand Jury of the Third Judicial Circuit in and for Columbia County. After reviewing the testimony, the Grand Jury returned a No True Bill for prosecution against inmate Davis. The case was then closed by FDLE.

Inmate Dorsey was ████████████ on May 27, 2016, for ████████████. One of the ████ ████████████. Based on ████████████, ████████████ and subsequent ████████████, he released Dorsey back to Security.

Medical Examiner's Office reported cause of death to be a result of the ████████████ ████████████.

**VII.      CHARGES**
**List alleged violations of Florida Law:**

1.  Violation of § 782.04 (1)(a) Florida Statutes, Murder

§ 782.04 (1)(a), Florida Statute.   The unlawful killing of a human being:
1.   When perpetrated from a premeditated design to effect the death of the person killed or any human being:

**VIII.      CONCLUSION**

Based on the information gathered during their investigation, it is the recommendation of FDLE Special Agent Larry Perez the allegation against Inmate Aaron Davis for **Murder, in violation of (982.04 (1)(a),** be termed as follows:

1.  (Closed, No True Bill returned by Grand Jury)

Inspector Lindboe reviewed the investigation completed by FDLE, and noted that administrative issues were identified in that ████████████ Dorsey following the stabbing and failed to send him for ████████████. The administrative issues will be addressed in IGIIS Case 17-03096.

# Florida Department of Corrections



# Office of the Inspector General

**CRIMINAL INVESTIGATION**
**INVESTIGATIVE ASSIST**
**CASE # 18-08869**

FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

#### Table of Contents

I.   AUTHORITY ................................................................................................................ 4
II.  METHODOLOGY ........................................................................................................ 4
III. ANALYSIS .................................................................................................................. 4
IV.  DEFINITIONS ............................................................................................................. 5
V.   PREDICATE ............................................................................................................... 6
VI.  SUMMARY OF INVESTIGATIVE FINDINGS ............................................................. 6
VII. CHARGES .................................................................................................................. 7
VIII. CONCLUSION ........................................................................................................... 7

---

FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

**Case Number:** 18-08869

**OIG Inspector:** Inspector Chris McGauley

**Outside Agency:** Florida Department of Law Enforcement

**Outside Agency Investigator:** Special Agent Terrance Tyler

**Date Assigned or Initiated:** 05/18/2018

**Complaint Against:** Inmate Robert Craft

**Location of Incident – Institution/Facility/Office:** Columbia Correctional Institution

**Complainant:** Captain Michael Kelly

**Outside Agency Case #:** TL-37-0080

**Use of Force Number:** N/A

**PREA Number:** N/A

**Classification of Incident:** Homicide

**Confidential Medical Information Included:** X  Yes         No

**Whistle-Blower Investigation:**      Yes      X  No

**Chief Inspector General Case Number:** N/A

FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

I.    **AUTHORITY**

The Florida Department of Corrections, Office of the Inspector General, by designation of the Secretary and § 944.31, Florida Statutes, is authorized to conduct any criminal investigation that occurs on property owned or leased by the department or involves matters over which the department has jurisdiction.

The testimony references included in this report are summations of oral or written statements provided to inspectors. Statements contained herein do not necessarily represent complete or certified transcribed testimony, except as noted. Unless specifically indicated otherwise, all interviews with witnesses, complainants, and subjects were audio or video recorded.

II.   **METHODOLOGY**

The investigation reviewed the derivations of the allegation advanced by the complainant. The scope of this investigation does not seek to specifically address tort(s), but violations of criminal statutes. The criterion used to evaluate each contention or allegation was limited to the following standard of analysis:

1. Did the subject's action or behavior violate Florida criminal statutes?

III.  **ANALYSIS**

The standard and analysis in this investigation is predicated with the burden of proving any violation of law, established by probable cause. The evidence considered for analysis is confined to the facts and allegations stated or reasonably implied. The actions or behavior of the subject are presumed to be lawful and in compliance with the applicable Florida law, unless probable cause indicates the contrary.

---

FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

IV.   **DEFINITIONS**

**Unfounded:**
Refers to a disposition of a criminal case for which probable cause does not exist to suggest the suspect's behavior or action occurred nor is an arrest or formal charge being initiated.

**Closed by Arrest:**
Refers to a disposition of a criminal case for which probable cause exists that an identified subject committed the offense and one for which an arrest or formal prosecution has been initiated.

**Exceptionally Cleared:**
Refers to a disposition of a criminal case for which probable cause exists that an identified suspect committed the offense, but one for which an arrest or formal charge is not initiated, or in the case of a death investigation, one for which no evidence exists that the death was the result of a crime or neglect.

**Open-Inactive:**
Refers to a disposition of a criminal case for which a criminal investigation commenced, but where evidence is insufficient to close as unfounded, closed by arrest, or exceptionally cleared.

**Investigative Assist Closed**
Refers to a disposition of an investigative assist, where the conduct being investigated by the outside agency did not concern allegations against a Department employee, contractor, inmate, offender, or other person either employed or under the supervision of the Department.

FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

**V.    PREDICATE**

On May 16, 2018, at approximately 7:07 pm, Inspector Chris McGauley *(Inspector McGauley)* was contacted by Inspector Supervisor Yolanda Brown *(Inspector Supervisor Brown)* and advised Inmate Darren Shira *(Inmate Shira)* DC#D38524 currently housed at Columbia Correctional Institution Annex *(CCI-A)* was pronounced deceased as a result of a homicide.

Florida Department of Law Enforcement *(FDLE)* Special Agent Tip Tyler *(SA Tyler)* and Inspector McGauley responded to CCI-A in reference to the death. SA Tyler advised he would be taking the lead in the investigation. Inspector McGauley was assigned the Investigative Assist on May 18, 2018.

**VI.    SUMMARY OF INVESTIGATIVE FINDINGS**

Based on the exhibits, witnesses' testimony, subject officer's statements, and the record as a whole, presented or available to the primary inspector, the following findings of facts were determined:

On May 16, 2018, at approximately 7:07 pm, Inspector Chris McGauley *(Inspector McGauley)* was contacted by Inspector Supervisor Yolanda Brown *(Inspector Supervisor Brown)* and advised Inmate Darren Shira *(Inmate Shira)* DC#D38524 currently housed at Columbia Correctional Institution Annex *(CCI-A)* was pronounced deceased as a result of a homicide.

Florida Department of Law Enforcement *(FDLE)* Special Agent Tip Tyler *(SA Tyler)* and Inspector McGauley responded to CCI-A in reference to the death. SA Tyler advised he would be taking the lead in the investigation. Inspector McGauley was assigned the Investigative Assist on May 18, 2018.

Upon response to the institution to begin the investigation SA Tyler assumed the lead in the investigation, and provided Inspector McGauley with an Investigative Demand Form *(attached)* for all documentation and video related to the inmate's death. Inspector McGauley obtained and provided SA Tyler with the following items:

1. Incident Report written by Captain Michael Kelly *(Captain Kelly)* Incident Report.

2. Autopsy Report from the Medical Examiner signed by Dr. Peter Gillespie, documenting the immediate cause of death ████████████

3. A DVD containing fixed wing video from █-Dormitory.

4. ██████████████████ concerning Inmate Shira and Inmate Robert Craft *(Inmate Craft)* DC# C00181.

On March 25, 2019, I contacted SA Tyler via phone requesting an update as to his progress, and to offer additional assistance if needed. He indicated he had completed his case and had submitted his reports for approval. When his reports are approved by his supervisor, he will send me a copy with the results.

On March 27, 2019, SA Tyler provided me copies of his final report *(attached)* via email *(attached)*, and advised there would be no further assistance needed from the OIG.

Case Number: 18-08869/2                                                    Page 6 of 7

---



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

FDLE's case conclusion is the Death of Inmate Shira was classified as a Homicide.

**VII.    CHARGES**
**List alleged violations of Florida Law:**

1. Violation of § 782.04(1)(a) Florida Statutes, Murder

   § 782.04(1)(a) Florida Statute,   The unlawful killing of a human being:

**VIII.    CONCLUSION**

Based on the information gathered during their investigation, it is the recommendation of FDLE Special Agent Terrance Tyler the death of Inmate Shira be classified a **Homicide**:

1. Investigative assist closed

Inspector Chris McGauley reviewed the investigation completed by FDLE, and no administrative issues were identified.

Case Number: 18-08869/2                                                    Page 7 of 7

# Florida Department of Corrections



# Office of the Inspector General

## CRIMINAL INVESTIGATION
## INVESTIGATIVE ASSIST
### CASE # 18-15212

FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

**Table of Contents**

I.     AUTHORITY ........................................................................................................................... 4

II.    METHODOLOGY .................................................................................................................... 4

III.   ANALYSIS .............................................................................................................................. 4

IV.    DEFINITIONS ......................................................................................................................... 5

V.     PREDICATE ........................................................................................................................... 6

VI.    SUMMARY OF INVESTIGATIVE FINDINGS ......................................................................... 6

VII.   CHARGES .............................................................................................................................. 7

VIII.  CONCLUSION ........................................................................................................................ 7

Case 2:17-cv-00232-JLB-MRM   Document 119-7   Filed 06/16/20   Page 49 of 53 PageID 712

**FLORIDA DEPARTMENT OF CORRECTIONS**
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

**Case Number:** 18-15212

**OIG Inspector:** Senior Inspector Chip Potter

**Outside Agency:** Florida Department of Law Enforcement

**Outside Agency Investigator:** Special Agent Craig Riley

**Date Assigned or Initiated:** 08/26/18

**Complaint Against:** Inmate Vashon Faison DC# 309794

**Location of Incident – Institution/Facility/Office:** Taylor Correctional Institution

**Complainant:** Correctional Officer Hozra Woodruff

**Outside Agency Case #:** TL-37-0090

**Use of Force Number:** None

**PREA Number:** N/A

**Classification of Incident:** Homicide

**Confidential Medical Information Included:** X   Yes _____ No

**Whistle-Blower Investigation:** ___ Yes   X   No

**Chief Inspector General Case Number:** None

Case Number: 18-15212                                   Page 3 of 7

---



Case 2:17-cv-00232-JLB-MRM   Document 119-7   Filed 06/16/20   Page 50 of 53 PageID 713

**FLORIDA DEPARTMENT OF CORRECTIONS**
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

**I.   AUTHORITY**

The Florida Department of Corrections, Office of the Inspector General, by designation of the Secretary and § 944.31, Florida Statutes, is authorized to conduct any criminal investigation that occurs on property owned or leased by the department or involves matters over which the department has jurisdiction.

The testimony references included in this report are summations of oral or written statements provided to inspectors. Statements contained herein do not necessarily represent complete or certified transcribed testimony, except as noted. Unless specifically indicated otherwise, all interviews with witnesses, complainants, and subjects were audio or video recorded.

**II.   METHODOLOGY**

The investigation reviewed the derivations of the allegation advanced by the complainant. The scope of this investigation does not seek to specifically address tort(s), but violations of criminal statutes. The criterion used to evaluate each contention or allegation was limited to the following standard of analysis:

1. Did the subject's action or behavior violate Florida criminal statutes?

**III.   ANALYSIS**

The standard and analysis in this investigation is predicated with the burden of proving any violation of law, established by probable cause. The evidence considered for analysis is confined to the facts and allegations stated or reasonably implied. The actions or behavior of the subject are presumed to be lawful in compliance with the applicable Florida law, unless probable cause indicates the contrary.

Case Number: 18-15212                                   Page 4 of 7



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

### IV.    DEFINITIONS

**Unfounded:**
Refers to a disposition of a criminal case for which probable cause does not exist to suggest the suspect's behavior or action occurred nor is an arrest or formal charge being initiated.

**Closed by Arrest:**
Refers to a disposition of a criminal case for which probable cause exists that an identified subject committed the offense and one for which an arrest or formal prosecution has been initiated.

**Exceptionally Cleared:**
Refers to a disposition of a criminal case for which probable cause exists that an identified suspect committed the offense, but one for which an arrest or formal charge is not initiated, or in the case of a death investigation, one for which no evidence exists that the death was the result of a crime or neglect.

**Open-Inactive:**
Refers to a disposition of a criminal case for which a criminal investigation commenced, but where evidence is insufficient to close as unfounded, closed by arrest, or exceptionally cleared.

**Investigative Assist Closed**
Refers to a disposition of an investigative assist, where the conduct being investigated by the outside agency did not concern allegations against a Department employee, contractor, inmate, offender, or other person either employed or under the supervision of the Department.

---

FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

### V.    PREDICATE

On August 26, 2018, at approximately ▮▮▮▮, at Columbia Correctional Institution *(CCI)*, Sergeant Hozra Woodruff *(Sergeant Woodruff)* while conducting a security check in the dorm he observed Inmate Juan Vazquez DC# T31017 lying on the ground in cell G2208, ▮▮▮▮▮▮▮. Inmate Vazquez was transported ▮▮▮▮▮▮ where he died, on August 28, 2019.

On August 28, 2019, there was a response to the death by Inspector John Santerfeit, and Florida Department of Law Enforcement Agent Terrance Tyler, to begin their investigation into Inmate Vasquez's death.

### VI.    SUMMARY OF INVESTIGATIVE FINDINGS

Based on the exhibits, witnesses' testimony, subject officer's statements, and the record as a whole, presented or available to the primary inspector, the following findings of facts were determined:

On August 26, 2018, at approximately ▮▮▮▮ at Columbia Correctional Institution *(CCI)*, Sergeant Hozra Woodruff *(Sergeant Woodruff)* while conducting a security check in the dorm he observed Inmate Juan Vazquez DC# T31017 lying on the ground in cell G2208, ▮▮▮▮▮▮▮. Inmate Vazquez was transported ▮▮▮▮▮▮ where he died, on August 28, 2019.

On August 28, 2019, there was a response to the death by Inspector John Santerfeit, and Florida Department of Law Enforcement Agent Terrance Tyler, to begin their investigation into Inmate Vasquez's death.

Inspector Santerfeit had not completed any reports in this case when it was reassigned to this writer, Lead Senior Inspector Chip Potter, on March 05, 2019. When this writer contacted Agent Tyler, it was determined, he did not respond to the scene FDLE Agent Craig Riley responded.

Upon response to the institution to begin their investigation Agent Riley assumed lead in the investigation, and provided Inspector Santerfeit with an Investigative Demand form *(attached)* for all documentation and video related to the inmate's death. Inspector Santerfeit obtained and provided Agent Riley with the following items:

1. Incident Report written by Lieutenant Jason Brevard *(Lieutenant Brevard)*.

2. Certificate of Death Worksheet signed by ▮▮▮▮▮▮ documenting the immediate cause of death ▮▮▮▮

3. Email between Marcia Winter, and Cynthia Yanez documenting ▮▮▮▮▮▮▮ ▮▮▮

4. A DVD containing Captain Aaron Lewis's *(Captain Lewis)* body cam video

When this writer was reassigned this case, March 05, 2019, I emailed Agent Riley and informed him from this date forward any assistance needed by Agent Riley will be provided by this writer.

FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF THE INSPECTOR GENERAL
**INVESTIGATIVE ASSIST SUMMARY REPORT**

On March 12, 2019, I submitted an email to Agent Riley requesting an update as to his progress, and to offer additional assistance if needed. He responded; he had been requested to conduct a couple of additional interviews which he has done, and submitted the reports for approval. When his reports are approved by his supervision he will send me a copy with the results. *(Agent Riley's email is attached)*

On March 15, 2019, Agent Riley provided me copies of his final report *(attached)* via email *(attached)*, and advised there would no further assistance needed from the OIG.

FDLE's case conclusion is the Death of Inmate Vazquez was classified a Homicide.

### VII.     CHARGES
**List alleged violations of Florida Law:**

1. Violation of § 782.04(1)(a), Florida Statutes, Murder

   § 782.04(1)(a), Florida Statute, The unlawful killing of a human being:

### VIII.     · CONCLUSION

Based on the information gathered during their investigation, it is the recommendation of FDLE Special Agent Craig Riley the death of Inmate Vasquez be classified a **Homicide**.

1. Investigative assist closed

Senior Inspector Potter reviewed the investigation completed by FDLE, and administrative issues were not identified.



# INMATE REQUEST

**STATE OF FLORIDA**
**DEPARTMENT OF CORRECTIONS**

Mail Number: _____
Team Number: _____
Institution: (13)

| TO:<br>(Check One) | ☐ Warden<br>☐ Asst. Warden | ☒ Classification<br>☐ Security | ☐ Medical<br>☐ Mental Health | ☐ Dental<br>☐ Other _____ |
|---|---|---|---|---|

| FROM: | Inmate Name<br>Prophet Pannon | DC Number<br>CU11537 | Quarters<br>N2-112 | Job Assignment<br>A/C | Date<br>10/29/20 |
|---|---|---|---|---|---|

**REQUEST** Informal Grievance                     Check here if this is an informal grievance ☒

On July 07,2020, I was approved for a protection Transfer, I was the
victim of a homoricde Attempt on June 21,2020 I was transferred
from here on July 31,2020. I was Accidentaly transferred back
to columbia Annex, When I have Already been approved for a protection
transfer in July 2020, so I was placed in conf on who I was
pending. explained Anything to me, what's going on? how long
Am I going to be back here see grievance Log# 312-2008-0215-
Relief sought: To be transferred and release from confined

All requests will be handled in one of the following ways: 1) Written Information or 2) Personal Interview. All informal grievances will be responded to in writing.

| Inmate (Signature): Prophet Pannon | DC#: CU11537 |
|---|---|

**DO NOT WRITE BELOW THIS LINE**

RECEIVED BY
OCT 23 2020

**RESPONSE** 257-2010-0266                     **DATE RECEIVED:**

CO1

Received reviewed & Evaluated: On 10-27-2020, I
interviewed you and told you exactly what is going to
happen in regards to placement in confinement and I
will reaffirm what I already told you. You will
remain confined pending a protection review to ensure no
issues with your return to this facility. In regards
to not being told, I deny your allegations.

[The following pertains to informal grievances only]
Based on the above information, your grievance is Denied (Returned, Denied, or Approved). If your informal grievance is denied, you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.

| Official (Print Name): D. Williams SEN | Official (Signature): | Date: 10/30/20 |
|---|---|---|

Original: Inmate (plus one copy)
CC: Retained by official if responding or if the response is to an informal grievance then forward to be placed in inmate's file
This form is also used to file informal grievances in accordance with Rule 33-103.005, Florida Administrative Code.

Informal Grievances and Inmate Requests will be responded to within 15 days, following receipt by staff.
You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing required by Rule 33-103.006, F.A.C., attaching a copy of your informal grievance and response, and forwarding your complaint to the warden or assistant later than 15 days after the grievance is responded to. If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.

DC6-236 (Effective 11/18)

Incorporated by Reference in Rule 33-103.005, F.A.C.

*EMERGENCY GRIEVANCE*                    **STATE OF FLORIDA**                          *SCO*
**INMATE REQUEST**            **DEPARTMENT OF CORRECTIONS**

Mail Number: _____
Team Number: _____ (13)
Institution: _____

**TO:** (Check One)
☐ Warden      ☐ Classification   ☐ Medical     ☐ Dental    *State Classification*
☐ Asst. Warden   ☐ Security      ☐ Mental Health  ☒ Other   *Officer*

| FROM: | Inmate Name *Prophet Pharlin* | DC Number *W11537* | Quarters *N12-112* | Job Assignment *AIC* | Date *10/26/20* |
|---|---|---|---|---|---|

**REQUEST** *EMERGENCY GRIEVANCE SCO*      Check here if this is an informal grievance ☒

*This grievance is notice that my life is in an imminent danger. On 6-21-20, I was the victim of a homicide attempt here on the hsg. unit A. A thorough and competent investigation was conducted by capt. H. Sieverse who concluded a resolve protection was necessary, SCO agreed and Batista ordered I be transferred. It is the perview of SCO and Tallahassee to decide housing for Prisoners, Despite my dire circumstances and the broad latitude of the functions of ASOa classification Glass has taken illegal actions and is attempting to lobby other peer members to null and void the SCO's decision to transfer me for protection and central office, Mr. Glass lacks the authority to override, or undue a SCO decision to transfer me for protective needs. Moreover Mr. Glass and others in the administration place my life in Jeopardy*

All requests will be handled in one of the following ways: 1) Written Information or 2) Personal Interview. All informal grievances will be responded to in writing.

| Inmate (Signature): *Prophet Rule* | DC#: *W11537* |
|---|---|

---

**DO NOT WRITE BELOW THIS LINE**

**RESPONSE** *257.2010.0295*

**RECEIVED BY**
OCT 26 2020
**DATE RECEIVED:** COLUMBIA CI

*See attached response.*

[The following pertains to informal grievances only]

Based on the above information, your grievance is _Denied_ (Returned, Denied, or Approved). If your informal grievance is denied, you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.

| Official (Print Name): *Glass* | Official (Signature): *Glass* | Date: *10/20/20* |
|---|---|---|

Original: Inmate (plus one copy)
CC: Retained by official responding or if the response is to an informal grievance then forward to be placed in inmate's file
This form is also used to file informal grievances in accordance with Rule 33-103.005, Florida Administrative Code.

Informal Grievances and Inmate Requests will be responded to within 10 days, following receipt by staff.
You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form as required by Rule 33-103.006, F.A.C., attaching a copy of your informal grievance and response, and forwarding your complaint to the warden or assistant warden no later than 15 days after the grievance is responded to. If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.

DC6-236 (Effective 12/14)

Incorporated by Reference in Rule 33-103.005, F.A.C.

**ATTACHED RESPONSE FOR INFORMAL GRIEVANCE LOG#251-2010-0295**

**Received, reviewed, and evaluated on 10-26-20:** One of the primary objectives of staff of the Department of Corrections is the placement of inmates in appropriate job assignments, custody levels, and institutional assignments in order to minimize the risk to the general public, maintain order, and security. Even if an inmate fits the minimum basic criteria for a particular program assignment, that is not a guarantee that s/he will be recommended or approved for that job. In addition, placement in such assignments are privileges not a right of the inmate. The ultimate decision as to whether or not the inmate is assigned to a specific program, facility, or job is based on a professional review made by the Institutional Classification Team in accordance with the rules of the Department. Until a decision regarding your placement and housing needs has been finalized by the Institutional Classification Team you will remained confined in administrative confinement.

Based on the above information, your grievance is **DENIED**. You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form as required by Rule 33-103.006, F.A.C., attaching a copy of your informal grievance and response, and forwarding your complaint to the Warden or Assistant Warden no later than 15 days after the grievance is responded to. If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.



**Witness Statement**

| | | |
|---|---|---|
| **State of Florida** | **Log #_____** | **Department of Corrections** |

**I.    Identifying Inmate Information**

DC # X82090_____    Inmate Name GIOVANNI ROSADO_____

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

**II.   Witness**

☐  Staff Member: Name and Position_____

☐  Other Individual: Name_____

☐  Inmate:    DC #_____    Name_____

**III.  Voluntary Refusal**

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____    Date_____

Signature of Investigating Officer_____    Date_____

**IV.   Statement**

SGT. CHUNN CONFISCATED AN OPEN PACK OF NOTEBOOK PAPER ON 4-27-22, FROM MY LOCKER & TESTED IT THE SAME MORNING IN FRONT OF CAPTAIN THOMAS & IT WAS NEGATIVE. ON 4-28-22, SGT. CHUNN INSTRUCTED OFFICER COX THE D.I.R. COORDINATOR TO TEST THE SAME THING ALREADY TESTED, WHILE IN THE SECURITY BLDG, ONLY SGT. CHUNN & OFC. COX PRESENT, THE TEST CAME BACK POSITIVE FOR "6 grams OF METHAMPHETAMINE". SGT. CHUNN IS CORRUPT & CONTINUOUSLY SETTING NOT ONLY MYSELF BUT OTHER INMATES AS WELL ON THE P.I.M. UNIT & THE GENERAL POPULATION, OPEN COMPOUND. SHE MUST BE NOT ONLY STOPPED, BUT INVESTIGATED FOR FALSIFYING A DOCUMENT & TAMPERING. SHE ALREADY HAS BEEN DEMOTED FROM A WHITE SHIRT FOR ENGAGING IN SEXUAL INTERCOURSE WITH AN INMATE.

Witness Signature Giovanni Rosado_____    Date 5-24-22

Signature of Investigating Officer_____    Date_____

DC6-112C (Revised 8/06)          Original: Inmate File          Copy: Central Office

**Witness Statement**

Log # 122-220816

**State of Florida**                                    **Department of Corrections**

**I.   Identifying Inmate Information**

DC # M48526          Inmate Name   Amed Gallardo

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

**II.   Witness**

☐   Staff Member:  Name and Position_____

☐   Other Individual:  Name_____

☐   Inmate:     DC #_____    Name_____

**III.   Voluntary Refusal**

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____  Date_____

Signature of Investigating Officer_____  Date_____

**IV.   Statement**

Sgt. Ms Chunn set me up planted 99 grams of cocaine on me
She said she find it on me, She pat me down and
Toch my private part I Told her I will Tell my Family
Them on Camara 5/19/22 at 7:30 To 8:30 she Told me she
can Touch me because it Not the frist Time she Touch
a man private part. them she said she find 99 grams
of cocain but The dorm Never was search or K9 dogs
or Nathing No lock down No piss Text was done on
me. she Just write a DR and Traying To CM
me for drugs that she Never Find on me
She Just set me up  Please help me.

Witness Signature _____ M48526_____  Date  5/21/22

Signature of Investigating Officer_____  Date_____

DC6-112C (Revised 8/06)          Original:  Inmate File          Copy:  Central Office

**State of Florida**

# Witness Statement

Log #_____

**Department of Corrections**

## I. Identifying Inmate Information

DC # _____  Inmate Name _____

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

## II. Witness

☐ Staff Member: Name and Position_____

☐ Other Individual: Name_____

☐ Inmate:  DC # *J-31731*_____  Name *Bobby R. Johnson*_____

## III. Voluntary Refusal

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____  Date_____

Signature of Investigating Officer_____  Date_____

## IV. Statement

Im writing this statement because I was set up with cocain on 4-21-22 by Sgt. Huggins; Sgt. Chunn. In the morning of 4-21-22 I was doing my assign work duty, Cleaning "L-2 bathroom" well Sgt. Chunn; Sgt. Huggins enter the door between 7:00am - 7:45am L-2 Side, awhile doing they daily rounds like always. They stop at my bunk area and begin to search my area with me present because I was cleaning L-2 showers at the time. I was told by a inmate that my bed, along with my locker was being search by Sgt. Chunn; Sgt. Huggins, so I watch them from the entry way of the bathroom because they area known to plant drugs on inmates. So about 5 minutes into they search I walk to my bed area and stood they for about 30 seconds and ask why is my bunk being such without me being present, all the while watching Sgt. Chunn go in and out of her left pocket. They both told me to go back to cleaning up the bathroom while they continue to search my bunk and locker. They took some legal work, photos and a few old letters telling me they are going to test I for drugs and about 5 hours later, call the door and told the Sgt. of the door to lock me up. They only, Witness Signature *Bobby R. Johns*_____ Date *5/18/22*_____

Signature of Investigating Officer_____  Date_____

to leave so they could plant the drugs on me

**Witness Statement**

State of Florida

Log #_____

Department of Corrections

**I.    Identifying Inmate Information**

DC # _____     Inmate Name _____

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

**II.    Witness**

☐    Staff Member: Name and Position_____

☐    Other Individual: Name_____

☐    Inmate:    DC # J-31731        Name Bobby R. Johnson

**III.    Voluntary Refusal**

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____     Date_____

Signature of Investigating Officer_____     Date_____

**IV.    Statement** I inmate Bobby R. Johnson # J-31731 is a witness to Sgt. Chunn and Sgt. Huggins setting inmates, and trying to turn inmates against each other. Well about a month ago I've witness Sgt. Chunn; Sgt. Huggins pull inmate Mark Smith out into C-2 Sally port to talk to him. When he came back inside of the quad I approach him and ask him what was they talking about. Inmate Mark Smith stated to me that Sgt. Chunn; Sgt. Huggins to him to assault inmate Roshef Paulen. I tried to talk him out of it but he told me that if he didn't do it that they will plant drugs on him and send him to "C.M." Sgt. Chunn; Sgt. Huggins gave him drugs and tobacco on many occassions and I know that for a fact because he always come back from seeing them and show me. Mark Smith always talks about how those two Sgts are trying to turn inmates against each other like it's a real problem on the P.U. unit when its really known issues at all. Sgt. Chunn; Sgt. Huggins are creating a hostile enviorment and are the ones that behind all the corruptions that going on at this institution.

Witness Signature Bobby R. John        Date 5/18/2022

Signature of Investigating Officer_____     Date_____

DC6-112C (Revised 8/06)        Original: Inmate File        Copy: Central Office

**State of Florida**

**Witness Statement**

Log #_____

**Department of Corrections**

| **I.** | **Identifying Inmate Information** |

DC # _____  Inmate Name _____

Violation Code and Short Title _____

Use of Force # _____

Date Report Written _____

| **II.** | **Witness** |

☐ Staff Member: Name and Position_____

☐ Other Individual: Name_____

☑ Inmate:  DC # B12955  Name Jason Mitchell

| **III.** | **Voluntary Refusal** |

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____  Date_____

Signature of Investigating Officer_____  Date_____

| **IV.** | **Statement** |

On 2-10-22 I was in the library studying for my G.E.D. While coming back my dorm SGT Told me To pack my stuff I'm going to jail, I was like for what? She said I don't know SGT, chunn said To lock you up. I got served a D.R. 2 days later for poss. of 14 grams of meth. There was no picture of the suppose 14 grams of meth. She lied and said she found These drugs on me while searching me. The day of This suppose search I was at the library and on the Rec yard. So she completly lied on me, I did 34 days on that D.R. that entire d.R. was faulty

Witness Signature _~JM~_____  Date 5-17-22

Signature of Investigating Officer_____  Date_____



STATE 020

FLORIDA DEPARTMENT OF CORRECTIONS
ISSO150 (01)                CHARGING DISCIPLINARY REPORT          04/18/2022
                                  LOG # 122-220655                           PAGE:        1
--------------------------------------------------------------------------------
DC#: W11537      INMATE NAME: PAULCIN, PROPHET          INFRACTION
VIOLATION CODE: 0024    TITLE: FIGHTING                 DATE: 04/16/22
FACILITY CODE: 122    NAME: WAKULLA ANNEX               TIME: 15:30
--------------------------------------------------------------------------------
I.   STATEMENT OF FACTS
     ON APRIL 16, 2022, APPROXIMATELY 1530 HOURS, I CAPTAIN R.
     TETREAULT CONDUCTED A CAMERA REVIEW AFTER AN ALTERCATION
     OCCURRED BETWEEN INMATE SMITH, MARK DC#E29305 AND INMATE
     PAULCIN, PROPHET, DC#W11537, BEHIND K DORMITORY ON THE
     RECREATION YARD DURING MOVEMENT FOR PM SINGLE DOSE. WHILE
     REVIEWING THE CAMERAS, AT APPROXIMATELY 1437 HOURS I
     OBSERVED INMATE SMITH RUN OUT FROM THE INMATE BATHROOM
     BEHIND LIMA DORMITORY AND AGGRESSIVELY CONFRONT INMATE
     PAULCIN AS HE WAS RETURNING TO HIS DORMITORY. AT THAT TIME,
     INMATE PAULCIN CAN BE SEEN STRIKING INMATE SMITH IN THE FACE
     AND UPPER TORSO AREA WITH A CLINCHED FIST REPEATEDLY.
     INMATE SMITH CAN ALSO BE SEEN ON FIXED WING CAMERA RETURNING
     STRIKES TO INMATE PAULCIN TO THE HEAD AND UPPER TORSO AREA.
     INMATE PAULCIN AND INMATE SMITH WERE GIVEN SEVERAL VERBAL
     ORDERS TO CEASE THEIR DISRUPTIVE BEHAVIOR AND EVENTUALLY
     CEASED THEIR DISRUPTIVE BEHAVIOR ONLY AFTER A DART FIRING
     ELECTRONIC IMMOBILIZATION DEVICE WAS PULLED AND POINTED AT
     INMATE SMITH AND INMATE PUALCIN AND SEVERAL VERBAL ORDERS
     WERE AGAIN GIVEN TO CEASE THEIR DISRUPTIVE BEHAVIOR. INMATE
     SMITH AND INMATE PAULCIN WERE PLACED IN HAND RESTRAINTS,
     ESCORTED TO MEDICAL FOR A PRE-CONFINEMENT MEDICAL ASSESSMENT
     AND PLACED IN ADMINISTRATIVE CONFINEMENT PENDING THE
     DISPOSITION OF THIS REPORT. INMATE SMITH SUSTAINED MINOR
     INJURIES CONSISTING OF A 3CM MINOR ABRASION TO THE LOWER
     CHIN AND RIGHT SIDE OF NECK. INMATE PAULCIN SUSTAINED MINOR
     INJURIES CONSISTING OF SWELLING TO THE RIGHT ORBITAL AREA
     AND MINOR SUPERFICIAL ABRASION TO THE SECOND DIGIT OF HIS
     LEFT HAND. INMATE PAULCIN, PROPHET DC#W11537 IS BEING
     CHARGED WITH A VIOLATION OF F.A.C. CHAPTER 33-601.314 RULES
     OF PROHIBITED CONDUCT 2-4 FIGHTING. THE DC4-708 (DIAGRAM OF
     INJURY) IS ATTACHED FOR BOTH INMATE SMITH AND INMATE PAULCIN
     FOR EVIDENCE PURPOSES. THE FIXED WING VIDEO IS ALSO
     ATTACHED FOR EVIDENCE PURPOSES.


   REPORT WRITTEN: 04/16/22, AT 16:00      BY: TRR19 - TETREAULT, RONALD R.
--------------------------------------------------------------------------------
II.   INMATE NOTIFICATION OF CHARGES: DATE DELIVERED: 4/18/22 AT 12:30pm

        NO HEARING SHALL COMMENCE PRIOR TO 24 HOURS OF DELIVERY OF CHARGES
        EXCEPT WHEN THE INMATE'S RELEASE DATE DOES NOT ALLOW TIME FOR SUCH
        NOTICE OR THE INMATE WAIVES THE 24 HOUR PERIOD AS AUTHORIZED IN RULE
        33-601, FLORIDA ADMINISTRATIVE CODE.

                DELIVERED BY : _____ - _____

                                                    4/22/22

FILED WITH AGENCY CLERK

MAY 27 2022

Department of Corrections
Bureau of Inmate Grievance Appeals

**PART B - RESPONSE**

| PAULCIN, PROPHET | W11537 | 22-6-14731 | WAKULLA ANNEX | J2103L |
|---|---|---|---|---|
| NAME | NUMBER | GRIEVANCE LOG NUMBER | CURRENT INMATE LOCATION | HOUSING LOCATION |

Your administrative appeal has been reviewed and evaluated. The response that you received at the institutional level has been reviewed and is found to appropriately address the concerns that you raised at the institutional level as well as the Central Office level.

You need to initiate the grievance process and file an informal if you are not satisfied with your inmate request response.

Your administrative appeal is denied.

A. Keaton

_A. Keaton_                                    5/24/22

| SIGNATURE AND TYPED OR PRINTED NAME OF EMPLOYEE RESPONDING | SIGNATURE OF WARDEN, ASST. WARDEN, OR SECRETARY'S REPRESENTATIVE | DATE |

**PART B - RESPONSE**

J3-118L
M2112L

| PAULCIN, PROPHET | W11537 | 2204-118-259 | WAKULLA ANNEX | M2112L |
|---|---|---|---|---|
| NAME | NUMBER | FORMAL GRIEVANCE LOG NUMBER | CURRENT INMATE LOCATION | HOUSING LOCATION |

Your request for Administrative Remedy or Appeal has been received, reviewed and evaluated. An investigation reveals the following:

This issue was adequately addressed by Captain Tetreault at the informal level, grievance log # 122-2204-0138.

Based on the foregoing, your Request for Administrative Remedy is D E N I E D.  You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form, providing attachment(s) as required by Chapter 33-103, and forwarding to the Bureau of Inmate Grievance Appeals, 501 South Calhoun Street, Tallahassee, Florida 32399-2500.

Responding Employee: L. Robison, Grievance Coordinator

Signature of Representative: P. Allen, Warden

|  |  |  |
|---|---|---|
| SIGNATURE AND TYPED OR PRINTED NAME OF EMPLOYEE RESPONDING | SIGNATURE OF WARDEN, ASST. WARDEN, OR SECRETARY'S REPRESENTATIVE | 4/29/22 DATE |

**MAILED**

MAY 0 2 2022

ASSISTANT WARDEN

**STATE OF FLORIDA**
**DEPARTMENT OF CORRECTIONS**

## INMATE REQUEST

Mail Number: _____
Team Number: _____
Institution: WAKC.I-Anner

| TO:<br>(Check One) | ☐ Warden<br>☐ Asst. Warden | ☐ Classification<br>☐ Security | ☐ Medical<br>☐ Mental Health | ☐ Dental<br>☐ Other Inspector General |
|---|---|---|---|---|

| FROM: | Inmate Name<br>Prophet Paulin | DC Number<br>W11537 | Quarters<br>J1-102 | Job Assignment<br>Conf. | Date<br>4/18/22 |
|---|---|---|---|---|---|

**REQUEST** Informal Grievance                    Check here if this is an informal grievance ☒

At approx 2:40 - 3:10 p.m. on 4/16/22, m.dorm was escorted to single dose by ofc Green, on the way back from single dose C.i.mmt dorm was let out and escorted by no staff, Sgt. Ethridge was assigned to supervise L-dorm but he was sitting under the pavilion in front of K-dorm, doing nothing. While m-dorm I'm was walking back without an escort through center gate. Please review outside recreation cameras in front of K-mdl-dorm, one ot L-dorm, I'm was allowed to walk to the recreational restroom and hide in prey, allowing m.dorm to walk by. while up E. Ethridge did nothing. Sgt. Ethridge failed to follow proper procedures and count the number of prisoners coming out of L-dorm for single dose and then continuing the same number of I'm being escorted to single dose. While m-dorm I'm were walking back from single dose through center gate to our dorm. we were unsupervised and not escorted by staff. We are on P.m. one of L-dorm I'm rose up from his hiding place in front of L-dorm outside restroom and aggressively approached me, with both fist clenched. He looked me directly. Please see attached

All requests will be handled in one of the following ways:  1) Written Information or    2) Personal Interview.  All informal grievances will be responded to in writing.

| Inmate (Signature): Prophet Paulin | DC#: W11537 |
|---|---|

RECEIVED
APR 18 2022

Wakulla Grievance Office
Wakulla Correctional Institute

---

### DO NOT WRITE BELOW THIS LINE

OGE- Ethridge
**RESPONSE** 122-2204-0138                    **DATE RECEIVED:** _____

A full wing camera review was conducted of the date and time identified and you were the first one to physically aggressive and physically strike the other inmate with clenched fist. The other inmate was not being aggressive at attempting to strike you. The footage review evidence does not substantiate your claims and therefore your grievance is denied.

---

[The following pertains to informal grievances only:

Based on the above information, your grievance is ___Denied___.  (Returned, Denied, or Approved).  If your informal grievance is denied, you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.]

| Official (Print Name): Lt R Tiburcio | Official (Signature): | Date: 4/25/22 |
|---|---|---|

Original: Inmate (plus one copy)
CC: Retained by official responding or if the response is to an informal grievance then forward to be placed in inmate's file
This form is also used to file informal grievances in accordance with Rule 33-103.005, Florida Administrative Code.

APR 25 2022

Informal Grievances and Inmate Requests will be responded to within 15 days, following receipt by staff.
You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form as required by Rule 33-103.006, F.A.C., attaching a copy of your informal grievance and response, and forwarding your complaint to the warden or assistant warden no later than 15 days after the grievance is responded to.  If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.

DC6-236 (Effective 11/18)

Incorporated by Reference in Rule 33-103.005, F.A.C.

in my eyes and threatened to kill me. I immediately become fearful for my safety. There was no security around to protect me. Please review cameras as evidence. I am on protective management due to multiple stabbing incidents and gang hits. Only because of the gross breach of security by sgt. E. Thridge and others was said I'm able to attack and injure me. If said I'm would of have been armed with a knife or weapon I would be dead right now. I sustained several abrasions to my left finger and right side face. Soreness to my neck and back the next day. I had no previous quarrels with said I'm. Upon information and belief, said prisoner was deliberately permitted to evade detection and hide in said area to await my return from single close. It is clear from the I'm's actions his intentions were sinister and he meant to cause me grave harm. I was subsequently evaluated by medical and placed on a/c pending investigation for protecting myself.

Relief Sought: That this matter be properly and thoroughly investigated 2.) That appropriate disciplinary actions be taken against sgt. E. Thridge and any other security personnel responsible for condoning, facilitating, and or turning a blind eye to said attack on me 3.) That I be immediately released from confinement and placed back in my dorm. 4.) That I be compensated a quarter million dollars for my injuries 5.) That all security cameras showing said breach of security and preparation of the attack on me by my assailant be properly preserved for future litigation. And 6.) and other relief any other relief be granted deemed proper and just.

4/17/22

Rudolph Raulerson
W11537

EXF

| State of Florida | **Witness Statement**<br>Log #_____ | Department of Corrections |
|---|---|---|

**I.   Identifying Inmate Information**

DC # _____      Inmate Name   _____

Violation Code and Short Title   _____

Use of Force # _____

Date Report Written   _____

**II.   Witness**

☐   Staff Member:  Name and Position_____

☐   Other Individual:  Name_____

☑   Inmate:   DC # E33457_____      Name Johnnie J. Lee_____

**III.   Voluntary Refusal**

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____   Date_____

Signature of Investigating Officer_____   Date_____

**IV.   Statement**

While in confinement at Wakulla Annex me and inmate prophet paulcin were roomates in J3211 and they moved inmate Mark Smith next to us in J3210. When mark smith noticed my roomate prophet paulcin Where next to him he apolsized and told my bunky and me that the gang Sgt. Huggins and pm. Sgt. Chunn had approached him and threaten him to do a hit for them. Mark Smith told us they agreed to pay him but if he refused he was to be set up with drugs and pending an outside case. Mark Smith also stated Sgt. Huggins and Sgt. Chunn Wanted inmate prophet paulcin dead or hurt badly and has ask others to take the hit as well. Mark Smith say he refused to use a knife he stated he didn't want to catch a murder charge.

Witness Signature _Johnnie L_____   Date 5-18-22_____

Signature of Investigating Officer_____   Date_____

DC6-112C (Revised 8/06)                    Original:  Inmate File          Copy:  Central Office



ISSO250                          FLORIDA DEPARTMENT OF CORRECTIONS                          05/17/2022
ISS 25                        REPORT OF CLOSE MANAGEMENT, DC6-233C                            PAGE: 1
                                      ** INMATE NOTICE **

    DC#        : W11537      NAME   : PAULCIN, PROPHET        EXT.STA  : ACTIVE     TRD       : 07/07/2039
    B/M                      CUR.LOC: WAKULLA ANNEX           CUSTODY  : CLOSE      TEAM      : 09
    PROCESS TYPE: REFERRAL   WK.ASG.: CONFINEMENT-ADMIN/OTHER BED      : J3112L     INTERNAL STATUS: AC - INVESTIGATION
    TOT #DR    : 114         #DR PER: N/A                     #CAT I DR: 22         LAST CAT I DR : 0016  08/13/2020
    CUR ES DSG : NO          LAST ES DSG :                    #ES DSG  :

-----------------------------------------------------------------------------------------------------------------

*** SECTION I.  REFERRAL FOR ASSIGNMENT TO CLOSE MANAGEMENT

    DATE OF REFERRAL:  05/17/2022   TIME:  10:14    FACILITY:  WAKULLA ANNEX

    REFERRAL BY:       CASTANO, S.
    STAFF ASSAULT CONV: NO

*CLO RECOMMENDATION: REC. FOR CM II
*BASIS:
AN ACT CAUSING INJURY OR AN ACT WHICH COULD HAVE RESULTED IN INJURY TO ANOTHER (2).
*RECOMMENDATION COMMENTS:
 PURSUANT TO CHAPTER 33-601.800, IT IS RECOMMENDED FOR INMATE PAULCIN, PROPHET W11537 TO BE PLACED IN CLOSE MANAGEMENT
 (CMII) BASED ON THE FOLLOWING INCIDENT. ON APRIL 16, 2022, AT APPROXIMATELY 1530 HOURS, CAPTAIN TETREAULT CONDUCTED A
 CAMERA REVIEW AFTER AN ALTERCATION OCCURRED BETWEEN SMITH, MARK E29305 AND PAULCIN ON THE RECREATION YARD BEHIND K. DORMITORY.
 AT APPROXIMATELY 1437 HOURS, THE CAPTURED VIDEO FOOTAGE SHOWED SMITH RUNNING OUT FROM THE INMATE BATHROOM, LOCATED BEHIND
 L. DORMITORY, AND CONFRONTING PAULCIN IN AN AGGRESSIVE MANNER AS HE WAS RETURNING TO HIS DORMITORY FROM MEDICAL. PAULCIN
 CAN BE SEEN STRIKING SMITH IN THE FACE AND UPPER TORSO AREA WITH A CLINCHED FIST AND SMITH RETURNING STRIKES TO PAULCIN
 TO THE HEAD AND UPPER TORSO AREA. PAULCIN AND SMITH WERE GIVEN SEVERAL VERBAL ORDERS TO CEASE THEIR DISRUPTIVE BEHAVIOR
 BUT ONLY DID SO AFTER A DART FIRING ELECTRONIC IMMOBILIZATION DEVICE WAS DIRECTED AT BOTH INMATES. DURING THE INVESTIGATION,
 INFORMATION WAS COLLECTED THAT PAULCIN, THROUGH CONVERSATION AND KITES, HAD PLANNED THIS ENTIRE INCIDENT WITH THE ASSISTANCE
 OF SMITH. PAULCIN PLANNED TO FILE FREE LAWSUITS AGAINST THE FACILITY AND HAS ALREADY CORRESPONDED WITH HIS LAWYER ABOUT
 THIS INCIDENT. TO SUPPORT HIS LEGAL CLAIM, PAULCIN IS ATTEMPTING TO HAVE SMITH WRITE A REPORT THAT SERGEANT HUGGINS AND
 SERGEANT CHUNN PAID HIM TO HIDE IN THE BATHROOM AND ATTACK HIM. ON THIS DATE, PAULCIN WAS PLACED IN ADMINISTRATIVE CONFINEMENT
 PENDING THE DISPOSITION OF DISCIPLINARY REPORT 2-4, FIGHTING. DUE TO THE ABOVE INCIDENT, PAULCIN HAS DEMONSTRATED AN INABILITY
 TO LIVE IN THE PROTECTIVE MANAGEMENT UNIT WITHOUT ABUSING THE RIGHTS AND PRIVILEGES OF OTHERS. FOR REASONS OF SECURITY
 AND THE EFFECTIVE MANAGEMENT OF THE INSTITUTION, A MORE RESTRICTIVE SETTING IS RECOMMENDED.

-----------------------------------------------------------------------------------------------------------------

*** SECTION II.  NOTICE OF CLOSE MANAGEMENT REVIEW

    YOU ARE HEREBY NOTIFIED THAT YOU SHALL RECEIVE A REVIEW BY THE INSTITUTIONAL CLASSIFICATION TEAM NO EARLIER THAN 48 HOURS
    FROM THE TIME THIS NOTICE IS DELIVERED.  YOU ARE PERMITTED TO SUBMIT INFORMATION TO THE TEAM VERBALLY OR IN WRITING
    REGARDING THE CONSIDERATION OF PLACEMENT ON CLOSE MANAGEMENT STATUS.

    NOTICE DELIVERED BY: _Castano_____  DATE_05/17/22_ TIME: _1346_

**FLORIDA DEPARTMENT OF CORRECTIONS**

**REQUEST FOR ADMINISTRATIVE REMEDY OR APPEAL**

RECEIVED

MAY 18 2022

Department of Corrections
Bureau of Policy Mgmt and Inmate Appeals

☐ Third Party Grievance Alleging Sexual Abuse

TO: ☐ Warden    ☐ Assistant Warden    ☒ Secretary, Florida Department of Corrections

From or IF Alleging Sexual Abuse, on the behalf of:

PAULCIN, Prophet _____  W11537  WAKulla C.I.-Annex
Last    First    Middle Initial    DC Number    Institution

---

**Part A – Inmate Grievance**

22-6-14731

This is An Administrative Appeal of Attached formal grievance Log #
2204-118-259. Grievant Appeals the denial of his formal grievance on the grounds
that the merits of his grievance was not addressed properly, And the grievance was
responded to by the grievance coordinator instead of the warden or no more
appropriate official.

5/10/22
DATE

_____ W11537
SIGNATURE OF GRIEVANT AND D.C. #

---

***BY SIGNATURE, INMATE AGREES TO THE FOLLOWING # OF 30-DAY EXTENSIONS:**

1
#    Signature

---

**INSTRUCTIONS**

This form is used for filing a formal grievance at the institution or facility level as well as for filing appeals to the Office of the Secretary in accordance with Rule 33-103.006, Florida Administrative Code. When an appeal is made to the Secretary, a copy of the initial response to the grievance must be attached (except as stated below).

When the inmate feels that he may be adversely affected by the submission of a grievance at the institutional level because of the nature of the grievance, or is entitled by Chapter 33-103 to file a direct grievance he may address his grievance directly to the Secretary's Office. The grievance may be sealed in the envelope by the inmate and processed postage free through routine institutional channels. The inmate must indicate a valid reason for not initially bringing his grievance to the attention of the institution. If the inmate does not provide a valid reason or if the Secretary or his designated representative determines that the reason supplied is not adequate, the grievance will be returned to the inmate for processing at the institutional level pursuant to F.A.C. 33-103.007 (6)(d).

RECEIVED BY

MAY 10 2022

Wakulla Asst Warden
Program/Grievance

RECEIVED
MAY 10 2022
WAKULLA CI WARE HOUSE

Submitted by the inmate on: _____
(Date)

Receipt for Appeals Being Forwarded to Central Office

Institutional Mailing Log #: 2205 1203 _____  6ᵉ
(Received by)

DISTRIBUTION:    INSTITUTION/FACILITY    CENTRAL OFFICE
                 INMATE (2 Copies)         INMATE
                 INMATE'S FILE             INMATE'S FILE - INSTITUTION/FACILITY    2204-118-259
                 INSTITUTIONAL GRIEVANCE FILE    CENTRAL OFFICE INMATE FILE
                                                CENTRAL OFFICE GRIEVANCE FILE        (122)

DC1-303 (Effective 11/13)    Incorporated by Reference in Rule 33-103.006, F.A.C.

**FLORIDA DEPARTMENT OF CORRECTIONS**

**REQUEST FOR ADMINISTRATIVE REMEDY OR APPEAL**

☐ **Third Party Grievance Alleging Sexual Abuse**

TO: ☒ Warden   ☐ Assistant Warden   ☐ Secretary, Florida Department of Corrections

From or **IF Alleging Sexual Abuse**, on the behalf of:

| PAULCIN, Prophet | W11537 | WAKC. I-Annex |
|---|---|---|
| Last    First    Middle Initial | DC Number | Institution |

2204-118· 259

| Part A – Inmate Grievance |
|---|

This is an administrative Appeal of Attached grievance Log# 122-2204-0138.

Grievance adopts and incorporates by reference all facts asserted in the attached informal grievance.

Grievant reference, D.R Log# 122-220055 written by Capt. R. Tetreault, in which he wrote that I/m smith approached me in An aggressive manner, said inmate was permitted to deliberately hide in the bathroom and attack me. I have A constitutional right to stand my ground. When approached by A known violent I/m with sinister intentions, who threatens to kill me. I'am on P.m. There was no security escorting eighter down, or properly supervising P.m I/m. upon information and belief said I/m was paid by staff to attack me. This matter was not properly and thoroughly investigated.

The response to my informal grievance, is an attempt to cover up said homicide attempt. The video recording directly contradicts the false facts averred in the grievance response.

Relief sought: that this matter be properly investigated and any other relief deemed necessary.

Thank you.

| 4/27/22 | Prophet Paulcin W11537 |
|---|---|
| DATE | SIGNATURE OF GRIEVANT AND D.C. # |

**\*BY SIGNATURE, INMATE AGREES TO THE FOLLOWING # OF 30-DAY EXTENSIONS:**   Ø / 1   _____

\# Signature

**INSTRUCTIONS**

This form is used for filing a formal grievance at the institution or facility level as well as for filing appeals to the Office of the Secretary in accordance with Rule 33-103.006, Florida Administrative Code.   When an appeal is made to the Secretary, a copy of the initial response to the grievance must be attached (except as stated below).

When the inmate feels that he may be adversely affected by the submission of a grievance at the institutional level because of the nature of the grievance, or is entitled to Chapter 33-103 to file a direct grievance he may address his grievance directly to the Secretary's Office.  The grievance may be sealed in the envelope by the inmate and processed postage free through routine institutional channels.  The inmate must indicate a valid reason for not initially bringing his grievance to the attention of the institution.  If the inmate does not provide a valid reason or if the Secretary or his designated representative determines that the reason supplied is not adequate, the grievance will be returned to the inmate for processing at the institutional level pursuant to F.A.C. 33-103.007 (6)(d).

APR 27 2022

Receipt for Appeals Being Forwarded to Central Office

Submitted by the inmate on: _____   Institutional Mailing Log #:_____   _____

Wakulla Assistant Warden   Date   (Received By)

Program/Grievance

**DISTRIBUTION:**

| INSTITUTION/FACILITY | CENTRAL OFFICE |
|---|---|
| INMATE (2 Copies) | INMATE |
| INMATE'S FILE | INMATE'S FILE - INSTITUTION./FACILITY |
| INSTITUTIONAL GRIEVANCE FILE | CENTRAL OFFICE INMATE FILE |
| | CENTRAL OFFICE GRIEVANCE FILE |

DC1-303 (Effective 11/13)   Incorporated by Reference in Rule 33-103.006, F.A.C.

FLORIDA DEPARTMENT OF CORRECTIONS
'ISSO150 (CI)                CHARGING DISCIPLINARY REPORT                    08/01/2022
                                  LOG # 122-221253                                    PAGE:        1

----------------------------------------------------------------------------

DC#: W11537    INMATE NAME: PAULCIN, PROPHET          INFRACTION
VIOLATION CODE:  0013    TITLE: SPOKEN THREATS        DATE: 07/29/22
FACILITY CODE:  122    NAME:  WAKULLA ANNEX           TIME: 09:20

----------------------------------------------------------------------------

I.    STATEMENT OF FACTS

      INMATE PAULCIN, PROPHET DC# W11537 IS BEING CHARGED WITH A
      VIOLATION OF F.A.C. CHAPTER 33-601.314 RULES OF PROHIBITED
      CONDUCT 1-3; SPOKEN, WRITTEN OR GESTURED THREATS.  ON
      07/29/2022 AT APPROXIMATELY 0920HRS, WHILE ASSIGNED AS
      PROTECTIVE MANAGEMENT SERGEANT AND PRESENT IN THE MEDICAL
      BUILDING AT THE HOLDING CELL WHEN I OBSERVED AND HEARD
      INMATE PAULCIN STATE "I GOT SOME'N FO' YOU BITCH, I'MA SHOW
      YOU.  YA'LL GONNA WORK TODAY.  YOU GONE LEARN ABOUT FUCKIN'
      WIT A NIGGA."  MY SUPERVISOR WAS NOTIFIED AND ADVISED THIS
      REPORT TO BE SUBMITTED.  INMATE PAULCIN REMAINS IN HIS
      CURRENT HOUSING STATUS PENDING THE DISPOSITION OF THIS
      REPORT.


      REPORT WRITTEN: 07/29/22, AT 13:25       BY: CJA74 - CHUNN, JESSI A.

----------------------------------------------------------------------------

II.    INMATE NOTIFICATION OF CHARGES: DATE DELIVERED:  ___/___/___, AT ___:___


          NO HEARING SHALL COMMENCE PRIOR TO 24 HOURS OF DELIVERY OF CHARGES
          EXCEPT WHEN THE INMATE'S RELEASE DATE DOES NOT ALLOW TIME FOR SUCH
          NOTICE OR THE INMATE WAIVES THE 24 HOUR PERIOD AS AUTHORIZED IN RULE
          33-601, FLORIDA ADMINISTRATIVE CODE.

              DELIVERED BY : _____ - _____

----------------------------------------------------------------------------

NOTICE TO INMATE:
AS AN INMATE BEING CHARGED WITH A VIOLATION OF THE RULES OF PROHIBITED
CONDUCT, YOU ARE ADVISED THE FOLLOWING:

----------------------------------------------------------------------------

INVESTIGATION:
AN IMPARTIAL INVESTIGATION WILL BE CONDUCTED ON THIS DISCIPLINARY REPORT.
DURING THE INVESTIGATION OF THE DISCIPLINARY REPORT, YOU WILL BE ADVISED
OF THE CHARGES AGAINST YOU AND YOU MAY REQUEST STAFF ASSISTANCE. DURING
THE INVESTIGATION YOU SHOULD MAKE KNOWN ANY WITNESSES TO THE INVESTIGATING
OFFICER. THE TESTIMONY OF WITNESSES SHALL BE PRESENTED BY WRITTEN STATEMENTS.
SEE RULE 33-601.307(3) FOR COMPLETE INFORMATION REGARDING WITNESSES. YOU WILL
HAVE THE OPPORTUNITY TO MAKE A STATEMENT IN WRITING REGARDING THE CHARGE AND
TO PROVIDE INFORMATION RELATING TO THE INVESTIGATION.

----------------------------------------------------------------------------

DELIVERY OF CHARGES:
A COPY OF THE CHARGES WILL BE PROVIDED TO YOU AT LEAST 24 HOURS PRIOR
TO THE CONVENING OF THE DISCIPLINARY HEARING UNLESS YOU WAIVE THE WAITING
PERIOD. THE HEARING MAY BEGIN ANY TIME AFTER THE 24 HOUR PERIOD UNLESS
YOU SIGN THE WAIVER.

----------------------------------------------------------------------------

FLORIDA DEPARTMENT OF CORRECTIONS

·ISSO150 (01)          CHARGING DISCIPLINARY REPORT                    PAGE:       1
                            LOG # 122-221253

---

DC#: W11537   INMATE NAME: PAULCIN, PROPHET          INFRACTION
VIOLATION CODE: 0013   TITLE: SPOKEN THREATS          DATE: 07/29/22
FACILITY CODE: 122   NAME: WAKULLA ANNEX              TIME: 09:20

---

I.   STATEMENT OF FACTS

        INMATE PAULCIN, PROPHET DC# W11537 IS BEING CHARGED WITH A
        VIOLATION OF F.A.C. CHAPTER 33-601.314 RULES OF PROHIBITED
        CONDUCT 1-3; SPOKEN, WRITTEN OR GESTURED THREATS.  ON
        07/29/2022 AT APPROXIMATELY 0920HRS, WHILE ASSIGNED AS
        PROTECTIVE MANAGEMENT SERGEANT AND PRESENT IN THE MEDICAL
        BUILDING AT THE HOLDING CELL WHEN I OBSERVED AND HEARD
        INMATE PAULCIN STATE "I GOT SOME'N FO' YOU BITCH, I'MA SHOW
        YOU.  YA'LL GONNA WORK TODAY.  YOU GONE LEARN ABOUT FUCKIN'
        WIT A NIGGA."  MY SUPERVISOR WAS NOTIFIED AND ADVISED THIS
        REPORT TO BE SUBMITTED.  INMATE PAULCIN REMAINS IN HIS
        CURRENT HOUSING STATUS PENDING THE DISPOSITION OF THIS
        REPORT.

---

    REPORT WRITTEN: 07/29/22, AT 13:25        BY: CJA74 - CHUNN, JESSI A.

---

II.  INMATE NOTIFICATION OF CHARGES: DATE DELIVERED: ___/___/___, AT ___:___

        NO HEARING SHALL COMMENCE PRIOR TO 24 HOURS OF DELIVERY OF CHARGES
        EXCEPT WHEN THE INMATE'S RELEASE DATE DOES NOT ALLOW TIME FOR SUCH
        NOTICE OR THE INMATE WAIVES THE 24 HOUR PERIOD AS AUTHORIZED IN RULE
        33-601, FLORIDA ADMINISTRATIVE CODE.

                    DELIVERED BY : _____ - _____

---

NOTICE TO INMATE:
AS AN INMATE BEING CHARGED WITH A VIOLATION OF THE RULES OF PROHIBITED
CONDUCT, YOU ARE ADVISED THE FOLLOWING:

---

INVESTIGATION:
AN IMPARTIAL INVESTIGATION WILL BE CONDUCTED ON THIS DISCIPLINARY REPORT.
DURING THE INVESTIGATION OF THE DISCIPLINARY REPORT, YOU WILL BE ADVISED
OF THE CHARGES AGAINST YOU AND YOU MAY REQUEST STAFF ASSISTANCE. DURING
THE INVESTIGATION YOU SHOULD MAKE KNOWN ANY WITNESSES TO THE INVESTIGATING
OFFICER. THE TESTIMONY OF WITNESSES SHALL BE PRESENTED BY WRITTEN STATEMENTS.
SEE RULE 33-601.307(3) FOR COMPLETE INFORMATION REGARDING WITNESSES. YOU WILL
HAVE THE OPPORTUNITY TO MAKE A STATEMENT IN WRITING REGARDING THE CHARGE AND
TO PROVIDE INFORMATION RELATING TO THE INVESTIGATION.

---

DELIVERY OF CHARGES:
A COPY OF THE CHARGES WILL BE PROVIDED TO YOU AT LEAST 24 HOURS PRIOR
TO THE CONVENING OF THE DISCIPLINARY HEARING UNLESS YOU WAIVE THE WAITING
PERIOD. THE HEARING MAY BEGIN ANY TIME AFTER THE 24 HOUR PERIOD UNLESS
YOU SIGN THE WAIVER.

---

FLORIDA DEPARTMENT OF CORRECTIONS                    08/01/2022

ISS0150 (01)                    CHARGING DISCIPLINARY REPORT                    PAGE:        1

LOG # 122-221225

------------------------------------------------------------------------

DC#: W11537    INMATE NAME: PAULCIN, PROPHET          |    INFRACTION
VIOLATION CODE: 0927    TITLE: UNAUTH USE OF DRUGS     |    DATE: 07/29/22
FACILITY CODE: 122    NAME: WAKULLA ANNEX              |    TIME: 08:30

------------------------------------------------------------------------

I.   STATEMENT OF FACTS

     INMATE PAULCIN, PROPHET DC# W11537 IS BEING CHARGED WITH A
     VIOLATION OF F.A.C. CHAPTER 33-601.314 RULES OF PROHIBITED
     CONDUCT 9-27 USE OF UNAUTHORIZED DRUGS-AS EVIDENCE BY
     POSITIVE RESULTS FROM URINALYSIS TEST OR OBSERVABLE
     BEHAVIOR.  ON 07/29/2022 AT APPROXIMATELY 0830HRS, WHILE
     ASSIGNED AS PROTECTIVE MANAGEMENT SERGEANT AND WALKING
     BEHIND M-2; I SMELLED THE STRONG SMELL OF K-2 EMITTING FROM
     THE EXHAUST FAN VENT.  I ENTERED THE M-2 BEDDING AREA AND
     OBSERVED THAT THE ODOR WAS EMITTING FROM THE BATHROOM.  UPON
     ENTERING THE BATHROOM AREA, I OBSERVED INMATE PAULCIN
     SEATED ON THE LAST TOILET, WITH THE "WET FLOOR" SIGN PROPPED
     ON THE PRIVACY WALL IN ORDER TO BLOCK HIM FROM VIEW OF THE
     OFFICERS STATION.  INMATE PAULCIN HAD RED, GLOSSY EYES AND
     WAS SLOW TO RESPOND TO ORDERS.  BASED ON MY TRAINING AND
     EXPERIENCE, I CONCLUDED THAT INMATE PAULCIN WAS UNDER THE
     INFLUENCE OF AN UNKNOWN SUBSTANCE.  MY SUPERVISOR WAS
     NOTIFIED AND ADVISED THIS REPORT TO BE SUBMITTED.  INMATE
     PAULCIN WAS PLACED IN ADMINISTRATIVE CONFINEMENT PENDING THE
     DISPOSITION OF THIS REPORT.


     REPORT WRITTEN: 07/29/22, AT 13:20      BY: CJA74 - CHUNN, JESSI A.

------------------------------------------------------------------------

II.  INMATE NOTIFICATION OF CHARGES: DATE DELIVERED: 9 / 3 , AT 6:00A


        NO HEARING SHALL COMMENCE PRIOR TO 24 HOURS OF DELIVERY OF CHARGES
        EXCEPT WHEN THE INMATE'S RELEASE DATE DOES NOT ALLOW TIME FOR SUCH
        NOTICE OR THE INMATE WAIVES THE 24 HOUR PERIOD AS AUTHORIZED IN RULE
        33-601, FLORIDA ADMINISTRATIVE CODE.

            DELIVERED BY : NLO7 - Nke

------------------------------------------------------------------------


NOTICE TO INMATE:
AS AN INMATE BEING CHARGED WITH A VIOLATION OF THE RULES OF PROHIBITED
CONDUCT, YOU ARE ADVISED THE FOLLOWING:

------------------------------------------------------------------------


INVESTIGATION:
AN IMPARTIAL INVESTIGATION WILL BE CONDUCTED ON THIS DISCIPLINARY REPORT.
DURING THE INVESTIGATION OF THE DISCIPLINARY REPORT, YOU WILL BE ADVISED
OF THE CHARGES AGAINST YOU AND YOU MAY REQUEST STAFF ASSISTANCE. DURING
THE INVESTIGATION YOU SHOULD MAKE KNOWN ANY WITNESSES TO THE INVESTIGATING
OFFICER. THE TESTIMONY OF WITNESSES SHALL BE PRESENTED BY WRITTEN STATEMENTS.
SEE RULE 33-601.307(3) FOR COMPLETE INFORMATION REGARDING WITNESSES. YOU WILL

FLORIDA DEPARTMENT OF CORRECTIONS
08/01/2022

ISSO:50 (01)          CHARGING DISCIPLINARY REPORT
                      LOG # 122-221251                              PAGE:     1

```
--------------------------------------------------------------------------
DC#: W11537   INMATE NAME: PAULCIN, PROPHET        INFRACTION
VIOLATION CODE: 0927   TITLE: UNAUTH USE OF DRUGS   DATE: 07/29/22
FACILITY CODE: 122     NAME: WAKULLA ANNEX          TIME: 08:30
--------------------------------------------------------------------------
```

I.    STATEMENT OF FACTS

INMATE PAULCIN, PROPHET DC# W11537 IS BEING CHARGED WITH A
VIOLATION OF F.A.C. CHAPTER 33-601.314 RULES OF PROHIBITED
CONDUCT 9-27 USE OF UNAUTHORIZED DRUGS-AS EVIDENCE BY
POSITIVE RESULTS FROM URINALYSIS TEST OR OBSERVABLE
BEHAVIOR.  ON 07/29/2022 AT APPROXIMATELY 0830HRS, WHILE
ASSIGNED AS PROTECTIVE MANAGEMENT SERGEANT AND WALKING
BEHIND M-2; I SMELLED THE STRONG SMELL OF K-2,EMITTING FROM
THE EXHAUST FAN VENT.  I ENTERED THE M-2 BEDDING AREA AND
OBSERVED THAT THE ODOR WAS EMITTING FROM THE BATHROOM.  UPON
ENTERING THE BATHROOM AREA, I OBSERVED INMATE PAULCIN
SEATED ON THE LAST TOILET, WITH THE "WET FLOOR" SIGN PROPPED
ON THE PRIVACY WALL IN ORDER TO BLOCK HIM FROM VIEW OF THE
OFFICERS STATION.  INMATE PAULCIN HAD RED, GLOSSY EYES AND
WAS SLOW TO RESPOND TO ORDERS.  BASED ON MY TRAINING AND
EXPERIENCE, I CONCLUDED THAT INMATE PAULCIN WAS UNDER THE
INFLUENCE OF AN UNKNOWN SUBSTANCE.  MY SUPERVISOR WAS
NOTIFIED AND ADVISED THIS REPORT TO BE SUBMITTED.  INMATE
PAULCIN WAS PLACED IN ADMINISTRATIVE CONFINEMENT PENDING THE
DISPOSITION OF THIS REPORT.


REPORT WRITTEN: 07/29/22, AT 13:20        BY: CJA74 - CHUNN, JESSI A.
```
--------------------------------------------------------------------------
```

II.   INMATE NOTIFICATION OF CHARGES: DATE DELIVERED: ___/___/___, AT ___:___

NO HEARING SHALL COMMENCE PRIOR TO 24 HOURS OF DELIVERY OF CHARGES
EXCEPT WHEN THE INMATE'S RELEASE DATE DOES NOT ALLOW TIME FOR SUCH
NOTICE OR THE INMATE WAIVES THE 24 HOUR PERIOD AS AUTHORIZED IN RULE
33-601, FLORIDA ADMINISTRATIVE CODE.

          DELIVERED BY : _____ - _____
```
--------------------------------------------------------------------------
```

NOTICE TO INMATE:
AS AN INMATE BEING CHARGED WITH A VIOLATION OF THE RULES OF PROHIBITED
CONDUCT, YOU ARE ADVISED THE FOLLOWING:
```
--------------------------------------------------------------------------
```

INVESTIGATION:
AN IMPARTIAL INVESTIGATION WILL BE CONDUCTED ON THIS DISCIPLINARY REPORT.
DURING THE INVESTIGATION OF THE DISCIPLINARY REPORT, YOU WILL BE ADVISED
OF THE CHARGES AGAINST YOU AND YOU MAY REQUEST STAFF ASSISTANCE. DURING
THE INVESTIGATION YOU SHOULD MAKE KNOWN ANY WITNESSES TO THE INVESTIGATING
OFFICER. THE TESTIMONY OF WITNESSES SHALL BE PRESENTED BY WRITTEN STATEMENTS.
SEE RULE 33-601.307(3) FOR COMPLETE INFORMATION REGARDING WITNESSES. YOU WILL

ISSO150 (01)
FLORIDA DEPARTMENT OF CORRECTIONS
CHARGING DISCIPLINARY REPORT
LOG # 122-221254

08/01/2022

PAGE:    1

---

DC#: W11537    INMATE NAME: PAULCIN, PROPHET
VIOLATION CODE: 0031    TITLE: POSS OF WEAPONS
FACILITY CODE: 122    NAME: WAKULLA ANNEX

INFRACTION
DATE: 07/29/22
TIME: 09:23

---

I.    STATEMENT OF FACTS

INMATE PAULCIN, PROPHET DC# W11537 IS BEING CHARGED WITH A
VIOLATION OF F.A.C. CHAPTER 33-601.314 RULES OF PROHIBITED
CONDUCT 3-1; POSSESSION OF A WEAPON.  ON 07/29/2022 AT
APPROXIMATELY 0923HRS, WHILE ASSIGNED AS PROTECTIVE
MANAGEMENT SERGEANT AND PRESENT IN THE MEDICAL BUILDING AT
THE HOLDING CELL, I OBSERVED INMATE PAULCIN IN POSSESSION OF
AN APPROXIMATELY .5" PIECE OF SHARPENED METAL WHICH HE USED
TO CUT HIS LEFT ARM.  INMATE PAULCIN WAS ORDERED TO
SURRENDER THE WEAPON, BUT DID NOT COMPLY - INSTEAD HE STATED
THAT IT WAS A RAZORBLADE AND HE HAD SWALLOWED IT. MY
SUPERVISOR WAS NOTIFIED AND ADVISED THIS REPORT TO BE
SUBMITTED.  INMATE PAULCIN REMAINS IN HIS CURRENT HOUSING
STATUS PENDING THE DISPOSITION OF THIS REPORT.

REPORT WRITTEN: 07/29/22, AT 13:28    BY: CJA74 - CHUNN, JESSI A.

---

II.    INMATE NOTIFICATION OF CHARGES: DATE DELIVERED: 7/6/1/22 AT 6:10

NO HEARING SHALL COMMENCE PRIOR TO 24 HOURS OF DELIVERY OF CHARGES
EXCEPT WHEN THE INMATE'S RELEASE DATE DOES NOT ALLOW TIME FOR SUCH
NOTICE OR THE INMATE WAIVES THE 24 HOUR PERIOD AS AUTHORIZED IN RULE
33-601, FLORIDA ADMINISTRATIVE CODE.

DELIVERED BY :    HLOS

---

NOTICE TO INMATE:
AS AN INMATE BEING CHARGED WITH A VIOLATION OF THE RULES OF PROHIBITED
CONDUCT, YOU ARE ADVISED THE FOLLOWING:

---

INVESTIGATION:
AN IMPARTIAL INVESTIGATION WILL BE CONDUCTED ON THIS DISCIPLINARY REPORT.
DURING THE INVESTIGATION OF THE DISCIPLINARY REPORT, YOU WILL BE ADVISED
OF THE CHARGES AGAINST YOU AND YOU MAY REQUEST STAFF ASSISTANCE. DURING
THE INVESTIGATION YOU SHOULD MAKE KNOWN ANY WITNESSES TO THE INVESTIGATING
OFFICER. THE TESTIMONY OF WITNESSES SHALL BE PRESENTED BY WRITTEN STATEMENTS.
SEE RULE 33-601.307(3) FOR COMPLETE INFORMATION REGARDING WITNESSES. YOU WILL
HAVE THE OPPORTUNITY TO MAKE A STATEMENT IN WRITING REGARDING THE CHARGE AND
TO PROVIDE INFORMATION RELATING TO THE INVESTIGATION.

---

DELIVERY OF CHARGES:
A COPY OF THE CHARGES WILL BE PROVIDED TO YOU AT LEAST 24 HOURS PRIOR
TO THE CONVENING OF THE DISCIPLINARY HEARING UNLESS YOU WAIVE THE WAITING
PERIOD. THE HEARING MAY BEGIN ANY TIME AFTER THE 24 HOUR PERIOD UNLESS
YOU SIGN THE WAIVER.

---

M.R. PRophet PAulGW Det#W

WAKulla C.I.—AnneX

110 melaleucA DRive

Crawfordville, Fl 32327



Label 107R, January 2008

Visit us at usps.com

UNITED STATES POSTAL SERVICE

PRIORITY
MAIL ®

1537 MZ-111

MAILED FROM A
CORRECTIONAL
FACILITY



US POSTAGE ™PITNEY BOWES

ZIP 32327   $ 009.55⁰
02 4W
0000386097 OCT  19  2022

OCT 2 0 2022

UNITED STATES DISTRICT COURT

ortherN DISTRICT OF FLORIDA

1 1 North ADAMS Street, Suite 322

Allahassee, FL 32301-7717